IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| OTO ANALYTICS, LLC, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | §    Civil Action No. |
| BENWORTH CAPITAL PARTNERS PR | § |
| LLC, BENWORTH CAPITAL PARTNERS | § |
| LLC, BERNARDO NAVARRO and | § |
| CLAUDIA NAVARRO, | § |
| | § |
| Defendants. | § |

## COMPLAINT

Plaintiff Oto Analytics, LLC (f/k/a Oto Analytics, Inc., d/b/a Womply) ("**Womply**"), by and through its undersigned counsel, files this Complaint against Defendants Benworth Capital Partners PR LLC, a Puerto Rico limited liability company ("**Benworth PR**"), Benworth Capital Partners LLC, a Florida limited liability company ("**Benworth FL**"), Bernardo Navarro ("**Mr. Navarro**"), and Claudia Navarro ("**Ms. Navarro**;" together with Mr. Navarro, the "**Navarros**;" and collectively with Benworth FL and Benworth PR, "**Defendants**") and alleges as follows:

## INTRODUCTION

1.     This case arises out of Defendants' fraudulent scheme to prevent Plaintiff Womply from collecting nearly $200 million in fees and interest that Benworth FL owes Womply for services rendered.

2.     Womply is a technology company that provided Benworth FL, a Florida lender owned by Defendant Bernardo Navarro, with valuable technology services that allowed Benworth FL to efficiently process, manage, and track the large volume of loans it made through the federal

Paycheck Protection Program (the "**PPP**").  With Womply's technology, Benworth FL processed and funded more than ***305,000 PPP loans*** with a principal amount of approximately ***$4 billion***, generating more than ***$680 million*** in revenue for Benworth FL.  Pursuant to agreements between Benworth FL and Womply, Benworth FL owes Womply approximately $153 million in fees plus more than $44 million in interest that continues to accrue.  In August 2021, Womply commenced a JAMS arbitration against Benworth FL to recover those fees (the "**Arbitration**").  Through discovery in that case, Womply has learned that Mr. Navarro and his wife, Claudia Navarro, have taken extraordinary measures to prevent Womply from collecting its debt, including:  (i) ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ (the "**Fraudulent Transfer**"); (ii) representing to Womply and the arbitrator that Benworth FL was holding Womply's fees "in trust," which the arbitrator has determined was ████████████ ████████ (iii) ████████████████████████████████; and (iv) misrepresenting the nature of Womply's services in a Congressional investigation into the PPP.  With permission from the arbitrator, Womply brings this case to unwind the Fraudulent Transfer and for other equitable relief.

3.        During the height of the COVID-19 pandemic, Congress directed the United States Small Business Administration (the "**SBA**") to implement the PPP, which provided for banks and other lenders to make federally guaranteed and (if statutory conditions are met) forgivable loans to businesses that sought to continue to cover payroll and other basic expenses.  The program required connecting millions of potential borrowers with thousands of lenders, and those lenders were required to review applicant information for compliance with the PPP's criteria.  If a lender decided to fund a loan and the loan was approved by the SBA, the lender also had to track and

service the loan in accordance with still further program requirements. All told, more than 10 million PPP loans were obtained from approximately 5,500 national and local lenders.

4.    Many of the PPP loans were of modest size, and much smaller than most lenders were accustomed to making. Moreover, the vast majority of the 5,500 PPP lenders did not have previous experience funding and managing a large volume of loans. As a result, many of those lenders lacked the personnel and technological infrastructure to receive thousands upon thousands of loan applications, process the applications, and maintain the records required for servicing and tracking so many loans. All of these challenges had to be overcome expeditiously enough to provide urgently needed economic relief to the borrowers.

5.    Womply sought to assist the lenders in solving some of these problems. As relevant here, Womply performed two primary functions: (i) Womply developed and maintained a website through which small businesses searching for PPP assistance could be connected with and submit application materials to PPP lenders for free; and (ii) Womply provided lenders with a technology platform allowing them to manage the enormous logistical difficulties inherent in reviewing, processing, and servicing thousands—and, in some cases, hundreds of thousands—of small-dollar PPP loans. Womply provided some or all such services to fifteen lenders and lender partners.

6.    One of the lenders that used Womply's services was Benworth FL. Before the PPP, Benworth FL focused on making mortgage loans with high interest rates to individuals who may have trouble getting loans from traditional banks. During the first round of the PPP in 2020, Benworth FL sought and obtained authorization from the SBA to make PPP loans and, using a largely manual process, Benworth FL processed and funded only approximately 700 PPP loans that year.

7.     In February 2021, during the second round of the PPP, Benworth FL contracted to use Womply's referral and technology services.  Womply's technology services automated many of Benworth FL's loan processing functions, which made Benworth's processing and management of loan applications much more efficient.  For participating in the PPP, Benworth FL received interest on the loans, a federal government guarantee, and "processing fees" from the federal government that were generous relative to the size of the loans.  Under its agreements with Womply, Benworth FL agreed to pay Womply certain fees for each of the loans Benworth FL processed and managed using Womply's technology platform.

8.     In early July 2021, after the PPP ended, Benworth FL disclosed that it was withholding approximately $43 million in fees due to Womply for 40,563 PPP loans that Benworth FL processed using technology provided by Womply, and it demanded that Womply cut its fees in half for those loans.  Womply did not agree to Benworth FL's attempt to retrade their agreements.  At the same time, Womply discovered that Benworth FL had failed to pay it more than $110 million in fees for other PPP loans Benworth FL processed using Womply's technology services.  In July 2021, Womply demanded that Benworth FL pay Womply its outstanding fees; Benworth FL refused, and Womply terminated its agreements with Benworth FL.

9.     Unbeknownst to Womply, at around the same time Womply was demanding payment of its fees, Defendants were busy orchestrating the Fraudulent Transfer, ██████████ ████████████████████████████████████████████.

10.     In the summer of 2021, the Navarros formed Benworth PR, which they wholly own, and caused Benworth FL to █████████████████████████████████████ ██████████████████████████████. ████████████████████████ ████████████████████████████████████ ██████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

11.     The separation of Benworth FL and Benworth PR as distinct corporate entities is an illusion—they are effectively the same company.  Benworth PR is described on the Benworth FL website as Benworth FL's "office in San Juan, Puerto Rico."  In addition, ████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████In order to make it appear as if Benworth FL and Benworth PR are separate companies, the Navarros

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████

12.     Benworth FL also took steps to prevent Womply from discovering the Fraudulent Transfer.  In October 2021, months after the Fraudulent Transfer, Benworth FL filed an Answer in the Arbitration that asserted it "has held the disputed fees in trust until its dispute with Womply, including the matter of fraudulent loans, is resolved."  ████████████████████ ███████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

13.     This is not the first time Mr. Navarro has been accused of diverting assets ██████

██████████████████████████.  As discussed below (*see infra* ¶¶ 205-209), in *TotalBank Florida Bank Corp. v. Bernardo Enrique Navarro*, Case No. 2012-012858 (Fla. Cir. Ct. Miami-Dade Cnty.), filed April 2, 2012, a default judgment was entered against Mr. Navarro, but Mr. Navarro claimed he could not satisfy the judgment.  The court in that case allowed the

judgment creditor to take the deposition of Ms. Navarro to determine whether Mr. Navarro's assets, including his interest in Benworth FL, were "being diverted to [his] wife."

14.     After learning of the Fraudulent Transfer through discovery in the Arbitration, Womply made a motion seeking the arbitrator's permission to disclose information obtained in that case (which was covered by a protective order) to a court of competent jurisdiction in order to obtain equitable and/or injunctive relief in connection with the Fraudulent Transfer.   After reviewing the information concerning the Fraudulent Transfer that Womply obtained in discovery, the arbitrator found that ████████████████████████████████████

██████████████████████████████████ The Arbitrator went on to find that ████████████████████████████

███████████████████████████" and that ████████████████████

██████████████████████████████████████████

███████████████████████████████████"

15.     The Arbitrator granted Womply's motion, finding that an "██████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

16.     Defendants' efforts to prevent Womply from collecting its debt did not stop at the Fraudulent Transfer.

17.     Mr. Navarro also sought to use his government contacts to undermine the Arbitration.  In August 2021, Mr. Navarro sent a letter to the SBA asking it to issue new rules that Benworth FL hoped to use to retroactively limit Womply's fees.  Mr. Navarro—who served as the

████████████████████████████████████████████████████
██████████████████████████████████████—also mislead ████████████ regarding the SBA's rules. ████████████████████████ sent a letter to the SBA, stating that he heard from Florida lenders that "ambiguity" in the SBA rules concerning agent fees "has created confusion and costly uncertainty between lenders and loan agents," and he asked the SBA to provide "clarification in writing, or," as Benworth FL had requested of the SBA, "through new rulemaking." Despite Mr. Navarro's lobbying efforts, the SBA left its rules, which do not cap Womply's fees, unchanged.

18. Benworth FL also made material misrepresentations to the House Select Subcommittee on the Coronavirus Crisis (the "**Subcommittee**") in connection with its investigation into the PPP in order to advance its position in the Arbitration. Under the PPP, Benworth FL was responsible for conducting a good faith review of PPP loan applicant information and for making all lending decisions, and Benworth FL retained those responsibilities under its agreements with Womply. Womply provided Benworth FL with loan applicant referral services and technology services that made processing loan applications more efficient, but Womply did not determine applicant eligibility for a PPP loan or otherwise make any lending decisions. Indeed, the agreements between Benworth FL and Womply make clear that Womply is not responsible for the accuracy, lawfulness, or completeness of an application, and that Womply did not endorse any application. And it was Benworth FL that decided which Womply-referred PPP loans to submit to the SBA for approval and, if approved, to fund. Despite this, Benworth FL told the Subcommittee that it relied on Womply to determine applicant eligibility. The purpose of this misrepresentation was twofold. First, Benworth FL sought to avoid accountability for its failure to conduct a good faith review of applicant information before deciding to fund PPP loans.

Second, Benworth FL sought to manipulate the findings of the Subcommittee's investigation to aid it in the Arbitration. Based on Benworth FL's misrepresentations about Womply's role, the staff of the Subcommittee issued a report (the "**Staff Report**") incorrectly concluding that Womply performed the services of a Lender Service Provider as that term is defined under SBA regulations. Benworth FL then used that conclusion to argue in the Arbitration that, because Womply should be considered a Lender Service Provider (it is not), Womply's fees are capped by SBA regulations (they are not).

19.     At bottom, Benworth FL owes Womply approximately $153 million in fees for services rendered and more than $44 million in contractual interest. Benworth FL's principal defense in the Arbitration is that Womply's fees for its technology services are capped by an SBA rule that governs fees for application preparation and referral services, but that argument has already been rejected by a federal court. Benworth FL's other defenses and counterclaims in the Arbitration are similarly legally and factually deficient, and Womply likely will obtain an award for substantial damages following the Arbitration hearing, which is scheduled for March 20, 2023.

20.     Womply now brings this action for an order rescinding the Fraudulent Transfer and for other equitable relief so that Womply can recover the fees and interest it earned under its contracts with Benworth FL.

## PARTIES

21.     Plaintiff Womply is a limited liability company organized under the laws of Delaware with no physical presence. To the extent Womply has a principal place of business, it is in Nevada, where its CEO resides. Womply is the successor in interest to Oto Analytics, Inc. d/b/a Womply.

22.     Defendant Benworth PR is a limited liability company organized under the laws of Puerto Rico with its principal place of business in San Juan, Puerto Rico. ████████████ ████████████████████████████████

23.     Defendant Benworth FL is a limited liability company organized under the laws of Florida with its principal place of business in Coral Gables, Florida.  Benworth FL's sole member and equity holder is Mr. Navarro.

24.     Defendant Bernardo Navarro is an individual who is a resident of Puerto Rico. Mr. Navarro is the sole member, founder, president, and CEO of Benworth FL. ████████ ████████████████████████████████████████ Mr. Navarro is ████████ ████████████████████████████ and is listed as an authorized person for Benworth PR on the Puerto Rico Registry of Corporations and Entities.  Mr. Navarro is married to Ms. Navarro.

25.     Defendant Claudia Navarro is an individual who, on information and belief, is a resident of Puerto Rico. ████████████████████████████████████████ Ms. Navarro also is ████████████████████████████. Ms. Navarro is married to Mr. Navarro.  Ms. Navarro is listed as an authorized person for Benworth PR on the Puerto Rico Registry of Corporations and Entities.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) because this is a civil action between a Plaintiff that is a citizen of Delaware and Defendants that are citizens of Florida and Puerto Rico.  None of Defendants have the same citizenship as Plaintiff.  The amount in controversy exceeds $75,000, exclusive of interests and costs.

27.     This Court has subject-matter jurisdiction over Womply's claim against Benworth FL because, although portions of the ongoing dispute between Womply and Benworth FL are subject to an agreement to arbitrate, such agreement does not include claims for injunctive or other equitable relief, which Womply is seeking here.  The agreement to arbitrate specifically provides:

> ***Without limiting a party's right to seek injunctive or other equitable relief in court***, any dispute between the parties related to the subject matter of this Agreement will be resolved by binding arbitration in the English language in San Francisco County, California under the rules of JAMS; the decision of the arbitrator will be enforceable in any court.  The prevailing party in any action to enforce this Agreement shall be entitled to costs and attorneys' fees.

(emphasis added.)

28.     This Court also has subject-matter jurisdiction over Womply's claim against Benworth FL because it does not concern the subject matter of the contract in which the arbitration agreement is contained, but instead concerns a fraudulent transfer ████████████████████ ███████.

29.     In addition, in an order dated January 17, 2023, the Arbitrator in the Arbitration between Benworth FL and Womply held:

> Pursuant to the relevant agreements between the parties, either party may seek equitable or injunctive relief concerning issues relevant to this Arbitration in a court of law.  These provisions allow Womply to seek equitable or injunctive relief in a court of competent jurisdiction relating to the alleged fraudulent transfer of ███.

30.     This Court has personal jurisdiction over Defendant Benworth PR because Benworth PR is a Puerto Rico limited liability company with its principal place of business located in this District.

31.     This Court has personal jurisdiction over Defendant Bernardo Navarro because he is domiciled in this District.  This Court further has personal jurisdiction over Mr. Navarro because

he has purposefully conducted activities in Puerto Rico on behalf of Benworth PR and is a ████ ██████████ authorized representative of Benworth PR, the causes of action herein arise from or relate to those purposeful activities with Puerto Rico, and the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

32.    This Court has personal jurisdiction over Defendant Claudia Navarro because, on information and belief, she is domiciled in this District.   This Court further has personal jurisdiction over Ms. Navarro because she has purposefully conducted activities in Puerto Rico on behalf of Benworth PR as its ███████████ authorized representative ███████████, the causes of action herein arise from or relate to those purposeful activities with Puerto Rico, and the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

33.    This Court has personal jurisdiction over Defendant Benworth FL because Benworth FL has purposefully conducted activities in Puerto Rico, the causes of action herein arise from or relate to those purposeful contacts with Puerto Rico, and the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

34.    As discussed in more detail below, Defendant Benworth FL has substantial connections to Puerto Rico, including that:

a.   Bernardo Navarro, Benworth FL's sole member, president, CEO, and founder is domiciled in, and therefore a citizen of, Puerto Rico;

b.   During the summer of 2021, ████████████████████████ ████████ a limited liability company organized under the laws of, and with its principal place of business in, Puerto Rico;

    c.    Benworth FL is party to agreements with Benworth PR for services related to loan forgiveness, loan servicing, monitoring fraud, and responding to subpoenas;

    d.    Benworth FL conducts substantial business in Puerto Rico, evidenced by the contact address listed on the homepage of its website:  221 Avenida Ponce de Leon, Suite 1401, San Juan, PR 00917;[1]

    e.    Benworth FL's website identifies Benworth PR as Benworth FL's "office in San Juan, Puerto Rico;"[2] and

    f.    Bernardo Navarro's public LinkedIn profile states that "Benworth Capital" is a "Florida-headquartered private equity licensed mortgage lender," and that it "also has offices in Puerto Rico."

35.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## FACTS

**A.    Congress Creates The Paycheck Protection Program Administered By The SBA Under The Existing Framework Of The SBA's Section 7(a) Program.**

36.    In response to the COVID-19 pandemic, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (the "**CARES Act**"), Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020), which, among other things, created the PPP.  The PPP allowed qualifying small businesses to apply for low-interest private loans to fund expenses such as payroll costs, rent, interest, and utilities.  PPP loans could be partially or fully forgiven if a borrower spent the loan

---

[1] *Benworth*, https://benworthcapital.com/ (last visited Jan. 22, 2023).

[2] *About Us*, https://benworthcapital.com/about/ (last visited Jan. 22, 2023).

money in accordance with the program requirements and were guaranteed by the SBA.  As a result, lenders that funded PPP loans bore no financial risk if borrowers failed to repay their loans.  The SBA paid lenders interest on the PPP loans and "Lender Processing Fees" pursuant to applicable SBA rules.  The President of the United States signed the CARES Act into law on March 27, 2020.

37.    Congress decided that the SBA should implement the PPP using the framework of its preexisting small-business lending program under Section 7(a) of the Small Business Act, 15 U.S.C. § 636(a).  Before the PPP, small businesses applying for a Section 7(a) loan sometimes engaged the services of "borrower Agents" that would help the applicant prepare a loan application.  Section 7(a) lenders also sometimes retained outside vendors, such as "Lender Service Providers" ("**LSP**"), to assist with lender functions.

38.    SBA regulations define the term "Agent," to include certain borrower Agents and certain types of lender-side outside vendors, including LSPs.  Those regulations define "Agent" to mean "an authorized representative, including an attorney, accountant, consultant, packager, lender service provider, or any other person representing an Applicant or Participant by conducting business with SBA."  13 C.F.R. § 103.1(a).

39.    The SBA defines "conduct business with SBA" to mean:

(1)    Preparing or submitting on behalf of an applicant an application for financial assistance of any kind, assistance from the Investment Division of SBA, or assistance in procurement and technical matters;

(2)    Preparing or processing on behalf of a lender or a participant in any of SBA's programs an application for federal financial assistance;

(3)    Participating with or communicating in any way with officers or employees of SBA on an applicant's, participant's, or lender's behalf;

(4)    Acting as a lender service provider; and

(5)     Such other activity as SBA reasonably shall determine.

13 C.F.R. § 103.1(b).

40.     SBA regulations separately define a category of "Referral Agents," independent of the definition of "Agent."  "Referral Agent means a person or entity who identifies and refers an Applicant to a lender or a lender to an Applicant."  13 C.F.R. § 103.1(f).

41.     The SBA has also recognized that lenders may choose to contract with technology service providers.  The SBA treats lenders' relationships with technology service providers differently from lenders' relationships with "Agents" that provide lender services.  The SBA Standard Operating Procedure (SOP) 50 10 6, effective October 1, 2020 (the "**SBA SOP**"), which is the principal guidance document interpreting the regulations governing the Section 7(a) program, states that "***SBA does not consider entities providing technology services that do not include underwriting to be Agents.***"  SBA SOP at 179, 185, 194 (emphasis added).  The fees lenders pay to technology service providers for providing the lenders with technology are not capped by SBA rules or any other applicable regulation, rule, or law.

42.     The SBA defines "technology services fees" to include, for example, "[t]he costs or fees for ***software or technology*** used in connection with preparing SBA loan documents . . . or closing the SBA-guaranteed loan," "[a]cquisition costs or fees for licensing ***software or software platforms*** to 7(a) Lenders solely for the purpose of performing administrative functions (not including underwriting functions), such as generating SBA-required forms," and "[f]ees associated with entities that develop systems or ***lending platforms to automate the 7(a) Lender's internal loan decision making process***."  *Id.* at 179 (emphasis added).

**B.** **Congress Passes Legislation And The SBA Issues Rules Regarding The Fees Agents Can Collect For Assisting Borrowers With Applications.**

    *i)*      *The SBA's Pre-PPP February 2020 Rule Regarding Borrower Agent Fees*

43.    Before the COVID-19 pandemic, the SBA had been working to "minimize the cost for a small business Applicant to obtain an SBA-guaranteed loan." Express Loan Programs; Affiliation Standards, 85 Fed. Reg. 7,622, 7,630 (Feb. 10, 2020) ("**February 2020 Rule**").[3] Among other issues, the SBA was concerned that borrowers would retain agents to assist them with obtaining SBA loans, and that those agents would charge the borrowers unreasonably high fees. Accordingly, the SBA proposed, and in February 2020 promulgated, an Interim Final Rule providing that fees that an "Agent" charged an "Applicant,"—*i.e.*, a borrower—"for services rendered in connection with obtaining an SBA-guaranteed loan must be reasonable." *Id.* at 7,647. As the SBA explained, "[b]ecause SBA's primary concern is to minimize the cost for a small business Applicant to obtain an SBA-guaranteed loan, these fee limitations will not apply when an SBA Lender pays fees to an Agent for services in connection with an SBA-guaranteed loan." *Id.* at 7,630–31.

44.    The February 2020 Rule also modified the definition of Agent so that Referral Agents (now called "**Loan Brokers**") would be a subset of Agents, rather than an independently defined category. *Id.* at 7,647.

45.    The February 2020 Rule was promulgated just as the COVID-19 pandemic was arriving in the United States. When Congress created the PPP program in March 2020 as part of the CARES Act, it rescinded the February 2020 Rule. CARES Act § 1102(e), 134 Stat. at 294, codified at 15 U.S.C. § 636.

---

[3] *Available at* https://www.govinfo.gov/content/pkg/FR-2020-02-10/pdf/2020-02128.pdf.

46.     In the CARES Act, Congress empowered the SBA to "establish[]" "limits" on fees that Agents could collect for "assist[ing] an eligible recipient"[4]—*i.e.*, a borrower—"to prepare an application for a [PPP] loan."  CARES Act § 1102(a)(2), 134 Stat. at 293, codified as amended at 15 U.S.C. § 636(a)(36)(P)(ii).   As discussed below, the SBA promptly promulgated a rule establishing a limit on fees that an Agent could charge *for assisting a borrower* with preparing an application for a PPP loan and referring the borrower to a lender, but it did not establish any limit on fees that an Agent could charge a PPP lender for assisting the lender with a PPP loan.

> ii)     *The SBA's April 2020 PPP Rule Creates Uncertainty About Who Pays Agent Fees.*

47.     On April 15, 2020, the SBA implemented the PPP by, among other things, promulgating an Interim Final Rule (the "**April 2020 PPP Rule**").  *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,816 (Apr. 15, 2020).[5] Under the April 2020 PPP Rule, for funding a PPP loan of $350,000 or less, the SBA would pay a lender a Lender Processing Fee equal to 5% of the PPP loan amount.

48.     Consistent with its statutory authority to limit fees that Agents could collect for "assist[ing] an eligible recipient to prepare an application for a [PPP] loan," CARES Act § 1102(a)(2), the SBA limited the fees that "[a]n agent who assists a borrower" could charge for "assistance in preparing an application for a PPP loan" (the "**Borrower Agent Fee Cap**").  85 Fed. Reg. at 20,816.  For PPP loans of $350,000 or less, an Agent could collect no more than 1% of the PPP loan amount for assisting the borrower.  *Id.*  The April 2020 PPP Rule explained that this 1%

---

[4] An "eligible recipient" is "an individual or entity that is eligible to receive a covered loan"—in other words, a borrower.  15 U.S.C. § 636(a)(36)(A)(iv).

[5] *Available at* https://www.govinfo.gov/content/pkg/FR-2020-04-15/pdf/2020-07672.pdf.

Borrower Agent Fee Cap was "reasonable based upon the application requirements and the fees that lenders receive for making PPP loans." *Id*.

49.     However, unlike under the pre-PPP February 2020 Rule, the April 2020 PPP Rule prohibited Agents from collecting fees from the borrower, including from the proceeds of the PPP loan. 85 Fed. Reg. at 20,816. Instead, it required that any Agent fees must be paid out of the fees the lender receives from the SBA. *Id*. The relevant text of the April 2020 PPP Rule's Borrower Agent Fee Cap provided:

> Who pays the fee to an agent who assists a borrower?
>
> Agent fees will be paid by the lender out of the fees the lender receives from SBA. Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds. The total amount that an agent may collect from the lender ***for assistance in preparing an application for a PPP loan (including referral to the lender)*** may not exceed: . . . One (1) percent for loans of not more than $350,000 . . . .

*Id.* (emphasis added).

50.     The April 2020 PPP Rule led to some confusion about who was responsible for paying a borrower Agent's fees. Some Agents helped borrowers prepare applications and referred the borrowers to lenders, but because the Agents could not collect fees from the borrowers, the Agents sought payment from the lenders. Those lenders refused to pay, arguing that they had never agreed to pay the Agent any fees for helping the borrower. As a result, some of these Agents sued the lenders seeking payment, arguing that the CARES Act and April 2020 PPP Rule created a statutory or regulatory obligation on the part of the lenders to pay the Agents their fees. *See, e.g.*, *Daniel T.A. Cotts PLLC v. Am. Bank, N.A.*, No. 2:20-cv-185, 2021 WL 2196636, at *1 (S.D. Tex. Feb. 9, 2021) (collecting cases). Federal district courts around the country uniformly rejected that argument. *Id.* at *4; *see also, e.g.*, *Johnson v. JPMorgan Chase Bank, N.A.*, No. cv-

20-4100, 488 F. Supp. 3d 144, 157 (S.D.N.Y. Sept. 21, 2020); *Am. Video Duplicating, Inc. v. City Nat'l Bank*, No. 2:20-cv-04036, 2020 WL 6882735, at *1 (C.D. Cal. Nov. 20, 2020). Those courts held that the April 2020 PPP Rule did not obligate a lender to pay a borrower Agent's fees; rather, the April 2020 PPP Rule required only that a borrower's Agent be paid—if at all—out of fees the lender received from the SBA. In other words, for an Agent to be paid for assisting a borrower with preparing an application for a PPP loan and referring the borrower to a PPP lender, the lender must first agree to pay the borrower Agent for providing those services to the borrower.

### *iii)   The Economic Aid Act Clarifies Who Pays Borrower Agent Fees.*

51.     In late 2020, Congress responded to the wave of litigation over Agent Fees by codifying the courts' holdings that the PPP did not create a statutory or regulatory obligation on the part of lenders to pay fees to borrower Agents. Specifically, in the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (the "**Economic Aid Act**"), Pub. L. No. 116-260, 134 Stat. 1182 (Dec. 27, 2020), Congress amended Section 7(a)(36)(P)(ii)—which, as discussed above, gave the Administrator of the SBA the power to limit the fees of a borrower Agent—to read as follows (with the newly added text in bold):

> An agent that assists an eligible recipient to prepare an application for a covered loan may not collect a fee in excess of the limits established by the Administrator. **If an eligible recipient has knowingly retained an agent, such fees shall be paid by the eligible recipient and may not be paid out of the proceeds of a covered loan. A lender shall only be responsible for paying fees to an agent for services for which the lender directly contracts with the agent.**

Economic Aid Act § 340(b)(1), 134 Stat. at 2050, codified at 15 U.S.C. § 636(a)(36)(P)(ii) (emphasis added to reflect newly added text).

52.     As supplemented by the Economic Aid Act, Section 7(a)(36)(P)(ii) made two important changes to the legal framework governing the fees of borrower Agents. First, Congress

abandoned the restriction on Agents collecting fees from borrowers and, instead, allowed borrower Agents to collect fees from borrowers who "knowingly" procured Agent services. Second, Congress made clear that lenders did not have a statutory or regulatory obligation to pay borrower Agents' fees; instead, lenders would be responsible for such fees only if they expressly agreed to pay them.

53.     The Economic Aid Act did not, however, alter the SBA's authority to establish limits on Agent fees as provided for by the CARES Act. That authority remained limited to the fees that an Agent collects for providing assistance to "an eligible recipient"—*i.e.*, a borrower— "to prepare an application" for a PPP loan.

54.     Neither Congress nor the SBA has ever purported to limit fees that an Agent can charge for services it provides to a *lender.* To the extent the SBA's regulations have spoken to that issue at all, it is clear that no such limitation exists. *See* 13 C.F.R. § 103.5(c) (except for a prohibition on sharing secondary-market premiums, "lenders have reasonable discretion in setting compensation for Lender Service Providers"); SBA SOP at 176–81, 195–96 (devoting seven pages in SBA's guidance document to explaining what fees an Agent or lender can collect from a borrower, but no pages to what fees an Agent can collect from a lender).

> ### iv)  *The Economic Aid Act Increases Lender Processing Fees For Small-Dollar Loans.*

55.     In addition to clarifying who pays a borrower Agent's fees, the Economic Aid Act also increased Lender Processing Fees for small loans, seeking to incentivize lenders to fund PPP loans for small businesses.

56.     Under the CARES Act, many relatively small businesses initially struggled to obtain PPP loans. Reviewing and processing PPP loan applications and managing and tracking a PPP loan portfolio require substantial resources and involve a tremendous amount of paperwork.

Many lenders were not able or willing to devote such resources to funding smaller PPP loans when they stood to recover a Lender Processing Fee of just 5% of the PPP loan amount under the April 2020 PPP Rule.  Instead, lenders focused on approving and funding larger PPP loans, which paid larger Lender Processing Fees.  Before the Economic Aid Act was enacted in December 2020, more than half of all funded PPP loans had a principal amount of $350,000 or more; more than 78% of all funded PPP loans had a principal amount of $100,000 or more; and the average PPP loan amount was $101,000.

57.     In an effort to increase the number of PPP loans going to smaller businesses, Congress increased the Lender Processing Fees for PPP loans of $50,000 or less from 5% of the loan amount (under the April 2020 PPP Rule) to the lesser of $2,500 or 50% of the loan amount. The following table illustrates the significant differences in fee amounts for several hypothetical smaller loan amounts:

| | PPP LENDER PROCESSING FEE | |
|---|---|---|
| Loan Amount | April 2020 PPP Rule | 2021 Amendment |
| $40,000 | $2,000 | $2,500 |
| $30,000 | $1,500 | $2,500 |
| $20,000 | $1,000 | $2,500 |
| $10,000 | $500 | $2,500 |
| $5,000 | $250 | $2,500 |
| $3,000 | $150 | $1,500 |

58.     Following the increase in Lender Processing Fees for these smaller PPP loans, the average PPP loan dropped to $59,000.

*v)*     ***The SBA Promulgates The January 2021 PPP Rule To Implement The Changes In The Economic Aid Act.***

59.     In January 2021, shortly after the Economic Aid Act was enacted, the SBA promulgated an Interim Final Rule (the "**January 2021 PPP Rule**").  Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by Economic Aid Act, 86 Fed. Reg. 3,692 (Jan. 14, 2021).  The SBA explicitly stated that, other than incorporating Congress's clarifications of who pays borrower Agents to the April 2020 PPP Rule, the January 2021 PPP Rule did not "substantively alter or affect PPP rules that were not amended by the Economic Aid Act," *id.* at 3,692, including the rule that borrower Agents could not collect more than 1% of a PPP loan amount for assisting a borrower with preparing an application and referring the borrower to a lender.

60.     In the January 2021 PPP Rule, the SBA changed the wording of the Borrower Agent Fee Cap to reflect the changes made by Congress in the Economic Aid Act.  The below table compares the language of the Borrower Agent Fee Cap in the April 2020 PPP Rule with the corresponding language in the January 2021 PPP Rule:

| April 2020 PPP Rule | January 2021 PPP Rule |
|---|---|
| Who pays the fee to an agent *who assists a borrower?*<br><br>Agent fees will be paid by the lender out of the fees the lender receives from SBA. Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed: . . . One (1) percent for loans of not more than $350,000 . . . .<br><br><br>85 Fed. Reg. at 20,816 (emphasis added). | Who pays the fee to an agent *who provides assistance in connection with a PPP loan?*<br><br>Agent fees may not be paid out of the proceeds of a PPP loan. <u>If a borrower has knowingly retained an agent, such fees will be paid by the borrower. A lender is only responsible for paying fees to an agent for services for which the lender directly contracts with the agent.</u> The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed: . . . One (1) percent for loans of not more than $350,000 . . . .<br><br>86 Fed. Reg. at 3,709 (emphasis added). |

61.     As reflected above, the SBA added the two underlined sentences to the Borrower Agent Fee Cap in the January 2021 PPP Rule in order to implement the Economic Aid Act's direction on when a borrower or a lender is responsible for paying a borrower Agent's fees.

62.     In addition, as reflected by the italicized language above, the SBA changed the prompt that appears before the Borrower Agent Fee Cap in the January 2021 PPP Rule.  That change is not related to anything in the Economic Aid Act or any other legislation passed by Congress.  While the SBA removed the reference to "a borrower" in the prompt that appeared in the April 2020 PPP Rule, there is nothing to suggest that with this change the SBA intended to implicitly expand the Borrower Agent Fee Cap to apply to fees Agents collect for providing services *to lenders*.  To the contrary, the Borrower Agent Fee Cap in the January 2021 PPP Rule limits only those fees an Agent collects for providing "*assistance in preparing an application for*

*a PPP loan (including referral to the lender)*," 86 Fed. Reg. at 3,709 (emphasis added), which are by their nature services provided to a borrower.

> ### C.   During The First Round Of The PPP In 2020, Womply Begins Providing Limited PPP Loan Referral Services.

63.     Womply was founded in 2011 as a technology company that provided small businesses with tools to facilitate reputation management, email marketing, and business intelligence.

64.     Because of its work with small businesses, Womply was keenly aware in early 2020 of the devastating impact that the COVID-19 pandemic was having on small businesses, including its own clients.  It recognized that many small businesses were at risk of shutting down permanently and desperately needed an injection of cash to stay afloat.

65.     Following the passage of the CARES Act, Womply saw an opportunity to use its existing technology platform to help small businesses obtain PPP loans.  In April 2020, Womply created a publicly available website through which small businesses seeking PPP loans could submit some basic contact and business information.

66.     Womply also contracted with several PPP lenders, pursuant to which Womply agreed to direct the small businesses that entered information in Womply's website to the lenders' websites.  Womply routed the applicants to the lenders based on the lenders' instructions regarding the types of loans they would fund.  Womply's website made clear to borrowers that Womply was not a lender and was not itself providing PPP loans.[6]

67.     After Womply directed a small business to a PPP lender partner, that lender was responsible for collecting additional information and supporting documentation from the

_____

[6] https://womply.com/ppp (last visited Jan. 22, 2023).

applicant, performing any Know Your Customer ("**KYC**") and anti-fraud checks the lender chose to perform, verifying applicant information, deciding whether to fund the loan, having a PPP loan application and promissory note completed and executed, organizing and maintaining the loan file, and processing, managing, and tracking the Womply-referred PPP loan and all other PPP loans the lender funded.

68.     For providing this limited referral service ("**Non-Fast Lane**"), Womply's lender partners agreed to pay Womply referral fees pursuant to negotiated agreements. In accordance with the April 2020 PPP Rule, Womply did not charge borrowers any fees. Benworth FL did not participate in Non-Fast Lane.

> **D.     Womply Develops A Technology Platform That Integrates Critical Technology Services, Allowing Lenders Like Benworth FL To Efficiently and Economically Process And Manage A Large Volume Of Small-Dollar Loans.**

69.     Womply was committed to helping many of the nation's smallest businesses, which were at greatest risk of going out of business during the pandemic, access the PPP. During the first round of the PPP in 2020, however, Womply observed that many lenders had limited personnel and technological infrastructure, and they were unable or unwilling to handle the workload associated with processing, managing, and tracking a large volume of PPP loans. Womply also recognized that, as discussed above (*supra* ¶ 56), many lenders focused primarily on funding larger PPP loans to maximize the interest the lenders received on the loans and the Lender Processing Fees the lenders received from the SBA. This left millions of eligible small businesses without ready access to PPP loans.

70.     These barriers were reflected in Womply's own data. Despite its efforts to convince lenders to loan to the smallest businesses, the average Womply-referred PPP loan funded by PPP lenders during the first round of PPP was approximately $52,000. While this was well below the

program-wide average of $101,000, it was much higher than the relatively small loans that the country's smallest businesses were eligible for.

71.     Womply sought to overcome these obstacles by developing new technology that would make it efficient and economical for lenders to process, manage, and track a large volume of small-dollar PPP loans for the country's smallest businesses.

72.     As part of that effort, Womply acquired Insurgent, Inc. d/b/a FundRocket ("**FundRocket**") in November 2020 for approximately $15 million in stock, obtaining FundRocket's proprietary technology platform and personnel with expertise in loan file management, small business data analysis, and fraud detection.

73.     Womply also developed its own technology and borrowed tens of millions of dollars in emergency financing to support PPP operations.  To that end, Womply leveraged its existing commerce platform and small business expertise, plus the technology and team acquired from FundRocket.  Womply personnel worked tirelessly to develop a new technology platform that successfully integrated technology services from multiple third-party applications.  Womply invested substantial amounts of time and money into this project, without any assurance that the initiative would be commercially successful.

74.     In late February 2021, Womply released "PPP Fast Lane," a technology platform that allowed small businesses to submit documents and information to apply for a PPP loan and allowed lenders to efficiently process, manage, and track their PPP loans, particularly the smaller PPP loans to the smallest businesses (the "**Technology Platform**" or "**Fast Lane**").

75.     Womply's Technology Platform was a major advancement compared to the initial website Womply developed to provide limited referral services in the first round of PPP in 2020. The Technology Platform had three main components:  (i) a user-friendly, borrower-facing website

through which small businesses could submit information to apply for a PPP loan for free; (ii) integrated technology services and application program interfaces ("**APIs**")—a type of complicated software code that allows data to be transferred—which evolved over time and ultimately included services from more than ten third-party technology service providers; and (iii) a lender-facing portal through which lenders could manage the entire PPP loan process.

76.     ***First***, the borrower-facing website allowed a prospective applicant to enter the information necessary to populate the SBA-required application form for a PPP loan and provide the documentation or information lenders used to evaluate each application.  Applicants continued to have access to the Fast Lane borrower-facing website after submitting their documentation and information, which allowed the applicants to, among other things, monitor the status of their applications and securely provide additional information to lenders.  Womply also provided customer service to applicants seeking assistance in connection with the Fast Lane borrower-facing website.

77.     ***Second***, the technology services integrated into the Technology Platform performed various services for lenders regarding the information provided by applicants.  Womply supported these tools through its own personnel and technology.  For example, the Technology Platform:

      a.  checked the validity of an applicant-provided email address using third-party application Kickbox;

      b.  verified an applicant's access to the applicant's email address and mobile telephone number using third-party applications SendGrid and Twilio;

      c.  verified government identification provided by applicants using Persona;

d.  performed biometric selfie scans using third-party application Persona to confirm that the applicant submitted a selfie of an actual human and that the face in the selfie matched the face on the government identification;

e.  checked applicant information against various databases to confirm identity using Persona;

f.  checked applicant information against various databases to identify potential red flags—such as individuals subject to OFAC sanctions and politically exposed persons—using Persona;

g.  extracted bank account information and transaction history using third-party application Plaid;

h.  performed knowledge-based authentication using third-party application DocuSign;

i.  classified tax documents provided by applicants using third-party application Mindee;

j.  extracted information from tax documents provided by applicants using third-party application Ocrolus; and

k.  scanned bank and tax documents provided by applicants to identify potential fraud using third-party applications Ocrolus and Inscribe.[7]

78.    After performing these various technology services, Womply routed loan applicants to a PPP lender based on a variety of factors.

---

[7] Womply added technology services at different points in time and each technology service did not necessarily apply to all applications at any given time.

79. **_Third_**, the Technology Platform also included a new lender-facing portal, which Womply developed in conjunction with 3E Software, Inc. d/b/a Teslar Software and other third parties. The lender-facing portal (the "**Teslar Portal**") was a web-based portal that allowed lenders to efficiently manage nearly the entire process of processing, reviewing, and managing PPP loans referred to the lender. Through the Teslar Portal, PPP lenders could, among other things:

    a. review applicant information and documentation so that the lender could determine whether an applicant qualified for a PPP loan and the amount of the loan;

    b. review KYC detail reports, proof-of-in-business reports, tax document reports, and funding instructions;

    c. approve PPP loans the lender wanted to fund, or reject PPP loans for missing information or other reasons;

    d. generate, populate, and transmit promissory notes;

    e. submit applicant information to the SBA for approval of a loan;

    f. monitor the status of loan applications under review by SBA;

    g. send adverse action notices for declined loans;

    h. resubmit loans with corrected information if needed; and

    i. initiate payment of loan proceeds.

80. The Technology Platform also provided lenders with cybersecurity protection.

81. Womply released the Technology Platform in February 2021. As discussed above, the Technology Platform—with its borrower-facing website, numerous integrated technology services, and Teslar Portal—ultimately integrated services from more than ten third-party applications. That required Womply engineers to develop unique APIs that would allow all of

these different applications to communicate and work with each other and with the Technology Platform. Womply also successfully developed APIs so that the Teslar Portal connected with the SBA. Womply and its software engineers engaged in a Herculean, virtually around-the-clock effort to develop and maintain these APIs, and Womply engineers continued to refine the Technology Platform throughout the remainder of the PPP.

82.     Womply's Technology Platform allowed lenders to use, in one web-based platform: (i) PPP referral services; (ii) Womply's loan portfolio management services; and (iii) a wide range of other integrated, valuable technology services that made processing loans more efficient. As a result, Womply's lender partners could easily and quickly conduct underwriting, determine whether to submit loan applications to the SBA, and fund the loans that the SBA approved. Without the Technology Platform and its Teslar Portal and integrated services, a lender wanting the same services would have needed to hire and maintain a large staff to perform all of those services in-house, which was not economical or logistically feasible for many lenders (particularly under the constraints the pandemic imposed), or contract with numerous separate technology service providers and manage to coordinate those services and the underlying data under enormous time constraints.

83.     Fifteen lenders and non-lender entities (which referred PPP loans to lenders) contracted with Womply for PPP loan applicant referral services. Seven of those entities also purchased access to the "PPP Fast Lane" Technology Platform and its integrated technology services from Womply. Even after Womply released the Technology Platform, Womply's Non-Fast Lane (referral-only) services remained available to lenders, and some of Womply's referral partners continued to use only Womply's Non-Fast Lane, referral-only services. Those Non-Fast Lane partners continued to be connected with prospective applicants via a separate website from

the Fast Lane borrower-facing website, and the Non-Fast Lane partners did not receive any of the enhanced technology services offered through the Technology Platform.  The partners that chose to receive Fast Lane services, on the other hand, received their referrals through the Technology Platform and the additional technology services integrated in the Technology Platform.

**E.      In 2020, Benworth FL Funds Fewer Than 1,000 PPP Loans.**

84.      Benworth FL is a limited liability company organized under the laws of Florida founded by Mr. Navarro in 2008.  Mr. Navarro is the founder, president, CEO ████████ ████████████ of Benworth FL.

85.      Benworth FL is a licensed mortgage lender whose business is focused on originating and servicing mortgage loans that traditional banks would not underwrite.  Benworth FL refers to these arrangements as "hard money loans," which are funded by private investors.

86.      These "hard money loans" do not always work out well for the borrowers. ███████████████████████████████████████████ In 2017, Benworth FL made headlines by foreclosing on the family home of a 14-year-old girl with cerebral palsy whose parents had stopped making monthly payments because they had been "misled into taking out a high-interest, short term loan . . . that they could not afford to pay back."[8]  Eventually,

---

[8] Areeba Shah, *Li'l Marco's big loan:  The tale of a senator, his private-equity pal and an inexplicable appointment,* SALON (Sept. 30, 2022), https://www.salon.com/2022/09/30/lil-marcos-big-loan-the-tale-of-a-senator-his-private-equity-pal-and-an-inexplicable-appointment/; *see also* Nicholas Nehamas, *Disabled Miami teen, parents won't lose home where she grew up,* THE MIAMI HERALD (May 27, 2018), https://www.miamiherald.com/news/local/community/miami-dade/kendall/article211986789.html; Nicholas Nehamas, *The loan came due. Her parents couldn't pay. Now a teen with cerebral palsy could lose her home,* THE MIAMI HERALD (Apr. 14, 2017), https://www.miamiherald.com/news/local/community/broward/article144479184.html.

Benworth FL agreed to settle the case in return for a payment from the family of $240,000, which was nearly $100,000 more than the original loan amount.

87.     Prior to 2020, Benworth FL was not an SBA-approved lender and did not issue any SBA-sponsored loans.  PPP was Benworth FL's first experience with SBA lending and regulations. (Ex. 1, August 5, 2022 Holland & Knight letter.)

88.     During the onset of the COVID-19 pandemic in 2020, Benworth FL's application to the SBA to become a PPP lender was approved.  Thereafter, the majority of Benworth FL's staff pivoted from the mortgage business to reviewing PPP loan applications.  Benworth FL also hired over 30 employees to review PPP loan applications.

89.     In 2020, ███████████████████████████████   ██████████████ Benworth FL identified approximately ████ PPP loan applicants and funded approximately 700 PPP loans with a total principal amount of approximately $22 million.

90.     In connection with funding those PPP loans in 2020, Benworth FL received processing fees from the SBA totaling more than ████████ and interest on the loans.  Benworth FL's financial statement for the year ending 2020 reported that ██████████████████ ██████████████████████████

### F.     In 2021, Benworth FL Contracts For Womply's Referral And Technology Services To Make Processing And Managing PPP Loans More Efficient.

91.     On February 25, 2021, Benworth FL and Womply entered into an Agent Agreement and Womply Developer Order Form (together, the "**February Agreements**").

92.     On April 14, 2021, Benworth FL and Womply entered into an Amended and Restated PPP Loan Referral Agreement (the "**Referral Agreement**") and a new Womply Developer Order Form (the "**Order Form**," and together with the Referral Agreement, the

"**Agreements**").  The Referral Agreement is attached hereto as Exhibit 2.  The Order Form is attached hereto as Exhibit 3.

93.    The Order Form also "includes and incorporates . . . the Womply Master Developer Agreement located at http://www.womply.com/mda" (the "**Master Developer Agreement**").  The Master Developer Agreement is attached hereto as Exhibit 4.

94.    The Agreements superseded the February Agreements.

   *i)*    ***Benworth FL Agreed To Pay Womply A 1% Referral Fee For Womply's PPP Referral Service.***

95.    Pursuant to the Referral Agreement, Benworth FL agreed to receive referrals of PPP loan applicants from Womply through the Fast Lane Technology Platform.

96.    Section 1.1 of the Referral Agreement provides that "Womply may, from time to time, refer to [Benworth FL] such PPP loan applicants as Womply shall, in its sole and absolute discretion, deem appropriate (each such applicant a 'Referral')."  (Ex. 2 § 1.1.)

97.    The Referral Agreement makes clear that Womply was only providing a referral service to Benworth FL pursuant to the agreement, that Womply was not vouching for the applicants it referred, and that Benworth FL was solely responsible for determining whether to fund an applicant's PPP loan.

98.    Specifically, the Referral Agreement states that "[Benworth FL] desires to engage in the origination, marketing, underwriting, and funding of loans, as well as the servicing, management and liquidation of the subsequently resulting loan portfolios, funded and created under the [SBA PPP]," and that "[Benworth FL] has the ability to independently evaluate, process, close, service, liquidate, and litigate commercial loans." (*Id.* at 1.)  The Referral Agreement also clarifies that "Benworth FL and Womply desire to establish an independent contractor relationship

whereby Womply provides referrals to [Benworth FL] in connection with potential loan applications seeking loans under the PPP." (*Id.*)

99.     Section 1.2 of the Referral Agreement also states in all capital letters:

> WOMPLY MAKES NO REPRESENTATIONS OR WARRANTIES ABOUT, AND HEREBY DISCLAIMS ALL RESPONSIBILITY FOR, THE ACCURACY, LAWFULNESS, OR COMPLETENESS OF ANY INFORMATION ACCOMPANYING A REFERRAL. FOR THE AVOIDANCE OF DOUBT, WOMPLY DOES NOT ENDORSE ANY REFERRAL. [BENWORTH FL] ASSUMES SOLE RESPONSIBILITY REGARDING WHETHER OR NOT ANY REFERRAL SHOULD BE SENT TO THE SBA FOR REVIEW.

(*Id.* § 1.2.)

100.     If Womply were responsible for determining whether an applicant qualified for a loan, or whether a loan should be funded, then Womply may be considered an LSP under SBA regulations.  However, the Referral Agreement expressly provides that "Womply is not a lender or lender service provider as defined by the SBA," reflecting that both Benworth FL and Womply understood that Womply was not underwriting loans or otherwise making lending decisions.  (*Id.* § 1.3.)  Consistent with this understanding, on September 9, 2021, ███████████████████████ ██████████████████████

101.     In exchange for Womply's referral service, Benworth FL agreed to pay Womply a Referral Fee equal to 1% of the amount of each Womply-referred PPP loan that Benworth ultimately funded.  (*Id.* § 2.2.)  This 1% Referral Fee is consistent with the Borrower Agent Fee Cap, which limits the fees an agent can receive for providing assistance in preparing an application for a PPP loan and referral of the applicant to the lender at 1% of the loan amount.  (*See supra* ¶¶ 48, 59.)

***ii)***     ***Benworth FL Agreed To Pay Womply An API Fee And A Technology Fee For Womply's Technology Services And Access To Its Technology Platform.***

102.    Pursuant to the separate Order Form, Womply agreed to provide Benworth with its "API Package," which included access to Womply's Fast Lane Technology Platform and the numerous technology services integrated therein.

103.    Womply's information extraction and verification technology services were specifically referred to in the Order Form as "Tax Documents," "Business Fraud Analytics," "Bank Data," "Identity," and "Account Verification," and the Technology Platform was referred to as "PPP Portfolio Management System." (Ex. 3 at 1.) The Order Form also made clear that these services include "integrations with and/or links to certain third-party service providers (including, without limitation, Plaid, Docusign, LexisNexis, Teslar, Inscribe, Ocrolus, AWS Mechanical Turk, Mindee, Persona, Twilio, Sendgrid, etc.) ('Third-Party Providers')." (*Id.* § 1.2.)

104.    Like the Referral Agreement, the Order Form makes clear that Benworth FL retained responsibility for determining which PPP loans to fund.

105.    Section 1.1 of the Order Form includes a disclaimer similar to the one found in Section 1.2 of the Referral Agreement. It states:

> WOMPLY MAKES NO REPRESENTATIONS OR WARRANTIES ABOUT, AND HEREBY DISCLAIMS ALL RESPONSIBILITY FOR, THE ACCURACY, LAWFULNESS, OR COMPLETENESS OF ANY INFORMATION ACCOMPANYING A REFERRAL (I.E., OUTPUT MADE AVAILABLE VIA THE SERVICES). FOR THE AVOIDANCE OF DOUBT, WOMPLY DOES NOT ENDORSE ANY REFERRAL. [BENWORTH FL] ASSUMES SOLE RESPONSIBILITY REGARDING WHETHER OR NOT ANY REFERRAL SHOULD BE SENT TO THE SBA FOR REVIEW.

(*Id.* § 1.1.)

106.    Section 1.2 of the Order Form also states:  "WOMPLY HAS NO CONTROL OVER AND ASSUMES NO RESPONSIBILITY FOR THE ACTIONS, ERRORS, OR OMISSIONS OF THE THIRD PARTY PROVIDERS."

107.    In addition, like in the Referral Agreement, and consistent with ███████ ████████████ (*see supra* at ¶ 100), the Order Form provides that "Womply is not a lender or lender service provider as defined by the SBA."  (Ex. 3 § 1.3.)

108.    In exchange for this "API Package," Benworth FL agreed to pay Womply an API Fee and a Technology Fee for each funded PPP loan that Benworth FL originated and processed using Womply's Technology Platform and technology services.  (*Id.* at 1, § 2.)

109.    The API Fee was a flat fee of $250 for each funded PPP loan.  (*Id.* at 1.)

110.    The Technology Fee was calculated as a percentage of the Lender Processing Fee that Benworth FL received from the SBA for funding the PPP loan, with the precise percentage determined by the total number of Womply-referred loans that Benworth FL funded.

111.    Specifically, Section 2.1.3 of the Order Form includes the following table specifying the Technology Fees Womply earns based on the volume of Womply-referred loans that Benworth FL funds:

| Tier | Referred Loan Tiers | Technology Fee Percentage |
|------|---------------------|---------------------------|
| 1 | 1 through 30,000 Referred Loans | 50% of the Lender Processing Fee for each Referred Loan |
| 2 | 30,001 through 45,000 Referred Loans | 60% of the Lender Processing Fee for each Referred Loan |
| 3 | 45,001 through 60,000 Referred Loans | 70% of the Lender Processing Fee for each Referred Loan |
| 4 | 60,001 through 300,000 Referred Loans | 80% of the Lender Processing Fee for each Referred Loan |

| 5 | Greater than 300,000 Referred Loans | 70% of the Lender Processing Fee for each Referred Loan |
|---|---|---|

(*Id.* § 2.1.3.)

112.     Section 2 unambiguously states that "the *max* percentage" in the table above—*i.e.*, the highest percentage in the "Technology Fee Percentage" column—"applies to Referred Loans *funded prior to achieving the Referred Loan Volume*."  (*Id.* § 2.1 (emphasis added).)

113.     Therefore, when Benworth FL funded the first 30,000 Referred Loans, Womply was entitled to a Technology Fee equal to 50 percent of the Lender Processing Fee for each Referred Loan.  But, when Benworth FL funded loan 30,001, Womply was entitled to 60 percent of the Lender Processing Fee for that one loan, plus 60 percent of the Lender Processing Fee for all loans "funded prior to achieving the Referred Loan Volume" of 30,001.  In other words, Benworth FL must pay Womply an additional 10 percent of the Lender Processing Fee for each of the first 30,000 Referred Loans.  Likewise, for loan 60,001, Womply is entitled to 80 percent of the Lender Processing Fee for that one loan, plus 80 percent of the Lender Processing Fee for all loans "funded prior to achieving the Referred Loan Volume" of 60,001.

114.     However, when Benworth FL achieves the Referred Loan Volume of 300,001, Womply is entitled to 70 percent of the Lender Processing Fee for that loan and all future Referred Loans, but the 70 percent does not apply to any "Referred Loans funded prior to achieving the Referred Loan Volume."  This is because only the "max percentage" achieved—in this case, 80 percent—applies to "Referred Loans funded prior to achieving the Referred Loan Volume" of 300,001.  (*Id.* § 2.1.3.)

115.     In sum, pursuant to Section 2 of the Order Form, Benworth FL is obligated to pay Womply Technology Fees equal to 80 percent of the Lender Processing Fee for the first 300,000

funded PPP loans and 70 percent of the Lender Processing Fee for each additional funded PPP loan.

116.    Under Section 2.2 of the Order Form, Benworth FL is entitled to a credit for any Referral Fees owed to Womply under the Referral Agreement.  (*Id.* § 2.2 ("Technology Fees payable to Womply for any Referred Loan shall be reduced by any Referral Fee paid to Womply for the same Referred Loan.").)

117.    As an example, assuming Benworth FL funded a PPP loan of $10,000 in tier 4 of the table in paragraph 111 above, Benworth FL would receive a Lender Processing Fee of $2,500 (plus interest on the loan), and Benworth FL would owe Womply:  (i) a Referral Fee of $100 (calculated as 1% of the $10,000 loan); (ii) an API Fee of $250; and (iii) a Technology Fee of $1,900 (calculated as 80% of Benworth FL's $2,500 Lender Processing Fee, minus the $100 Referral Fee).

118.    The Order Form further provides that "where the Lender Processing Fee for a given Referred Loan is two-hundred and fifty dollars ($250) or less . . . [t]here will be no Technology Fee due from [Benworth FL] to Womply." (*Id.* § 2.1.2–2.1.2.1.)  In addition, "[s]uch Referred Loans will be disregarded when calculating the Referred Loan Tiers" above.  (*Id.* § 2.1.2.2.)

119.    At the time Womply and Benworth FL executed the Agreements, it was evident that for loans below a certain threshold amount, Benworth FL would pay Womply more in fees than Benworth FL would receive in Lender Processing Fees for funding those relatively small loans.  For example, if Benworth FL funded a PPP loan of $800 in tier 4 of the chart in paragraph 111 above, it would receive a Lender Processing Fee of $400, but it was obligated to pay Womply a Referral Fee of $8, an API Fee of $250, and a Technology Fee of $312 for a total of $570.  However, Womply later agreed that for each PPP loan Benworth funded, Womply would not

invoice Benworth FL for fees greater than the Lender Processing Fee Benworth FL received for funding the loan. This meant that Benworth FL would never lose money for funding a PPP loan, but for certain relatively small loans, Benworth FL may keep only the interest on the loans.

        **iii)**    **Benworth FL Agreed To Pay Womply Interest If Benworth FL Failed To Timely Pay Womply Its Fees.**

120.     The Order Form provides that "[w]ithin fifteen (15) days of [Benworth FL] receiving the Lender Processing Fee from the SBA, [Benworth FL] will pay Womply all associated Technology Fees for each applicable Referred Loan." (*Id.* at § 2.3.) The Referral Agreement also provides that "[w]ithin thirty (30) days of [Benworth FL] receiving the Lender Fee from the SBA, [Benworth FL] will pay Womply all associated Referral Fees for each applicable Referred Loan." (Ex. 2 § 2.3.) On information and belief, lenders were typically paid Lender Processing Fees from the SBA within seven days of funding a corresponding PPP loan.

121.     Delinquent Referral Fees, API Fees, and Technology Fees incur interest under Womply's Referral Agreement and the Master Developer Agreement. The Referral Agreement states that Referral Fee payments not timely made "are subject to a finance charge of 1.5% per month or the maximum permitted by law, whichever is lower, plus all costs of collection." (*Id.* § 2.4.) Similarly, the Master Developer Agreement says that late payments "are subject to a finance charge of 1.5% per month or the maximum permitted by law, whichever is lower, plus all expenses of collection." (Ex. 4 § 2.)

        **iv)**    **Womply Is Entitled To Terminate The Agreements If Benworth FL Fails To Pay Womply's Fees.**

122.     The Referral Agreement entitles Womply to terminate the Referral Agreement "immediately upon delivery of a Notice of Termination if [Benworth FL] is in material breach of any warranty, representation, covenant or obligation under this Agreement and is not able to cure such breach within seven (7) calendar days of receiving the Notice of Termination." (Ex. 2 § 4.2.)

In addition, Section 3.2 of the Master Developer Agreement states that, if Benworth FL fails to satisfy its payment obligations to Womply, then Womply is entitled to "immediately suspend the Services," in addition to other remedies.  (Ex. 4 § 3.2.)

123.    In the event Womply terminates the Agreements, Womply remains entitled to recover all fees that are due, become due, or will become due under the Agreements, as well as the costs Womply incurs in connection with collecting those fees.  (Ex. 2 § 4.5 ("Womply shall be entitled to all Referral Fees accrued in connection with Referred Loans pursuant to the terms and provisions of Section 2 above . . . ."); Ex. 3 § 2 (providing that Benworth FL will be responsible for "Womply's costs of collection in the event of [Benworth FL's] delinquent payment").)

### G.    Benworth FL Funds More Than 305,000 PPP Loans In 2021 Using Womply's Technology Platform But Fails To Pay Womply All Of Its Fees.

124.    Benworth FL processed, funded, and managed *305,790* Womply-referred PPP loans with a principal amount of more than *$4 billion* in just four months.  In connection with processing, funding, and managing those PPP loans using Womply's Technology Platform, Benworth FL received more than $680 million in Lender Processing Fees from the SBA, as well as interest on the $4 billion in loans.

125.    However, while lacking any legal basis for doing so, Benworth FL refused to pay Womply more than $153 million in Referral Fees, API Fees, and Technology Fees now well past due under the Agreements.  Those unpaid fees accrue interest at the agreed rate of 1.5% per month, and accrued interest to date on the unpaid fees totals more than $44 million.

126.    The PPP loans for which Benworth FL underpaid Womply, or failed to pay Womply at all, fall into three buckets:

   *i)*   ***Benworth FL Underpays Technology Fees For The First 300,000 Womply-Referred PPP Loans That Benworth FL Funded.***

   127.  As discussed above, under Section 2 of the Order Form, Benworth FL must pay Womply Technology Fees equal to 80 percent of its Lender Processing Fee for each of the first 300,000 Referred Loans, and 70 percent of its Lender Processing Fee for each additional Referred Loan. (Ex. 3 § 2.1.)

   128.  And, in fact, Benworth complied with Section 2 of the Order Form for some loans. After Benworth FL funded more than 60,000 Referred Loans and therefore was in tier 4 of the Technology Fee chart, Benworth FL paid Womply 80% of the Lender Processing Fee that Benworth FL received in connection with Referred Loans it funded in earlier tiers.

   129.  However, Benworth FL later interpreted Section 2 of the Order Form in a manner that is plainly inconsistent with its unambiguous terms. Benworth FL incorrectly interprets Section 2 of the Order Form as requiring Benworth FL to pay Womply ███████████████ ████████████████████████████████████████████████ As a result of Benworth FL's misinterpretation of the Order Form, Benworth FL underpaid Womply its Technology Fees for 228,785 PPP loans, resulting in a shortfall in Technology Fee payments to Womply of $56,355,799.

   130.  Under the Agreements, Benworth FL owes interest on these unpaid Technology Fees totaling more than $16.2 million.

   *ii)*   ***Benworth FL Withholds All Fees Due On Approximately 40,000 PPP Loans For Which Benworth FL Claims It Fails To Make Enough Profit.***

   131.  Benworth FL also failed to pay Womply any fees for 40,563 PPP loans for which Benworth FL would make less than $250 per loan (not including interest) after paying Womply's fees (the "**Small-Dollar Loans**"). Benworth FL admitted that it was withholding these fees in the

hopes that Womply would agree to renegotiate the fee structure in the Agreements and allow Benworth FL to keep more of its Lender Processing Fees for those loans.

132.    On July 1, 2021, Benworth FL sent an email to Womply identifying 40,563 Small-Dollar Loans.  Benworth FL calculated that it owed Womply a total of more than $40 million for these Small-Dollar Loans, but Benworth FL demanded that Womply agree to a new fee structure that would allow Benworth FL to keep a "$500 distribution per loan," which amounted to a discount on Womply's fees totaling $20,281,500.

133.    Benworth FL withheld from Womply the total of over $42 million as leverage in the hopes that Womply would renegotiate the parties' Agreements.  Indeed, Benworth FL made clear that if Womply agreed to Benworth FL's demands, Benworth FL "could immediately release these funds to [Womply]."  Womply refused Benworth FL's demands.

134.    The fees due to Womply on the Small-Dollar Loans total $41,968,158.  Under the Agreements, Benworth FL owes interest on these unpaid fees totaling more than $12 million.

135.    Even under Benworth FL's incorrect interpretation of Section 2 of the Order Form regarding the calculation of Technology Fees, Benworth FL owes Womply $39,043,108 in delinquent fees and more than $11.2 million in interest on the Small-Dollar Loans.

*iii)*    ***Benworth FL Withholds All Of Womply's Fees For Approximately 28,000 Additional PPP Loans For No Discernable Reason.***

136.    Benworth FL funded and, on information and belief, received Lender Processing Fees for 28,067 Womply-referred PPP loans for which it failed to pay Womply any of the Referral Fees, API Fees, or Technology Fees that Benworth FL agreed to pay in the Agreements (the "**Additional Unpaid Loans**").  These loans are in addition to the Small-Dollar Loans identified above.

137.    At the time these fees became due, Benworth FL did not provide Womply with any explanation for why the fees were being withheld.

138.    The fees due to Womply on the Additional Unpaid Loans total $55,369,387.  Under the Agreements, Benworth FL owes interest on these unpaid fees totaling more than $15.9 million.

139.    Even under Benworth FL's incorrect interpretation of Section 2 of the Order Form regarding the calculation of Technology Fees, Benworth FL owes Womply $50,145,053 in delinquent fees and more than $14.4 million in interest on the Additional Unpaid Loans.

**H.    Womply Terminates The Agreements For Benworth FL's Material Breach.**

140.    Benworth FL's failure to pay Womply its fees constitutes a material breach of the Agreements.

141.    On July 21, 2021, Womply sent an email to Mr. Navarro at Benworth FL detailing some of the fees Benworth FL failed to pay.  Among other things, the email stated:

> We are disappointed and concerned that Benworth has not paid or confirmed that it intends to pay Womply the over $44 million in fees that Benworth admits it has been withholding from Womply in connection with nearly 41,000 referred loans.  We also have reason to believe that Benworth has failed to pay Womply approximately $103 million in total fees now due in connection with approximately 28,000 other loans.  These late fees have accrued interest totaling $660,000 as of today, and they are continuing to accrue interest at a rate of about $28,000 per day.

> If we do not receive a payment of all outstanding fees totaling $147 million by COB tomorrow, Thursday July 22nd, we will be left with no option but to send Benworth a notice of termination pursuant to Section 4.2 of the Amended and Restated PPP Loan Referral Agreement for Benworth's material breach of its payment obligations.  We are saddened it has come to this, but we must insist that Benworth comply with its contractual obligations.

142.    Mr. Navarro did not dispute that Benworth FL owed Womply these fees.  But Benworth FL did not pay Womply any of the outstanding fees.

143.    In accordance with the Agreements, Womply notified Benworth FL of its material breach by email on July 23, 2021, and delivered a Notice of Termination to Benworth FL by First Class Certified Mail on July 29, 2021.

144.    Again, neither Mr. Navarro nor anyone else at Benworth FL disputed that Benworth FL owed Womply substantial fees.  Benworth FL failed to cure its material breach of the Agreements within seven days, and therefore the Agreements were terminated according to their terms.

**I.      Benworth FL Petitions The SBA To Issue New Rules To Retroactively Cap Womply's Fees And Seeks To Influence ███████████████████████.**

145.    On August 16, 2021, Benworth FL (and two other Florida lenders that also sought to avoid paying Womply its fees) sent a letter to the SBA asking it to issue new rules that would have retroactively reduced the amount of fees Womply could charge for its technology services (the "**August 16 Letter**").  The August 16 Letter is attached hereto as Exhibit 5.

146.    In the August 16 Letter, Benworth FL identified the April 2020 PPP Rule and its Borrower Agent Fee Cap regarding limits on fees that lenders can pay borrower agents for PPP loan application preparation and referral services.  Ignoring the January 2021 PPP Rule, Benworth FL incorrectly claimed that the SBA had not "issued regulations . . . regarding the maximum loan agent fees that lenders could pay for referrals" of PPP loans after passage of the December 2020 Consolidated Appropriations Act and, without referring to Womply directly, stated that "[t]he absence of this guidance has caused considerable ambiguity and unnecessary disputes between lenders and loan agents."  (Ex. 5.)

147.    On information and belief, the reference to "loan agents" in the August 16 Letter was a reference to Womply.

148.    Benworth FL proposed that the SBA address this purported "oversight" by issuing "a short regulation . . . indicating that no lender may pay more than 50% of their earned processing fees made on these smaller ($50,000 and under) PPP loans to any loan agent." (*Id.*)  Unlike the January 2021 Final Rule, which regulated the fees a borrower agent could receive only for providing "assistance in preparing an application for a PPP loan," Benworth FL's proposed rule would have capped an agent's fees for ***any*** service.  On information and belief, Benworth FL was hoping that it could rely on such a rule to refuse to pay Womply all of the fees Benworth FL agreed to pay for Womply's referral and technology services.

149.    Mr. Navarro also improperly sought to leverage his connection to ▮▮▮▮▮▮



150.    Mr. Navarro has hosted several campaign fundraisers for ▮▮▮▮▮ and served as the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Mr. Navarro served as ▮▮▮▮ for ▮▮▮▮ 2016 reelection campaign.  Mr. Navarro has also served as the ▮▮▮▮▮▮▮▮▮▮▮ campaign for reelection to ▮▮▮▮ in 2022 and is a director of ▮▮▮▮▮▮▮, a not-for-profit corporation organized under the laws of Florida.  Mr. Navarro has personally contributed over $25,500 to ▮▮▮▮▮ political campaigns and associated political action committees throughout the ▮▮▮ career.

151.    Indeed, Mr. Navarro's attempts to influence ▮▮▮▮▮ and integrate himself into the ▮▮▮ circle included the facilitation of a $850,000 bridge loan to ▮▮▮▮ in January 2021, which was only disclosed 18 months later when ▮▮▮ included it on a financial disclosure form.  In April 2021, Mr. Navarro was appointed to the Southern District of Florida's

Judicial Advisory Commission by ███████████, which is responsible for making formal recommendations to the Senator and Congress to fill federal judicial vacancies.

152.   On August 16, 2021, Benworth FL ██████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████

153.   On August 16, 2021, Mr. Navarro ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████

████████████████████████████

████████████████████████████████████████████████ ████████████████████████████

154.   Ten days later, ████████████ sent a letter addressed to Administrator Guzman of the SBA, dated August 26, 2021 (the "**August 26 Letter**").  In the August 26 Letter, ████████████ writes that "potential ambiguity" in the rules about agent fees "has created confusion between lenders and loan agents in my state, and should be remedied by a clarification from the SBA regarding how such loans should be treated."  The August 26 Letter is attached hereto as Exhibit 6.

**J.     The SBA Rejects Benworth FL's Efforts To Have New Agent Fee Rules Issued.**

155.   The SBA did not adopt Benworth FL's proposal to issue new rules regarding agent fees.

156.   On September 14, 2021, the SBA sent a letter (the "**September 14 Letter**") to Benworth FL that simply referred back to the rules regarding agent fees in the January 2021 PPP Rule, which are identical to the rules in the earlier April 2020 PPP Rule.  Therefore, the SBA

confirmed to Benworth FL what was already clear:  that the SBA limited the fees an agent could collect from a lender to 1% of a PPP loan for providing "assistance in preparing an application for a PPP loan (including referral to the lender)," but not for other services.  A copy of the September 14 Letter is attached hereto as Exhibit 7.

### K.      Womply Commences Arbitration Against Benworth FL To Recover Its Fees.

157.    On August 25, 2021, Womply commenced arbitration proceedings against Benworth FL in San Francisco, California, pursuant to Section 10 of the Referral Agreement, by filing a Demand for Arbitration and Statement of Claim with JAMS.

158.    In the Arbitration, Womply seeks payment of the $153,063,872[9] in Referral Fees, API Fees, and Technology Fees that are past due under the Agreements, as well as the interest that has accrued on those late fees under the Agreements.

159.    On October 1, 2021, Benworth FL filed its Answer to Womply's Demand for Arbitration, Affirmative Defenses and Counterclaims.   However, each of Benworth FL's counterclaims contained therein are either legally deficient or moot.

160.    Two of Benworth FL's principal affirmative defenses and all of its counterclaims are based on the argument that Womply is an "agent" under SBA regulations, and therefore Womply can only collect its 1% Referral Fee, even for giving Benworth FL access to its Technology Platform and technology services, under the Borrower Agent Fee Cap.  Benworth FL therefore claims that it need not pay Womply the more than $153 million due under the Agreements.  It also claims that Womply must disgorge API and Technology Fees that Benworth FL already paid Womply for services rendered.

---

[9]Based on additional analysis and information, Womply now estimates that Benworth FL owes Referral Fees, Technology Fees, and API fees totaling $153,693,344.

161.    As described above (*supra* ¶¶ 59-62), Benworth FL's argument that the Borrower Agent Fee Cap limits all of Womply's fees for all of its services is plainly wrong.  To the extent any of Womply's services are subject to the Borrower Agent Fee Cap, it is Womply's referral services, for which Benworth FL agreed to pay Womply a Referral Fee equal to 1% of a PPP loan amount consistent with the Borrower Agent Fee Cap.  Womply's Fast Lane Technology Platform and extensive technology services do not constitute "assistance with preparing a PPP loan application (including referral to the lender);" instead, they made it more efficient for Benworth FL to **process** the loan applications.  Therefore, the API and Technology Fees that Benworth FL agreed to pay for access to the Technology Platform and integrated technology services are not subject to the Borrower Agent Fee Cap.

162.    Benworth FL's interpretation of the Borrower Agent Fee Cap has already been rejected by the United States District Court for the Northern District of Texas (the "**Texas Court**") in *Oto Analytics, Inc. v. Capital Plus Financial, LLC*, No. 3:21-CV-2636-B, 2022 WL 1488441, at *8–10 (N.D. Tex. May 11, 2022).  In that case, Womply brought claims against another PPP lender for failure to pay Womply's fees, and the lender sought to dismiss Womply's claims, arguing (among other things) that Womply's Technology Fees were illegal because they exceeded the 1% Borrower Agent Fee Cap.  The Texas Court rejected that argument, holding that "Referral Fees and Technology Fees are for distinct services" and that the Borrower Agent Fee Cap "does not foreclose a Technology Fee like the one" charged by Womply.  *Id.* at *9.

163.    In its affirmative defenses, Benworth FL also argues that Womply is barred from recovering its outstanding Referral Fees, because Womply "promised Benworth that it would materially improve its technology platform" to detect fraudulent applications, but that Womply "did not intend to honor that promise when it was made."  That affirmative defense is not only

factually baseless, it also is legally deficient.  Among other reasons, the Agreements between Womply and Benworth FL make clear that Womply is not responsible for the "accuracy, lawfulness, or completeness of an applicant's information" and that Benworth FL is "solely responsible" for determining whether to submit applicant information to the SBA for approval. (Ex. 2 § 1.2; Ex. 3 § 1.1.)

164.    Benworth FL also claimed in the Arbitration that it was holding "any disputed fees in trust until its dispute with Womply . . . is resolved."  As discussed below, that representation was false when it was made.

**L.      Womply Discovers That Benworth FL** ██████████████████████
████████████  **To Avoid A Judgment In The Arbitration.**

165.    Through discovery in the Arbitration, Womply has learned that Defendants

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

(the "**Fraudulent Transfer**").

166.    Womply first learned of the Fraudulent Transfer during a deposition of Mr. Navarro on October 26, 2022.  However, ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████.  Womply thereafter filed a motion to compel discovery into Benworth PR, and the arbitrator in the Arbitration ordered Benworth FL to produce Benworth FL's agreements with Benworth PR and to produce Mr. Navarro for a second deposition to answer questions regarding Benworth PR ██████████

████████████████████.  Womply's counsel took Mr. Navarro's deposition again on December 16, 2022.  As discussed below, that additional discovery revealed that ████████

████████████████████████████████████████

████████████████████.

    *i)*       ***The Navarros Started Planning To Move Assets Out Of Benworth FL As Early As May 2021.***

    167.    On May 4, 2021, the SBA announced that most PPP funding had been exhausted, but that approximately $8 billion remained for "community financial institutions."  Benworth FL is not a community financial institution, and therefore it could no longer submit PPP loan applicant information to the SBA for approval as of May 4, 2021.  Accordingly, by May 4, 2021, Benworth FL had submitted all of the Womply-referred PPP loans that it decided to fund and, assuming those loans were approved by the SBA, Benworth FL could calculate the fees it would owe Womply.

    168.    On May 31, 2021, Benworth FL entered into a Loan Servicing Agreement (the "**Original LSA**") with "Benworth Capital Partners PR," which did not exist and was described in the Original LSA as a "company in formation under the laws of the Commonwealth of Puerto Rico."  Mr. Navarro executed the Original LSA on behalf of Benworth FL, and Ms. Navarro executed it on behalf of the non-existent Puerto Rico company.  The Original LSA is attached hereto as Exhibit 8.

    169.    The Original LSA provided that the Puerto Rico company would provide Benworth FL with two categories of services.  One category of services was related to servicing Benworth FL's traditional mortgage loans.  The other category of services was related to Benworth FL's PPP loans.  As to the latter category, the Original LSA provided that the Puerto Rico company would act as Benworth FL's "agent to assist with its portfolio of [PPP] loans, mainly by assisting with obtaining Forgiveness for said loans, Servicing, administering Guaranteed Purchase, and to provide Fraud monitoring for said loans."

170.    After Mr. and Ms. Navarro formed Benworth PR one month later on June 28, 2021, they executed an Amended Loan Servicing Agreement dated September 23, 2021 (the "**Amended LSA**," and together with the Original LSA, the "**LSAs**"), on behalf of Benworth FL and Benworth PR, respectively.  The Amended LSA is attached hereto as Exhibit 9.

171.    The Amended LSA provides additional detail regarding the administrative services Benworth PR would provide Benworth FL related to its PPP loans.  Specifically, Benworth PR agreed to: (i) "communicate with borrowers to encourage them to apply for forgiveness;" (ii) "monitor all fraudulent loan applications," "submit SBA OIG investigations," and "submit Suspicious Activity Reports to FINCEN of the United States Treasury Department;" (iii) "facilitate the response to all subpoenas and request for information from any and all governmental agency;" (iv) "submit fraudulent or non-performing loans to the United States Small Business Administration (SBA) for Guaranteed Purchase" (*i.e.,* for the SBA to purchase the loan pursuant to the SBA's guarantee); (v) "administer servicing functions;" and (vi) "work with [Benworth FL's] customers who have submitted a Forgiveness Application to the SBA and are required by the SBA to provide additional information needed to the SBA to process the Forgiveness Application" (collectively, the "**LSA PPP Services**").  (*Id.* at 2-3.)

   *ii)*    ***Benworth PR's Fees*** ███████████████████ ***And Are Not Reasonable For The Services Benworth PR Provided.***

172.    For the LSA PPP Services, Benworth FL agreed to pay Benworth PR $500 per PPP loan for loan forgiveness services and $50 per PPP loan for services related to fraud monitoring and guaranteed purchase.  Benworth FL also agreed to pay an additional 65 basis points of the outstanding amount of a PPP loan for "loan Servicing."  The Amended LSA also provides for additional potential fees.  Specifically, if Benworth cancels "servicing," a "$50.00 fee per [PPP loan] cancelled shall apply in addition to the minimum servicing fee charge per file."  Benworth

PR also has the ability to obtain fees "at an hourly rate of $75.00 to $250.00 per hour" for additional services, including "trial testimony, deposition testimony, travel and waiting time in litigation matters."

173. ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████

174. ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

175. ███████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

176.     Benworth FL funded a total of approximately 311,000 PPP loans.  Therefore, at a rate of $550 per PPP loan, Benworth FL agreed to pay Benworth PR more than ***$171 million*** in fees pursuant to the LSAs.  Had Benworth FL instead ███████████████████████████

███████████████████████████████████████████████████

177.     For certain relatively small PPP loans, Benworth FL pays Benworth PR more in fees to service the loans under the LSA than Benworth FL received to fund the loans in the first place.  For example, for making a $1,000 PPP loan, Benworth FL receives $500 in Lender Processing Fees from the SBA, but it pays Benworth PR $550 to service that same loan.  And this is before taking into account the fees Benworth FL agreed to pay Womply.[10] █████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

178.     In addition to the $550 per PPP loan fee, Benworth PR also may be entitled to 65 basis points of the outstanding amount of Benworth FL's PPP loans.  ████████████████

███████████████████████████████████████████████████

---

[10] As discussed above, Benworth FL's agreements with Womply also provide that, for some loans, Benworth FL will owe Womply more in fees than Benworth receives for funding the loan. However, Womply agreed that Benworth FL would never owe Womply more than it received for funding a loan, and Womply's damages claim in the Arbitration is consistent with that approach. By contrast, Mr. Navarro testified that ███████████████████████████████████ █████████████████████████████████████

███████████████████████████████████████████████████████

████████ For the Womply-referred PPP loans, which have a principal amount of approximately $4 billion, this could be up to an additional $26 million in fees paid to Benworth PR.

179. Benworth FL also could receive additional fees for any servicing cancellation by Benworth, or if Benworth PR performs other services outside of the scope of the Agreements. Mr. Navarro testified ██████████████████████████████████████████████ ██████████████████████████

iii) **_Benworth FL_** ████████████████████████████████
███████████████████████████████████

180. ████████████████████████████████████████████████
████████████████████████████

181. ████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████

182. It also establishes ████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

183. It further shows that █████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

184.     On information and belief, Benworth FL has transferred additional funds to Benworth PR for services related to Benworth FL's mortgage loans.

*iv)     **Benworth PR Is Benworth FL's Puerto Rico Office.***

185.     While the Navarros formed Benworth PR as a separate entity, it functions as little more than Benworth FL's San Juan, Puerto Rico office.

186.     Both Benworth FL and Benworth PR engage in the same business.  In the Amended LSA, both Benworth FL and Benworth PR are described as a "mortgage lender/servicer" (Ex. 9 at 1), and ████████████████████████████████████████████████

187.     █████████████████████████████████████████████████████

██████████████████████████████████████████████████████

188.     The website www.benworthcapital.com lists both Benworth FL's Florida address and Benworth PR's Puerto Rico address as points of contact, does not differentiate between Benworth FL and Benworth PR, and refers to Benworth PR as Benworth FL's "office in San Juan, Puerto Rico."

189.     Mr. Navarro's public profile on the website LinkedIn also states:

> Bernie Navarro is Founder and President of Benworth Capital, a Florida-headquartered private equity licensed mortgage lender. Benworth offers hard money loans to purchase, refinance and for second mortgages on properties in Florida.  Established in 2008, the company has grown to become one of the largest private equity lenders in Florida. ***The Company also has offices in Puerto Rico***.

190.     In addition, Benworth FL could have performed all of the LSA PPP Services itself. In fact, before the Navarros formed Benworth PR in June 2021, ████████████████████

███████████████████████████████████████████████████████████

███████████

191.    In a letter to Congress, Benworth FL explained that it conducted a "Transfer Pricing Analysis" in 2022 to determine "what functions were performed by what entity."  That analysis determined that "86 percent of the work to process and service PPP loans was performed" by Benworth PR, and the remaining 14 percent was performed by Benworth FL.

192.    There is no valid reason for Benworth FL to outsource loan servicing to Benworth PR at exorbitant rates, causing Benworth FL to lose money on certain PPP loans, ████████████ ███████████████████████████████████

193.    █████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████

194.    █████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████.

195.    ████████████████████████████████████

196.    █████████████████████████████████████████
█████████████████████████████████████████████████████

197. ███████████████████████████████████

███████████████████████████████████████

██████████████████████████████

198. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████

199. ███████████████████████████████████

████████████████████████

*v)*    ***The Navarros Formed Benworth PR*** ████████████████

200.    In the Arbitration, █████████████████████████████

██████████████████████

201.    In any event, ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

202. ███████████████████████████████████

█████████████████████

203.    At his depositions, ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████

204.    However, Mr. Navarro testified ███████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ The following

excerpt is from Mr. Navarro's deposition:





### vi)   *This Is Not The First Time Mr. Navarro Has Been Accused Of Diverting Assets To Avoid A Judgment.*

205.    In *TotalBank Florida Bank Corp. v. Bernardo Enrique Navarro*, Case No. 2012-012858 (Fla. Cir. Ct. Miami-Dade Cnty.), filed April 2, 2012, a default judgment was entered against Mr. Navarro.  A transcript from a January 29, 2014 hearing in *TotalBank* is attached hereto as Exhibit 10.

206.    In that case, the judgment creditor sought to garnish Mr. Navarro's wages under suspicion that, while Mr. Navarro did not have personal assets sufficient to satisfy the judgment against him, Benworth FL did.

207.    Benworth FL responded to the creditor by claiming it was not indebted to Mr. Navarro in any salary or wages and that it did not possess or control any of his property.

208.    Under oath, Mr. Navarro revealed that Ms. Navarro owned 91% of Benworth FL, while her responsibilities at the company included washing the floors and typing.  (*See* Ex. 10 at 8:5–9:23, 16:3–15.)  ██████████████████████████████████████████ █████████████████████████████████████)

209.    Thereafter, the creditor sought to depose Ms. Navarro, and Mr. Navarro moved for a protective order barring the deposition.  In a hearing on the motion, the court allowed the deposition of Ms. Navarro to go forward, recognizing the creditor's concern that Mr. Navarro's

assets, including his interest in Benworth FL, were "being *diverted to [his] wife*." (*Id.* at 17:20–18:4 (emphasis added), 17:20–19:22.)

**M.      The Arbitrator Grants Womply's Emergency Request To Disclose Confidential Information Obtained Through Discovery To A Court.**

210.     After discovering the Fraudulent Transfer, Womply filed a motion in the Arbitration asking for permission to disclose documents and information it obtained through discovery in the Arbitration, which were covered by a protective order, to a court of competent jurisdiction so that Womply could pursue equitable and/or injunctive relief related to the Fraudulent Transfer (the "**Emergency Request**").

211.     On January 17, 2023, the Arbitrator issued an order granting Womply's Emergency Request.

212.     In the order, the Arbitrator stated:

In its Answer to Demand for Arbitration filed on October 1, 2021, Benworth alleges, in Paragraph 17, that it "has held the disputed fees in trust until its dispute with Womply, including the matter of fraudulent loans, is resolved."

█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████

213.     The Arbitrator also concluded that "an extensive record has been developed concerning ██████████████████████████████████████," and "[a]t the very least, that record raises a triable issue regarding whether ███████████████ ████████████████████████████████████████████ ██████████████████████████████████████."

214.     The Arbitrator then noted that under the arbitration agreement between Benworth

FL and Womply, Womply is permitted "to seek equitable or injunctive relief in a court of

competent jurisdiction relating to ████████████████████████████████████████████████

████████████████████." The Arbitrator then ordered that:

> The Parties shall be permitted to disclose Protected Material (as
> defined in the Stipulated Protective Order approved and adopted on
> January 19, 2022) to a court of law of competent jurisdiction to the
> extent necessary to assert or defend against claims and causes of
> action for equitable or injunctive relief arising from ████████████
> ████████████████████████████████████████████████
> ████████████████████████████████████████████████
> ████████████████████. The parties shall, consistent with
> applicable law, take all reasonable and lawful steps to file the
> Protected Material under seal.

## COUNT I – ACTUAL FRAUDULENT TRANSFER
### (Against Benworth PR and Benworth FL)

215.     Womply hereby incorporates paragraphs 1 through 214 as if fully stated herein.

216.     Benworth FL owes Womply a debt of more than $153 million in fees due under the

Agreements, plus more than $44 million in interest that continues to accrue.

217.     Womply's fees became due in and between May 2021 and August 2021.

218.     ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

219.     ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ In addition, Benworth PR is

effectively the Puerto Rico office of Benworth FL.

220.     ████████████████████████████████████████████████

221. ███████████████████████████████████████████

222. Defendants concealed the Fraudulent Transfer from Womply.

223. Benworth FL made misrepresentations to Womply in order to prevent Womply from discovering the Fraudulent Transfer. Benworth FL represented in the Arbitration that Womply's fees were being held "in trust," ████████████████. ██████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

224. Mr. Navarro and Ms. Navarro formed Benworth PR on June 28, 2021, three days before disclosing to Womply that Benworth FL had not paid all of Womply's fees when due.

225. ████████████████████████████████████████ Womply commenced the Arbitration on August 25, 2021, against Benworth FL seeking payment of the fees due under the Agreements.

226. ████████████████████████████████████████

████

227. ████████████████████████████████████████

228. ████████████████████████████████████████

████████████████████████████████████

229. ████████████████████████████████████████

████

**COUNT II – CONSTRUCTIVE FRAUDULENT TRANSFER**
(Against Benworth PR and Benworth FL)

230. Womply hereby incorporates paragraphs 1 through 229 as if fully stated herein.

231. Benworth FL owes Womply a debt of more than $153 million in fees due under the Agreements, plus more than $44 million in interest that continues to accrue.

232.  Womply's fees became due in and between May 2021 and August 2021.

233.  ████████████████████████████████████████████████

████████████████████████████████████████████████████

234.  ████████████████████████████████████████████████

████████████████████████████████████

235.  ████████████████████████████████████████████████

████████████████████████████████████

236.  ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

237.  ████████████████████████████████████████████████

████████████████████████████████████████████████████

███

238.  Benworth FL made misrepresentations to Womply in order to prevent Womply from discovering the Fraudulent Transfer.  Benworth FL represented in the Arbitration that Womply's fees were being held "in trust," but that was not true. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

239.  Mr. Navarro and Ms. Navarro formed Benworth PR on June 28, 2021, three days before disclosing to Womply that Benworth FL had not paid all of Womply's fees when due.

240.  █████████████████████████████████████████████Womply commenced the Arbitration on August 25, 2021 against Benworth FL seeking payment of the fees due under the Agreements.

**COUNT III – DECLARATORY JUDGMENT – ALTER EGO OR SUCCESSOR**
(Against Benworth PR and Benworth FL)

241.    Womply hereby incorporates paragraphs 1 through 240 as if fully stated herein.

242.    Benworth FL owes Womply a debt of more than $153 million in fees due under the Agreements, plus more than $44 million in interest that continues to accrue.

243.    An actual controversy exists regarding whether Benworth PR is liable for Benworth FL's debt to Womply.

244.    The existence of Benworth PR as a separate legal entity from Benworth FL is a sham.

245.    Benworth PR should be held liable for Benworth FL's debt to Womply, because Benworth PR is the alter ego of Benworth FL and/or because Benworth PR is the successor to Benworth FL.

246.    The facts supporting holding Benworth PR liable for Benworth FL's debt to Womply under alter ego and/or successor liability include but are not limited to:

    a.    Benworth PR was not formed for a reasonable business purpose;

    b.    The Navarros formed Benworth PR on June 28, 2021, after Benworth FL incurred a debt to Womply;

    c.    The Navarros formed Benworth PR for the fraudulent purpose of diverting assets from Benworth FL and leaving Benworth FL undercapitalized and unable to satisfy its debts to Womply;

    d.    Benworth FL █████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████;

e.      Under the LSA Agreements, Benworth FL transferred all of the benefits and liabilities associated with Benworth FL's PPP loan portfolio to Benworth PR, except Benworth FL's liability to Womply;

f.      Benworth FL misrepresented to Womply and the arbitrator in the Arbitration that it was holding Womply's fees "in trust" pending the resolution of the Arbitration;

g.      Benworth PR ████████████████████████;

h.      Benworth PR services Benworth FL's mortgage and PPP loans and provides other services ████████████████████;

i.      Both Benworth PR and Benworth FL are ████████████████ ████████████;

j.      The website www.benworthcapital.com lists both Benworth FL's Florida address and Benworth PR's Puerto Rico address as points of contact, does not differentiate between Benworth FL and Benworth PR, and refers to Benworth PR as Benworth FL's "office in San Juan, Puerto Rico;"

k.      Mr. Navarro's public LinkedIn profile states that "Benworth Capital" is "a Florida-headquartered private equity licensed mortgage lender," and that it "also has offices in Puerto Rico;"

l.      Mr. Navarro ████████████████████████ ████████;

m.      On information and belief, Mr. Navarro ████████████████ ████████ without regard to their independent existence; and

n.   Mr. Navarro .

247.   Declaring that Benworth PR is the alter ego of or successor to Benworth FL is necessary to prevent Womply from being deprived of more than $153 million in fees and $44 million in interest now due and owing under the Agreements.

248.   Womply respectfully requests that the Court declare that:  (i) Benworth PR is the alter ego of and/or the successor to Benworth FL, and (ii) Benworth PR is liable for Benworth FL's debt to Womply.

### COUNT IV – DECLARATORY JUDGMENT – VEIL PIERCING
(Against Bernardo Navarro, Claudia Navarro, and Benworth PR)

249.   Womply hereby incorporates paragraphs 1 through 248 as if fully stated herein.

250.   Benworth FL owes Womply a debt of more than $153 million in fees due under the Agreements, plus more than $44 million in interest that continues to accrue.

251.   An actual controversy exists regarding whether Mr. and Ms. Navarro are personally liable for Benworth PR's debt to Womply and/or for unwinding the Fraudulent Transfer.

252.   To the extent Benworth PR is liable for Benworth FL's debt to Womply, or Benworth PR must unwind the Fraudulent Transfer, and Benworth PR does not have sufficient assets to satisfy the debt or unwind the Fraudulent Transfer, as the case may be, Mr. and Ms. Navarro should be held personally liable for satisfying Benworth PR's obligations in that regard.

253.   The facts supporting holding the Navarros personally liable for Benworth PR's obligations include but are not limited to:

a.   Mr. Navarro has extensive or pervasive control over Benworth PR because:



██████████████████████████████████████████

████████████████████████; (v) █████████████████████████████

████████████████████████████████; (vi) █████████████████████████

████████████████████; and (vii) he is one of two people listed as an authorized person for Benworth PR on the Puerto Rico Registry of Corporations and Entities;

b.    Ms. Navarro has extensive or pervasive control over Benworth PR because she: (i) ██████████████████████████; (ii) ██████████████████████ ████████████; (iii) ██████████████████████████████████ ████████████; (iv) ████████████████████████; (v) █████████████ ████████████; and (vi) is one of two people listed as an authorized person for Benworth PR on the Puerto Rico Registry of Corporations and Entities;

c.    The Navarros have abused Benworth PR's corporate form to perpetrate a fraud against Womply;

d.    Benworth PR was not formed for a reasonable business purpose;

e.    The Navarros formed Benworth PR on June 28, 2021, after Benworth FL incurred a debt to Womply;

f.    The Navarros formed Benworth PR for the fraudulent purpose of ███████ ███████████████████████████████████████████ ██████████████████████████;

g.    Benworth FL ████████████████████████████████████ ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████ ;

h.     Under the LSA Agreements, Benworth FL transferred all of the benefits and liabilities associated with Benworth FL's PPP loan portfolio to Benworth PR, except Benworth FL's liability to Womply;

i.     Benworth PR ██████████████████████████████████ ;

j.     Benworth PR services Benworth FL's mortgage and PPP loans and provides other services █████████████████████████████ ;

k.     Both Benworth PR and Benworth FL ████████████████████ ███████████████ ;

l.     The website www.benworthcapital.com lists both Benworth FL's Florida address and Benworth PR's Puerto Rico address as points of contact, does not differentiate between Benworth FL and Benworth PR, and refers to Benworth PR as Benworth FL's "office in San Juan, Puerto Rico;"

m.     Mr. Navarro's public LinkedIn profile states that "Benworth Capital" is "a Florida-headquartered private equity licensed mortgage lender," and that it "also has offices in Puerto Rico;"

n.     Mr. Navarro ██████████████████████████████████████ ████████████

o.     On information and belief, Mr. Navarro ████████████████████████ ██████████ without regard to their independent existence; and

p.     Mr. Navarro ██████████████████████████████████████ ██ .

254.     To the extent Benworth PR is undercapitalized and/or does not have sufficient funds to fully rescind the Fraudulent Transfer, Benworth PR's corporate fiction should be discarded, the Navarros should be held personally liable for Benworth PR's liabilities by piercing the corporate veil, and the Navarros should be subject to all equitable remedies ordered against Benworth PR.

255.     Womply respectfully requests that the Court declare that, to the extent Benworth PR is liable for Benworth FL's debt to Womply, or Benworth PR must unwind the Fraudulent Transfer, and Benworth PR does not have sufficient assets to satisfy the debt or unwind the Fraudulent Transfer, as the case may be, Mr. and Ms. Navarro are personally liable for satisfying Benworth PR's obligations in that regard.

**PRAYER FOR RELIEF**

256.     WHEREFORE, Womply respectfully requests that the Court enter judgment in Womply's favor and grant the following relief:

a.   Rescission of the Fraudulent Transfer;

b.   Attachment of Defendants' assets;

c.   A declaration that (i) Benworth PR is the alter ego of and/or the successor to Benworth FL, and (ii) Benworth PR is liable for Benworth FL's debt to Womply;

d.   A declaration that, to the extent Benworth PR is liable for Benworth FL's debt to Womply, or Benworth PR must unwind the Fraudulent Transfer, and Benworth PR does not have sufficient assets to satisfy the debt or unwind the Fraudulent Transfer, as the case may be, Mr. and Ms. Navarro are personally liable for satisfying Benworth PR's obligations in that regard;

     e.   An award of Womply's costs of collecting the delinquent Referral Fees, API

          Fees, and Technology Fees, including Womply's attorneys' fees and costs

          in connection with this action; and

     f.   Any other relief the Court deems just and proper.


Dated this 24th day of January, 2023.

                         Respectfully submitted,


*Of Counsel:*                     By: <u>*s/Alejandro J. Cepeda Diaz*</u>

Willkie Farr & Gallagher LLP           *Attorneys for Plaintiff Oto Analytics, Inc.*
                                   *d/b/a Womply*

Alexander L. Cheney (*pro hac vice* pending)
One Front Street                      Alejandro J. Cepeda Diaz
San Francisco, CA 94111             USDC-PR 222110
(415) 858-7400                       McConnell Valdés LLC
acheney@willkie.com                 270 Muñoz Rivera Ave.
                                  Hato Rey PR 00918
Stuart R. Lombardi (*pro hac vice* pending)    Tel: (787) 250-5637
787 7th Avenue                       Email: ajc@mcvpr.com
New York, NY 10019
(212) 728-8000
slombardi@willkie.com

Joshua S. Levy (*pro hac vice* pending)
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000
jlevy@willkie.com