DocuSign Envelope ID: 66726985-8584-4E67-B922-C7A2A51A0330

# JAMS ARBITRATION CASE REFERENCE NO. 1210038203

In the Matter of the Arbitration Between

Oto Analytics d/b/a Womply,

        Claimant,

    and                               FINAL AWARD

Benworth Capital Partners LLC,

        Respondent.

_____

<u>Counsel:</u>

| **Counsel for Claimant:** | **Counsel for Respondent:** |
|---|---|
| Alexander L. Cheney, Esq. | Jorge L. Piedra Esq, |
| Tiffany Lin, Esq. | Michael R. Lorigas, Esq. |
| Mark Stancil, Esq. | Dwayn A. Robinson, Esq. |
| Zoe R. Packman, Esq | Eric S. Kay, Esq. |
| Willkie Farr & Gallagher LLP | Kozyak Tropin Throckmorton |
| One Front St., 34th Floor | 2525 Ponce de Leon Blvd., 9th Floor |
| San Francisco, CA 94111 | Miami, FL 33134 |
| | |
| Daniel L. Morris, Esq. | Simon S. Grille, Esq. |
| Katherine Hanley, Esq. | Daniel C. Girard, Esq. |
| Adriana Morton, Esq. | Girard Sharp |
| Vincent Palmeri, Esq. | 601 California St., Suite 1400 |
| Stuart R. Lombardi, Esq. | San Francisco, CA 94108 |
| Willkie Farr & Gallagher LLP | |
| 787 Seventh Ave. | Martin Teckler, Esq. |
| New York, NY 10019 | Blank Rome LLP |
| | 1825 Eye St., NW |
| Joshua S. Levy, Esq. | Washington DC 20006 |
| Willkie Farr & Gallagher LLP | |
| 1875 K. St, NW | |
| Washington, DC 20006-1238 | |

| **Party Represented:** | **Party Represented:** |
|---|---|
| Oto Analytic, Inc. dba Womply | Benworth Capital Partners, LLC |

**Arbitrator:**

Alexander L. Brainerd, Esq
JAMS
Two Embarcadero Center
Suite 1400
San Francisco, CA 94111

**Place of Arbitration: San Francisco, California**

**Date of Interim Award: December 21, 2023**

**Date of Final Award: May 30, 2024**

**Authority to Arbitrate:** The parties' agreement to arbitrate the various claims, counterclaims and defenses asserted in this Arbitration is set forth in Paragraph 10 of the Amended and Restated PPP Loan Referral Agreement entered into on April 14, 2021.

## I.    INTRODUCTION

During the height of the COVID-19 pandemic, Congress enacted the CARES Act, which directed the United States Small Business Administration (the "SBA") to implement a program through which qualifying applicants could apply for government-guaranteed and potentially forgivable loans from private lenders. The purpose of this program, called the Paycheck Protection Program (the "PPP") was to inject money into American businesses quickly and with few strings attached in order to help businesses survive the economic impact of the pandemic.

In early 2021, during the second year of the PPP, Claimant, Oto Analytics, Inc. d/b/a Womply ("Claimant" or "Womply") developed a technology platform marketed under the name PPP Fast Lane, which allowed relatively small lenders to efficiently review, process, fund, and manage PPP loans. For funding PPP loans, lenders received, among other things: (1) 1% interest on the loans; (2) lender processing fees from the federal government; and (3) a 100% government

guarantee on the loans, meaning they bore no risk that the loans would not be paid so long as the loans satisfied all SBA requirements. Using Womply's technology platform, seven PPP lenders funded billions of dollars of PPP loans in just a few months in 2021.

One of the lenders that contracted to use Womply's technology platform was Respondent Benworth Capital Partners, LLC ("Respondent" or "Benworth"). Benworth is a mortgage lender that originates and services mortgage loans that traditional banks do not underwrite. After COVID hit, Benworth applied to the SBA and was approved to become a PPP lender. It is undisputed that Benworth's profits grew dramatically once it became a PPP lender and began using the technology that Womply provided.

On February 25, 2021, Womply and Benworth entered into two contracts – an Agent Agreement and Womply's Developer Order Form (together, the "February Agreements"). Pursuant to the February Agreements, Womply was to refer PPP loan applications to Benworth that prospective borrowers had completed using Womply's technology platform. Womply also provided Benworth with technology to process and fund a very high volume of PPP loans. On April 14, 2021, Womply and Benworth entered into an Amended and Restated PPP Loan Referral Agreement (the "Referral Agreement") and a new Womply Developer Order Form (the "Order Form) (collectively, the "Agreements"), which incorporated Womply's Master Development Agreement. Those Agreements superseded the earlier agreements.

The Agreements provided for the following payment of fees to Womply in exchange for Benworth's receipt of Womply's services: (1) a 1% Referral Fee[1] for applicant information

---

[1] The Referral Agreement defines "Referral Fees" as follows: "In consideration of Womply providing Lender with Referrals, Lender shall pay to Womply the referral fee set forth in the table below, which is expressed as a percentage of the outstanding balance of the Referred Loan at the time of loan disbursement . . . for each loan originated by Lender under the PPP resulting from a Referral." (JX 123.)

collection and referral services; (2) an Application Programming Interface ("API") Fee; and (3) a tier-based Technology Fee[2] for access to Womply's Technology Services[3] and a lender-specific portal called the Teslar Portal. The Technology Fee was calculated as a percentage of the Lender Processing Fee that Benworth received for funding each PPP loan.

Shortly after the parties began working together, disputes arose as to the proper amounts that Benworth was to pay Womply for its referral and Technology Services. Once the PPP program ended, those disputes continued, and this arbitration ensued.

Specifically, Womply argues that Benworth breached the Agreements by failing to pay Referral Fees, API fees (explained below), and Technology Fees. Benworth contends that it does not owe Womply the fees that it currently seeks, and in fact, is entitled to reimbursement of the fees that it has already paid because: (1) the 1% referral fee cap (the "1% Agent Fee Cap") applies to the totality of the services provided by Womply not just to the Referral Fees; and (2) Womply is a Lender Service Provider; thus, pursuant to the SBA regulations, it should have submitted the parties' Agreements to the SBA, and its failure to do so renders the Agreements illegal and unenforceable as a matter of law. Benworth also contends that it only owed Womply 70% of Benworth's lender processing fees for its Technology Services under the tiered approach in the parties' contract.

## II.     PROCEDURAL HISTORY

On August 25, 2021, pursuant to section 10 of the Referral Agreement, dated April 14, 2021, Womply submitted a Demand for Arbitration to JAMS, asserting the following claims

---

[2] The Referral Agreement defines Technology Fees as "[t]he percentage owed for any Referred Loan . . . determined based on the Referred Loan Tier for that specific loan." (*Id.*) Benworth agreed to pay Womply Technology Fees "for each loan originated by [Benworth] under the PPP resulting from a Referral." (*Id.*)

[3] Technology Services is defined in the parties' Agent Agreement in paragraph 5.b, where an extensive list of eight distinct services is listed.

DocuSign Envelope ID: 66726985-858A-4E67-B932-C7A2A51A0339

against Benworth: (1) Breach of Contract for Failure to Pay Referral Fees; (2) Breach of Contract for Failure to Pay API Fees; and (3) Breach of Contract for Failure to Pay Technology Fees. In its Demand, Womply is seeking at least $151,673,382 in damages, plus interest at a rate of 1.5 percent per month. Womply also asks for an award of attorneys' fees and costs in connection with this arbitration.

On October 1, 2021, Benworth submitted a Response to Womply's Demand. In its Response, Benworth denied all of Womply's claims against it and set forth the following affirmative defenses: (1) Illegality: arguing that Womply is barred from recovering any API fees or Technology Fees because such fees are disguised agent fees that exceed the limits established by the SBA Administrator in the Interim Final Rule; (2) Setoff: arguing that any damages award should be reduced by all amounts Benworth provided Womply in excess of its legal contractual obligations (*i.e.*, any amounts Benworth paid Womply for API and Technology Fees); (3) Failure of Condition Precedent: arguing that Womply is barred from recovering any Referral Fees to the extent that Benworth has not received the corresponding Lender Fees from the SBA; and (4) Promissory Fraud: arguing that Womply is barred, in whole or in part, from recovering outstanding Referral Fees because Womply promised Benworth that it would materially improve its technology platform to reduce the risk of loss but did not, in fact, intend to honor that promise when it was made.

On February 6, 2023, after the Arbitrator ordered Benworth to either (1) produce certain SBA emails and its list of fraudulent loans to Womply, or (2) notify Womply and the Arbitrator whether it intends to withhold any of these documents based on the discretion of the SBA and whether it would dismiss or continue to pursue its Promissory Fraud affirmative defense. Benworth voluntarily dismissed its Promissory Fraud affirmative defense, without prejudice, Benworth also

abandoned its Failure of Condition Precedent affirmative defense in this arbitration. That defense was never litigated or argued at any point during these proceedings.

In its Response, Benworth also submitted various counterclaims against Womply, including claims for (1) Declaratory Relief;[4] (2) Breach of Contract;[5] (3) Severance and Enforcement;[6] and (4) Money Had and Money Received.[7] In addition to damages and declaratory relief, Benworth seeks pre- and post-judgment interest as well as attorneys' fees, costs, and expenses associated with these arbitral proceedings. Womply denied all material allegations of those counterclaims on October 15, 2021, and it raised various affirmative defenses.

On January 19, 2022, the Arbitrator signed and issued the parties' Joint Stipulated Protective Order. The Arbitrator also ruled on various discovery motions as part of the pre-Hearing proceedings. In addition to ruling on the discovery motions, the Arbitrator made the following rulings, among others: denied Womply's request to submit a Motion for Summary Disposition; granted Benworth's Motion to Disqualify Expert William M. Manger, Jr. ("Manger") to the extent

---

[4] In its request for Declaratory Relief, Benworth seeks a determination and declaration (i) that the provisions of the Order Form and Master Developer Agreement requiring payment of API fees, Technology Fees, and default interest thereon are illegal, void, and unenforceable against Benworth as a matter of law and therefore should be severed from the remainder of the Order Form and Master Developer Agreement; (ii) that Benworth is entitled to obtain a return of all payments received by Womply under the Order Form and Master Developer Agreement; (iii) that Benworth is not obligated to pay Womply any allegedly outstanding API fees or Technology Fees under the Order Form and Master Developer Agreement; and (iv) that Womply is obligated to promptly reinstate Benworth's access to Womply technology platform or otherwise transmit electronic copies of borrowers' loan files.

[5] Benworth's Breach of Contract cause of action asserts that Womply materially breached the Order Form by retaining the Technology Fees and demanding additional Technology Fees from Benworth in this Arbitration.

[6] In this counterclaim, Benworth asserts that the API fee and the Technology Fee provisions of the Order Form are void, and its remaining provisions are valid, and that the API fee and the Technology Fee provisions are accordingly severable and the Order Form enforceable as to its remaining provisions. Thus, according to Benworth, enforcement of the remaining provisions of the Order Form eliminates Womply's entitlement to any API fees and any Technology Fees, and mandates that Womply return all such fees it was paid by Benworth pursuant to those invalid provisions.

[7] Pursuant to this counterclaim, Benworth asserts that because Womply obtained money that belongs to Benworth improperly and without lawful entitlement based on a provision void for illegality, Womply's retention of the money would be inequitable and result in unjust enrichment. Benworth claims that Womply is consequently required to return the money to Benworth, with Womply owing Benworth in excess of $420,000,000.00.

that Womply wanted Manger to give a legal opinion on how to apply the SBA regulations, but allowed Manger to testify about the history of the PPP program and regulatory scheme; granted Womply's Motion to Exclude Seaborn Testimony insofar as Benworth wanted Seaborn to testify in her official capacity at the SBA since Seaborn had not been disclosed by Benworth as an expert; and denied Benworth's Motion for a Continuance. The Arbitrator also denied Benworth's Motion to Admit Congressional Report, concluding that, while the existence of the report is in the record, the content of the report is "rank hearsay" and does not fall within any of the hearsay exceptions asserted by Benworth. The history of these rulings is reflected in the case history located in JAMS Access.

A seven-day in-person evidentiary hearing ("the Hearing") was held before the Arbitrator at the San Francisco office of JAMS on March 20, 21, 22, 23, 24, 27, and 28, 2023. At the Hearing, Womply was represented by counsel Alex Cheney, Joshua Levy, Katherine Hanley, Stuart Lombardi, and Daniel Morris of the law firm Willkie Farr & Gallagher LLP. Benworth was represented by counsel Dwayne Robinson, Jorge Piedra, and Michael Lorigas of the law firm of Kozyak Tropin & Throckmorton. The following witnesses testified at the arbitration Hearing:

(1) William Manger, Jr., expert for Womply;

(2) Tony Scammell, founder of Womply;

(3) Cory Capoccia, Chief Business Development Officer and former President at Womply;

(4) Thom Keyes, Director of Finance at Womply;

(5) Bernardo Navarro, President of Benworth;

(6) Maria Victoria de la Cruz Muelle, Operations Manager at Benworth.

DocuSign Envelope ID: 66726985-858A-4E67-B932-C7A3A51A0330

Multiple exhibits were also introduced and admitted into evidence at the Hearing. Virtual closing arguments took place on June 29, 2023, starting at 9:30 a.m. PDT. All of these proceedings were transcribed by a court reporter, and the closing arguments were also recorded.

On May 12, 2023, the parties submitted post-Hearing briefs. Reply briefs were submitted on May 31, 2023. On June 29, 2023, a Hearing was held via Zoom, at which time the parties presented closing oral arguments. In conjunction with that Hearing, the parties provided copies of the slides they used to support their arguments and a Joint Compendium of SBA Rules and Regulations.

The Arbitrator, having heard and considered the oral and documentary evidence submitted at the Hearing, heard and considered counsel's arguments at the Hearing, read and considered the parties' arguments in their briefs, and conducted the legal research necessary for proper resolution of this matter, including a detailed analysis of the parties' contracts and the SBA rules and regulations incorporated therein, hereby issues the following Final Award.

## III.    SUMMARY OF RELEVANT LAWS, REGULATIONS, AND RULES

The Agreements at issue in this matter specifically provide that California law and the SBA regulations apply herein, and in case of conflict, the SBA regulations shall control. The relevant SBA regulations that provide the regulatory framework for this case are summarized below.

A.  Overall Structure of Regulations

In response to the COVID-19 pandemic, Congress passed legislation creating the PPP, which allowed eligible small businesses to apply for low-interest loans under the framework of the SBA's preexisting small-business lending program under Section 7(a) of the Small Business Act, 15 U.S.C. § 636(a) ("Section 7(a)"). The PPP was designed to fund expenses such as payroll costs, rent, interest, and utilities.  PPP loans were made first from April 3, 2020 to August 8, 2020 ("PPP

Year One"), and again from January 11, 2021 to June 30, 2021 ("PPP Year Two").  The PPP was created and governed by a patchwork of federal laws and SBA regulations, rules, and guidance. Such guidance included SBA Standard Operating Procedures (the SBA "SOP"), a nearly 600-page document containing policies and procedures governing the PPP.

Under SBA regulations, PPP loans could be partially or fully forgiven if a borrower spent the loan money in accordance with the program requirements.  (JX022; JX013.)  The loans were 100% guaranteed by the SBA (*id.*), so long as the loans complied with all SBA regulations and requirements.  In addition, lenders received interest on funded loans at a rate of 1%. (JX013.) Lenders also received Lender Processing Fees for each funded loan.  For funding a PPP loan of $50,000 or less during PPP Year One, a lender would receive a Lender Processing Fee equal to 5% of the loan's principal amount. In December 2020, Congress increased the Lender Processing Fees a lender would receive for funding relatively small PPP loans.  Specifically, for funding a PPP loan of $50,000 or less in PPP Year Two, a lender would receive a Lender Processing Fee equal to the lesser of $2,500 or 50% of the loan amount. (JX022.)

B.   The 1% Agent Fee Cap

In the CARES Act, which was signed into law on March 27, 2020, the SBA recognized that small businesses applying for Section 7(a) loans, and lenders that make those loans, sometimes engage the services of various types of "Agents" and other service providers.  SBA regulations define "Agent" as "an authorized representative, including an attorney, accountant, consultant, packager, lender service provider, or any other person representing an Applicant or Participant by conducting business with SBA."  (13 C.F.R. § 103.1(a); *see also id.* § 103.1(b)(2) (defining "conduct business with SBA" as "[p]reparing or processing on behalf of a lender or a participant in any of SBA's programs an application for federal financial assistance . . . .").)  SBA regulations

separately define "Referral Agent" as "a person or entity who identifies and refers an Applicant to a lender or a lender to an Applicant." (*Id.* § 103.1(f).)

Congress empowered the SBA to "establish[]" "limits" on fees that Agents could collect for "assist[ing] an eligible recipient"—i.e., a borrower—"to prepare an application for a [PPP] loan." (CARES Act § 1102(a)(2), 134 Stat. at 293 (codified as amended at 15 U.S.C. § 636(a)(36)(P)(ii)).) Thus, in PPP Year One, the SBA issued three rules regarding fees an Agent charges for assisting a borrower: (i) Agent fees must be paid by the lender out of its Lender Processing Fees, (ii) Agent fees may not be paid by the borrower or out of PPP loan proceeds, and (iii) the fees that "[a]n agent who assists a borrower" could collect for providing "assistance in preparing an application for a PPP loan (including referral to the lender)" are limited to 1% of a PPP loan for loans of $350,000 or less (the "1% Agent Fee Cap"). (JX013.) Specifically, the April 2020 PPP Rule states in relevant part:

> Who pays the fee to an agent who assists a borrower? Agent fees will be paid by the lender out of the fees the lender receives from SBA. Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed: . . . [o]ne (1) percent for loans of not more than $350,000 . . . .

(*Id.* (emphasis added).)

The SBA also explained that the 1% Agent Fee Cap for "assistance in preparing an application for a PPP loan (including referral to the lender)" was "reasonable based upon the application requirements and the fees that lenders receive for making PPP loans." (*Id.*)

In light of some confusion that arose regarding these payments, and more specifically, which entity was required to pay, on December 20, 2021, Congress, in the Economic Aid Act, amended Section 7(a)(36)(P)(ii). which, as discussed above, gave the Administrator of the SBA

the power to limit an Agent's fees for assisting an "eligible recipient" (*i.e.,* a borrower), to add the text below:

> An agent that assists an eligible recipient to prepare an application for a covered loan may not collect a fee in excess of the limits established by the Administrator. If an eligible recipient has knowingly retained an agent, such fees shall be paid by the eligible recipient and may not be paid out of the proceeds of a covered loan. A lender shall only be responsible for paying fees to an agent for services for which the lender directly contracts with the agent. (Economic Aid Act § 340(b)(1), 134 Stat. at 2050 (codified at 15 U.S.C. § 636(a)(36)(P)(ii).) Thus, as amended by the Economic Aid Act, Section 7(a)(36)(P)(ii) made two changes to the legal framework governing the fees of Agents assisting borrowers. First, Congress abandoned the restriction on Agents collecting fees from borrowers and, instead, allowed borrower Agents to collect fees from borrowers who "knowingly" procured Agent services. Second, Congress made clear that lenders did not have a statutory or regulatory obligation to pay an Agent's fees for assisting a borrower; instead, lenders would be responsible for such fees only if they expressly agreed to pay them. The SBA maintained the 1% Agent Fee Cap on fees for an Agent who provides a borrower with "assistance in preparing an application for a PPP loan (including referral to the lender)," and it again stated that this cap was "reasonable based upon the application requirements and the fees that lenders receive for making PPP loans." (JX022 at 18-19.)

Under no statute or regulation has Congress or the SBA limited fees that an Agent or other service provider can charge for services provided to a lender. For example, the SBA does not limit the fees that a technology service provider charges for providing technology services to a lender. The SBA defines these "technology services fees" to include "[t]he costs or fees for software or technology used in connection with preparing SBA loan documents . . . or closing the SBA-guaranteed loan," "[a]cquisition costs or fees for licensing software or software platforms to 7(a) Lenders solely for the purpose of performing administrative functions (not including underwriting functions), such as generating SBA-required forms," and "[f]ees associated with entities that develop systems or lending platforms to automate the 7(a) Lender's internal loan decision making process." (JX019 at 179.)

In addition, the SBA does not limit the fees that a Lender Service Provider ("LSP") can collect from a lender for providing the lender with LSP services.[8] As discussed in greater detail in the next section, an Agent (including a technology service provider) can be an LSP if it performs certain lender functions for a lender, such as underwriting. (JX008 (13 C.F.R. § 103.1(d) (defining LSP as "an Agent who carries out lender functions in originating, disbursing, servicing, or liquidating a specific SBA business loan or loan portfolio for compensation from the lender"); JX019 at 179 ("Entities providing technology services that include underwriting are considered to be LSPs").) If an LSP helps a borrower prepare an application for a PPP loan and refers the borrower to a lender, the fees the LSP collects for those application preparation and referral services are subject to the 1% Agent Fee Cap, but any other fees it collects for providing LSP services to the lender are not subject to the 1% Agent Fee Cap pursuant to any rule or statute. Indeed, the SBA "expects 7(a) Lenders and LSPs to negotiate the terms of the contract to meet the needs of the 7(a) Lender" (JX019 at 186), and lenders have "reasonable discretion in setting compensation for [LSPs]." (JX333 (13 C.F.R. §103.5(c).)

Finally, the SBA SOP devoted seven pages to explaining the fees an Agent or lender can collect from a borrower, but nowhere in the SOP are there limits set on the fees an Agent can collect from the lender for providing services to the lender. (*See* JX019 at 176–81, 195–96.) Thus, in summary, for PPP Year Two, the only Agent fees that are limited by the laws, regulations, and rules applicable to the PPP are the fees any Agent (including an LSP) collects (either from a lender or borrower) for providing a borrower with "assistance in preparing an application for a PPP loan (including referral to the lender)." (JX022 at 3, 7, 9-10.) This 1% Agent Fee Cap does not apply

---

[8] As will be discussed in more detail below, the SBA regulations define an LSP as "an Agent who carries out lender functions in originating, disbursing, servicing, or liquidating a specific SBA business loan or loan portfolio for compensation from the lender." (*Id.* § 103.1(d).)

to any other fees an Agent collects for providing any other services—either to a borrower or a lender. (*See Oto Analytics, Inc. v. Capital Plus Fin., LLC*, 2022 WL 1488441, at *9–10 (N.D. Tex. May 11, 2022) ("The 1% Agent Fee Cap] limits the fee for 'preparing an application for a PPP loan,' but not for any other reason."). The fees an LSP or other Agent collects for providing a lender with LSP or other Agent services (including underwriting), or the fees a technology service provider collects for providing a lender with technology services, are not capped by any law, regulation, or rule.

C.   Lender Service Providers

SBA regulations define an LSP as "an Agent who carries out lender functions in originating, disbursing, servicing, or liquidating a specific SBA business loan or loan portfolio for compensation from the lender." (JX008, § 103.1(d)*.)* The SBA SOPs also offer a non-exhaustive list of lender service providers, such as:

i.   An individual or entity engaged by a 7(a) Lender to provide services for the purposes of obtaining Federal financial assistance that include interaction with the Applicant either in person or through the use of technology, to request or obtain eligibility and/or financial information that will be provided to the 7(a) Lender. This includes Agents who:

  a.  Perform any pre-qualification review based on SBA's eligibility and credit criteria . . . prior to submitting the Applicant's information to the 7(a) Lender; or

  b.  Provide to the 7(a) Lender an underwritten application, whether through the use of technology or otherwise.

ii.    Entities providing technology services to a 7(a) Lender that include underwriting.[9]

iii.    An individual or entity generates a significant number of 7(a) Lender's loan originations. As a general rule, SBA considers a "significant number" to be two-thirds (66%) or more of the 7(a) Lender's loan originations for the prior 12 months.

(JX019 at 184-85.)

Lenders "are responsible for the actions of their LSPs" (JX019 at 187), and lenders "must be able to demonstrate that [the lender] exercises day-to-day responsibility for evaluating, processing, closing, disbursing, servicing, liquidating, and litigating its SBA portfolio" (*id*. at 184). Similarly, LSP agreements must include certain borrower-protection provisions. (*See, e.g., id.* at 186–87 (requiring LSP agreements to "describe the specific parameters governing the LSP's access to" SBA borrower payments and to "state that all compensation paid to the LSP will be paid by the 7(a) Lender").) And "Lenders must submit each LSP agreement" to the SBA "for review." (*Id.* at 184 ("All participating Lenders must submit each LSP agreement to the [SBA's Loan Guaranty Processing Center (LGPC)] for review").) Federal regulations provide that "any Lender Service Provider must execute and provide to SBA a Lender Service Provider agreement" for the SBA to

---

[9] Underwriting, in the traditional sense, is the process of assessing and taking on a financial risk, such as a loan, in return for a fee. (*See, e.g., Whitman v. State Farm Ins. Co.*, 2022 WL 4081916, at *5 n.7 (W.D. Wash. Sept. 6, 2022) (collecting sources); *see also* Underwrite, Webster's Third New International Dictionary, Unabridged (3rd ed. 1961) ("Webster's Unabridged") ("to put up funds for or guarantee financial support of"). In the context of PPP loans, however, because the purpose of the PPP was to get money to struggling businesses quickly, and the loans were guaranteed and potentially forgivable, lenders did not have to evaluate credit risk, or the financial risk associated with making a loan under the PPP. Instead, in the April 2020 PPP Rule, the SBA provided that a lender's obligations before underwriting a loan were relatively limited. (JX013.) Before underwriting a PPP loan, all a lender was required to do was (i) review the borrower's "Paycheck Protection Application Form" and confirm receipt of the certifications contained therein, (ii) "[c]onfirm receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020," (iii) review the borrower's payroll documentation and confirm the borrower's average monthly payroll costs for the preceding year, and (iv) follow applicable Bank Secrecy Act requirements. (*Id.*) While Womply provided Benworth with technology that to some extent automated and assisted Benworth with these functions, Womply did not conduct the good faith review or participate in the decision to fund and submit the loan to the SBA for approval, which were the underwriting activities necessary to make the loan.

review and approve.  (JX333 (13 CFR § 103.5(a), (c)).)  However, lenders "are responsible for the actions of their LSPs." (JX019 at 184, 186–87.) The 2020 SOP states that "[a]An LSP may only receive compensation from the 7(a) Lender for services provided under an SBA-reviewed LSP Agreement. Such charges must not be passed on to the Applicant or paid out of the SBA-guaranteed loan proceeds." (*Id*. at 185-87.)

  D. <u>Technology Service Providers</u>

  The SBA recognizes that lenders may contract with technology service providers, which the SBA treats differently from "Agents."  The SBA SOP states repeatedly that the "SBA does not consider entities providing technology services that do not include underwriting to be Agents." (*Id*. at 179, 185, 194 (emphasis added).)

<b>IV. SUMMARY OF FACTS[10]</b>

  A. <u>The PPP Program</u>

  As noted above, in 2020 and 2021, during the height of the COVID-19 pandemic, Congress passed legislation that provided for the SBA to implement a program through which qualifying applicants could apply for government-guaranteed and potentially forgivable loans from private lenders. This program – the PPP – was intended to inject money into American businesses quickly and with few strings attached in order to help businesses survive the economic impact of the pandemic. Pursuant to its mandate, the SBA promulgated various Interim and Final Rules applying to the PPP program. These rules were changed and/or updated from 2020 to 2021. Specifically, in 2021, Congress amended the Economic Aid Act to allow borrower Agents to collect fees from

---

[10] The factual recitation that follows is necessary to this Final Award. It is derived from admissions in the pleadings and the testimony and evidentiary exhibits presented at the Hearing. To the extent that any of this recitation differs from any party's position, that is the result of determinations by the Arbitrator as to credibility and relevance, burden of proof considerations, legal principles, and the weighing of the evidence, both oral and written.

borrowers who "knowingly" procured Agent services, and it clarified that lenders did not have a statutory or regulatory obligation to pay an Agent's fees for assisting a borrower, and instead left it to the lender and Agent to decide whether or not to agree by contract to such fees.

Notably, the Economic Aid Act did not alter the 1% Agent Fee Cap for agents who assist borrowers in preparing an application for a PPP loan and referring the loan application to a lender. Moreover, nothing in the Act suggested that the SBA intended to expand the 1% Agent Fee Cap to fees that Agents or service providers collect for providing other services to lenders.

B. <u>Womply</u>

Womply was a technology company that delivered software and tools to small businesses to help with marketing, customer management, and business management. In 2020, during PPP Year One, Womply released a free website that connected businesses seeking a PPP loan to PPP lenders, and several lenders agreed to pay Womply for this referral-only service.

In early 2021, during PPP Year Two, Womply created a new technology solution known as PPP Fast Lane. Womply's founder and CEO, Toby Scammell ("Scammell") testified at the Hearing that Womply developed PPP Fast Lane in early 2021 to "solve the key problem" of PPP lenders lacking "technology to process at scale [] very small loans" for small businesses. Womply's PPP Fast Lane thus provided lenders "with the technology necessary to take [PPP] applications and all of the associated information" and to allow lenders to "process it and do their underwriting in a much more efficient and scalable manner." (Tr., Scammell, 317:9-24.)

C. <u>Benworth</u>

Benworth is a mortgage lender that originates and services mortgage loans that traditional banks do not underwrite. After COVID hit, Benworth applied to the SBA to become a PPP lender, and in April 2020, Benworth's application to become a PPP lender was approved. ██████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

D.   The Parties' Relationship and Their Contracts

In February 2021, during PPP Year Two, Benworth and Womply were introduced by a mutual business connection. The two companies decided to enter into a business relationship. On February 25, 2021, Womply and Benworth entered into the Agent Agreement and Womply Developer Order Form (*i.e.*, the February Agreements).  (JX035 (2/25/21 Email from B. Navarro to C. Capoccia).) Pursuant to these agreements, Womply was to refer PPP loan application packages that had been prepared using Womply's technology platform to Benworth and provide an array of technology services. (*Id.*)

Specifically, the Agent Agreement says Womply will provide both "Processing Services" and "Technology Services." As to Processing Services, Womply agreed to the following:

• "Assisting each loan applicant in responding to questions about its eligibility under the PPP," (*id.*, § 5(a)(ii));

• "Providing loan applicants a technology platform that offers the Technology Services (defined below)," (*id.*, § 5(a)(ii));

17

• "Coordinating the collection and review of required due diligence documentation under the PPP . . . including documentation necessary for Lender to comply with application KYC/AML/BSA[1] Laws,"(*id.*, § 5(a)(iii));

• "Communicating with loan applicants regarding loan applications process and status, including without limitation SBA rejections, and responding to loan applicant questions in connection therewith," (*id.*, § 5(a)(v)); and

• "Assisting Lender with the preparation and submission to the SBA of any reporting or documentation with respect to Included Loans, as required by SBA Regulations,"( *id.*, § 5(a)(vii).)

As to Technology Services, Womply agreed to "make available to Lender and loan applicants a technology platform," (*id.*, §5(b)), that conducted the following services (among others):

• "Providing loan applicants" "a technology platform into which loan applicants can input information necessary to complete its applicable borrower application for the PPP," (*id.*, § 5(b)(i));

• "Ensuring the collection of all certifications, documentation and other information necessary to complete the borrower application form and such other forms or documents as the SBA may require in connection with the origination of Loans under the PPP," (*id.*, § 5(b)(ii)); and

• "Submitting on Lender's behalf each borrower application through the SBA Paycheck Protection Program, or such other online platform as the SBA may designate for transmitting data to the SBA[,]" (*id.*, § 5(b)(x).)

The second round of PPP funding was set to expire on March 31, 2021. Congress extended that deadline to May 31, 2021. Around this time, Womply began communicating with its lawyers about its agreement with Benworth and drafted new agreements. This was about the same time that Womply referred its first batch of PPP loan applications to Benworth. Benworth contends that it initially experienced numerous issues with Womply's technology platform, which delayed or prevented it from funding PPP loans. These purported issues are not germane to this Arbitration.

On April 14, 2021, Womply and Benworth entered into the Referral Agreement and the Order Form, which incorporated Womply's Master Development Agreement (*i.e.*, the Agreements). (JX103 (Referral Agreement); JX123 (4/15/21 email from C. Capoccia to B.

18

Navarro attaching Order Form); JX339 (Womply Master Developer Agreement).)   The Agreements, which were executed in April 2021, superseded the February Agreements, although they encompassed much of the same material but more accurately described Womply's services. (JX103; JX123.)

The Referral Agreement states that "[Benworth] and Womply specifically acknowledge that [Benworth] retains ultimate responsibility for all loan decisions, including approvals, underwriting, closings, disbursements, due diligence, and loan servicing actions . . . ." (JX103.) Section 1.2 of the Referral Agreement also states:

> WOMPLY MAKES NO REPRESENTATIONS OR WARRANTIES ABOUT, AND HEREBY DISCLAIMS ALL RESPONSIBILITY FOR, THE ACCURACY, LAWFULNESS, OR COMPLETENESS OF ANY INFORMATION ACCOMPANYING A REFERRAL. FOR THE AVOIDANCE OF DOUBT, WOMPLY DOES NOT ENDORSE ANY REFERRAL.   [BENWORTH] ASSUMES SOLE RESPONSIBILITY REGARDING WHETHER OR NOT ANY REFERRAL IS OR SHOULD BE SENT TO THE SBA FOR REVIEW.

(*Id.* at JX103.1 § 1.2 (capital letters in original).)  A nearly identical provision is located in Section 1.1 of the Order Form.  (JX123.)  In addition, both the Referral Agreement and the Order Form expressly provide that "Womply is not a . . . lender service provider as defined by the SBA."[11] (JX103; JX123.)  The Agreements also expressly adopted SBA regulations. (*Id.*) The Agreements were never submitted to the SBA for approval, the import of which is heavily contested in this Arbitration and will be addressed below.

The Agreements also provide that, in exchange for Womply's services, Benworth would pay Womply the following fees.

---

[11] As noted above, a lender service provider is defined as: "an Agent who carries out lender functions in originating, disbursing, servicing, or liquidating a specific SBA business loan or loan portfolio for compensation from the lender." (JX008 (13 C.F.R. § 103.1(d).)

## 1. Fees under the Referral Agreement

Pursuant to the Referral Agreement, Benworth agreed to pay Womply a 1% Referral Fee for applicant information collection and referral services. Specifically, the Referral Agreement provides that "Womply may . . . refer to [Benworth] such PPP loan applicants as Womply shall, in its sole and absolute discretion, deem appropriate (each such applicant a 'Referral')." (JX103, § 1.1.) Womply identified the referred loan applicants via its Fast Lane platform, which allowed borrowers to answer question prompts pertaining to SBA loan application questions and to upload or attach documents. In exchange for Womply's referral services, Benworth agreed to pay Womply a Referral Fee equal to 1% of the amount of each Womply-referred PPP loan that the SBA approved and Benworth ultimately funded. (*Id*. § 2.2.) This Referral Fee was only paid for those PPP loans where Womply was "the first to submit a complete package" to Benworth. (*Id* § 1.1.)

## 2. Fees under the Order Form – API fees and Technology Fees

Pursuant to the separately executed Order Form, Benworth agreed to pay Womply an Application Programming Interface ("API") fee (the "API fee") and a tier-based Technology Fee for access to Womply's technology services and the Teslar Portal. Specifically, pursuant to the separate Order Form, Womply agreed to provide Benworth with its "API Package,"[12] which included access to the Teslar Portal and the technology platform's numerous integrated technology services. (JX123.) These services include "integrations with and/or links to certain third-party service providers (including . . . Plaid, Docusign, LexisNexis, Teslar, Inscribe, Ocrolus, AWS

---

[12] In the Master Development Agreement, the API Package is defined as the "the package of application programming interface materials provided by Womply . . . solely as necessary to make an application owned and operated by the Client . . . interoperate with the Womply service described on womply.com . . . ." (JX 339.) The April 14, 2021 Womply Developer Order Form lists the following as part of the API Package that Womply was to provide to Benworth: tax documents, business fraud analytics, bank data, identity, account verification, and PPP Portfolio Management System. The API fee, which the agreements do not explicitly define, is the fee Benworth was to pay Womply for the API Package (*i.e.* "$250 per funded PPP loan sourced through" Womply's services). (Tr. 13 [Work Order Form].)

DocuSign Envelope ID: 66726985-858A-4E67-B933-C7A30F1A0330

Mechanical Turk, Mindee, Persona, Twilio, Sendgrid, etc.) ('Third-Party Providers')." (*Id.*, § 1.2.)
In exchange for this API Package, Benworth agreed to pay Womply API and Technology Fees for
each funded PPP loan that Benworth originated and processed using Womply's technology
platform. (*Id.*, § 2.) The API fee was a flat $250 fee for each funded PPP loan. (*Id.* at JX123.13.)

The Technology Fee was calculated as a percentage of the Lender Processing Fee that
Benworth received for funding each PPP loan, as reflected in the table below. (*Id.* at JX123.14 §
2.)

| Tier | Referred Loan Tiers | Technology Fee Percentage |
|------|--------------------|---------------------------|
| 1 | 1 through 30,000 Referred Loans | 50% of the Lender Processing Fee for each Referred Loan |
| 2 | 30,001 through 45,000 Referred Loans | 60% of the Lender Processing Fee for each Referred Loan |
| 3 | 45,001 through 60,000 Referred Loans | 70% of the Lender Processing Fee for each Referred Loan |
| 4 | 60,001 through 300,000 Referred Loans | 80% of the Lender Processing Fee for each Referred Loan |
| 5 | Greater than 300,000 Referred Loans | 70% of the Lender Processing Fee for each Referred Loan |

The Order Form specifies that "[Benworth] shall pay Womply the technology fees
described" in the table above "for each loan originated by [Benworth] under the PPP resulting from
a Referral," and that "the max percentage applies to Referred Loans funded prior to achieving the
Referred Loan Volume." (*Id.* at JX123.14 § 2.1.) Under Section 2.2 of the Order Form, Benworth
is entitled to a credit for Referral Fees paid to Womply. (*Id.* at JX123.14 § 2.2 ("Technology Fee
payable to Womply for any Referred Loan shall be reduced by any Referral Fee paid to Womply
in respect of such Referred Loan").) Further, pursuant to the Order Form, "where the Lender
Processing Fee for a given Referred Loan is two-hundred and fifty dollars ($250) or less . . . [t]here

will be no Technology Fee due from [Benworth] to Womply," and "[s]uch Referred Loans will be disregarded when calculating the Referred Loan Tiers" above. (*Id.* §§ 2.1–2.2.)

        3.  <u>Other Fees</u>

Benworth also agreed to pay Womply interest and its cost of collection if it failed to timely pay Womply's fees. The Referral Agreement states that Referral Fee payments not timely made "are subject to a finance charge of 1.5% per month or the maximum permitted by law, whichever is lower, plus all costs of collection." (JX103.)  Similarly, the Master Developer Agreement says that late payments "are subject to a finance charge of 1.5% per month or the maximum permitted by law, whichever is lower, plus all expenses of collection."  (JX339.)   Benworth also agreed to pay Womply its cost of collecting delinquent fees and interest.  (JX103; JX103.; 2.4; JX339.) Pursuant to the Order Form, Womply was required to return to Benworth any Technology Fees that "the SBA or governmental agency determines were not in compliance with applicable SBA and/or PPP Loan Program Requirements." (JX123, §2.3.)

The Agreements did not obligate Benworth to process and fund loans referred by Womply. If Benworth believed it would not make enough money by funding a particular PPP loan or through its underwriting it rejected the loan, Benworth was not obligated to submit a loan to the SBA for approval and funding. But in PPP Year Two, using Womply's Technology Platform, Benworth was able to fund 304,897 PPP loans with a total principal amount of $4,022,951,398. Without Womply's technology platform, Benworth would have had to manage and track all its PPP loans manually.

      E.  <u>Womply's Technology</u>

        1.  <u>Borrower-Facing Technology</u>

Womply's borrower-facing website (Womply's "Borrower Portal") allowed a prospective

DocuSign Envelope ID: 66726985-858A-4E67-B933-C7A30F1A0380

applicant to enter the necessary information to populate the SBA required application form for a PPP loan and to provide the documentation or certifications lenders used to evaluate each application. Womply's Borrower Portal allowed a borrower to do this from a cell phone. For example, SBA rules required PPP loan applicants to submit their name, phone number, address, and Social Security number (or Employment Identification Number) to a PPP lender, and the SBA's PPP loan form required applicants to provide average monthly payroll, number of employees, and certain other information. (JX061; JX013.) Womply's Borrower Portal allowed an applicant to submit this information to a lender.

Womply's Borrower Portal also permitted applicants to provide information and upload documentation that was not necessarily required for a PPP loan application but that lenders considered in underwriting loans. For example, the Borrower Portal required borrowers to upload a photo of a government issued ID and certain tax filings. (Tr., Scammell 334:21-335:24.) Applicants were also required to take and upload a "selfie" photo and could connect their bank account to PPP Fast Lane. (Tr., Scammell, 400:3-401:13; JX 370 at JX370.11, 16-17.; Tr. 368:16-369:22, 371:5-20; JX 338 at 36-44.)

Womply did not determine an applicant's eligibility for a loan, and it communicated this directly to applicants. (Tr., Scammell, 339:18-340:3, 341:21-342:20; JX123 at JX123.9 § 1.2, JX 123.14 § 1.1; JX338 ("Womply makes no representations regarding your eligibility or ineligibility for a PPP loan").) Applicants continued to have access to the Borrower Portal after submitting their documentation and information, which allowed them to, among other things, monitor the status of their applications and securely provide additional information to lenders. Womply did not charge applicants any fees.

2. <u>Womply's Technology Platform</u>

Tools integrated into Womply's technology platform performed various services to assist lenders with their processing and consideration of applicant information. These tools helped "lenders do their jobs faster and more efficiently." (Tr., Scammell, 317:25-318:7.) Among other things, these tools verified applicant information, extracted data from and analyzed documents uploaded by borrowers, and generated reports regarding applicant information and documents for lenders to review when making underwriting decisions. ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████

Many of these services were performed using technology from third-party service providers that were linked to or integrated into Womply's technology platform, and Womply paid these third-party service providers for their technology.  For example, Womply's technology verified email addresses using SendGrid, it verified phone numbers using Twilio, it verified the existence of addresses using Google Maps, it verified identity using Persona, it analyzed and extracted data from documents using Inscribe, Mindee, and Ocrolus, and it connected to bank accounts using Plaid. (Tr., Scammell, 337:2-25, 344:1-345:1, 350:1-351:25, 359:14-360:5, 398:17-399:20, 401:1-16, 353:12-355:5.) Womply's technology also "extracted the necessary data from [the tax documents] and summarized that data . . . so that it was readily available inside of [the]

Teslar [Portal]" for the lender to review, saving lenders from having to manually confirm that data with the applicants' documents. (Tr., Scammell, 393:6-394:20, 407:10-408:5.) And it extracted "transaction data and information about the bank account[s] . . . so that [Womply] could run a variety of analytics on it for lenders." (Tr., Scammell, 415:24-416:8.) This allowed lenders to "analyze the legitimacy of the bank account and . . . the applicant" by "running fraud analytics on that applicant," and it allowed the lender to assess whether the borrower complied with the SBA's requirement that the borrower had been "in business before February 15th, 2020." (Tr., Scammell, 372:14-373:20.) When it came time for loan funding, Plaid would again confirm the applicant's bank account information so that the lender could be certain it was sending funds to the proper account because "accounts could change frequently." (*Id.*, Scammell, 410:8-412:2.) ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ Virtually all the information collected and verified by Womply's technology platform was uploaded into the Teslar Portal so that Benworth, as the lender, could access it during its good faith review and other underwriting activities.

3.   Lender-Facing Portal

Womply's technology platform included a lender-facing portal (the "Teslar Portal"), which Womply developed in conjunction with 3E Software, Inc. d/b/a Teslar Software and other third parties. (Tr., Scammell, 380:3-5, 380:24-181:18; JX036.) The Teslar Portal was a web-based portal that allowed lenders like Benworth to access applicant information and the results of Womply's various technology services that verified and analyzed information for them. Through the Teslar Portal, lenders like Benworth could (among other things) efficiently review applicant information, generate loan documents, submit information to the SBA for approval, and initiate payment of loan

proceeds. The Teslar Portal also organized all the files associated with a lender like Benworth's PPP loan portfolio.

As Scammell testified at the Hearing:

> Teslar by itself is just a shell. There's no data in Teslar. There's no documents in Teslar. There's no information that comes into Teslar. What Womply's technology services did . . . we collected analyzed, and synthesized all of the information that was necessary so that when that loan officer logged into Teslar, they would be able to search by borrower name, pull up a record, and all of the information was there at their fingertips so they could decide [to] approve or decline on that loan . . . Womply's technologies which were totally separate from Teslar, were feeding into Teslar and making Teslar valuable. Without those technology services, Teslar was nothing. (Tr., Scammell, 318:8-319:16.)

And as Cory Capoccia ("Capoccia"), Womply's former President, testified at the Hearing, lenders like Benworth could organize, sort, and review the information related to the Womply-referred PPP loans in the Teslar Portal in the following ways: (1) the "dashboard" view identified the status of each of the loans in a lender like Benworth's queue including the total number of loans that were awaiting the applicant's signature, approved by a lender and sent to the SBA for approval, issued a loan number by the SBA, were awaiting funding by Benworth or were funded by Benworth (Tr., Capoccia, 568:14-571:13; JX363); (2) lenders like Benworth could use another page in the Teslar Portal to "complete[] their actual processing of the loans and their good faith review" of each loan (Tr., Capoccia, 572:3-20); and (3) lenders like Benworth could use another view in Teslar to review "the different fields or data points" of a single loan file. (Tr., Capoccia, 573:12-574:11.)

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

DocuSign Envelope ID: 66726985-858A-4E67-B933-C7A30F1A0380

███████████████████████████████████████

█████████████

      Benworth could also use the Teslar Portal to move a PPP loan from one stage to another. For example, a lender could instruct the Teslar Portal to generate a PPP loan application via DocuSign that was pre-populated with the information provided by an applicant in the Borrower Portal. (Tr., Scammell, 490:22-491:19.) The pre-populated application would then be sent to the applicant through Benworth's DocuSign account, and using DocuSign the applicant signed the application and sent it back to Benworth. (*Id.*, 466:13-467:18.) Then, after a loan application was signed, the application would be placed in a status called "Pending SBA Submission." (Tr., Capoccia, 568:23-569:5.) Also, Benworth could review an applicant's information and documentation in the Teslar Portal at that stage to conduct the SBA-required good faith review of the applicant's information and documentation. (Tr., Capoccia, 569:6-11; JX022; Tr., de la Cruz, 1489:3-24, 1599:7-23.) Finally, if Benworth decided to fund a loan, it had to submit the applicant's information to the SBA for review and approval. (Tr., Capoccia, 569:12-21.) Benworth could accomplish this by clicking a button in the Teslar Portal, and the Teslar Portal would then send the applicant's information to the SBA through its connection to the SBA's E-Tran system using the lender's unique "lender[] identifier keys." (Tr., Scammell 385:23-386:11, 520:23-521:14; ██████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

      Benworth could also choose to automate some of the Teslar processes. For example, Benworth provided its promissory note to Womply and Teslar so that PPP Fast Lane could automatically populate it and send it to applicants after the SBA approved the loans. (Tr., de la

DocuSign Envelope ID: 66726985-858A-4E67-B933-C7A30F1A0320

Cruz, 1577:13-1578:8, 1579:16-1580:6, 1583:24-1584:9.) Navarro also approved the automatic submission of second-draw loan applications to the SBA if Benworth had processed the applicant's first draw loan application. (JX081.)

As discussed above, neither Womply nor its technology platform services determined which loans Benworth should fund. Instead, Womply's technology platform provided services and information to Benworth that it could use to decide whether it wanted to underwrite a loan.  The decision whether to underwrite a loan was always Benworth's and Benworth was always responsible for conducting a good faith review of a borrower's application. This is demonstrated by the fact that the Agreements between Womply and Benworth provided that Womply "disclaims all responsibility for the accuracy lawfulness, or completeness of any information accompanying a referral," that "Womply does not endorse any referral," and that Benworth "assumes sole responsibility regarding whether or not any referral is or should be sent to the SBA for review." (JX123 at JX123.9 § 1.2, JX123.14 §1.1 (emphasis omitted).) Womply also reminded Benworth that "[l]enders are responsible for doing a good faith review of the info provided by Borrowers" and that "Womply is not responsible for . . . Lender failures to conduct their own good faith review." (JX085 at JX085.2.) The good faith review is the crucial underwriting step of reviewing all critical information to determine that the loan met the SBA requirements. Womply separately advised Benworth that it did "not recommend that [Benworth] have Teslar autosubmit all of [its] pending SBA Submission queue without any good faith reviews being conducted by Benworth," and that it was "very important that Benworth continue to conduct good faith review of the applications in [its] queue." (JX146 at JX146.1.) ████████████████████

████████████████████████████████████████████████ ██ ████████

████████████████████████████████████████

███████████████████████████████████████████████ Womply

referred approximately 365,000 PPP loans through PPP Fast Lane to Benworth, and Benworth ultimately only funded approximately 305,000 Womply-referred loans, denying approximately 60,000 of the loans that Womply referred. (*See* Tr., Navarro 1338:1-5; Tr. De la Cruz, 1508:14-19.)

### F. The Dispute

On April 30, 2021, Benworth made its first payment to Womply. At the time, Benworth did not challenge any of Womply's fees, and Womply did not challenge Benworth's calculation of Technology Fees. Later, however, Womply sent Benworth corrected invoices that retroactively applied the 80% Technology Fee tier since Benworth had been paying Womply a 70% Technology Fee for each of the loans, but Womply realized that it would refer more than 300,000 loans to it. In total, Benworth has paid Womply $464,991,487 in fees.

On July 1, 2021, after the PPP ended, Womply learned that Benworth had not paid approximately $42 million in fees pursuant to its calculations under the Agreements. The parties tried to reach agreement on the payment of these fees but were unsuccessful. Thereafter, Benworth stopped paying Womply its fees altogether.  This Arbitration ensued, with Womply seeking the payment of its outstanding Referral Fees, API fees, and Technology Fees; the interest on those delinquent fees that continues to accrue under the Agreements; and Womply's costs of collecting the delinquent fees, including attorneys' fees.

## V.     ANALYSIS

### A. Parties' Positions

#### 1. Womply

Because Benworth processed and funded 304,897 PPP loans with a principal amount of

DocuSign Envelope ID: 66726985-858A-4E67-B933-C7A30F1A0380

$4,022,951,398 using Womply's technology platform and services pursuant to the Agreements, Womply contends that it is entitled to (1) Referral Fees equal to 1% of $4,022,951,398 (*i.e.*, $40,229,514); (2) API fees equal to $250 for each of the 304,897 PPP loans that Benworth processed and funded (*i.e.*, $76,224,250); and (3) Technology Fees equal to 80% of the Lender Processing Fee that Benworth received from the SBA on the first 300,000 PPP loans Benworth funded and 70% of the Lender Processing Fee that Benworth received for each PPP loan Benworth funded thereafter (*i.e.*, $500,211,105).

Benworth has paid Womply $35,881,239 in Referral Fees. Thus, Womply contends that it is entitled to an additional $4,348,275 in Referral Fees. Benworth paid Womply $59,157,250 in API fees; thus, Womply contends that it is entitled to an additional $17,067,000 in API fees. Benworth paid Womply $369,952,999 in Technology Fees; thus, Womply contends that it is entitled to an additional $130,258,107 in Technology Fees. Womply also contends that it is entitled to interest and costs of collection, pursuant to section 2.4 of the Referral Agreement and section 2 of the Master Developer Agreement.

    2.  <u>Benworth</u>

Benworth contends that the Technology Fee provisions of the Agreements are fees principally related to providing assistance to borrowers in preparing an application for a PPP loan and are thus capped at 1 percent under the 1% Agent Fee Cap. Benworth therefore asserts that it has already overpaid Womply by paying it $464,991,487, or 68.3 percent of the $680 million in lender processing fees that it has received from the SBA. Thus, according to Benworth, not only is Womply not entitled to the additional $153,693,344 that it currently seeks, Womply must return $429,110,248 million in excess monies that Benworth improperly paid it pursuant to their Agreements. Moreover, Benworth argues that because Womply is a lender service provider and

the SBA regulations and SOP provide that lender service providers are not entitled to be paid by lenders unless the SBA has approved their compensation agreements, Womply must return the unlawful fees that it received from Benworth rather than receive additional payment from Benworth because no such approval of the Referral Agreement or Order Form has occurred.

Finally, Benworth argues that, if Womply is, in fact, entitled to some amount of Technology Fees, it is only entitled to fees calculated at a rate of 70 percent because Benworth processed more than 305,000 PPP loans, and therefore the 70% Technology Fee tier should be applied retroactively to all loans. Moreover, Benworth contends that once Womply's fees are calculated at the correct percentage rate, those fees should be offset by the amount of "illegal" Technology and API fees that Womply collected from Benworth.

B. Choice of Law

The Agreements contain choice of law clauses that provide that California law, and the SBA regulations govern the Agreements, and in case of conflict, the SBA regulations shall control. (JX 103; JX 123.) The choice of law provision in the Referral Agreement reads in relevant part:

> This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to the provisions of the conflict of laws thereof. This agreement is subject to all Applicable Laws, including SBA Regulations. In the event of any conflict between the governing law and the SBA Regulations (defined below), the SBA Regulations shall control. "SBA Regulations" means all PPP requirements and SBA guidelines under the CARES Act, the Economic Aid Act, the PPP Flexibility Act, any rules or guidance that have been issued by the SBA implementing the PPP, including SBA regulations published at 86 Fed. Reg. 3692 (Jan. 14, 2021) and 85 Fed. Reg. 208811 (Apr. 15, 2020) and any subsequent Interim Final Rules and other guidance as may have been or may be subsequently issued by SBA or the U.S. Department of the Treasury with respect to the origination, servicing and forgiveness of loans under the PPP and Frequently Asked Questions, or any other applicable SBA loan requirements, including those codified in 13 CFR part 120, in each case as amended, supplemented or modified from time to time. (*Id.*)

Thus, it is undisputed that the Arbitrator shall consider both California law and the SBA rules and regulations when interpreting the parties' Agreements, and in case of any conflict, the SBA regulations shall prevail.

### C.   Breach of Contract Elements

Under California law, to prevail on a claim for Breach of Contract, a plaintiff must prove the following: (1) the existence of a contract between the parties; (2) the plaintiff's performance or excuse for nonperformance; (3) the defendant's failure to perform (breach); and (4) resulting damages. (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1388.) Benworth is challenging the first, third, and fourth elements of Womply's Breach of Contract claims.

### D.   Breach of Contract Burden of Proof

With regard to the first prong of Womply's Breach of Contract cause of action, Benworth contends that Womply has the burden of proof to show that the contracts they entered into are valid. Womply contends that because contract validity (*i.e.*, illegality) is one of Benworth's affirmative defenses, Benworth has the burden to prove that the contracts are illegal.

It is black-letter law in California that the plaintiff bears the burden of proving all elements of its claims, while the defendant bears the burden of proving all elements of its affirmative defenses and counterclaims. (*See, e.g.*, *Pollock v. Tri-Modal Distribution Servs., Inc.* (2021) 11 Cal.5th 918, 945 ("[For] any affirmative defense, the burden is on the defendant to prove all facts essential to each element of the defense [citing Cal.Evid.Code §500]])) Moreover, legality is not an element of a breach of contract claim. (*See Oasis W. Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821 (listing elements of breach of contract); CACI No. 303 (2022) (same).) Instead, California law recognizes "the presumption [] that plaintiff acted lawfully," while "illegality is an affirmative

32

DocuSign Envelope ID: 66726985-858A-4E67-B933-C7A30F1A0390

defense" for which "defendants have the burden of pleading and proof." (*Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.* (2014) 745 F.3d 343, 350.)

Here, Benworth asserts two affirmative defenses (illegality and setoff) and four counterclaims, (declaratory relief, breach of contract, severance and enforcement, and money had and received), all alleging that Womply's fees under the Agreements are "unlawful," "illegal," and "not in compliance with SBA Regulations" because they exceed the limits established by the SBA Administrator in the Interim Final Rule. (Benworth's Answer, 6-11.) Benworth thus "pled illegality as an affirmative defense" and as the basis of its counterclaims, so "it ha[s] the burden to establish [those] affirmative defense[s and counterclaims] at trial." (*See Lenhart v. San Diego City Emps.' Ret. Sys.,* (Cal.Ct.App. Mar. 26, 2020) 2020 WL 1467228, at *12.)

E.   <u>Analysis of Breach of Contract Claim</u>

Whether either party is entitled to the relief that they seek is premised on three distinct questions. First, are the fees enumerated in the Order Form as Technology Fees subject to the 1% Agent Fee Cap and therefore illegal, or were the parties entitled to contract for a different formula for deciding those fees? Second, is Womply an LSP and therefore required to have submitted the Agreements to the SBA, and if so, what are the consequences for having failed to do so? And third, if the 1% Agent Fee Cap does not apply to Womply's Technology Services, is Womply entitled to 70% or 80% of Benworth's lender fees based on the tier-based formula outlined in the Order form?

Each of these questions is addressed below.

1.   <u>Are the fees set forth in the Order Form as Technology Fee subject to the 1% Agent Fee Cap and therefore illegal, or were the parties entitled to contract for a different formula for deciding those fees?</u>

Under the Referral Agreement, Benworth agreed to pay Womply Referral Fees subject to the 1% Agent Fee Cap for the referral of loan applications. Under the separate Order Form, Benworth also agreed to pay Womply API fees and Technology Fees not subject to the 1% cap for

Womply's API Package, which included access to the Teslar Portal and various technology services that provided Benworth with applicant information that Womply collected and to some extent verified.

Benworth asserts that the Order Form's Technology Fees are illegal and should be severed from the Order Form Agreement because they are subject to the SBA Regulations 1% Agent Fee Cap since they are related to preparing and referring PPP applications. Womply contends that the Technology Fees are not subject to the 1% Agent Fee Cap, and Benworth has breached the parties' Agreements by failing to pay at the agreed upon percentage rate.

As discussed above, in the CARES Act, Congress empowered the SBA to "establish[]" "limits" on fees that Agents could collect for "assist[ing] an eligible recipient"—*i.e.*, a borrower— "to prepare an application for a [PPP] loan" and for referral of the loan. (CARES Act § 1102(a)(2), 134 Stat. at 293 (codified as amended at 15 U.S.C. § 636(a)(36)(P)(ii)).) In PPP Year One, the SBA issued three rules regarding fees an Agent charges for assisting a borrower: (i) Agent fees must be paid by the lender out of its Lender Processing Fees, (ii) Agent fees may not be paid by the borrower or out of PPP loan proceeds, and (iii) the fees that "[a]n agent who assists a borrower" could collect for providing "assistance in preparing an application for a PPP loan (including referral to the lender)" are limited to 1% of a PPP loan for loans of $350,000 or less (the 1% Agent Fee Cap"). (JX013.) Specifically, the April 2020 PPP Rule states in relevant part:

> Who pays the fee to an agent who assists a borrower? Agent fees will be paid by the lender out of the fees the lender receives from SBA. Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed: . . . [o]ne (1) percent for loans of not more than $350,000 . . . . (*Id*. (emphasis added).)

When Congress amended section 7(a)(36)(P)(ii) of the CARES Act with the Economic Aid Act in December 2021, it added the following text:

An agent that assists an eligible recipient to prepare an application for a covered loan may not collect a fee in excess of the limits established by the Administrator. If an eligible recipient has knowingly retained an agent, such fees shall be paid by the eligible recipient and may not be paid out of the proceeds of a covered loan. A lender shall only be responsible for paying fees to an agent for services for which the lender directly contracts with the agent. (Economic Aid Act § 340(b)(1), 134 Stat. at 2050 (codified at 15 U.S.C. § 636(a)(36)(P)(ii).)

The SBA maintained the 1% Agent Fee Cap on fees for an Agent who provides a borrower with "assistance in preparing an application for a PPP loan (including referral to the lender)," however, and it again stated that this cap was "reasonable based upon the application requirements and the fees that lenders receive for making PPP loans." (JX022 at pp. 18–19.)

Benworth does not dispute that, pursuant to the SBA regulations, the 1% Agent Fee Cap applies only to fees paid to Agents for "assist[ing] an eligible recipient"—*i.e.*, a borrower— "to prepare an application for a [PPP] loan." (*See* Benworth, Post-Arb. Br., p. 1 (acknowledging that fees for efforts unrelated to preparing and referring applicant are outside agent fee cap).)[13] Instead, Benworth contends that because Womply's Technology Services only assisted applicants in preparing PPP loan applications, (or they assisted Womply in complying with its obligations under the Agreements and therefore compensating it for performing "Services"), the 1% Agent Fee Cap applies. Benworth denies having received any benefit, or it at least argues that it received only a minimal benefit, from Womply's Technology Services, and it maintains that Womply must prove which of its Technology Services, if any, assisted Benworth outside of preparation and referral of PPP applications. Specifically, setting forth an elaborate and unsubstantiated formula, Benworth

---

[13] In its briefs, Benworth attempts to broaden the application of the 1% Agent Fee Cap, stating that it applies to "any tasks *related to* preparing or referring PPP loan applications." (*See* Benworth Post-Arb. Br., p. 1.) The regulations are much narrower, however. They clearly state that the Fee Cap applies only to Agents who are "assist[ing]" a borrower in preparing a PPP loan, including a "referral" of a loan applicant to a lender.

argues that Womply would, at a minimum, need to establish that more than 66% of its Technology Fees were incurred for matters unrelated to preparing or referring PPP loan applications.

Benworth's position fails for the following reasons.

First, nothing in the parties' Agreements demonstrates any intent by the parties to authorize payment of Womply's Technology Fees only if they can be tied to a particular cost or to authorize the Arbitrator to carve up the Technology Fees and allocate a portion of them to each of Womply's services based on the relative costs of those services. (*See Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955 ("When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible.").) The Arbitrator cannot disregard the parties' Agreements and create his own price for each of Womply's services nor can he create a formula for allocating payment for Womply's services when no such authority is found in the Agreements. (*See Wells v. Union Oil Co. of Cal.* (1938) 25 Cal.App.2d 165, 167 (courts cannot rewrite clear terms of contract).)

Second, while Benworth tries to conflate Womply's referral services, API Services and Technology Services, the parties clearly perceived those services to be different at the time of contracting since they were enumerated separately in different contracts and each service had a different formula for fees. It is a basic tenet of contract interpretation under California law that the whole of a contract is to be taken together so as to give effect to every part, with each clause aiding in the interpretation of another, and an interpretation giving effect to all provisions is preferred to one rendering any part of the contract meaningless. (*See* Cal.Civ.Code §1641; Cal.Civ.Proc. §1858.) Under Benworth's interpretation, the Technology Services and associated fee provision would be impermissibly rendered meaningless since they would be subsumed within the Agreements' referral services and fees. But at the time of contracting the parties viewed them as

sufficiently distinct to be placed in different agreements, and they were sufficiently distinct to apply the 1% Agent Fee Cap to the referral services but a wholly different formula to the Technology Services. A federal court recently upheld similar separate fee provisions for "Referral Fees and Technology Fees" because the fees were for "distinct services." (*See Oto Analytics*, *supra*, 2022 WL 1488441, *9.)

Third, the evidence introduced at the Hearing was clear that the substance of Womply's Technology Services was, in fact, different from Womply's referral services, and more specifically, the evidence proved that the Technology Services served the purpose of benefitting Benworth in accomplishing its underwriting functions as a lender under the SBA regulations. Indeed, it is undisputed that without Womply's Technology Services, Benworth would have had to conduct manual reviews of each PPP loan applicant's information, making it impossible for it to have successfully processed billions of dollars in PPP loan applications. (*See* Tr., Scammell, 317:25-318:7; ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

Womply's Technology Services also allowed Benworth to review each "Paycheck Protection Application Form" and confirm receipt of the certifications contained therein, to "[c]onfirm receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020," and to review the applicant's payroll documentation and confirm the borrower's average monthly payroll costs for

the preceding year. Also, the Technology Services "extracted the necessary data from [the tax documents] and summarized that data . . . so that it was readily available inside of [the] Teslar [Portal]" for Benworth to review. (Tr., Scammell, 393:6-394:20, 407:10-408:5.) It also extracted "transaction data and information about the bank account[s] . . . so that [Womply] could run a variety of analytics on it for lenders." (Tr., Scammell, 415:24-416:8.) This allowed Womply to "analyze the legitimacy of the bank account and . . . the applicant" by "running fraud analytics on that applicant," and it allowed Benworth to assess whether the borrower complied with the SBA's requirement that the borrower had been "in business before February 15th, 2020." (Tr., Scammell, 372:14-373:20.) All the services directly benefited Benworth and allowed it to process and make over 300,000 loans. These services were distinct from and had nothing to do with assisting a potential borrower in completing an application.

The Teslar Portal also allowed Benworth to access applicant information and the results of Womply's various technology applications and services. For example, through the Teslar Portal, Benworth could review applicant information, generate loan documents, submit information to the SBA for approval, and initiate payment of loan proceeds, *inter alia*. The Teslar Portal also organized all the files associated with a lender's PPP loan portfolio. (*See, e.g.*, Tr., Capoccia, 568:14-571:13; 572:3-20; 573:12-574:11JX363 at JX363.1; Tr., de la Cruz, 1489:3-1491:24, 1503:20-1504:1, 1599:7-23, 1503:20-1504:1; Tr., Scammell, 385:23-386:11, 490:22-491:19; 466:13-467:18; ███████████████████████████████████████

And if Benworth decided to decline the loan, it could "move it to the [dashboard] box that said 'withdrawn' or 'declined.'" ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

DocuSign Envelope ID: 66726985-858A-4E67-B933-C7A30F1A0380

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████

Thus, while it is true, as Benworth contends, that Benworth did not receive direct links to any of the third-party technology solutions identified in Section 1.2 of the Order Form, this is irrelevant because Benworth still received the benefit of those third-party services when the information extracted from the data via Womply's technology was integrated into Teslar – the technology that allowed Benworth to decide whether to underwrite and process the referrals made by Womply. This technology, therefore, greatly increased the likelihood that a loan would be approved and funded, which, pursuant to the SBA regulations, was the only way that Benworth would receive payment for the Womply-referred loans. (*See* JX022 at JX022.18.) Thus, the Technology Service provided a significant benefit to Benworth. Indeed, at the time of contracting, Benworth must have believed just that since it agreed to pay a hefty percentage of its loan processing proceeds from the SBA to Womply for every Womply-referred loan that was approved and funded using Womply's technology. It is therefore wholly disingenuous and a complete distortion of the evidence for Benworth to now argue that no benefit was received from the Womply technology.

Fourth, it must be pointed out that Benworth's position that Womply's Technology Fees only benefited applicants is inconsistent with its position regarding Womply's purported role as an LSP. As noted below, when arguing for illegality, Benworth contends that Womply is an LSP, which the SBA defines as "an Agent who carries out lender functions in originating, disbursing, servicing, or liquidating a specific SBA business loan or loan portfolio for compensation from the lender." (*See id.* § 103.1(d).) With regard to its Technology Services, argument, however, in an

attempt to apply the 1% Agent Fee Cap, Benworth is arguing that Womply was merely "assist[ing] an eligible recipient"—i.e., a borrower— "to prepare an application for a [PPP] loan." In other words, on the one hand, Benworth is arguing that Womply was "carr[ying] out lender functions," and on the other, it is arguing that Womply provided no benefit to Benworth – the lender. Benworth's two positions cannot be reconciled.

Finally, Benworth's argument that Womply's Technology Fees violate the Borrower Agent Fee Cap has already been rejected by a federal court. In *Oto Analytics*, *supra*, 2022 WL 1488441, Womply brought claims against PPP lender Capital Plus Financial, LLC ("Capital Plus") for failure to pay Womply's fees in connection with Capital Plus's use of Womply's PPP Fast Lane Services— the same services that Womply provided to Benworth. (*Id*. at *1–2.) Capital Plus moved to dismiss arguing, among other things, that the Borrower Agent Fee Cap prohibits Womply from collecting any Technology Fees because they exceed 1% of the PPP loan amount—the same argument Benworth asserts in these proceedings. (*Id*. at *8.) The Court denied Capital Plus's motion, holding that the 1% Agent Fee Cap "does not foreclose a Technology Fee like the one" Womply charged. (*Id*. at *9.) Instead, "[t]he regulation limits the fee for 'preparing an application for a PPP loan,' but not for any other reason," and the fees Womply received for providing technology and other services are not subject to the Agent Fee Cap because they 'do not directly relate to a PPP loan application.'" (*Id*. at *10 [quoting 86 Fed. Reg. 3,692, 3,709–10 (Jan. 14, 2021)].) This federal court decision forecloses the arguments Benworth is asserting herein.

While not necessary to resolution of this issue, extrinsic evidence supports the Arbitrator's conclusions in the Final Award and demonstrates the parties' intent and understanding of the Technology Services and Fees under the Agreements. (*See Founding Members of the Newport Beach Country Club*, *supra*, 109 Cal.App.4th at 955 ("Extrinsic evidence is admissible to prove a

meaning to which a contract is reasonably susceptible.").) Namely, throughout their relationship, Benworth had been calculating and paying Womply's fees based on the three distinct formulae in the parties' Agreements. Benworth therefore understood the Technology Fees, and the formula for calculating them, to be distinct from the fees and formulae for the Referral and API fees. Specifically, Benworth did not view the Technology Fees to be subject to the SBA's 1% Agent Fee Cap, at least not until the parties' relationship began to deteriorate and litigation was imminent. And even if Benworth had some undisclosed understanding of the Technology Fees earlier in the parties' relationship (although no evidence was introduced demonstrating as much), California recognizes the objective theory of contracts, under which "it is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation." A party's undisclosed intent or understanding is irrelevant to contract interpretation. (*Id.* at 956.)

Based upon the above, the Technology Services provided by Womply to Benworth were not subject to the SBA's 1% Agent Fee Cap because they were not fees paid to Womply for "assist[ing] an eligible recipient" —*i.e.*, a borrower— "to prepare an application for a [PPP] loan," Womply has successfully proven that Benworth breached their Agreements by failing to pay the Technology Fees. The Technology Fees are not illegal and therefore, they need not be severed from the Order Form.

2.  Is Womply an LSP and therefore required to have submitted the Agreements to the SBA and if so, what are the consequences of having failed to do so?

Benworth contends that the parties' Agreements are not valid under SBA regulations because Womply was a Lender Service Provider and failed to submit the Agreements to the SBA. There are multiple problems with Benworth's position.

i.  Was Womply an LSP?

As noted above, the SBA regulations define an LSP as "an Agent who carries out lender functions in originating, disbursing, servicing, or liquidating a specific SBA business loan or loan portfolio for compensation from the lender." (13 C.F.R. § 103.1(d).) No persuasive evidence was introduced at the Hearing demonstrating that Womply was "originating, disbursing, servicing, or liquidating a specific SBA business loan or loan portfolio" for compensation from Benworth. Instead, Womply was providing referral services under the Referral Agreement and thereby acting as a Referral Agent, and Womply was providing technology services pursuant to the Order Form. It was not performing underwriting services.

Benworth argues that Womply originated loans. But Benworth provides no statutory or regulatory definition of the term "originate." Moreover, nothing in the evidence introduced at the Hearing indicated that Womply did anything more than collect data from potential applicants to refer those applicants to Benworth and then provide separate technology services to be able to verify, access, and sort through that data. That does not fall within even a layman's understanding of what origination of a loan to the SBA means. In that regard, "originate" must mean something different than "refer," as the SBA regulations appear to make a distinction between the two activities. As the functions of an LSP are listed as "originating, disbursing, servicing or liquidating" a loan, the most logical definition of originating is underwriting and approving a loan and submitting it to the SBA for final approval. This definition is strongly supported by the parties' own agreements. In the Referral Agreement, Benworth contracted to pay Womply Technology Fees "for each loan originated by [Benworth] under the PPP resulting from a Referral." Thus, the parties understood and agreed that it was Benworth that originated the loans, not Womply. Also, in the context of this contractual provision, it is clear that originate must mean to underwrite, submit to the SBA and fund. Womply did not engage in anything like those activities.

Benworth also contends that Womply provided technology services to Benworth that included underwriting and therefore it was an LSP. Benworth relies on the SBA SOP, which provides a non-exhaustive list of LSPs that includes: "iv. Entities providing technology services to a 7(a) Lender that include underwriting." When underwriting a PPP loan, the SBA only requires a lender to (1) review the borrower's "Paycheck Protection Application Form" and confirm receipt of the certifications contained therein, (2) "[c]onfirm receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020," (3) review the borrower's payroll documentation and confirm the borrower's average monthly payroll costs for the preceding year, and (4) follow applicable Bank Secrecy Act requirements. While it is true that Womply's technology to some extent electronically performed some of these functions, Womply was not performing underwriting as part of the good faith review Benworth was obligated to conduct with respect to every loan it sent to the SBA. Benworth was required to take the information developed by the Womply technology and make a final determination that all necessary criteria had been met before submitting a loan to the SBA for approval. It was Benworth, not Womply, that was underwriting the PPP loans. This finding is confirmed by the fact that Benworth, not Womply, rejected over 60,000 of the referred loans.

Benworth also relies on the SOP language that states "[a]n individual or entity [that] generates a significant number of 7(a) Lender's loan originations" is also an LSP. The SOP adds: "As a general rule, SBA considers a 'significant number' to be two-thirds (66%) or more of the 7(a) Lender's loan originations for the prior 12 months." (JX019 at 184-85.) At the Hearing, expert testimony was elicited explaining that when an SOP conflicts with a regulation or rule, it is the language of the regulation or rule that ultimately prevails. (*See*, *e.g.*, Tr., 237:1-7, 270:12-25.) As discussed above, there is no proof that Womply was originating loans and the language of the SOP

therefore does not apply to Womply. In addition, this, and many of the other elements on this "non-exhaustive list" of LSPs in the SOP are not found anywhere in any SBA rule or regulation and are often in conflict with or contradict the relevant rule or regulation. For example, one of the SOP provisions upon which Benworth relies states that an LSP "provide[s] services for the purposes of obtaining Federal financial assistance that include[s] interaction with the Applicant either in-person or through the use of technology. . . ." As written, if this SOP were to be applied to the various entities involved in the PPP program, then virtually every individual or entity involved in the program would be considered an LSP.  This result would be absurd and would be in direct conflict with the SBA rules and regulations that specifically define and differentiate between the different types of providers and agents. Accordingly, Benworth's reliance on this list is unavailing.

The parties' course of conduct strongly points to the fact that Womply was not an LSP.  The Agreements contained explicit language stating that Womply was not an LSP as defined by the SBA. (*See* JX123 at 9, 14.) ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████

Finally, Benworth never once raised the LSP issue prior to litigation or even once this Arbitration had commenced in its Response to Womply's Demand, its Affirmative Defenses, or its Counterclaims. Instead, Benworth's counsel appears to have created this argument during the course of litigation in a creative effort to raise a legal issue where no legal issue actually existed. Indeed, if, at the time of contracting, Benworth had truly believed that it was contracting with Womply to become an LSP and to perform LSP services, presumably Benworth would have entered into an LSP Agreement with Womply ███████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████, it would have then

entered into an LSP Agreement with Womply rather than the actual Agreements, which, notably,

contain language explicitly stating that "Womply is not a lender or lender service provider as

defined by the SBA." (*See* JX123 at 9, 14.)

Based upon the above, Womply was not an LSP.

      ii.    <u>If Benworth had proven that Womply was an LSP, would the Agreements be invalid and void because Womply did not submit them to the SBA?</u>

Even if Benworth had proven that Womply was an LSP, which it has not, its contention

that the Agreements are therefore invalid and void because Womply did not submit them to the

SBA is rejected, for the following reasons.

First, Benworth has not cited any rule or regulation that states that, if an Agent fails to

provide the SBA with a compensation agreement pursuant to section 103.5(a), that agreement then

becomes invalid or void. Under California rules of statutory interpretation, which apply equally to

regulations, the Arbitrator is "not [empowered to] insert language that is otherwise not present."

The Arbitrator's "job is [merely] to interpret and apply statutes [and regulations]." (*See Pieri v.

City & County of San Francisco* (2006) 137 Cal.App.4th 886, 892; *see also Head v. Civ. Serv.

Com.* (1996) 50 Cal.App.4th 240 243 ("the same rules of construction and interpretation which

apply to statutes govern the construction and interpretation of rules and regulations of

administrative agencies.").) And while the SOP states that an LSP may only receive compensation

from a lender "for services provided under an SBA-reviewed LSP Agreement," (JX019 at 185-

87), this section does not state that an agreement is illegal or invalid if it is not submitted to the

SBA. Also, when this provision is read in context it is clear that this provision, like most of the SBA regulations, is directed toward protecting the borrower, not the lender.

Second, while it is true that, generally, under California law, a contract made in violation of a regulatory statute is void, this rule "is not absolute, and many exceptions have arisen. (*See MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 435-36.) "In compelling cases, illegal contracts will be enforced in order to avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff . . . In each case, the extent of enforceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts." (*California Physicians' Serv. v. Aoki Diabetes Rsch. Inst.* (2008) 163 Cal.App.4th 1506, 1516 (quoting *Asdourian v. Araj* (1985) 38 Cal.3d 276, 292 (internal quotations omitted)).) Thus, here, even if Benworth had proven that Womply was an LSP and that Womply's failure to submit the Agreements to the SBA meant that the Agreements were illegal, based on the factors cited in *MW Erectors*, Benworth's position would still not prevail. Benworth has not cited any authority indicating that the purpose of the purportedly "transgressed law" (*i.e.*, the required SBA review of LSP agreements) is to protect lenders like Benworth. Instead, the purpose of the review is to protect the borrower to ensure they are not charged unreasonable fees. (*See*, *e.g.*,  CARES Act § 1102(a)(2), 134 Stat. at 293 (codified as amended at 15 U.S.C. § 636(a)(36)(P)(ii) (Congress empowering SBA to "establish[]" "limits" on fees that Agents could collect for "assist[ing] an eligible recipient"—i.e., a borrower—"to prepare an application for a [PPP] loan.")); JX019 at 176–81, 195–96 (devoting seven pages to explaining fees an Agent or lender can collect from a borrower, but not limiting fees Agent can collect from lender for providing services to the lender; *see also* Manger testimony.)

DocuSign Envelope ID: 66726985-858A-4E67-B933-C7A30F1A0330

Further applying the court's reasoning in *California Physicians' Serv.*, *supra*, Benworth, a sophisticated business entity with previous experience with LSP contracts would be unjustly enriched if the Agreements were to be found void and not enforceable since Benworth would reap the benefit of its and Womply's failure to submit the Agreements to the SBA after having received the substantial benefits of Womply's services. Indeed, it is undisputed that, as a result of Womply's services, Benworth, which was previously a small mortgage company with modest financial success, became a company making billions of dollars of loans through its PPP lending program and earning hundreds of millions of dollars. Benworth could not have accomplished this without Womply's technological support, and it should therefore not be permitted to withhold monies due under its contractual obligations.

Womply also introduced copious evidence of the efforts that went into developing its Fast Lane and related Teslar systems and the various application within those systems for which Womply had to pay a fee. Failing to compensate Womply for these efforts would result in a disproportionately harsh penalty.

Benworth has failed to prove that, even if Womply was an LSP, the parties' failure to submit the Agreements to the SBA would have rendered the Agreements invalid or void.

### 3. Since the 1% Agent Fee Cap does not apply to Womply's Technology Services, is Womply entitled to 70% or 80% of Benworth's lender fees based on the tier-based formula outlined in the Order form?

The question remains whether Womply was entitled to 70% or 80% of Benworth's lender fees for its Technology Services based on the tier-based formula outlined in the Order Form. (*See* JX123 at JX123.14, §2.) The parties generally both agree that the tiers apply retroactively such that when Benworth reaches a new tier, the maximum percentage that is then applicable applies not only to loans in that tier but also to loans funded prior to reaching that tier. The parties principally rely on the following provision in the Agreements: "Client shall pay Womply the

DocuSign Envelope ID: 66726985-858A-4E67-B933-C7A30F1A0330

technology fees described below for each loan originated by Client under the PPP resulting from a Referral (which for purposes of clarity, the max percentage applies to Referred Loans funded prior to achieving the Referred Loan Volume) . . . ."  (*Id.* § 2.1.)

Womply contends, however, that all the tiers should operate retroactively except for the last tier, claiming that 80% is the "max percentage" overall and that 70% only applied to loan 300,000 and above. In other words, Womply avers that, once Benworth reached the threshold of 300,001 loans, only that tier reduces the applicable rate from 80% to 70% (*Id.*) There is no dispute that Benworth reached that threshold. (*See, e.g.,* Tr., Navarro, 1334:23-25.)

Based on principles of California contract law, Womply's interpretation of the Order Form is rejected. As noted above, under California law, "[t]he fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the mutual intention of the parties. . . . Such intent is to be inferred, if possible, solely from the written provisions of the contract." (*E.M.M.I. Inc. v. Zurich Am. Ins. Co.* (2004) 32 Cal.4th 465, 470 (citing Cal. Civ. Code § 1636) (internal quotations omitted).) "'The proper interpretation of a contract is disputable if the contract is susceptible of more than one reasonable interpretation, that is, if the contract is ambiguous. An ambiguity may appear on the face of a contract . . . .'" (*Moore v. Wells Fargo Bank, N.A.* (2019) 39 Cal. App. 5th 280, 287.) "Where the terms of an agreement are ambiguous, they should be interpreted most strongly against the party who caused the uncertainty to exist." (*Id.* at 288.)

The plain terms of the Order Form do not support Womply's argument that all the tiers should apply retroactively except for the one tier that benefits Benworth. Under the plain terms of the agreement, once Benworth funds the 300,001 loans, the maximum rate applicable is 70%. (*See* JX123.14, § 2.1.3.) The agreement's text dictates that "the max percentage applies to Referred

Loans funded prior to achieving the Referred Loan Volume," *i.e.*, 300,001 loans. (*See id.*) That means that once the 300,000-loan threshold is reached, the 70% fee rate must apply to loans 1 through 300,000.

To the extent there is any ambiguity, it must be construed against Womply since Womply drafted the Agreements. (*See Moore*, 39 Cal.App.5th at 287; Tr. 728:13.) Moreover, assuming any ambiguity, a review of extrinsic evidence also demonstrates that the 70% rate should be applied. At the hearing, Womply's Director of Finance, who oversaw Womply's accounts payable and accounts receivable functions, initially agreed with Benworth's interpretation. (Tr., Keyes, 840:6-10, 857:2-5.) The director, Thom Keyes ("Keyes"), testified: "My initial assumption when I read through the tiers, was that Tier 5 [, *i.e.,* the 70% tier] was the highest tier and that that would apply to all loans prior to that." (*Id.* at 857:2-5.) And evidence was introduced demonstrating that Keyes shared this initial interpretation with Benworth during a call with Benworth's controller, Mildred Avila ("Avila"), which is memorialized in an email from Keyes. (*See* JX196.) During that call, Avila informed Keyes that Benworth would pay at 70% (JX196.2; Avila Dep. Tr. 170:2-10), and Keyes confirmed that Benworth subsequently did pay at 70%. (Tr. 931:2-22*; see also* Avila Dep. Tr. 180:5 − 181:22.) Moreover, while Benworth paid its initial two invoices to Womply using the 80% rate, the fact is that Benworth paid all invoices after that at a rate of 70% for the Technology Fees without any objection from Womply.

Womply has asserted that Benworth's reading, and Keyes' initial interpretation should not prevail because the Order Form does not include a mechanism to "refund" fees once the highest tier is reached. (*See, e.g.,* Tr., 856:18-22.) But as Benworth explained, there was no express mechanism in the Order Form that Womply drafted for retroactively charging higher percentages for Technology Fees associated with previously funded loans once Benworth hit higher tiers under

DocuSign Envelope ID: 66726985-858A-4E67-B933-C7A30E1A0380

the chart either. (*Id*. at 937:15-22.) And yet, that is precisely what Womply did. (*See id*.) Womply has cited no legitimate reason why it would have been unable to refund fees to Benworth once Benworth reached that highest tier.[14]

For all the reasons stated above, Womply is entitled to 70% of the Lender Processing Fees for each loan it referred to Benworth that was made and funded.

Based on the above, Womply has proven each of its Breach of Contract claims.

### 4.   Failure to Pay Referral Fees

There is no dispute that Benworth entered into the Referral Agreement, funded 304,897 Womply-referred loans under that Agreement, and received its Lender Processing Fee from the SBA for each of those loans more than 30 days ago. (*See* Tr., Navarro, 1300:9-1301:15; Tr., Keyes, 894:16-24, 891:4-8, JX335.) In the Referral Agreement, Benworth unambiguously agreed to pay Referral Fees calculated as 1% of the principal loan amount for each of those PPP loans. (Tr., Navarro, 1427:12-15; JX123 at § 2.2.). The parties also agreed that the Referral Fees were due out of the Lender Processing Fees that Benworth received from the SBA. (Tr., Keyes 919:3-7; JX123 at § 2.1.). Benworth does not dispute that it received Lender Processing Fees on 304,897 loans ▮

▮ In fact, during counsel's opening statement, Benworth represented: "So what's at issue in this arbitration is not the referral fee, and it's not the API fee." (Tr., Benworth's Opening, 121:17-18.)

---

[14] The Arbitrator has not been tasked with assessing the reasonableness of the fees that the parties agreed to in the Agreements since this arbitration is merely addressing Womply's Breach of Contract claim. ▮

The total principal amount of all Womply-referred PPP loans that Benworth funded is $4,022,951,398 and Womply's Referral Fee is 1% of that principal amount, or $40,229,514. (JX335, Tr., Keyes, 897:15-22.) Benworth paid Womply $35,881,239 in Referral Fees. (JX264; *see also* Tr, Keyes, 880:13-17 (testifying that Womply did not receive payments after issuing the July 14, 2021 invoice).) Accordingly, by failing to pay Womply the full amount it is owed under the Referral Agreement, Benworth has breached that agreement and owes Womply an additional $4,348,275 in Referral Fees. (*See* Tr., Keyes, 902:21-903:14.)

5.   Failure to Pay API Fees

There is no dispute that Benworth entered into the Order Form and agreed to pay Womply an API fee of $250 for each loan it funded under the Order Form. (Tr., Navarro, 1300:9-1301:15, 1189:13-18; JX123.) Benworth also does not dispute that it funded 304,897 loans using the Technology Services Womply provided under the Order Form. (Tr., Navarro, 1338:1-4.) The calculation of the API fees is therefore undisputed. ███████████████████ ████████████████████████████████████ Indeed, counsel for Benworth has stated multiple times that the API fee is not at issue. (*Id.*, Benworth's Opening, 120:7-10 ("And the API fee . . . is regarding Teslar, okay. That's the portfolio management system. We're not contesting that fee, okay."); *see also* Tr. 121:17-18 ("So what's at issue in this arbitration is not the referral fee, and it's not the API fee"); Benworth Post-Arb. Br., p. 1 ("Benworth does not dispute the $250 API fee attributable to Teslar was not subject to the 1% fee cap.").

Under the Order Form Benworth agreed to pay Womply an API fee of $250 for each of the 304,897 PPP loans Benworth funded, for a total of $76,224,250. (JX335; *see also* Tr., Keyes, 902:21-903:8.) Benworth paid Womply only $59,157,250 in API fees. (JX264; *see also* Tr., Keyes, 880:13-17.) Accordingly, by failing to pay Womply the full amount it owed under the Order Form

DocuSign Envelope ID: 66726985-858A-4E67-B933-C7A30E1A0380

for the API fees, Benworth has breached that agreement and owes Womply an additional $17,067,000 in unpaid API fees. (Tr., Keyes, 902:21-903:14.)

### 6. Failure to Pay Technology Fees

As discussed above, the 70%-tiered rate should apply to Womply's Technology Fees. Based on that tiered rate, it is undisputed that Womply was owed $529,876,104 in Technology Fees, but it was only paid $464,991,487. This constitutes a breach of the parties' Agreement. Benworth is therefore liable to Womply for this breach in the remaining amount of $64,884,617.

### F. Benworth's Counterclaims

Benworth's counterclaims have each been addressed above. Further analysis of these counterclaims is therefore not necessary. Thus, for all the reasons discussed in detail above:

The first three claims for relief in Benworth's Counterclaim I, requesting a determination and declaration (i) that the provisions of the Order Form and Master Developer Agreement requiring payment of API fees, Technology Fees, and default interest thereon are illegal, void, and unenforceable against Benworth as a matter of law and therefore should be severed from the remainder of the Order Form and Master Developer Agreement; (ii) that it is entitled to obtain a return of all payments received by Womply under the Order Form and Master Developer Agreement; and (iii) that it is not obligated to pay Womply any allegedly outstanding API fees or Technology Fees under the Order Form and Master Developer Agreement are DENIED. As will be discussed in more detail in section VI of this Award, the fourth request for declaratory relief in Counterclaim I ("Counterclaim I (iv)"), which seeks a declaration that Womply is obligated to promptly reinstate Benworth's access to Womply technology platform or in the alternative to transmit electronic copies of borrowers' loan files, is GRANTED.

DocuSign Envelope ID: 66726985-858A-4E67-B933-C7A30F1A0380

Benworth's Counterclaim II for Breach of Contract, asserting that Womply materially breached the Order Form by retaining the Technology Fees and demanding additional Technology Fees from Benworth in this Arbitration is DENIED.

Benworth's Counterclaim III for Severance and Enforcement, which asserts that, because the API fee and the Technology Fee provisions of Order Form are void, and its remaining provisions are valid, the API and Technology Fee provisions should be severed from the Order Form and the rest of the provisions enforced, thereby requiring Womply to return all fees it paid to Benworth pursuant to the API and Technology Fee provisions, is DENIED.

Benworth's Counterclaim IV for Money Had and Money Received, which seeks to order Womply to return the monies it received from Benworth "improperly and without lawful entitlement" based on a Technology Fees provision that is "void for illegality" because the retention of such monies "would be inequitable and result in unjust enrichment" is DENIED.[15]

G. Damages

Based on the totality of the record in this matter and the application of the plain language of the parties' Agreement, which includes the SBA's PPP rules and regulations explicitly incorporated therein, Womply has proven all the elements of its three Breach of Contract claims, and with the exception of Counterclaim I (iv), Benworth has failed to prove any of its counterclaims or affirmative defenses. Womply is therefore entitled to the following damages:

- $4,348,275 in Referral Fees;
- $17,067,000 in API fees; and

---

[15] The cases cited in Benworth's brief to support this counterclaim need not be examined in light of the Arbitrator's conclusion that the Technology Fee provision in the Order Form and the parties' Agreements as a whole are not void, illegal, or unenforceable and that Benworth breached those fee provisions by failing to make timely payment to Womply. These conclusions vitiate Benworth's claim that Womply's retention of these fees would be inequitable or result in unjust enrichment.

- $64,884,617 in Technology Fees.[16]

Benworth is not entitled to any offset of these amounts, and it is not entitled to the return or disgorgement of any of the fees it has already paid Womply because it has not paid Womply anything in excess of its legal contractual obligations.

The Arbitrator is somewhat sympathetic to Benworth's argument that, in light of this damages award, it will receive only a fraction of its compensation from the SBA as compared to what Womply will receive despite the fact that it will be servicing many of the 300,000+ loans for another five years while Womply only performed services for Benworth for a few months. However, Benworth's argument misses the mark in two respects. First, ample evidence was introduced at the Hearing demonstrating the amount of time, effort, and expense that Womply put into the development of the Fast Lane services and related technology. Womply's efforts, therefore, cannot be viewed only from the vantage of more limited time that it spent specifically engaged with Benworth. Second, it is not, actually, the Arbitrator's role to decide what is "fair;" he is instead merely tasked with interpreting the contract provisions. And third, Benworth chose to enter into these Agreements with Womply; no evidence was introduced that it was coerced in any way. Benworth therefore cannot now argue that the Agreements are unfair or too one-sided. Such arguments should have been made during the parties' negotiations. ███████████████ ████████████████████████████████████████████████████. It is now too late to complain about agreements that were reached during an arms-length negotiation.

---

[16] Benworth contends that "[n]one of Womply's [Technology Fee] damages calculations were performed in accordance with Section 2.1.3 of the Order Form because Womply assigned loans to a tier based on the date Benworth received payment from the SBA instead of the date the loan was approved by the SBA. Since Womply did not assign loans to the correct tier as required by the Order Form, it failed to correctly calculate damages under its interpretation of the tiers and therefore has failed to submit any credible evidence supporting its damages claim, even if its interpretation prevails" (Benworth Post Hearing Resp. Br.) Benworth did not provide an alternative calculation for these fees, however, nor did it provide the dates that the SBA approved each of the Womply-referred loans. Further, any difference in fees would be negligible. This argument, therefore, does not alter the damages award in any way.

(*See Series AGI W. Linn of Appian Grp. Invs. DE LLC, v. Eves* (2013) 217 Cal.App.4th 156, 164 ("[C]ourts will not rewrite contracts to relieve parties from bad deals nor make better deals for parties than they negotiated for themselves."].)

## VI.   PHASE II: BENWORTH'S COUNTERCLAIM I, FINANCE CHARGES, ATTORNEYS' FEES AND COSTS

A.   Procedural History

On December 21, 2023, an Interim Award was issued in this Arbitration, finding in favor of Womply on all three of its breach of contract claims and denying all of Benworth's Counterclaims. Womply was awarded the following damages:

1.   $4,348,275 in Referral Fees

2.   $17,069,000 in API Fees

3.   $64,884,617 in Technology Fees

In addition, Womply was awarded finance charges in an amount to be determined and the cost of collecting the delinquent fees. The parties were ordered to meet and confer with respect to what issues remained to be resolved and to submit a proposed procedure and schedule for resolving those issues.

On December 28, 2023, Benworth filed a Motion for Reconsideration, seeking reconsideration of most of the findings and awards set forth in the Interim Award. Womply filed a Response to Benworth's Motion for Reconsideration on January 2, 2024 and Benworth filed a Reply on January 8, 2024. On January 18, 2024, a Hearing was held by Zoom at which Benworth's Motion for Reconsideration was addressed and the procedure and schedule for resolving the remaining issues of finance charges, attorneys' fees and costs were discussed.

DocuSign Envelope ID: 66726985-858A-4E67-B933-C7A30E1A0380

On February 20, 2024, Order No. 8 was issued regarding the Motion for Reconsideration and the procedure and schedule for resolving the outstanding issues. With the exception of Benworth's Counterclaim I, the Motion was DENIED.  The Motion to Reconsider Counterclaim I was granted. Counterclaim I seeks numerous declarations, including that Womply is obligated to promptly transmit to Benworth electronic copies of Benworth's loan files. That request for a declaration is GRANTED while all other relief sought in Counterclaim I is DENIED. This ruling will be formally addressed in this Final Award.  Order No. 8 also set forth a schedule and procedure for resolving all remaining issues.

Pursuant to the schedule established by Order No. 8, as amended by the parties, on March 8, 2024, Womply submitted a Motion for Finance Charges and Collection Costs, seeking (1) an award of Finance Charges in the amount of $53,747,132.07 as of the date of its brief, calculated at a compound rate of 1.5% per month, (2) $6,922,010.10 in attorneys' fees and (3) $543,362.08 in costs.  In support of its motion, Womply submitted a Declaration of Thomas Keyes, Director of Finance at Womply, which set forth information concerning how the finance charges, fees and costs were calculated. Attached to the Keyes Declaration were various supporting exhibits, including time entries supporting Willkie Farr's fee request, a comparison of standard hourly rates for several national law firms for the time period relevant to this litigation and an itemization of the costs sought by Womply.

On March 29, 2024, Benworth submitted its Response to the Womply motion, in which it argued that Womply was not entitled to any finance charges because it failed to provide adequate, let alone mathematical, support for the calculation of finance charges.  Benworth also asserted that if any finance charges are due and owing they must be calculated at the rate of 10% per annum simple interest, the legal rate permitted in California, and that any effort to collect compound

DocuSign Envelope ID: 66726985-858A-4E67-B933-C7A30F1A0330

interest would be in violation of California law.  Benworth also argued that Womply's requested attorneys' fees should be reduced by $3,872,567.89 and its costs by $538,292.53. In support of its position with respect to attorneys' fees and costs, Benworth submitted the declaration of Michael J. Brychal, Legal Audit Director and Attorney at Suart, Mave, Mitchell & James of St. Louis, Missouri.  Mr. Brychel, who specializes in auditing legal billing and requests for legal fees, questioned many of the billing practices of Willkie Farr, but he did not render an opinion regarding whether the requested fees were reasonable.

On April 5, 2024, Womply submitted its Reply in support of its motion.  While still asserting that it was entitled to finance charges calculated at 1.5% per month or 18% per annum, at a compound rate, it also submitted a further declaration from Mr. Keyes containing calculations of finance charges at 18% per annum using simple interest and at 10% per annum using simple interest.

Commencing on April 8, 2024, and continuing on April 9 and 11, a Hearing was held by Zoom on the issues of finance charges, attorneys' fees and costs. In addition to oral argument presented by the parties, Mr. Brychel and Mr. Keyes appeared and testified.

Following the Hearing, on April 17, 2024, Benworth submitted its Phase II Closing Brief. Womply filed its Response on April 19, 2024. Attached to Womply's brief as Exhibit A was an additional finance charge spreadsheet reflecting the amounts Womply contends that it is owed through June 30, 2024 at 18% per annum simple interest as well as 10% per annum simple interest. These further calculations also address an issue developed during the examination of Mr. Keyes during the Hearing, namely, the proper accounting for $920,000 of overcharges Benworth paid to Womply.[17]

---

[17] This chart omits any calculations using compound interest. Womply therefore appears to have abandoned any request to calculate its finance charges in that manner. As the Arbitrator ruled at the April 2024 Hearing, compound

DocuSign Envelope ID: 66726985-858A-4E67-B933-C7A30F1A0380

B.  Benworth's Counterclaim I

The Interim Award denied all of Benworth's Counterclaims.  As part of its Motion for Reconsideration, Benworth sought reconsideration of Counterclaim I (iv), which seeks a declaration concerning the delivery of borrower files to Benworth. Benworth argues that its request for declaratory relief concerning its delivery of borrower files was not litigated in the Hearing or previous proceedings because the parties had been negotiating a resolution of that element of Counterclaim I and those negotiations had only recently been abandoned without resolution. Based on this record, Benworth's Motion for Reconsideration is GRANTED.

Counterclaim I (iv) seeks a declaration based on Section 4.3 of the Referral Agreement that "Womply is obligated to promptly reinstate access to Womply's technology platform or otherwise transmit copies of borrowers' loan files."  As Section 4.3 of the Referral Agreement clearly obligates Womply to do exactly as stated in the request for declaratory relief sought by Benworth, and as Womply has conceded that Benworth's motion should be granted, Benworth's Counterclaim I (iv) is GRANTED and Womply is ordered to promptly transmit copies of borrowers' loan files to Benworth or, in the alternative, to promptly reinstate Benworth's access to Womply's technology platform.

C.  Finance Charges

1.  Contractual Entitlement

Under the parties' Master Development Agreement, the parties agreed that finance charges would amount to "1.5% per month or the maximum permitted by law, whichever is lower." (JX339.3-.4 §2 ["Client will pay Womply for the Service as set forth in the Order Form provided

---

interest is not permitted under California law unless a contract specifically provides for it, which is not the case here. (*See* Cal.Civ.Code §1916-2; *McConnell v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1983) 33 Cal.3d 816, 822-23.) Further, to the extent Womply still is relying on the argument that Benworth waived its right to contest the application of compound interest, that argument is rejected.

to the Client (the 'payments'). Payments must be made within fifteen (15) days from the date of Womply's invoice. Unpaid invoices are subject to a finance charge of 1.5% per month or the maximum permitted by law, whichever is lower, plus all expenses of collection."]; *see also* JX123.10 §2.4 (Referral Agreement) ["Referral Fee payments not made in accordance with the forgoing schedule are subject to a finance charge of 1.5% per month or the maximum permitted by law, plus all costs of collection."].) Under California law, the maximum interest rate permitted in breach of contract actions is 10% per annum. (Cal.Civ.Code §3289(b) ["If a contract entered into after January 1, 1986 does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach."].)

2.   The Appropriate Rate of Interest

Womply asserts it is entitled to finance charges calculated at the rate of 1.5% per month, which equals 18% per annum. The parties' contracts clearly state that finance charges would equal "1.5% per month or the maximum permitted by law, whichever is lower." Thus, section 3289(b)'s 10% per annum interest rate applies, not the 1.5% per month interest rate, because (1) the parties did not stipulate to a legal rate of interest; and as such, the 10% per annum rate applies under section 3289(b); and (2) based on basic math, the 10% per annum interest rate "is lower" than the 18% per annum interest rate, and the parties agreed to apply whichever rate "is lower" in their agreements.

Relying on *Southwest Concrete Products v. Gosh Construction Corporation* (1990) 51 Cal.3d 701, Womply argues that its proposed 18% per annum interest rate is allowed because the court in *Southwest* stated that "a provision in a commercial sales contract which calls for interest of 18 percent per year on late payments" does not violate California "usury law." According to Womply, the California Supreme Court in *Southwest* rejected the argument that Benworth is

59

DocuSign Envelope ID: 66726985-858A-4E67-B933-C7A30F1A0380

making here that the contractual finance charges are capped at 10% per annum under the California Constitution and section 3289 of the California Civil Code.

Womply's argument is unavailing for multiple reasons. First, the California Supreme Court in *Southwest* did not consider section 3289 in rendering its decision. The Court, therefore, did not, and indeed, could not, reject the argument that Benworth is making. Second, it follows that, because the Court in *Southwest* was not considering any arguments related to section 3289, it had no occasion to consider whether the ten percent contractual interest rate set forth in section 3289 was "lower" than then 18% per annum interest rate for which the parties had contracted. Indeed, the parties' contract did not contain language similar to the contract here (*i.e.*, "whichever is lower"). Womply's argument that the Court considered and rejected the arguments that Benworth is making is therefore without merit.

Under the parties' agreements, a 10% per annum simple interest rate applies to the calculation of the finance charges that Womply is owed.

### 3. Womply's Entitlement to Receive Finance Charges

Despite the contractual provisions in the relevant agreements which establish Womply's entitlement to finance charges, Benworth asserts that Womply is not entitled to finance charges because it failed to provide any mathematical support for the finance charges it seeks. Further, Benworth argues that to the extent Womply attempts to supply such support or correct its calculation of finance charges in its reply papers, those calculations may not be considered. Benworth's position fails as a matter of fact and law.

Womply's position regarding finance charges was fully explained by Mr. Keyes at the evidentiary Hearing in March of 2023, when he testified in some detail about how he calculated finance charges by applying an interest rate of 1.5% per month or 18% per annum using compound

interest. At that time, he did not present the spreadsheets containing his mathematical calculations. They were not requested at the Hearing and apparently were not sought during discovery. Regardless, the method of calculation was fully described by Mr. Keyes and he explained in some detail how those calculations were based on Benworth's own data.

When Womply filed its Motion for Finance Charges and Collection of Costs on March 8, 2024, it again asserted a right to finance charges calculated at 18% per annum using compound interest. Mr. Keyes provided a declaration bringing the calculation of finance charges forward to the current date and provided an explanation of how those calculations were made. When Benworth filed its opposition to Womply's motion, it attacked the use of compound interest, argued that 10% simple interest was the highest rate that could be applied and asserted that the absence of mathematical calculations prevented Womply from recovering any finance charges. Benworth did not at any time request the spreadsheets containing Keye's mathematical calculations, nor did it provide any calculations of its own. Further, Benworth knew it would have an opportunity to cross examine Mr. Keyes at the forthcoming evidentiary Hearing on Phase II issues.

Womply filed its Reply in support of its motion and while still asserting its right to finance charges at a compound rate of 18% per annum, it also provided calculations of finance charges at 18% and 10% simple interest. At that time, therefore, days before the April 2024 evidentiary Hearing, Benworth had Womply's calculations of finance charges at the rate of 10% simple interest, which is the rate Benworth asserted was legally required.

On the first day of the Hearing, April 8, 2024, Womply was ordered to provide Benworth with Mr. Keyes's spreadsheets containing his mathematical calculations. Womply provided the spreadsheets within an hour of the order. On April 11, 2024, Benworth used the recently-produced spreadsheets to extensively cross examine Mr. Keyes, with special emphasis on his treatment of

Womply overcharges.  After the Hearing, on April 17, 2024, Benworth filed its Phase II Closing Brief.  At that time, it had all of Mr. Keyes's calculations of finance charges, including the supporting spreadsheets. In particular, Benworth had the Keyes calculation based upon 10% simple interest, the rate it argued was legally required. Had Benworth had any substantial disagreement with the calculations advanced by Womply, it could have presented its position in its closing brief and provided its own calculations. It failed to do so.

The above factual record establishes that Benworth had ample opportunity to challenge the finance charge calculations offered by Womply and suffered no prejudice with respect to those calculations. Turning now to the law advanced by Benworth in support of its position, the asserted law is equally unavailing.

As previously noted, Benworth asserts that Womply is not entitled to recover *any* finance charges because Womply failed to provide an evidentiary basis for its finance charge calculation. Benworth maintains that Womply instead relied solely on the declaration of Mr. Keyes, which contains no mathematical support for the calculations he provided.  However, the caselaw cited by Benworth in support of its position is not persuasive. Some of the cited cases are federal court decisions, not decisions of California courts, despite the fact that California law applies here. In addition, some of the cases are factually distinguishable from the instant matter, such as *Diamondstar Ent. Holdings, LLC v. THH, LLC* (C.D. Cal. 2022) 641 F. Supp. 3d 849, where the court found plaintiff's prejudgment interest calculations deficient because the plaintiff did not state what amount of prejudgment interest it was seeking, the date that interest began accruing, and why and when it believed the amount of damages in the case became undisputed. (*Id*. at 870-71.) ) Such defects are not present here. Similarly, in *Carlson Produce, LLC v. Clapper,* No. 18-CV-07195-VKD (N.D. Cal. Feb. 3, 2020) 2020 WL 533004, the court denied Carlson Produce's request for

prejudgment interest because it did not explain why it relied on a monthly calculation of interest. (*Id.* at *8; *see also Andrade v. Arby's Rest. Grp., Inc.* (N.D. Cal. 2016) 225 F. Supp. 3d 1115, 1140-41 [the Court received "no documentation" suggesting how it might calculate the interest due].) Here, Womply repeatedly explained that it was relying on a monthly interest calculation because of the language in the parties' agreements, and Womply provided the Arbitrator and Benworth with some documentation of Mr. Keyes' calculations by way of Mr. Keyes' declaration. *Carlson Produce* and *Andrade* are therefore inapplicable. Benworth has, in fact, cited no case in which a court required the production of spreadsheets of a party's interest calculation as it contends Womply was required to produce here.

Also, while Womply's position had been, throughout these proceedings, that under the parties' contracts, it is entitled to finance charges calculated using a 1.5% per month interest rate,[18] no caselaw cited by Benworth prohibited Womply from propounding different finance charge calculations using the 10% per annum interest rate after Benworth advocated for application of that rate in its Response to Womply's Motion for Finance Charges. Indeed, even *St. Mary v. Sup. Ct.* (2014) 223 Cal.App.4th 762, a case upon which Benworth relies in its briefs, does not stand for this position. In *St. Mary*, the court declined to hear arguments that were not raised until the "reply papers [that] were filed one week before the hearing, thereby precluding [the opposing party] from addressing such claims in [its] opposition." (*Id.* at 782-83.) Here, however, Benworth was not prevented from addressing Womply's 10% per annum finance charge calculations in Womply's Reply brief since Benworth actually first raised this issue in its own previously filed Opposition brief. In addition, Benworth had ample opportunity to further address Womply's

---

[18] Benworth admits as much in its Phase II Closing Brief where it states: "From the inception of this Arbitration in August 2021 until early April 2024, the only theory Womply offered to calculate finance charges was based on compound interest at 18% per annum." (*Id.*, p.1.)

calculations at the Hearing and in its Phase II Closing Brief. Benworth's reliance on *Gonzales v. Superior Court* (1987) 189 Cal.App.3d 1542 is equally unpersuasive. In *Gonzales*, the court explained that "[i]t is elemental that a notice of motion must state in writing the 'grounds upon which it will be made.' Only the grounds specified in the notice of motion may be considered by the trial court." (*Id.* at 1546 [internal citations omitted].) As stated above, throughout these post-hearing proceedings, Womply has clearly and consistently stated that it is seeking an award of finance charges based on the language in the parties' agreement. While Womply's interpretation of that language (*i.e.*, application of an interest rate of 1.5% per month rather than 10% per annum) may have been incorrect, the fact is that Womply has given Benworth sufficient notice of its position.

No on-point or persuasive California legal authority has been cited for the proposition that Womply waived its ability to provide calculations for an alternative position with regard to interest after that alternative position was raised in Benworth's briefs by failing to provide detailed calculations for its initial position. Moreover, as discussed, *supra*, Womply did actually provide sufficiently detailed calculations.

Benworth's arguments are therefore rejected. Womply provided sufficient documentation to Benworth regarding its calculation of finance charges using the 10% per annum interest rate so as to provide Benworth with a full and fair opportunity to respond to Womply's request. (*See* JX382.) Indeed, when Benworth demanded that Womply produce the spreadsheet upon which Mr. Keyes was relying prior to his testimony at the April hearing, Womply did so within the hour, and the Arbitrator granted Benworth's request to delay Keyes' cross-examination an additional day so that Benworth had sufficient time to review the data. (Fee Hearing Tr., 36:25-38:2; 105:17-25; 107:29-9; 111:21-25; 191:6-22; 194:17-195:4.) After live cross-examination of Mr. Keyes,

Benworth then marked the spreadsheet that Womply produced as an exhibit. (*Id.*, 209:13-23.) Having provided sufficient notice to Benworth of its calculations using what the Arbitrator has now deemed the correct interest rate under the parties' agreements, Womply is entitled to recover finance charges under the parties' agreements using the proper interest rate for those charges at 10% per annum simple interest.

          4.   <u>Accounting for Benworth's $920,000 Overpayment</u>

Benworth argues that Womply's request for finance charges should be adjusted to reflect that Benworth overpaid Womply on technology fees by more than $920,000. Womply contends that it already accounted for the overpayments by declining to apply any finance charges to the entire class of loans for which there was an overpayment, including to loans for which there was an underpayment. (Fee Hr'g Tr. 221:12-222:13.) In addition, in its Response to Benworth's Closing Brief, Womply also agreed to adjust its finance charge request to credit Benworth with $929,953.90 in overpayments and apply these overpayments as credits to the earliest possible loans, which, according to Womply, results in the largest reduction of finance charges and is therefore the allocation most favorable to Benworth. Womply's calculations accounting for these adjustments were set forth in Exhibit A to its Response to Benworth's Closing Brief. Benworth arguably was not given an opportunity to challenge these additional calculations. However, after Womply filed its Closing Brief, Benworth made no request to provide its own calculations or to file a sur reply, either of which would have been granted. In addition, the adjustments for the overcharge have little impact on the total amount of Finance Charges. For the reasons stated above, Womply has adequately accounted for the overpayment in its calculations and any request for further adjustments is DENIED.

          D.   <u>Attorneys' Fees</u>

California law requires that where "the contract specifically provides that attorneys' fees and costs, which are incurred to enforce that contract, shall be awarded" to "the party who is determined to be the party prevailing on the contract," then that prevailing party "shall be entitled to reasonable attorney's fees in addition to other costs." (Cal.Civ.Code §1717(a).) Here, the Referral Agreement and Order Form each provide that "[t]he prevailing party in any action to enforce this Agreement shall be entitled to costs and attorneys' fees." (JX123 at JX 123.9, 123.12 (§ 10); JX123.13, 123.15 (§4).) Womply is the prevailing party in this arbitration, having prevailed on the three Breach of Contract causes of action that it asserted against Benworth and having successfully defended against all but one of Benworth's affirmative defenses and counterclaims on the contract. As the prevailing party, Womply seeks to recover $6,922.010.10 in compensable attorneys' fees and $543,362.08 in costs. (*See* Keyes Decl. Exs. A, B, D.)

The standard for awarding fees in California is fairly well settled. The starting point is the lodestar (hours times hourly rate) submitted by the moving party. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122; *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084.) The Court (or Arbitrator) must then separately determine whether the number of hours spent was reasonable, and then determine whether the requested hourly rate is reasonable for the community in which the matter was tried. The prevailing party bears the burden of documenting the appropriate hours expended and must submit evidence in support of those hours worked. (*Hensley v. Eckerhart* (1983) 461 U.S. 424, 433.) While contemporaneous time sheets are the best evidence of attorneys' hourly work, declarations from counsel may also be sufficient. (*See Syers Properties III, Inc. v. Rankin* (2014) 226 Cal.App.4th 691, 698-99; *Raining Data Corp. v. Barrenechea* (2009) 175 Cal.App.4th 1363, 1375-76; *Taylor v. Cty. Of Los Angeles* (2020) 50 Cal.App.5th 205, 207.) The "reasonable hourly rate" of an attorney seeking fees is determined based on the prevailing rate for private attorneys in

the community who have comparable skill, reputation, and experience in conducting noncontingent litigation of the same type. (*Ketchum*, *supra*, 24 Cal.4th at 1133; *Horsford v. Bd. of Trustees of Cal. State Univ.* (2005) 132 Cal.App.4th 359, 394.)

California law is clear that "padding in the form of inefficient or duplicative efforts is not subject to compensation." (*See Ketchum*, *supra*, 24 Cal.4th 1122, 1132. *Democratic Party of Washington State v. Reed* (9th Cir. 2004) 388 F.3d 1281, 1286-87 [where party claims that several lawyers were needed to perform task, courts are directed to use their own judgment and discretion to adjust compensation based on needless duplication]; *Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1326 ["Indeed, the five attorneys [defendant] deployed on the motion appear to have expended [undue] time telephoning, conferencing, and e-mailing each other . . . supporting the trial court's conclusion the matter was overstaffed"].) California courts also frown upon the use of block billing since block billing necessarily obscures the amount of time spent on individual tasks, and it opens the door to overstatement of the amount of time a lawyer reasonably spent on that task. (*Welch v. Metropolitan Life Ins. Co.* (9th Cir. 2007) 480 F.3d 942, 945, n.2; *Bell v. Vista Unified Sch. Dist.* (2000) 82 Cal.App.4th 672, 689 [explaining that court should exercise its discretion in assigning reasonable percentage to block-billed entries, or simply cast those entries aside].)

Relying on the report of Mr. Brychel, Benworth contends that Womply is not entitled to at least $3,872,657.89 of the $6,922,010.10 in attorneys' fees that it currently seeks. While Mr. Brychel "does not recommend payment or deduction of fees" as part of his practice, in his report, he identified "the following categories of questioned fees and costs" to "allow others to make such ultimate decisions":

        a.     Multiple Attendance at Events;

b.      Clerical and Administrative Tasks;

c.      Wrong Case Billing;

d.      Vague Task Descriptions;

e.      Double Billing

f.      Block Billing

g.      Billing Rates in Excess of Reasonable Prevailing Rates;

h.      Billing Rate Increases.

(Brychel Report, ¶¶49, 50.)

Mr. Brychel does not give an opinion as to whether or not Womply's requested fees are reasonable. Indeed, at the April hearing in which he testified, Mr. Brychel explained: "I'm not offering an opinion either way as to whether [Womply's fees and costs] are reasonable or not", and "I am not opining either way about what should or should not be awarded." (Fee Hr'g Tr. 122:24-124:21; 142:17-25.) Instead, Mr. Brychel, via his report, merely applied "generally accepted billing principles" to Womply's attorneys' time records to "audit" those records to look for "drafting task descriptions" and "billing descriptions" that did not comply with those principles. In other words, Mr. Brychel's report merely challenged Willkie Farr's descriptions of its services in its time entries as opposed to challenging the services themselves.

With that in mind, the Arbitrator has thoroughly reviewed Mr. Brychel's report and carefully considered the concerns he has raised regarding the billing entries. He has also taken into account the intensity in which this heavily contested dispute has been litigated, with over a year of document discovery, seven depositions, multiple discovery disputes and conferences, a seven-day evidentiary hearing akin to a full-fledged trial, which was preceded by disputes regarding the testimony of certain witnesses that required briefing and which was followed by closing

arguments, two sets of extensive pre- and post-hearing briefing, and briefing related to Benworth's Motion for Reconsideration.

In light of all of the above, the Arbitrator finds the majority of Womply's requested fees reasonable. However, based on Womply's evidence submitted with the declaration of Mr. Keyes, the Arbitrator finds Womply's attorneys' hourly rate slightly high for the services that they provide in the community in which they work. For example, Exhibit C to Mr. Keyes declaration is a chart showing partner and associate rates at Willkie as well as "peer firms" from 2021-2023. Willkie rates are slightly higher than the rates of those "peer firm" across the board during this three-year period. (*See* Keyes Decl., Ex. C.) The Arbitrator has also identified some instances of duplication of work, block billing, vague descriptive billing, and billing for clerical and administrative tasks in the over 4,000 time records submitted by Womply's attorneys. The Arbitrator, therefore, as the "best judge of the value of professional services rendered" herein and acting within the scope of the "broad authority" afforded to him "to determine the amount of a reasonable fee," reduces Womply's requested fees by fifteen percent. (*See PLCM Grp. v. Drexler* (2000) 22 Cal.4th 1084, 1095.) Womply is therefore entitled to $5,883,708.58 in attorneys' fees, which amounts to a $1,038,301.52 in fee reduction.

E. Costs

Womply seeks costs totaling $543,362.08 for JAMS services, court reporting and transcript services, e-discovery vendors, legal research platforms, trial-graphics and technology consultants, travel and lodging for the Hearing, shipping and postage, teleconferencing services, and printing. (*See* Keyes Decl., ¶¶ 21-24, Ex. D.)

Benworth does not dispute that Womply is entitled to recover its costs herein, but it challenges $538,292.53 of Womply's requested costs,[19] arguing that they are not authorized under California Code of Civil Procedure section 1033.5. In his report, Mr. Brychel more specifically identifies those challenged costs as follows: $88,942.81 in online research charges, $20,787.73 for document production related charges, $51.00 in postage, $378,405.27 in charges without receipts, and $50,105.72 in travel charges without receipts. (*See* Brychel Report ¶¶89-90, p.32 [chart outlining disputed costs].) Each of these challenges, and others that Benworth asserts in its briefs, will be addressed below.

Online research charges are not expressly permitted or prohibited under section 1033.5, although, relying on *Ladas v. Cal. State Auto. Ass'n* (1993) 19 Cal.App.4th 761, 776, Benworth contends that online research charges are prohibited as nonrecoverable investigative expenses. (Cal.Civ.Proc. §1033.5(b)(2).) However, *Ladas* has not been followed for this proposition in any case since the decision was issued, and in the intervening 30 years, online research has developed into more than just an investigative tool for attorneys. It is now an essential research tool for effective legal research and representation. The Arbitrator, therefore, finds *Ladas* inapplicable to this modern-day dispute, and he finds these costs for legal research "reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation" and "reasonable in amount," and therefore recoverable under California Code of Civil Procedure section 1033.5(c)(2), (3), and (4). (*See* Cal.Civ.Proc. §1033.5(c)(2), (3), (4).)

Asserting that the Arbitrator "is bound by California law," Benworth also challenges Womply's requested costs for online research [($88,942.18), document production for KL

---

[19] On April 8 2024, Benworth advised the Arbitrator and Womply that it was withdrawing its objections to Womply's recovery of JAMS filing fees and costs. Those costs, therefore, would be excluded from Benworth's proposed cost reduction.

Discovery ($20,787.73), couriers ($1,175.87), and postage ($51.00) as overhead charges that are typically covered by the firm's hourly rates. Benworth cites two federal court decisions for this proposition. (*See* Benworth's Response to Womply's Motion for Finance Charges and Collection Costs, p.15 [discussing and citing *Graff v. City of Tehachapi* (E.D. Cal. Sept. 15, 2016) 2016 WL 4944005, at *5 and *Carr v. Tadin, Inc.* (S.D. Cal. 2014) 51 F. Supp.3d 970, 985-86].) Neither case relies upon any California statutes or decisions. Thus, having cited no on-point California authority for this proposition, Benworth's argument is rejected.

Benworth also challenges Womply's request for $79,249.94 in expert fees paid to Mr. Manger. Section 1033.5(b)(1) explicitly prohibits the recovery of expert fees not ordered by the court. (*See* Cal.Civ.Proc. §1033.5(b)(1).) Womply, therefore, cannot recover these costs.[20]

Benworth next challenges Womply's request for $8,637.92 for expenses associated with postage, teleconferencing, and outside duplicating. These costs are prohibited under California Code of Civil Procedure section 1033.5(b)(3). (*See* Cal.Civ.Proc. §1033.5(b)(3).) Womply, therefore, cannot recover them.

Transcripts ordered by the court are recoverable under section 1033.5(a)(9), but they are expressly not recoverable under section 1033.5(b)(5) if the court did not so order. Because the Arbitrator did not order transcripts in this matter, the $82,517.76 in costs for those transcripts that Womply herein seeks are not recoverable.

Benworth challenges Womply's (1) $53,774.30 in travel expenses associated with its non-California lawyers' travel, lodging, and meals to attend the March 2023 hearing; (2) $98,788.45 in costs for its litigation support vendor – FTI Consulting, Inc.; (3) $20,787.73 in costs for document production via KL discovery, and (3) $9,194.35 in transcript costs related to the deposition of

---

[20] Notably, Womply does not challenge Benworth's position as to expert fees in its briefs.

DocuSign Envelope ID: 66726985-858A-4E67-B933-C7A30F1A0380

Mildred Avila, arguing that none of these costs were reasonably necessary to the conduct of the arbitration. (*See* Cal.Civ.Proc. §1033.5(c)(2).) Benworth's objection to these costs is rejected. Arbitrating a case of this magnitude, with millions of dollars at stake, justified each of these expenses. Indeed, California courts have regularly allowed the recovery of such expenses. (*See El Dorado Meat Co. v. Yosemite Meat & Locker Serv., Inc.* (2007) 150 Cal.App.4th 612, 620.) Benworth's arguments to the contrary are of no avail, and the Arbitrator awards Womply these costs in his discretion. (*See id.* §1033.5(c)(4).)

Finally, Benworth argues that the Arbitrator should disallow nearly $400,000 in costs that it contends are not verified. Benworth's argument ignores Mr. Keyes's sworn declaration submitted with Womply's fee request, however, in which he itemized and described every expense that Womply is seeking. Benworth has failed to cite any controlling authority requiring Womply to submit anything further. Benworth's request to tax nearly $400,000 in costs for this reason is therefore rejected.

In sum, of the $543,362.08 in costs that Womply seeks, it is entitled to recover $372,956.46. It is not entitled to recover costs for the $79,249.94 in expert fees it paid to Mr. Manger, the $8,637.92 for expenses associated with postage, teleconferencing, and outside duplicating, and the $82,517.76 in court reporter costs and transcripts.

## VII. FINAL AWARD

Based on the above and the entire record in this matter, the following Final Award is issued:

1. Womply's three Claims for breach of contract are GRANTED.

2. With the exception of Counterclaim I(iv), all of Benworth's Counterclaims are DENIED.

3. Benworth's Counterclaim I(iv) is GRANTED and Womply is ordered to promptly transmit to Benworth copies of borrowers' loan files, or in the alternative, to reinstate Benworth's access to Womply's technology platform.

4. With respect to Womply's Claims for breach of contract, Womply is awarded the following damages:

    a. $4,348,275 in Referral Fees;

    b. $17,067,000 in API fees;

    c. $64,884,617 in Technology Fees;

5. Womply is awarded Finance Charges calculated at 10% per annum simple interest until paid, which as of May 31, 2024 are $25,387,670.50.

6. Womply is awarded $5,883,708.58 in attorneys' fees.

7. Womply is awarded $372,956.46 in costs.

IT IS SO ORDERED.

Date:    5/30/2024 | 2:12 PM PDT

*Alexander L Brainerd*

Alexander L. Brainerd, Esq.
Arbitrator