# EXHIBIT 1

# Holland & Knight

|  |  |
|---|---|
| Tel   305 374 8500 | Holland & Knight LLP |
| Fax   305 789 7799 | 701 Brickell Avenue, Suite 3300 |
|  | Miami, FL 33131 |
|  | www.hklaw.com |

Wifredo A. "Willy" Ferrer
305-789-7780
Wifredo.Ferrer@hklaw.com

August 5, 2022

*VIA EMAIL*

The Hon. James E. Clyburn
(c/o Derek Collins (Derek.Collins@mail.house.gov)
Chairman
Select Subcommittee on the Coronavirus Crisis
House of Representatives
Congress of the United States
2157 Rayburn House Office Building
Washington, D.C. 20515-6143

Dear Mr. Chairman:

As you know, Holland & Knight LLP represents Benworth Capital Partners, LLC ("**Benworth**") in connection with your April 26, 2022 request for information (the "**April RFI**") and your July 1, 2022 request for information (the "**July RFI**"). As stated therein, the April RFI and the July RFI relate to a Select Subcommittee investigation into potential waste, fraud, and abuse in Paycheck Protection Program ("**PPP**") loans facilitated by financial technology ("**FinTech**") companies.

## A.      Information Requests

Below we respond to the questions raised in the July RFI. For ease of reference, we state your questions followed by our responses.

1. Please explain the Benworth Capital (Benworth) process for identifying ineligible applicants and preventing fraud related to PPP loan applications received from Womply, including detailed descriptions of any programs enacted to provide oversight of the services provided by Womply and the names and titles of the staff tasked with overseeing those programs.

*Benworth's Response:*

We start by providing important context and background information related to Benworth, its history and its relationship with Oto Analytics, Inc. ("**Womply**"). This will assist in painting a more complete and accurate picture of Benworth's connection to your investigation.

Established in 2008, Benworth is a minority owned licensed mortgage lender/servicer in the state of Florida.  Benworth was approved as a PPP lender on April 21, 2020 for the second round of PPP lending authorized by Congress.  While Benworth had been on the lending business for years, PPP was Benworth's first experience with SBA lending and regulations.

Benworth and Womply began their business relationship in or around February 2021, a few months before PPP ended in May 2021.  Womply had developed *Fast Lane*, an online platform for the completion and filing of PPP applications.  *Fast Lane* was designed for PPP applications from "non-employer businesses" (e.g., house contractors, truckers, real estate agents, cleaners, etc.).  Benworth is a mission-based lender that serves these exact types of borrowers, borrowers who have less access to traditional bank lending.  And after months of isolating and practicing social distancing due to COVID-19, these borrowers desperately needed PPP relief funds by early 2021 to stay afloat.  Benworth saw *Fast Lane* as a valuable tool to help its customer base and allow the faster processing of PPP loans while ferreting out unqualified borrowers and fraudsters.

Through *Fast Lane*, applicants submitted to Womply information and documents required under PPP and other applicable laws and regulations.  A key service Womply offered was verifying—on the basis of such information and documents—the applicant's eligibility for a PPP loan.  *Fast Lane* also had technological controls during the application process to, among other things, validate the applicant's: (i) identity, (ii) authenticity and type of documents submitted, (iii) calculations for the PPP loan amount, and (iv) bank account information.  These controls were aimed at preventing fraud related to identity theft, using fake documents, or the same person obtaining multiple PPP loans.  Womply's controls were supported by the services of reputable technology firms like LexisNexis, DocuSign, Plaid and Persona.  A primary reason why Benworth contracted with Womply was *Fast Lane* and its ability to identify ineligible applicants and stop fraud.

Benworth was not prohibited from relying on Womply for eligibility verification and fraud prevention.  But as the lender of record, Benworth did oversee Womply's services.  It was not feasible under the time-sensitive circumstances to have written policies and procedures specific to PPP applications referred by Womply.[1]  Benworth, after all, started working with Womply when PPP was an ongoing program that was soon ending.  Benworth was reviewing tens of thousands of PPP applications per week, and SBA officials were encouraging lenders to process PPP applications faster.  The SBA's own management later admitted that the "focus had to be on providing financial assistance as quickly as possible to respond to the crisis rather than carefully reviewing PPP loans."[2]  In this fast-paced, time-sensitive environment, it was not possible to embark on the time-consuming process necessary to create written policies and procedures.

---

[1] Benworth did have an "Anti-Money Laundering Program – Suspicious Activity Reporting Policy – Know Your Client/Customer (KYC) Policy" manual from before the PPP for its non-PPP business.  Although not specific to the PPP applications referred by Womply, Benworth personnel relied on this manual for general guidance on fraud and how to detect it.

[2] U.S. SMALL BUS. ADMIN.'S OFFICE OF INSPECTOR GEN., SBA'S HANDLING OF POTENTIALLY FRAUDULENT PAYCHECK PROTECTION PROGRAM LOANS (Report 22-13) app. C (2022) [hereinafter the "**SBA-OIG Report**"].

In addition, the PPP rules regarding what constituted fraud and the amount of due diligence expected from lenders were not clear.  On the one hand, PPP regulations required lenders to follow applicable Bank Secrecy Act ("**BSA**") requirements to detect illegal activity like fraud.[3]  On the other hand and because "[s]peed became the highest priority,"[4] PPP regulations told lenders they could rely on self-certifications and attestations made by the applicants regarding their eligibility and the accuracy of their documents.[5]  And if they relied in "good faith," lenders were given a safe harbor against an "enforcement action" and "any penalties relating to loan origination or forgiveness" of PPP loans.[6]  This meant that lenders like Benworth were largely permitted to take the applicant's word as true as to his or her PPP application.  This is different from the type of due diligence required under the BSA, which involves some independent verification of an applicant's information and documents.[7]  As the SBA's Inspector General wrote in an official report, the "SBA did not provide lenders specific and sufficient guidance to effectively identify, track, address, and resolve potentially fraudulent PPP loans."[8]  As a result, lenders "were faced with uncertainty on how to resolve issues they were uncovering."[9]  This made the adoption of written policies and procedures even more challenging.

While it did not have a written program, Benworth did exercise a more than reasonable degree of control and review over Womply's services.  Benworth never worked with Womply before.  Thus, for the first five weeks of the relationship, Benworth conducted manual reviews of every application package (including PPP forms and supporting documents) referred by Womply through *Fast Lane*.  There was a short set of written instructions in an internal PPP guidance document accessible to Benworth's employees, which specifically instructed them to review the applicants' tax documents for possible fraud.  The manual reviews were done by Benworth employees who received training on PPP requirements and BSA compliance.

During the approximately four months when they worked together, Benworth communicated regularly with Womply to discuss possible flaws in Womply's controls and other related matters.  Many issues flagged by Benworth contributed to actual improvements in Womply's platform (e.g., after Benworth reported application packages containing the supporting documents of other applicants, Womply changed its provider of KYC data collection services).  In most exchanges, Womply accommodated Benworth

---

[3] 86 Fed. Reg. 3692, 3708 (Jan. 14, 2021) [hereinafter "**First Draw PPP IFR**"]; 86 Fed. Reg. 3712, 3721 (Jan. 14, 2021) [hereinafter "**Second Draw PPP IFR**"].

[4] SBA-OIG Report, *supra* note 2 at 2.

[5] First Draw PPP IFR, *supra* note 3, at 3708; Second Draw PPP IFR, *supra* note 3, at 3721.

[6] *Id*.

[7] To add even more confusion, there was the fact that the U.S. Department of the Treasury was involved in the drafting and promulgation of these PPP rules.  One of Treasury's bureaus is the Financial Crimes Enforcement Network ("**FinCEN**"), which has played a pivotal role in the design of the current BSA regulations and is probably one of their most important interpreters.

[8] SBA-OIG Report, *supra* note 2 at 8.

[9] *Id*. at 10.

and provided assurances it would fix the issues Benworth spotted. As Womply's controls improved, Benworth went from manually reviewing every application package to reviewing a sample size (first one out of five packages, then one out of ten, and so on). In total, Benworth personnel conducted manual reviews of over 100,000 application packages received from Womply, one third of the total loans Womply sent to Benworth.[10]

In the final weeks of PPP, Benworth discovered that Womply was not providing Benworth with the applicants' supporting documents in many of the packages being submitted. Around this time, Benworth also started receiving complaints—and even some subpoenas—relating to loans referred by Womply (which Benworth investigated, leading Benworth to report to the SBA and to the Financial Crimes Enforcement Network approximately 4,000 potentially suspicious PPP loans.). The relationship with Womply changed at that moment. There were many discussions and disagreements about Womply's performance. Benworth mentioned discontinuing its work with Womply. Simultaneously, a dispute relating to PPP fees arose between Benworth and Womply. And around July 2021, Womply terminated its agreements with Benworth and stopped providing services (Womply thus terminated Benworth's access to *Fast Lane*, where PPP forms and supporting documents were located).

Within a short period of time, Womply became Benworth's top source for PPP referrals. Consequently, from the very beginning, a lot of people at Benworth were involved in the Benworth and Womply relationship. These included the top three officers involved in PPP operations (Bernardo Navarro – President; Toya de la Cruz – PPP Operations Manager; and Mildred J. Avila – Comptroller), other Benworth employees, and more than 30 temporary Benworth employees hired to work on PPP applications.

In conclusion, Womply handled eligibility verification and fraud prevention in connection with hundreds of thousands of PPP applications referred to Benworth by Womply. Due to time constraints and unclear PPP rules, Benworth could not adopt a written program specific to Womply's PPP applications. But in practice, Benworth spent significant time, energy, and resources monitoring Womply's performance. This included manual review by Benworth personnel of a large number of application packages and repeated discussions with Womply's top officers. In the frightening, urgent, and uncertain COVID-19 environment, Benworth's actions were reasonable, appropriate, and complied with applicable laws and regulations.

2. In what way and to what extent did Benworth rely on the automatic checks, Know Your Customer (KYC) management, bank and tax document analysis, and anti-fraud measures undertaken by Womply when determining whether Benworth would submit a PPP loan application to the Small Business Administration (SBA) for approval and funding?

*Benworth's Response:*

---

[10] For further details, *see infra* our responses to questions 3 and 3.a.

As stated in our response to information request 1 above, a primary reason Benworth worked with Womply was because Womply's services included identifying ineligible applicants and preventing fraud. To timely provide these services in connection with hundreds of thousands of PPP applications, Womply relied on automated checks and other technological tools supported by reputable technology firms (e.g., LexisNexis, DocuSign, Plaid, Persona, etc.). Womply's *Fast Lane* platform included a number of controls during the application process, designed to, among other things, validate the applicant's identity, the authenticity and type of documents submitted, the applicant's calculations for the PPP loan amount, and the applicant's bank account information.

We also explained above how Benworth personnel conducted manual reviews of over 100,000 (about one-third of the total) application packages received from Womply. These reviews were done by employees trained in PPP requirements and BSA compliance (including fraud prevention). Obviously, Benworth did not duplicate Womply's technological controls—a primary purpose of working with Womply was to access and rely on its technological tools. But in the manual reviews, Benworth personnel were instructed to—and did—review the whole application package to determine if Womply's technological controls were working well. For instance, Benworth personnel reviewed completion reports for identity-verification checks to compare the pictures in the applicants' selfies and their government-issued IDs. Similarly, following specific instructions, Benworth personnel conducted independent review of the applicants' tax records to confirm that they appeared legitimate, were the type permitted under PPP regulations, and supported the applicants' loan amount calculations.

Benworth's manual reviews uncovered many incomplete or suspicious PPP applications that it then rejected. And Benworth likewise confirmed no red flags in many PPP applications received from Womply. As discussed above, Benworth was in constant communication with Womply to discuss questions or flaws connected to Womply's controls and to provide other important feedback. Benworth grew concerned when complaints rose in the final weeks of PPP. While the number of complaints received and investigated by Benworth was under 2% of the total PPP loans referred by Womply, Benworth took these complaints seriously and sought to remedy all problems.[11] To date, Benworth has flagged and reported to government authorities roughly 4,000 potentially suspicious PPP loans.

Benworth was not prohibited from utilizing Womply to check eligibility verification and spot fraud. Benworth also exercised reasonable, diligent oversight of Womply's services. As SBA officials have acknowledged, speed was *the* priority and fraud prevention rules were unclear.[12] In other words, Benworth acted prudently and responsibly in very uncertain times in the midst of an economic calamity for millions of Americans.

---

[11] This percentage is similar to the total percentage of loans identified by the SBA's OIG as being potentially fraudulent loans identified. SBA-OIG Report, *supra* note 2 at app. C ("Although the volume of [complaints] may have been unprecedented, the volume of PPP loans made by the SBA was also unprecedented").

[12] *See supra* notes 2, 8-9.

3. How many PPP loan applications did Benworth receive from Womply for onward submission to the SBA?

*Benworth's Response:*

Among other items, Womply's *Fast Lane* platform stored PPP applications rejected by Benworth in which the SBA never assigned a loan number. As advised in response to information request 1, Womply terminated Benworth's access to *Fast Lane* around July 2021. Benworth did not have copies of the PPP applications without SBA numbers when this occurred. But to the best of its recollection, Benworth estimates that the total number of such applications ranged from 85,000 to 100,000. The PPP applications without SBA numbers are part of the total number of applications received from Womply, and thus our response is based on our best estimate (not an exact count).

Taking into account this estimate plus PPP applications that were submitted to the SBA and other rejected applications which had assigned SBA numbers, Benworth estimates that it received a total of 423,782 to 438,782 PPP applications from Womply.

a. How many of these loan applications received a manual review by employees of Benworth to verify eligibility or to identify fraud?

*Benworth's Response:*

The exact number of PPP applications that received a manual review to verify eligibility or to identify fraud is hard to estimate.

First, Benworth did not track PPP applications that were reviewed before funding and then approved. These applications were part of the larger group of approved applications that Benworth tracked, but which also included PPP applications approved without review.

Second, while there are records of PPP applications that were reviewed before funding but then rejected, such records (as maintained in the ordinary course of business) are not organized to identify which were rejected for ineligibility, possible fraud, or for being incomplete. These records include the 85,000 to 100,000 PPP applications without SBA numbers stored only in *Fast Lane*, plus approximately 33,000 other PPP applications that do have SBA numbers.

Third, Benworth reviewed 4,351 PPP applications after they were approved and funded.

b. How many of these loan applications were rejected, denied, or not submitted to the SBA at the direction of Benworth employees and due to suspicion of fraud or ineligibility? Please exclude incomplete applications from this total.

*Benworth's Response:*

As explained above, records of PPP applications Benworth reviewed before funding but then rejected are not organized to identify which were rejected for ineligibility, possible fraud, or for being incomplete. This concerns both the records in Benworth's possession for approximately 33,000 PPP applications with SBA numbers, as well as the records of 85,000 to 100,000 PPP applications without SBA numbers stored only in *Fast Lane*.

4.  For the below questions, unless otherwise instructed, please provide answers corresponding to the 2021 fiscal year. If necessary to fully answer the below questions, please include information related to parent, holding, and other related entities.

      a.  What was the processing fee income generated from Benworth's participation in the PPP?

   *Benworth's Response:*

   In the 2021 fiscal year, Benworth's income corresponding to PPP-loan fees was $361,773,377.50.

      b.  What was Benworth's total revenue from operations? How did this compare to the 2020 fiscal year?

   *Benworth's Response:*

   In the 2021 fiscal year, Benworth's total revenue from operations was $402,889,450.99. In the 2020 fiscal year, Benworth's total revenue from operations was $4,024,186.

      c.  What amount of Benworth's total revenue from operations was a result of Benworth's participation in the PPP?

   *Benworth's Response:*

   In the 2021 fiscal year, $399,791,746.96 out of a total revenue from operations of $402,889,450.99 resulted from Benworth's participation in the PPP.

      d.  What was Benworth's net operating income before taxes? How did this compare to the 2020 fiscal year?

   *Benworth's Response:*

      e.  What were Benworth's total operating expenses, including general administrative expenses and salaries/wages? How did this compare to the 2020 fiscal year?

*Benworth's Response:*



f.  What were Benworth's operating expenses as a percentage of total revenues? How did this compare to the 2020 fiscal year?

*Benworth's Response:*

g.  What was the dollar value of employee and management bonus expense incurred by Benworth?  How did this compare to the 2020 fiscal year?

*Benworth's Response:*

In the 2021 fiscal year, Benworth incurred $5,255,844.52 in employee and management bonuses.  In the 2020 fiscal year, Benworth incurred $133,218.75 in employee and management bonuses.

5.  If necessary to fully answer the below questions, please include information related to relevant parent, holding, and other related entities.

a.  How many total employees did Benworth have in 2020 and in 2021?

*Benworth's Response:*

In 2020, Benworth had 31 employees.  In 2021, Benworth had 52 employees.

b.  How many Benworth employees were dedicated full time and exclusively to AML, BSA, eligibility verification, or fraud compliance, including those employed full time to prevent, detect, or investigate potential fraud, broken up month by month, from January 2019 to October 2021?

*Benworth's Response:*

As kept in the ordinary course of business,  Benworth's records are not organized to identify the information requested.  From these records however, we infer that, per month, Benworth had approximately 6 employees exclusively dedicated to compliance in 2019, 18 in 2020, and 24 in 2021.

8

c.   What were the total budgets for, and amounts allocated to, AML, BSA, eligibility verification, and fraud compliance at Benworth in 2019, 2020, and 2021, excluding amounts budgeted or allocated to third party contractors? Please include a breakdown of these expenses.

*Benworth's Response:*

As kept in the ordinary course of business,  Benworth's records are not organized allowing identification of the information requested.   If third parties' services are excluded, Benworth's main compliance resource and expense were its employees. Benworth allocated $473,695.25 to payroll expenses in 2019, $740,553.98 in 2020, and $ 1,254,169.15 in 2021.  Many Benworth  employees performed eligibility verification or compliance work during PPP but not on a full-time basis.  Salaries and related payments to these employees would certainly be expenses allocated to compliance, but just partially.   And there is no information we have identified to determine what portion corresponded to eligibility verification or compliance work (as opposed to other, non-compliance work).

6.   What was the total dollar amount of the disbursements, payouts, or other payments that were made to Benworth and its parent/holding company shareholders, executives, or owners in 2020, 2021, and 2022?

*Benworth's Response:*

Benworth President Bernardo Navarro is the sole shareholder of the company.  As such, all profits ultimately flow to him.  Please note, however, that because of the dispute with Womply concerning PPP fees, a major portion of Benworth's PPP income is under discussion and may ultimately change depending on the outcome of such dispute.

## B.    Documents

Pursuant to the April RFI, we issued a document production to you on May 10, 2022. That  production  contained  documents  Bates  stamped  BWSSCCResp0000001  to BWSSCCResp0000033.   And now pursuant to the July RFI, we hereby produce documents Bates stamped BWSSCCResp0000033 to BWSSCCResp0000052.  This production includes all records in Benworth's possession, custody, or control we have been able to identify concerning document request 3 in the July RFI.   Please note that we have not waived any applicable privileges.  As such, any production or disclosure of privileged materials is inadvertent.  And on behalf of Benworth, we hereby certify that (i) a diligent search has been completed of all documents in Benworth's possession, custody, or control that reasonably could contain responsive material; and (ii) all responsive documents located during the search have been produced to the Select Subcommittee.

As to document request 1 in the July RFI, Benworth is not in possession, custody, or control of responsive records.

Regarding document request 2 in the July RFI, when we spoke with your staff on July 22nd, we agreed that for the time being, we will provide the following information in lieu of responsive records:

a.  As stated in response to information requests 3 and 3.a above, we estimate that Womply referred a total of 423,782 to 438,782 PPP applications to Benworth, and we estimate that Benworth personnel conducted manual reviews of at least 122,351 of these applications to, among other things, verify eligibility or to identify fraud.  Further, we estimate that at least 118,000 of the PPP applications in question were reviewed before the loan was funded, and 4,351 of them after the loan was funded.

b.  As advised in our responses to information requests 1 and 2 above, all PPP applications referred by Womply were subject to manual review before funding during the first five weeks of the relationship.  When Benworth began reviewing only a sample size, the PPP applications subject to manual review were randomly selected.  Lastly, the PPP applications that were reviewed post-funding were selected after Benworth received either a complaint or subpoena in relation to them.

c.  We also explained in our responses to information requests 1 and 2 how these PPP applications were reviewed.  Benworth personnel was instructed to review the whole application package (including PPP forms and supporting documents) received from Womply to ensure completion, eligibility, and that the applicant passed Womply's fraud-prevention controls, among others.

If you have any questions or issues related to this matter, please contact us.

Sincerely yours,

Wifredo A. Ferrer

cc:    Brandon White (Brandon.White@mail.house.gov)
       Jennifer Gaspar (Jennifer.Gaspar@mail.house.gov)
       Molly Claflin (Molly.Claflin@mail.house.gov)
       Laura O'Neil (Laura.O'Neill@mail.house.gov)
       Matthew Ellison (Matthew.Ellison@mail.house.gov)
       Michael E. Hantman (michael.hantman@hklaw.com)
       Marcelo Ovejero (marcelo.ovejero@hklaw.com)
       Denise Perlich (denise.perlich@hklaw.com)