## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| OTO ANALYTICS, LLC, | Civil No. 23-01034 (GMM) |
| Plaintiff, | |
| v. | |
| BENWORTH CAPITAL PARTNERS PR LLC, BENWORTH CAPITAL PARTNERS LLC, BERNARDO NAVARRO and CLAUDIA NAVARRO, | |
| Defendants. | |

## MOTION TO INTERVENE UNDER FED. R. CIV. P. 24

**TO THE HON. GINA MÉNDEZ MIRÓ**
**UNITED STATES DISTRICT COURT JUDGE:**

**COMES NOW** the Federal Reserve Bank of San Francisco (the "Reserve Bank"), by and through its undersigned legal counsel, and respectfully requests that this Court grant it permission to intervene in this action initiated by Oto Analytics, LLC ("Plaintiff" or "Womply") as allowed by Rule 24(a)(2) or, in the alternative, Rule 24(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). In support thereof, the Reserve Bank states as follows:

### I.     PRELIMINARY STATEMENT[1]

The Court should authorize intervention in this case because the Reserve Bank has an interest in property and transactions that are the subject of the action, this Court's disposition of the action may impair the Reserve Bank's interests, and no party to this case will adequately

---

[1] Capitalized terms used but not defined in this section shall have the meanings ascribed to them elsewhere in this *Motion*.

represent those interests. As such, the Reserve Bank's timely request to intervene complies with all requirements outlined in Fed. R. Civ. P. 24(a) and (b).[2]

*First*, the Reserve Bank's request is timely sought and will not unfairly prejudice the parties to this case, which is currently in its initial stages. This Court only recently lifted the stay of this case given the issuance of a final arbitration award, as discussed below, and the Complaint filed by Womply (the "Womply Complaint") requests relief that, if granted, would impact the Reserve Bank's interests, including a request for the attachment of assets that include the Reserve Bank's collateral. Moreover, discovery as to the causes of action in the Womply Complaint has not yet commenced.

*Second*, the Reserve Bank's preexisting security interest in the PPP Collateral is directly related to this case. Womply is affirmatively seeking to attach and collect against the PPP Collateral, which is currently being held by the Defendants.[3] Womply's attachment and collection efforts would cripple the ability of Benworth to continue to service the Pledged PPP Loans that form a part of the PPP Collateral, which failure would both further erode the Reserve Bank's secured position and could result in additional claims against Benworth FL. As such, Womply is seeking remedies in this case that threaten to impair the Reserve Bank's preexisting secured interest and its capacity to collect against the Defendants. Additionally, Womply seeks relief against Benworth PR and the Navarros based on its claims against Benworth FL on theories of veil piercing, *alter ego*, and fraudulent conveyance. Given the Reserve Bank's substantial unpaid claims against Benworth FL, it has an interest in any relief sought by Womply that may interfere with its ability to be paid by any of the Defendants.

---

[2] The Reserve Bank's *Complaint in Intervention* is attached hereto pursuant to Fed. R. Civ. P. 24(c).
[3] The Defendants in this case are Benworth Capital Partners LLC ("Benworth FL"), Benworth Capital Partners PR LLC ("Benworth PR" and, together with Benworth FL, "Benworth"), and the individuals Bernardo Navarro ("Mr. Navarro") and Claudia Navarro ("Ms. Navarro" and, together with Mr. Navarro, the "Navarros").

*Third*, the Reserve Bank will not be adequately represented absent authorization for it to intervene. There is no indication that any existing party will advocate for the protection of the Reserve Bank's first-priority liens and, therefore, intervention is proper because only the Reserve Bank will seek to protect its rights and preserve the PPP Collateral. As explained in greater detail herein and in the *Complaint in Intervention* attached hereto, if this Court were to grant Womply's requests, such determination would impact the PPP Collateral and the capacity of the Reserve Bank to recover what is currently due and owing to it.

As a result, this Court should allow the Reserve Bank to intervene in this case as of right or, in the alternative, determine that the Reserve Bank should be authorized and permitted to intervene.

## II.    RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  The Reserve Bank and Benworth's Relationship Under the PPPLF

1.      In March of 2020, in response to the Coronavirus (COVID-19) pandemic, the United States Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") to provide fast and direct economic assistance for American workers, families, small businesses, and industries.

2.      The CARES Act established the Paycheck Protection Program (the "PPP"), which was implemented by the United States Small Business Administration (the "SBA") with support from the Department of the Treasury. The PPP provided small businesses with funds to pay payroll costs and benefits, as well as interest on mortgages, rent, and utilities.

3.      In April of 2020, to support the effectiveness of the PPP and the flow of credit to households and businesses, the Board of Governors of the Federal Reserve System, with the approval of the Secretary of the Treasury, authorized the establishment of the Paycheck

Protection Program Liquidity Facility (the "PPPLF"), which extended credit to eligible financial institutions that originated PPP loans.

4.      Benworth FL was one such PPP-eligible lender. It obtained PPPLF financing pursuant to the *Paycheck Protection Program Liquidity Facility Letters of Agreement* dated May 4, 2020, January 14, 2021, and January 30, 2023 (collectively, the "Letters of Agreement").

5.      The Letters of Agreement incorporate the *Reserve Bank's Operating Circular No. 10* (as amended and supplemented from time to time, the "Operating Circular" and, together with the Letters of Agreement, the "Program Agreements"), which together set forth the relevant terms and conditions that govern Benworth FL's relationship with the Reserve Bank.

6.      Under the Program Agreements, Benworth FL was authorized to request credit advances ("Advances") from the Reserve Bank. Those Advances were secured by PPP loans pledged as collateral to the Reserve Bank (the "Pledged PPP Loans") and set to mature on the maturity dates of the Pledged PPP Loans, subject to the terms of the Program Agreements.[4]

7.      The Reserve Bank filed a UCC Financing Statement in the state of Florida on May 11, 2020, to perfect its lien over the PPP Collateral.

8.      Notably, the PPP Collateral includes all "[p]roceeds and products" of the Pledged PPP Loans. This includes PPP borrower collections, payments received from the SBA for principal balances on account of loan forgiveness and guaranty purchase, and the interest paid by the PPP borrowers and SBA on the principal amount of the Pledged PPP Loans (which accrues at the rate of 1.00% per annum).

---

[4] Specifically, the Reserve Bank has properly perfected, valid, first-priority liens on (i) "all [Benworth FL's] rights, title, and interest in property (wherever located)" that is identified on a collateral schedule, identified on the Reserve Bank's books and records as pledged to, or subject to a security interest, or that is in the possession or control of the Reserve Bank, (ii) "all documents, books and records, including programs, tapes, and related electronic data processing software, evidencing or relating to" the foregoing, and (iii) "all proceeds and products" of the foregoing, "including but not limited to interest, dividends, insurance, rents and refunds" (collectively, the "PPP Collateral").

9.      Under the Program Agreements, upon the occurrence of an event of default, the maturity date of all Advances is accelerated and all Advances become due and owing.

10.     Unless otherwise provided under the Program Agreements, if a PPPLF borrower such as Benworth FL fails to pay an Advance on its maturity date, the Reserve Bank shall first seek repayment from realization on the PPP Collateral. To the extent of any deficiency of the collateral against the amount advanced, the Reserve Bank may thereafter pursue any other remedies available under the Program Agreements, including seeking payment directly from Benworth FL (*i.e.*, the deficiency becomes a recourse obligation).

11.     However, if a PPPLF borrower such as Benworth FL "(i) has breached any of the representations, warranties, or covenants made under the [Program Agreements] or (ii) has engaged in any fraud or misrepresentation in connection with any Advance or any request to obtain an Advance under the PPPLF," all Advances made to the PPPLF borrower immediately become recourse obligations, regardless of the value of the PPP Collateral.

12.     In addition, failure by a PPPLF borrower to meet any of the requirements of the Program Agreements, including if the PPP Collateral fails to satisfy the requirements for guaranty purchase of PPP loans by the SBA, may, at the sole discretion of the Reserve Bank, void the non-recourse provisions of the Program Agreements and any related provisions. [5] The Reserve Bank's rights therefore become full recourse with respect to the portion of any Advance equal to the amount of the valuation of the non-conforming PPP Collateral.

13.     When an obligation becomes recourse, the Reserve Bank may pursue various remedies "separately, successively, or concurrently," including debiting the account of the

---

[5] Under the PPP, the SBA agrees to guaranty PPP loans (through an agreement to purchase the loans) that have not been forgiven by the SBA or paid in full by the borrower, provided the lender has complied with SBA requirements and required lending practices.

PPPLF borrower's correspondent, taking possession of its collateral, or "pursu[ing] any other remedy available to collect, enforce, or satisfy" any unpaid obligation against any of the borrower's assets.

14.     On or about December 27, 2023, Benworth FL informed the Reserve Bank of certain developments impacting its financial position, including with respect to litigation proceedings it is involved in with Oto Analytics, LLC (d/b/a Womply) ("Womply"). Benworth FL acknowledged to the Reserve Bank at that time that it did not have access to sufficient funds to pay the Interim Award (as defined and discussed below), or any commensurate or larger final award that may be awarded.

15.     As a result of the foregoing and other facts disclosed by Benworth FL to the Reserve Bank, the Reserve Bank determined that various events of default had occurred under the Program Agreements.

16.     Events of default included, but were not limited to, (i) that the Reserve Bank "deem[ed] itself insecure with respect to the financial condition of" Benworth FL and Benworth FL's ability to perform its obligations under the Program Agreements as provided for under the Operating Circular, and (ii) Benworth FL's Insolvency (as defined under the Operating Circular), in each case, based on Benworth FL's inability to pay the Final Award and financial statements, reports, and other information disclosed by Benworth FL to the Reserve Bank. As a consequence of these events of default, the entire amount outstanding on Benworth FL's Advances from the PPPLF has become due and owing.

17.     In addition, the Reserve Bank determined that Benworth FL had breached multiple representations, warranties, or covenants it made under the Program Agreements, causing the Advances to Benworth FL to become recourse obligations. These breaches included,

but were not limited to, a breach of the representation that no event of default had occurred or was continuing, and a breach of the covenant to promptly notify the Reserve Bank when events of default occurred. As a result of these breaches, the amounts outstanding on all of Benworth FL's Advances have become recourse obligations.

18.     Moreover, the Reserve Bank has become aware that Benworth FL has failed to comply with the terms of the PPP for at least some portion of the outstanding Pledged PPP Loans, which has caused Benworth FL's outstanding Advances to become recourse obligations, independent of the aforementioned breaches of the Program Agreements' representations, warranties, and covenants. In particular, the SBA has already denied over $60 million of Benworth FL's requests for guaranty purchase of Pledged PPP Loans. Benworth FL has represented to the Reserve Bank that for a period of years, it did not have appropriate documentation to support its requests for guaranty purchases for all of the relevant PPP loans, either due to Womply's withholding of the appropriate documentation, discussed below, or due to other problems internal to Benworth FL. These facts have caused the Reserve Bank to determine that Benworth FL has failed to comply with the terms of the PPP for at least some portion of its PPP portfolio, causing the Advance amounts to become recourse.

19.     On February 27, 2024, the Reserve Bank memorialized and provided notice of the events of default and breached covenants that caused the Advances to become immediately due and payable and the obligations to become full recourse in a letter sent to Benworth FL (the "Default Notice").[6]

---

[6] Additionally, on or around June 14, 2024, to further protect its collateral and upon notice to Benworth FL, the Reserve Bank exercised its right to move Benworth FL to a "direct pay" structure whereby the SBA remits payments associated with loan forgiveness reimbursement and loan guarantee amounts for the Pledged PPP Loans directly to the Reserve Bank instead of Benworth FL. Payments made on the Pledged PPP Loans by PPP borrowers continue to be remitted to Benworth FL.

20.     Pursuant to the Program Agreements, Benworth FL received Advances from the Reserve Bank from time to time in an aggregate principal amount of approximately $4.3 billion, secured by approximately 300,000 Pledged PPP Loans and the other PPP Collateral. Upon information and belief, Benworth FL processed, funded, and managed this loan portfolio, earning accrued interest income and various other fees in relation to those loans.

21.     As of July 10, 2024, the amount outstanding under the Program Agreements consists of an aggregate principal amount of $66,980,967.08, plus interest, and other fees, costs and reimbursable amounts under the Program Agreements.

22.     Benworth FL owns the Pledged PPP Loans. Upon information and belief, pursuant to Loan Servicing Agreements ("LSAs") executed in 2021, Benworth PR services Benworth FL's loans and provides other services such as fraud monitoring and loan forgiveness.

23.     Upon information and belief, Womply's failure to provide Benworth FL with certain requested loan files, as discussed below, has disrupted Benworth PR's ability to effectively service the Pledged PPP Loans, and has impaired Benworth FL's ability to promptly pay the amount currently due and owing to the Reserve Bank under the Program Agreements.

**B.  Benworth's Relationship with Womply**

*i.  Womply's Provision of Services to Benworth and Allegations of Misconduct*

24.     As alleged in the Womply Complaint, starting in February 2021, Benworth FL contracted to use Womply's services related to the PPP loans originated by Benworth FL. Under the parties' agreements, Benworth FL was to pay Womply certain fees for these services. Womply alleges it is owed approximately $200 million in unpaid fees and interest from Benworth FL.

25.    Womply has been publicly criticized in the past for failing to provide information to the federal government and has faced fraud allegations. As detailed in a December 2022 report by the Select Subcommittee on the Coronavirus Crisis,[7] starting in May 2021, Womply refused to provide requested information to a lender, Fountainhead, and the SBA Office of Inspector General (the "SBA OIG") to aid an investigation into potential fraud related to a group of Womply-referred loans. House Report at 52.

26.    The same report notes that "Womply also resisted providing data to Benworth to assist an SBA OIG investigation" in April of 2021. *Id*. at 54. When asked directly by the SBA OIG to provide the requested files, Womply "declined to provide the information to Benworth and directed the SBA OIG to fill out a web form on the 'Contact Us' section of Womply's website." *Id*.

27.    More recently, Womply agreed to pay $26 million to the Federal Trade Commission to settle charges related to deceptive acts or practices in connection with Womply's advertising of PPP services to small business consumers.[8]

28.    According to Benworth, Womply has threatened the Reserve Bank's secured interest by, for years, refusing to provide Benworth FL access to certain loan files that are necessary for the servicing of its PPP loan portfolio. Additionally, Womply seeks an attachment of the Defendants' assets in its prayer for relief, which would directly impact the Reserve Bank's secured interest in its collateral and also could directly interfere with Benworth's ability to continue servicing the Pledged PPP Loans, further imperiling the value of the Reserve Bank's collateral.

---

[7] Select Subcommittee on the Coronavirus Crisis, *"We Are Not the Fraud Police": How Fintechs Facilitated Fraud in the Paycheck Protection Program* (Dec. 2022) (the "House Report").
[8] *Federal Trade Commission v. Oto Analytics, Inc. and Toby Scammell*, Stipulated Order for Permanent Injunction and Monetary Judgment, Case No. 24-CV-1661 (N.D. Cal. April 3, 2024).

ii. *The Arbitration*

29.     As set out in the Womply Complaint, on August 25, 2021, Womply commenced JAMS arbitration against Benworth FL in San Francisco, California (the "Arbitration"), seeking payment of unpaid fees that Benworth FL allegedly owes Womply under the parties' agreements.

30.     On December 21, 2023, the arbitrator overseeing the Arbitration issued an interim award (the "Interim Award") that, if finalized and not set aside, would require Benworth FL to pay Womply over $86 million on account of unpaid fees, plus contractual interest and Womply's costs of collection of the debt. *See* ECF Nos. 99-1 and 100. The arbitrator concluded that Womply proved all elements of its breach of contract claims related to the payment of referral fees, Application Programming Interface ("API") fees, and technology fees related to the services provided for the processing, management, and tracking of the large volume of PPP loans issued by Benworth FL to small businesses. Furthermore, the arbitrator concluded that Benworth FL did not prove any of its defenses. The arbitrator did not consider any arguments related to criticisms by the SBA of Womply's conduct in referring PPP loan applications to lenders such as Benworth FL, *see supra* note 7.

31.     Benworth FL informed the Reserve Bank that Womply has been in possession of numerous loan files related to Benworth FL's PPP loan portfolio that it has failed to turn over to Benworth for a number of years (with requests for these documents dating back to 2021). Benworth FL informed the Reserve Bank that it requires these loan files in order to continue servicing loans. Benworth FL also stated that these files are necessary to process guaranty purchase applications that are pending or are on appeal with the SBA with respect to the Pledged PPP Loans, and to make new guaranty purchase requests.

32.     The prompt resolution of the guaranty purchase applications before the SBA is of particular importance, as the SBA will only provide payment to Benworth on a given PPP loan that is not eligible for forgiveness once the corresponding guaranty purchase application is approved. If the application is not approved, Benworth may not receive any payment on the loan. Therefore, upon information and belief, the fate of these applications before the SBA directly and materially impacts Benworth FL's ability to repay its creditors, including the Reserve Bank.

33.     On March 20, 2024, Womply filed a motion in the Arbitration captioned *Womply's Motion for Benworth to Deposit Funds into an Escrow Account*, requesting that the arbitrator order Benworth FL to deposit approximately $86 million—the amount of the Interim Award—into an escrow account pending confirmation of a final award. In its motion, Womply argued that Benworth FL is pursuing a strategy to delay payment of any final award, which will give it time to transfer or hide assets out of Womply's reach. Womply asserted that the escrow order was necessary to ensure that Benworth FL does not render any final award in the Arbitration meaningless. On or about April 11, 2024, the arbitrator denied Womply's motion.

34.     On June 11, 2024, the arbitrator issued a final award requiring Benworth FL to pay Womply nearly $118 million in unpaid fees, interest, and costs.[9] Pursuant to the Final Award, Womply is required to promptly transmit the requested loan files to Benworth FL or reinstate Benworth FL's access to those files via Womply's technology platform, to the extent it has not yet done so.

---

[9] Benworth FL subsequently moved to correct the final award to clarify that the arbitrator was not deciding whether Womply would be entitled to post-award interest. Womply agreed to the clarification and the arbitrator entered a corrected final award on June 26, 2024 reflecting that change (the "Final Award"). On July 1, 2024, Womply filed a petition in the United States District Court for the Northern District of California to confirm the Final Award and enter judgment in conformity. *See* Petition to Confirm Arbitration Award and For Entry of Judgment, *Oto Analytics, LLC v. Benworth Capital Partners LLC*, No. 3:24-cv-03975 (N.D. Cal. July 1, 2024).

*iii.*  *The Current Litigation Between Benworth and Womply*

35.    Based on information gained through discovery in the Arbitration, Womply filed the instant case to, among other things, "unwind" a transfer of approximately $171 million (the "Fraudulent Transfer") from Benworth FL to Benworth PR, which the Navarros own and control. *See* Womply Compl. ⁋ 2. Womply further seeks the attachment of the Defendants' assets including funds that were fraudulently transferred to Benworth PR and/or the Navarros. *Id.*

36.    On March 27, 2023, Benworth PR filed its *Motion to Dismiss or Stay Proceedings Pending the Outcome of Arbitration* ("Motion to Stay") because the parties agreed to submit certain controversies to the Arbitration. *See* ECF No. 34.

37.    On March 29, 2023, Benworth FL filed its *Motion for Joinder to the "Motion to Dismiss or Stay Proceedings Pending Outcome of Arbitration"* and on August 31, 2023, the Navarros filed their *Motion for Joinder to the "Motion to Dismiss or Stay Proceedings Pending Outcome of Arbitration" [D.E. 34] and the "Joint Reply Brief in Support of Motion to Dismiss [D.E. 61]* requesting the Court to allow them to join Benworth PR's *Motion to Stay. See* ECF Nos. 35 and 90.

38.    On October 12, 2023, this Court stayed the case pending the outcome of the Arbitration. *See* ECF No. 96.

39.    On December 26, 2023, Womply filed *Plaintiff Oto Analytics, LLC's Motion to Lift Stay* ("*Motion to Lift Stay*") requesting that this Court lift the stay because the arbitrator had issued the Interim Award. *See* ECF Nos. 99 and 100.

40.    On January 8, 2024, the Defendants filed their *Opposition to Plaintiffs' Motion to Lift Stay (D.E. 100)*, and on January 11, 2024, this Court entered an order denying Womply's

*Motion to Lift Stay* until the Arbitration proceedings had concluded and a final award was issued. *See* ECF Nos. 104 and 106.

41.     On June 12, 2024, Womply filed *Plaintiff Oto Analytics, LLC's Notice of Conclusion of Arbitration and Motion to Lift Stay*, requesting that this Court lift the stay of this action given the conclusion of the Arbitration and the issuance of the Final Award. *See* ECF No. 107.

42.     On June 13, 2024, the Defendants filed their *Joint Opposition to Plaintiff's Notice of Conclusion of Arbitration and Motion to Lift Stay*. *See* ECF No. 111.

43.     On June 20, 2024, Womply filed *Plaintiff Oto Analytics, LLC's Motion to Inform the Court of Recent Events*. *See* ECF No. 117. Among other things, Womply's motion notified this Court that the Final Award "rendered Benworth FL's debt to Womply a 'fixed liability' that is 'a contractual equivalent of a judgment,'" and that the case should proceed to discovery.

44.     On June 24, 2024, the Court granted Womply's request to lift the stay and ordered the parties to jointly file a proposed scheduling/case management order. *See* ECF No. 119. Benworth moved for reconsideration of the decision, *see* ECF No. 120, which this Court subsequently denied, *see* ECF No. 121.

45.     As discussed above, the Reserve Bank's collateral includes, without limitation, all "proceeds and products" (including both principal and interest) Benworth FL has collected in respect of the Pledged PPP Loans, a portion of which has, upon information and belief, been transferred to Benworth PR pursuant to the LSAs between Benworth FL and Benworth PR or otherwise, and also to the Navarros as shareholders of Benworth FL, Benworth PR or otherwise. Therefore, the Reserve Bank's first-priority lien extends to and includes the Fraudulent Transfer that Womply seeks to unwind and attach through the Womply Complaint.

46.     To the extent that any property or assets transferred from Benworth FL to Benworth PR or the Navarros constitute PPP Collateral, such property or assets must be made available to satisfy any obligations under the Program Agreements, including any unpaid Advances, on a first-priority basis, ahead of the rights of Womply or any other party.

### C.  The Reserve Bank's Complaint Against Benworth and the Navarros

47.     In addition to seeking intervention, on July 10, 2024, the Reserve Bank filed its own *Complaint* against Benworth PR, Benworth FL, and the Navarros (the "Reserve Bank Complaint").[10] In the Reserve Bank Complaint, the Reserve Bank alleges that under the Program Agreements, Benworth FL owes it approximately $66,980,967.08 in principal, plus interest and other fees and costs, and that the Navarros caused Benworth FL to fraudulently transfer assets to Benworth PR and themselves to prevent the Reserve Bank from collecting Benworth FL's debt.

48.     Accordingly, the Reserve Bank Complaint requests: (1) rescission of various fraudulent transfers; (2) a declaration that Benworth PR is the *alter ego* of and/or the successor to Benworth FL, and Benworth PR is thus liable to the Reserve Bank; (3) a declaration that the Navarros are personally liable for satisfying Benworth FL's and Benworth PR's obligations to the Reserve Bank as a result of the piercing of the corporate veil; and (4) an award of costs in the Reserve Bank's favor consisting of unpaid principal and accrued interest including, as applicable, default interest, as well as additional costs owing under the Program Agreements.[11]

---

[10]*Federal Reserve Bank of San Francisco v. Benworth Capital Partners LLC et al.*, Case No. 24-01313 at ECF. No 1.
[11] The applicable non-default interest rate under the Program Agreements is thirty-five (35) basis points. In the ordinary course, Benworth FL receives the payments associated with the Pledged PPP Loans, including the principal plus the one hundred (100) basis points of interest, and remits the principal plus thirty-five (35) basis points to the Reserve Bank in accordance with and subject to the terms of the PPPLF. Under the Program Agreements, all interest, including the sixty-five (65) basis points retained by the PPPLF borrower, is property and collateral of the Reserve Bank until all Advances are repaid in full. Additionally, interest on any Advance that is not repaid when due (whether by acceleration or otherwise) is calculated at a rate five hundred (500) basis points higher than the otherwise applicable interest rate.

III.    **DISCUSSION**

A. **The Reserve Bank Should Be Allowed to Intervene As of Right Under Fed. R. Civ. P. 24(a)(2).**

Under Fed. R. Civ. P. 24(a)(2), which governs intervention as of right, the Reserve Bank must show that "(i) its motion is timely; (ii) it has an interest relating to the property or transaction that forms the foundation of the ongoing action; (iii) the disposition of the action threatens to impair or impede its ability to protect this interest; and (iv) no existing party adequately represents its interest." *Ungar v. Arafat*, 634 F.3d 46, 50 (1st Cir. 2011) (citation omitted); *Travelers Indem. Co. v. Dingwell*, 884 F.2d 629, 637 (1st Cir. 1989). The Reserve Bank meets all four criteria for intervention as of right.

i.    *The Reserve Bank's Request to Intervene Is Timely.*

To determine whether a motion to intervene is timely, the First Circuit has advanced four guiding factors: "(1) the length of time the applicant knew or reasonably should have known that its interest was imperiled before it moved to intervene; (2) the foreseeable prejudice to existing parties if intervention is granted; (3) the foreseeable prejudice to the applicant if intervention is denied; and (4) idiosyncratic circumstances which, fairly viewed, militate for or against intervention." *Banco Popular de Puerto Rico v. Greenblatt*, 964 F.2d 1227, 1231 (1st Cir. 1992) (citations omitted). "A motion to intervene is timely if it is filed promptly after a person obtains actual or constructive notice that a pending case threatens to jeopardize his rights." *R & G Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 584 F.3d 1, 8 (1st Cir. 2009) (citation omitted). "Perfect knowledge of the particulars of the pending litigation is not essential to start the clock running; knowledge of a measurable risk to one's rights is enough." *Id.*

As discussed above, the case has been stayed pending the issuance of the Final Award, and this Court lifted the stay just two weeks ago, with a proposed case management plan having been

filed in the last week. *See* ECF Nos. 119 & 122. Given Womply's efforts to attach assets that (i) include the PPP Collateral and/or (ii) are necessary to allow Benworth to continue servicing the Pledged PPP Loans in the ordinary course, the Reserve Bank determined its interests were at risk and filed this request to intervene. Thus, the Reserve Bank's request for intervention promptly followed the imperilment of its interests, which favors intervention.

Further, this case is still in its infancy. The Court has not issued a scheduling and case management order or set a scheduling conference, the Defendants have not filed answers to the Womply Complaint, and discovery has not commenced.[12] Thus, the Reserve Bank's intervention will not delay the case and, therefore, the parties to the case will not be unfairly prejudiced. *See W Holding Co. v. Chartis Ins. Co. Puerto Rico*, 845 F. Supp. 2d 422, 426-27 (D.P.R. 2012) (finding that a "complaint in intervention was timely filed" where "the case was still in its initial stages at the time the [intervenor] moved to intervene" and defendant's answer to the complaint was not yet due); *see also Fed. Deposit Ins. Corp. v. Diaz-Martinez*, 376 F. Supp. 3d 220, 224 (D.P.R. 2019) (motion to intervene was timely where defendants had "made no attempt to advance their counterclaims"); *see also Lockhart v. Travelers Com. Ins. Co.*, 2022 WL 541789, *5 (E.D. Cal. Feb. 23, 2022) (motion to intervene was timely where the prospective intervenor "filed its motion before th[e] court took any substantive action and none of the parties would appear to suffer any prejudice" from the intervention). Conversely, as discussed in the following subsection, the Reserve Bank's interests would be prejudiced if this Court does not allow it to intervene.

Accordingly, this request to intervene is timely as required by Fed. R. Civ. P. 24(a)(2).

---

[12] A conference pursuant to Fed. R. Civ. P. 26(f) has not occurred, but the Reserve Bank is prepared to participate in such conference when it occurs pursuant to a Court-ordered schedule.

    *ii.*  <u>*The Reserve Bank's Interest in the PPP Collateral Is Directly Connected to*</u>
<u>*the Relief Sought in This Case.*</u>

The First Circuit has emphasized that an intervenor's claim must bear a "sufficiently close relationship" to the dispute between the original litigants. *See W Holding Co. v. Chartis Ins. Co. Puerto Rico*, *supra* at 427 (citations omitted). Moreover, an intervenor must assert a right or interest in the property or matter that is the object of the litigation and show that said right or interest may actually be affected by the final disposition of the cases. *Id.* The asserted "interest must be direct, not contingent." *Conservation L. Found. of New England, Inc. v. Mosbacher*, 966 F.2d 39, 42 (1st Cir. 1992) (citation omitted). "Potential economic harm to a would-be intervenor is a factor that warrants serious consideration in the interest inquiry." *See Pub. Serv. Co. of New Hampshire v. Patch*, 136 F.3d 197, 205 (1st Cir. 1998) (citation omitted).

The prime target of Womply's action is the assets held by the Defendants and the allegedly fraudulent transactions orchestrated to prevent Womply from collecting its purported debt. As a substantial unpaid creditor of Benworth FL, the Reserve Bank has at least an equal claim to the assets of Benworth FL as Womply, and any relief sought by Womply must not prejudice or impair the Reserve Bank's rights against the Defendants. Importantly, any cash transfers made from Benworth FL include funds that include, in whole or in part, PPP Collateral in which the Reserve Bank maintains a security interest and a senior priority right to collect against them.

Accordingly, the Reserve Bank has a sufficient "interest relating to the property or transaction that forms the foundation of the ongoing action" as required by Fed. R. Civ. P. 24(a)(2).

    *iii.*  <u>*The Disposition of This Action Threatens the Reserve Bank's Ability to*</u>
<u>*Protect Its Interest in the PPP Collateral.*</u>

The Reserve Bank seeks to intervene in this case to, among other things, ensure that the relief sought in this case does not prejudice the Reserve Bank's collateral or its ability to recover

on the debts owed by the Defendants, and to prevent Womply from impermissibly leapfrogging the Reserve Bank in the order of priority. Womply's request for attachment of assets, which is part of the relief requested in the Womply Complaint, would directly impact the Reserve Bank's collateral both because it would purport to grant Womply an interest in the Reserve Bank's existing collateral and because it would interfere with Benworth FL's ability to service the Pledged PPP Loans, all of which would inure to the detriment of the Reserve Bank.[13]

Accordingly, the Reserve Bank expects to advocate that at a minimum, Womply should not be allowed to attach assets that are PPP Collateral, that any relief granted by this Court will permit the Reserve Bank to recover against non-PPP Collateral assets at least *pro rata* with Womply, and that any attachment should provide Benworth with sufficient liquidity to continue its PPP loan servicing operations.

As discussed above, in addition to seeking intervention, the Reserve Bank filed its own complaint for breach of contract, collection of money, and rescission of fraudulent transfers of funds from Benworth FL to Benworth PR and the Navarros, among other relief. Providing the remedies requested by Womply would prejudice the Reserve Bank's rights as asserted in this action. *See Giancaspro v. Network Travel Experiences, Inc.*, 2022 WL 19569513, at *5 (C.D. Cal. Nov. 3, 2022) (secured creditor demonstrated that there may be a practical impairment of its interest if intervention is not granted); *Ocean Thermal Energy Corp. v. Coe*, 2020 WL 4108161 (C.D. Cal. Mar. 5, 2020) at *3 (secured creditor alleging superior interest in property to be sold by a receiver "demonstrated it may suffer a practical impairment of its interests as a result of the pending litigation," meriting intervention) (citation omitted); *S.E.C. v. LADP Acquisition, Inc.*,

---

[13] Womply's efforts to improve its standing vis-à-vis other creditors is particularly improper where, as discussed above, Benworth FL has told the Reserve Bank that Womply's refusal to provide necessary documentation to Benworth has impaired Benworth's ability to operate, which imperils the ability of Benworth's creditors to recover on account of their debt (all while Womply seeks to attach assets for its own benefit).

2015 WL 13593622, at *3-4 (C.D. Cal. June 17, 2015) (bank had "a significantly protectable interest relating to the subject of the action" where it had a security interest in, and a contractual right to foreclose on, the defendant's property that was frozen in the lawsuit); *W Holding Co. v. Chartis Ins. Co. Puerto Rico*, *supra* at 428 (proposed intervenor had an interest in the action and would be impaired by the final disposition of the action).

Accordingly, the Reserve Bank will be prejudiced if intervention is denied, as required by Fed. R. Civ. P. 24(a)(2).

### iv.  *The Reserve Bank Is Not Adequately Represented.*

Finally, if the Reserve Bank is not allowed to intervene, no party to this case will adequately represent its interests. With respect to Rule 24(a)(2)'s fourth prong, "[t]ypically, an intervenor need only make a 'minimal' showing that the representation afforded by a named party would prove inadequate." *B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc.*, 440 F.3d 541, 545 (1st Cir. 2006) (citation omitted). An intervenor may make such showing by "demonstrat[ing] that its interests are sufficiently different in kind or degree from those of the named party." *Id.* at 546 (citation omitted). It is sufficient that the proposed intervenor's goals do not overlap with those of the other litigants. *See Giancaspro*, *supra* at *6; *Ocean Thermal*, *supra* at *3 (finding the requirement satisfied where the plaintiff and intervenor asserted claims to the assets at issue).

Here, the Reserve Bank's interests differ from the other parties in this action in various ways. *First,* Womply seeks to attach assets that will directly impact the Reserve Bank's collateral and Benworth's ability to service the loans comprising that collateral. There is no indication that a party will advocate for the preservation and protection of the liens in favor of the Reserve Bank. *Second*, Benworth FL has defaulted under the terms of the Program Agreements, and the Reserve Bank has a right to collect against its collateral. Given that Womply is not a party to the Program

Agreements, the Reserve Bank is the only party interested in asserting its rights under those agreements. Although Womply may also seek remedies pursuant to its own contracts with the Defendants, the Reserve Bank's rights as a secured creditor of Benworth FL will only be adequately protected by the Reserve Bank itself. *Third*, Womply's actions, including its protracted failure to turn over loan files to Benworth which are necessary to service the Pledged PPP Loans, stand in stark contrast to the Reserve Bank's interest and indicate that the Reserve Bank's interests are not safeguarded by Womply. And *fourth*, the Reserve Bank is the only party to this action with a significant interest in ensuring that the ongoing loan servicing and administration that is necessary for small businesses to receive the full benefits of the PPP and PPPLF that Congress and the Board of Governors of the Federal Reserve intended is not put in jeopardy. As a result, the Reserve Bank is incentivized to litigate vigorously and has more at stake regarding the resolution of the case, a fact that militates in favor of granting intervention. *See Glancy v. Taubman Cts., Inc.*, 373 F.3d 656, 675 (6th Cir. 2004) ("Asymmetry in the intensity . . . of interest can prevent a named party from representing the interests of the absentee.").

As such, "no existing party adequately represents" the Reserve Bank's interests in this case, as required by Fed. R. Civ. P. 24(a)(2), which merits intervention. *See Suiza Dairy Inc. v. Rivero Cubano*, No. CV 04-1840 (DRD), 2005 WL 8159035, at *4 (D.P.R. Mar. 23, 2005) (granting motion to intervene where "neither Plaintiff nor Defendants may adequately represent the [intervenors'] property interests").

### B.  The Reserve Bank Also Complies With the Requirements For Permissive Intervention Under Fed. R. Civ. P. 24(B).

As an alternative to intervention as of right, Rule 24(b) provides that a "court may permit anyone to intervene who: (i) is given a conditional right to intervene by a federal statute; or (ii) has a claim or defense that shares with the main action a common question of law or fact."

Fed. R. Civ. P. 24(b). Courts "enjoy[] very broad discretion" to grant permissive intervention under Rule 24(b), and will consider whether the putative intervenor (i) files a "timely motion," (ii) "has a claim or defense that shares with the main action a common question of law or fact," and (iii) will not "unduly delay or prejudice the adjudication of the original parties' rights." *Id.*; *see also Daggett v. Comm. on Governmental Ethics & Election Practices*, 172 F.3d 104, 112-13 (1st Cir. 1999). "The First Circuit has noted that the threshold for permissive intervention is low, and that once the threshold requirements are satisfied, the district court may consider almost any factor rationally relevant." *Autonomous Municipality of San Juan v. Fin. Oversight & Mgmt. Bd. for Puerto Rico*, No. 3:17-CV-02009, 2017 WL 11286619, at \*3 (D.P.R. Oct. 27, 2017) (internal quotation marks and citations omitted); *see also Daggett*, *supra* at 113.

For the same reasons discussed above with regards to the Reserve Bank's request for intervention as of right, permissive intervention is proper in this case. Attachment of the Defendants' assets in favor of Womply will directly impact the Reserve Bank's secured interest in the PPP Collateral and could hamper Benworth's ability to service the Pledged PPP Loans (further diminishing the value of the PPP Collateral). Therefore, the Reserve Bank has shown that the relief it would request in the *Complaint in Intervention* shares questions of law and fact with the claims and defenses in this case.

Finally, as discussed above, intervention under Fed. R. Civ. P. 24(b) is timely and will not result in any prejudice to the parties. Rather, authorizing the Reserve Bank to intervene in this action will allow the Court to adequately evaluate the merits of the relief requested by Womply. Thus, intervention should also be allowed under Fed. R. Civ. P. 24(b).

## IV.    <u>CONCLUSION</u>

The Reserve Bank has shown that it complies with all the requirements that this Court must consider when evaluating a motion to intervene as of right or to grant permissive intervention under Fed. R. Civ. P. 24(a) or (b). Therefore, the Reserve Bank submits that the Court should grant this request for permission to intervene thereby allowing it to safeguard its interests and rights in respect of the PPP Collateral pursuant to the Program Agreements.

Dated: July 10, 2024                    Respectfully submitted,

Lisa M. Schweitzer (*pro hac vice* pending)
lschweitzer@cgsh.com

Thomas S. Kessler (*pro hac vice* pending)
tkessler@cgsh.com

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
*Attorneys for the Federal Reserve Bank of San Francisco*

*s/ Antonio L. Roig Lorenzo*
Antonio L. Roig Lorenzo
antonio.roig@oneillborges.com
USDC-PR No. 207712

*s/ Salvador J. Antonetti Stutts*
Salvador J. Antonetti Stutts
salvador.antonetti@oneillborges.com
USDC-PR No. 215002

*s/ Ubaldo M. Fernández Barrera*
Ubaldo M. Fernandez Barrera
ubaldo.fernandez@oneillborges.com
USDC-PR No. 224807

*s/ Aníbal A. Román Medina*
Anibal A. Roman Medina
anibal.roman@oneillborges.com
USDC-PR No. 308410

O'NEILL & BORGES LLC
250 Muñoz Rivera Ave., Ste. 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944
*Attorneys for the Federal Reserve Bank of San Francisco*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on July 10, 2024, I filed a copy of the foregoing document using the Court's CM/ECF system, which will automatically generate a Notice of Electronic Filing to all counsel of record in this matter.


<u>*s/ Aníbal A. Román Medina*</u>
Aníbal A. Román Medina