**Federal Reserve Banks**
**Operating Circular No. 10**

# LENDING

**Effective August 28, 2023**

**FEDERAL RESERVE BANKS**
**OPERATING CIRCULAR NO. 10**
**Effective August 28, 2023**

# LENDING

(Click CTRL + section or page number to go directly to the section)

| | | |
|---|---|---|
| 1.0 | SCOPE | 1 |
| 2.0 | DEFINED TERMS | 1 |
| 3.0 | ADVANCES | 5 |
| 4.0 | INTEREST | 5 |
| 5.0 | REPAYMENT OF ADVANCE | 5 |
| 6.0 | GRANT OF SECURITY INTEREST | 6 |
| 7.0 | COLLATERAL | 6 |
| 8.0 | MAINTENANCE OF LENDING DOCUMENTS | 9 |
| 9.0 | REPRESENTATIONS AND WARRANTIES | 10 |
| 10.0 | COVENANTS | 11 |
| 11.0 | WAIVER OF IMMUNITY; SUBMISSION TO JURISDICTION | 13 |
| 12.0 | REMEDIES | 14 |
| 13.0 | INDEMNIFICATION | 15 |
| 14.0 | MISCELLANEOUS | 16 |
| 15.0 | AMENDMENT | 17 |
| 16.0 | NOTICE | 17 |
| 17.0 | TERMINATION | 18 |
| 18.0 | GOVERNING LAW | 18 |
| 19.0 | WAIVER OF JURY TRIAL | 19 |
| 20.0 | STATUS OF PREVIOUS LENDING AGREEMENT | 19 |

**APPENDIX 1: FINANCING STATEMENT COLLATERAL DESCRIPTION**

**APPENDIX 2: TERMS OF CONTROL AGREEMENT**

**APPENDIX 3: APPLICATION PACKAGE FOR U.S. BORROWERS**
      **FORM OF OC-10 LETTER OF AGREEMENT**
      **FORM OF OC-10 CERTIFICATE**
      **FORM OF OC-10 AUTHORIZING RESOLUTIONS FOR BORROWERS**
      **FORM OF OC-10 OFFICIAL AUTHORIZATION LIST**

**APPENDIX 4: APPLICATION PACKAGE FOR BRANCHES OR AGENCIES OF NON-U.S. BORROWERS**
      **FORM OF OC-10 LETTER OF AGREEMENT**
      **FORM OF OC-10 CERTIFICATE**
      **FORM OF OC-10 AUTHORIZING RESOLUTIONS FOR BORROWERS**
      **FORM OF OC-10 OFFICIAL AUTHORIZATION LIST**
      **FORM OF OPINION OF FOREIGN OUTSIDE COUNSEL**
      **FORM OF OPINION OF UNITED STATES OUTSIDE COUNSEL**

**APPENDIX 5: ANCILLARY AGREEMENTS**
      **FORM OF AGREEMENT FOR THIRD-PARTY CUSTODIAN TO HOLD COLLATERAL**
      **FORM OF CORRESPONDENT CREDIT AND PAYMENT AGREEMENT**
            **EXHIBIT 1: LETTER OF AGREEMENT TO CORRESPONDENT CREDIT AND PAYMENT AGREEMENT**

**APPENDIX 6: PROHIBITION AGAINST FEDERAL ASSISTANCE TO ANY SWAPS ENTITY**

**APPENDIX 7: DISCOUNT WINDOW DIRECT**

**CREDIT AND SECURITY TERMS**

**1.0    SCOPE**

This Operating Circular is issued by each Reserve Bank and sets forth the terms under which an entity may, in accordance with the Federal Reserve Act and regulations promulgated thereunder by the Board of Governors of the Federal Reserve System, obtain Advances from, incur Obligations to, or pledge Collateral to a Reserve Bank.

**2.0    DEFINED TERMS**

**2.1**    The capitalized terms used hereafter in this Operating Circular have the meanings defined below:

**Account** means a "Master Account" as defined in the Reserve Banks' Operating Circular No. 1.

**Advance** means an extension of credit to the Borrower (not including a discount of paper) pursuant to Regulation A, including any renewal or extension thereof.

**Advance Repayment Amount** means the amount of an Advance, plus all accrued and unpaid interest thereon.

**Adverse Claim** has the meaning set forth in Section 9.1(d) of this Operating Circular.

**Application Package** means the Application Package, substantially in the form of Appendix 3 or 4, as appropriate, which the Borrower submitted in connection with its agreement to this Operating Circular.

**Bank** means the Reserve Bank in whose district the Borrower is located (determined in accordance with 12 C.F.R. Section 204.3(g) (Regulation D), or such other Reserve Bank with which the Borrower has entered into a borrowing relationship under this Operating Circular.

**BIC-held Collateral** means Collateral that is in the possession or control of the Borrower or stored or maintained with a third-party custodian pursuant to an authorized BIC Arrangement.

**Board of Governors** means the Board of Governors of the Federal Reserve System.

**Borrower** means an entity that incurs an Obligation to the Bank.

**Borrower-in-Custody or BIC Arrangement** means an arrangement whereby the Bank authorizes a Borrower, or a third party (including affiliates of a Borrower), to store or maintain possession of the Collateral, as described in Section 7 of this Operating Circular.

**Business Day** means any day the Bank is open for conducting all or substantially all its banking functions.

**Certificate** means the certificate, substantially in the form set forth in the

1

appropriate Application Package, provided to the Bank by the Borrower.

**Collateral** means:

    (i)    all the Borrower's rights, title, and interest in property (wherever located, now owned or hereafter acquired), including, but not limited to, accounts, chattel paper, inventory, equipment, instruments, investment property, general intangibles, documents, deposit accounts, commercial tort claims and, real property that is (a) identified on a Collateral Schedule, (b) identified on the books or records of a Reserve Bank as pledged to, or subject to a security interest in favor of, the Bank or any other Reserve Bank or (c) in the possession or control of, or maintained with, the Bank or any other Reserve Bank including, but not limited to, investment property, but excluding any investment property in any Unrestricted Securities Account maintained at any Reserve Bank that the Borrower may not encumber under applicable law;

    (ii)    all documents, books and records, including programs, tapes, and related electronic data processing software, evidencing or relating to any or all of the foregoing; and

    (iii)    to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all supporting obligations given by any person with respect to any of the foregoing, including, but not limited to interest, dividends, insurance, rents and refunds.

**Collateral Schedule** means the written, electronic or other statement(s) listing Collateral in effect at any time. Each statement of Collateral shall be in the form required by the Bank and shall identify the items of Collateral with the specificity required by the Bank. The removal of an item from a statement of Collateral will not be effective and will not affect the Bank's security interest in the item unless such removal is made in accordance with this Operating Circular and the Bank's procedures, including prior Bank approval or authorization.

**Correspondent** means a depository institution that maintains an Account with a Reserve Bank and that has agreed to permit a Borrower to utilize its Account to receive Advances and make payments to Reserve Banks pursuant to the Correspondent Credit and Payment Agreement substantially in the form set forth in Appendix 5.

**Discount Window Direct** means the online application described in Appendix 7.

**Event of Default** means the occurrence of any of the following:

    (i)    the Borrower fails to repay or satisfy any Obligation when due;

    (ii)    the Borrower fails to perform or observe any of its obligations or agreements under the Lending Agreement or under any other instrument or agreement delivered or executed in connection with the Lending Agreement or under any other agreement with the Bank or another Reserve Bank;

2

(iii)    any representation or warranty made or deemed to be made by the Borrower under or in connection with the Lending Agreement, or that is contained in any certificate, document or financial or other statement delivered by it or in connection with the Lending Agreement, is inaccurate in any material respect on or as of the date made or deemed made;

(iv)    the Insolvency of the Borrower;

(v)    the Lending Agreement or any other agreement delivered or executed in connection with the Lending Agreement ceases, for any reason, to be in full force and effect, or any person so asserts or any security interest or lien created hereby ceases to be enforceable or have the same effect and priority purported to be created hereby;

(vi)    the creation of an encumbrance upon Collateral, or placement of a levy, judicial seizure of, or an attachment upon Collateral;

(vii)    whenever the Bank deems itself insecure with respect to the financial condition of the Borrower or the Borrower's ability to perform its Obligations.

**FRB Lending Documents** has the meaning set forth in Section 8.0 of this Operating Circular.

**Indebtedness** means the total of the Borrower's overdrafts (whether intraday or overnight) in its Account(s) and any penalties and charges thereon.

**Indemnified Party** has the meaning set forth in Section 13.1 of this Operating Circular.

**Insolvency** means:

(i)    the condition of insolvency;

(ii)    that a proceeding relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to adjudicate an entity bankrupt or insolvent or seeking reorganization, adjustment, dissolution, liquidation or other relief with respect to the Borrower or the Borrower's debt is commenced;

(iii)    that an assignment for the benefit of the Borrower's creditors occurs;

(iv)    that a receiver, custodian, conservator, or the like is appointed for the Borrower or for any of its United States or foreign branches or agencies;

(v)    that the Borrower has been closed by order of its supervisory authorities, or a public officer has been appointed to take over such entity;

3

(vi)    that the Borrower ceases or refuses to make payments in the ordinary course of business, or admits in a record its inability to pay its debt as they become due;

(vii)    the Borrower's business is suspended, or any party has presented or filed a petition for winding-up or liquidating the Borrower; or

(viii)    any other circumstances that evince the Borrower's inability to pay its debts when due.

**Lending Agreement** means this Operating Circular, any Collateral Schedule, each document in the Application Package executed or furnished to the Bank by the Borrower, and any other agreement or document executed by the Borrower in connection with this Operating Circular, in each case as the same may be amended, supplemented or otherwise modified from time to time.

**Letter of Agreement** means the Letter of Agreement, substantially in the form found in Appendix 3 or 4, as appropriate, pursuant to which the Borrower agrees to be bound by the terms of this Operating Circular.

**Obligation**, whether now existing or hereafter incurred, means:

(i)    Advance Repayment Amounts;

(ii)    Indebtedness;

(iii)    any other liabilities of the Borrower to the Bank or any other Reserve Bank, including without limitation, any service fees, whether due or to become due; and

(iv)    any expense the Bank or its designee(s) may incur to:

a.    obtain, preserve and/or enforce the Lending Agreement or the Bank's security interest in Collateral and the Borrower's Obligations under the Lending Agreement,

b.    collect any or all of the foregoing, or

c.    assemble, transport, maintain or preserve Collateral (including, without limitation, taxes, assessments, insurance premiums, repairs, reasonable attorneys' fees, rent, transportation, storage costs, and expenses of sale).

**Regulation A** means the Board of Governors' Regulation A, 12 C.F.R. part 201, as amended, supplemented or otherwise modified from time to time.

**Reserve Bank** means any one of the Federal Reserve Banks (including the Bank).

**UCC** means the Uniform Commercial Code as amended, supplemented or otherwise modified from time to time.

**Unrestricted Securities Account** has the meaning set forth in Operating Circular No. 7.

4

**2.2** The following terms are used herein as defined in Articles 8 and 9 of the UCC: account, chattel paper, control, deposit account, documents, equipment, financial assets, financing statement, general intangibles, instruments, inventory, investment property, record, securities account and securities intermediary.

## 3.0 ADVANCES[1]

**3.1** A request for an Advance shall be made to the Bank in a form and time acceptable to the Bank. An Advance must be secured by Collateral acceptable to the Bank. Upon the Bank's request, the Borrower shall submit a written application for an Advance. The Bank may also require the Borrower to execute a promissory note and/or additional relevant agreements or documents at any time with respect to an Advance.

**3.2** The Bank's making of an Advance is subject to the terms of the Federal Reserve Act as implemented by Regulation A.

**3.3** The Bank's approval of a request for an Advance shall be evidenced by, and the Advance shall be deemed made at the time of, the Bank's record of the credit of the amount of the Advance to an Account agreed upon by the Borrower and the Bank.

## 4.0 INTEREST

**4.1** The interest rate applicable to an Advance shall be the rate, as from time to time established by the Bank subject to the determination of the Board of Governors, that applies to the particular credit program described under Regulation A under which the Bank made the Advance. Interest on an Advance shall accrue from the day the Advance is credited to the Account and shall be payable at the applicable rate in effect on that day, except that if the interest rate changes while an Advance is outstanding, the new rate shall apply as of the day on which the rate change is effective. Interest shall be computed on the basis of 365 days in a year.

**4.2** If all or any portion of an Advance Repayment Amount is not paid when due (whether by acceleration or otherwise), interest on the unpaid portion of the Advance Repayment Amount shall be calculated at a rate 500 basis points higher than the applicable rate then in effect until the unpaid Advance Repayment Amount is paid in full.

## 5.0 REPAYMENT OF ADVANCE

**5.1** The Borrower promises to pay an Advance Repayment Amount when due in actually and finally collected funds. An Advance Repayment Amount is immediately due and payable:

---

[1] Although a Reserve Bank almost always extends credit in the form of an Advance, a Reserve Bank may extend credit by discounting paper that meets the requirements described in the Federal Reserve Act and Regulation A if the Reserve Bank concludes that a discount more effectively would meet the needs of the situation. A loan in the form of a discount would be subject to a separate agreement between the Reserve Bank and the Borrower. Such agreement may be based on this Operating Circular and, if so, may vary or supplement the terms of this Operating Circular as appropriate.

5

Operating Circular No. 10
Effective August 28, 2023

(a)    on demand;

(b)    without any demand, notice or other action:

(i)    on the due date and time specified by the Bank in writing (provided that if such date falls on a day that is not a Business Day, the due date shall be extended to the next Business Day). If no due date and time is specified, then an Advance Repayment Amount is due 24 hours after the Advance was made (provided that if such time falls on a day that is not a Business Day, the time shall be extended to such time on the next Business Day); or

(ii)    upon the occurrence of any Event of Default described in clause (iv), (v) or (vii) of the definition of such term; or

(c)    at the Bank's option, upon the occurrence of any other Event of Default; or

(d)    at the Bank's option, if the Borrower, in whole or in part, is acquired, merged, dissolved, or nationalized, or sells or otherwise disposes of substantially all of its assets, or if the Borrower is taken over in any other way by any other person or entity.

5.2    Operating Circular No. 1 issued by the Reserve Bank maintaining the Account where Indebtedness is incurred governs when such Indebtedness is due and payable; provided, however, that if an Advance Repayment Amount becomes due under Sections 5.1(a), (b)(ii), (c) or (d), all other Obligations shall become due and payable immediately, without any demand, notice, or other action.

5.3    The Borrower waives any right to presentment, notice of dishonor, protest, and any other notice of any kind except as expressly provided for herein.

5.4    The Borrower may prepay an Advance Repayment Amount, in whole or in part, without penalty.

5.5    The Bank or the appropriate Reserve Bank will debit the Borrower's Account for the Advance Repayment Amount and all other Obligations when due. If the Borrower does not have an Account, the Borrower must make arrangements satisfactory to the Bank for paying the Advance Repayment Amount prior to requesting any Advance, such as making payment through a Correspondent.

## 6.0    GRANT OF SECURITY INTEREST

For value received and in consideration of the Bank permitting the Borrower to obtain Advances or incur Indebtedness, the Borrower hereby transfers and assigns to the Bank and grants to the Bank for itself and as agent for each other Reserve Bank to which an Obligation is or becomes owing, a continuing security interest in and lien on the Collateral as collateral security for the timely and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all Obligations.

## 7.0    COLLATERAL

7.1    The Borrower shall ensure that the Collateral meets the requirements as the Bank

may from time to time prescribe and shall deliver, hold, store or otherwise maintain Collateral on such terms and conditions as the Bank may from time to time prescribe. Borrower must keep all Collateral Schedules current and updated and otherwise comply with the Bank's instructions.

**7.2** The Bank may at any time request the Borrower to replace any item of Collateral or to grant a lien and security interest in additional assets of a type and in an amount acceptable to the Bank, and the Borrower shall promptly do so.

**7.3** Unless otherwise specified by the Bank in writing, the Borrower shall promptly withdraw from the Collateral Schedule:

(a)    any Collateral that has a payment of principal or interest past due, in whole or in part, for more than 30 days (or 60 days past due for mortgage notes, and other types of consumer debt, including student loans);

(b)    any Collateral that has been paid in full by the obligor;

(c)    any Collateral if the obligor on such Collateral becomes insolvent, or if a receiver, custodian, or the like is appointed for the obligor; or

(d)    any Collateral that does not meet the other eligibility requirements that the Bank may prescribe from time to time.

Prior to such withdrawal, however, the Borrower shall pledge substitute Collateral acceptable to the Bank by submitting an updated Collateral Schedule or otherwise pledging such Collateral to the Bank.

**7.4** Except as may be the case for book-entry securities held on a Reserve Bank's books pursuant to Operating Circular No. 7 issued by the Bank, the Bank has no duty to collect any income accruing on Collateral or to preserve any rights relating to Collateral.

**7.5** The Borrower hereby:

(a)    authorizes the Bank at any time to file or record in any filing office in any jurisdiction which the Bank determines appropriate to perfect the security interests set forth hereunder, financing statements, and any amendments or continuation statements related thereto without the signature of the Borrower therein, that describes the Collateral substantially as set forth on Appendix 1 hereto, and the Borrower shall, promptly at the Bank's request, provide any additional information required by Article 9 of the UCC, as in effect in any relevant jurisdiction, for the sufficiency or acceptability of any financing statement;

(b)    ratifies its authorization for the Bank to have filed any financing statement, including any amendment or continuation statement related thereto, in any jurisdiction, where the same has been filed prior to the date on which the Letter of Agreement is signed by the Borrower;

(c)    authorizes the Bank, at any time, to take any and all other actions that may be necessary or, in the Bank's sole discretion, desirable to obtain,

7

preserve, perfect or enforce the Bank's security interest in the Collateral;

(d) authorizes the Bank to endorse or assign as the Borrower's agent any item of Collateral, to cause Collateral consisting of uncertificated securities to be marked on the books of the securities issuer as pledged to the Bank or its nominee as pledgee, and to inspect Collateral held by the Borrower and copy any relevant records and/or documents.

**7.6** If the Bank approves, the Borrower may pledge BIC-held Collateral subject to the following:[2]

(a) BIC-held Collateral shall be prominently identified as Pledged to the Bank and subject exclusively to the Bank's written instructions. At the Bank's request, the Borrower shall, without delay, prominently and conspicuously affix a legend to items of BIC-held Collateral indicating that such items are subject to a security interest in favor of the Bank.

(b) The Borrower shall mark its records to show that BIC-held Collateral has been pledged to the Bank and is subject exclusively to the Bank's written instructions. Any computer-generated list or report containing BIC-held Collateral must incorporate a legend indicating that such Collateral is pledged to the Bank.

(c) Upon the Bank's request, the Borrower shall at all times segregate BIC-held Collateral from its own assets or the assets of any other party and shall hold Collateral in such location(s) approved by the Bank. BIC-held Collateral shall not be removed from such location(s) without the prior written approval of the Bank.

(d) The Borrower may withdraw or replace BIC-held Collateral only with the approval of the Bank and on terms acceptable to the Bank.

(e) The Bank may from time to time notify Borrower of additional requirements on BIC-held Collateral. The Borrower's failure to comply with such requirements shall disqualify the Borrower from participation in the BIC Arrangement.

**7.7** With respect to any item of Collateral not delivered or transferred to the Bank or its custodian, including BIC-held Collateral, the Borrower shall hold such item of Collateral in trust for the Bank until the Collateral is delivered or transferred in accordance with the Bank's instructions. The Borrower bears the risk of loss for any Collateral held in the Borrower's possession or control, at any custodian, maintained in an account at a securities intermediary other than a Reserve Bank, or in transit to or from the Bank. The Borrower also bears the risk of any accidental

---

[2] If Collateral is maintained by a third party (including an affiliate of the Borrower), the Borrower must comply with (or compel such third party's compliance with) the provisions in this Operating Circular pertaining to BIC-held Collateral. In addition, such third party must execute an Agreement for Third-Party Custodian to Hold Collateral, the form of which is in Appendix 5. Finally, the Bank may require the third party to complete Collateral Schedules and participate or comply with inspection and certification requirements related to the BIC-held Collateral. For purposes of this Operating Circular, "affiliate" means a parent, direct or indirect subsidiary of the Borrower or any entity having the same parent or ultimate parent as the Borrower.

8

Operating Circular No. 10
Effective August 28, 2023

loss or damage to Collateral in the Bank's possession or control to the extent the Bank exercised reasonable care.

7.8    Unless an Event of Default occurs or the Bank expressly directs otherwise, any proceeds, dividend, interest, rent, proceeds of redemption, and/or any other payment received by the Borrower regarding any Collateral may be retained by the Borrower. If the Bank directs that any of the foregoing be paid to the Bank, the Borrower shall remit those payments, or cause such payments to be remitted, promptly to the Bank and, until receipt by the Bank, such payments are deemed to be held in trust for the Bank.

7.9    The Bank is under no obligation to allow for the withdrawal of any item of Collateral from the pledge to the Bank, or to allow the removal of any item of Collateral from the Collateral Schedule or otherwise release its security interest in any item of Collateral unless:

(a)    the Borrower has provided substitute Collateral acceptable to the Bank; or

(b)    the Bank has verified, in accordance with its normal customs and procedures, that all Obligations have been unconditionally repaid in full and that the Borrower is not currently in default under another agreement with the Bank or any other Reserve Bank.

7.10    In order to perfect its security interest in property, whether now owned or hereafter acquired, maintained with any other Reserve Bank including, but not limited to, any deposit account, investment property in any Unrestricted Securities Account, and items in the process of collection and their proceeds, but excluding any investment property in any Unrestricted Securities Account maintained at any Reserve Bank that the Borrower may not encumber under applicable law, Bank will enter, or has entered, a control agreement, substantially in the form of Appendix 2, with any other Reserve Bank with respect to any accounts of Borrower maintained at such Reserve Banks. Borrower hereby agrees to and consents to be bound by the terms of any such control agreement. It is understood that any such control agreement creates in favor of the Bank and for the benefit of the other Reserve Banks, a legal, valid, and enforceable security interest, perfected by control, within the meaning of the UCC, in Collateral described in this section. The Bank will not exercise its rights in such accounts under such agreement except upon the occurrence of an Event of Default.

7.11    Unless Bank notifies the Borrower otherwise, the Borrower shall be permitted to Transfer Collateral consisting of securities held in the Borrower's Unrestricted Securities Account as provided for in Operating Circular No. 7. Securities that the Borrower Transfers shall be free and clear of any security interest of the Bank created hereunder. The term "Transfer" as used in this Section, has the meaning set forth in Operating Circular No. 7.

## 8.0    MAINTENANCE OF LENDING DOCUMENTS

The Borrower must maintain at all times a copy of any Collateral Schedule, each document in the Application Package executed or furnished to the Bank by the Borrower, and any other agreement or document executed by the Borrower in connection with this Operating Circular, in each case, as the same may be amended, supplemented or otherwise

9

Operating Circular No. 10
Effective August 28, 2023

modified from time to time (collectively, the "FRB Lending Documents"), and should treat such documents as official records of the Borrower. The Borrower must also maintain at all times a current statement of outstanding Advances and Indebtedness. The FRB Lending Documents, (i) if in paper form, must be maintained together in a secure location on or accessible from the Borrower's premises; or (ii) if in electronic form, must be maintained in a manner that is easily and readily accessible from the Borrower's information technology systems. If the Borrower is a U.S. branch or agency of a foreign bank, the FRB Lending Documents must be maintained in or be accessible from the office of the Borrower's U.S. branch or agency located in the Federal Reserve District in which the Borrower obtains Advances or incurs Indebtedness.

## 9.0    REPRESENTATIONS AND WARRANTIES

**9.1**    The Borrower represents and warrants that:

(a)    (i) the Borrower has the power and authority, and the legal right, to make, deliver and perform the Lending Agreement and to obtain Advances or otherwise incur Indebtedness; (ii) the Borrower has taken all necessary organizational action to authorize the execution, delivery and performance of the Lending Agreement and to authorize the obtaining of Advances on the terms and conditions of the Lending Agreement; (iii) no consent or authorization of, filing with, notice to or other act by or in respect of, any governmental authority or any other person is required in connection with the obtaining of Advances hereunder or with the execution, delivery, performance, validity or enforceability of the Lending Agreement; and (iv) the Lending Agreement has been duly executed and delivered on behalf of the Borrower;

(b)    the Borrower is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and in each jurisdiction where the conduct of its business requires qualification, and is not in violation of any laws or regulations in any respect which could have any adverse effect whatsoever upon the validity, performance or enforceability of any of the terms of the Lending Agreement;

(c)    the Lending Agreement constitutes a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms;

(d)    the Borrower has rights in Collateral sufficient to grant an enforceable security interest to the Bank, and its rights in Collateral are free of any assertion of a property right that would adversely affect a Reserve Bank's right to Collateral, including but not limited to any claim, lien, security interest, encumbrance, preference or priority arrangement or restriction on the transfer or pledge of Collateral (an "Adverse Claim"), except as created by, or otherwise permitted under, the Lending Agreement or by the Bank;

(e)    all information set forth on the Certificate is accurate and complete and there has been no change in such information since the date of the Certificate;

(f)    (i) the Lending Agreement is effective to create in favor of the Bank for itself

10

and for the benefit of the other Reserve Banks, if applicable, a legal, valid, and enforceable security interest in the Collateral described in the Lending Agreement and proceeds thereof; (ii) when financing statements are filed in the state filing offices located in the jurisdictions specified on the Certificate, those security interests shall constitute a fully and validly perfected lien on, and security interest in, all rights, title and interest of the Borrower in such Collateral as to which perfection can be obtained by filing, as security for the Obligations, in each case prior and superior in right to any other person (except for liens that arise by operation of law); and (iii) no financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except such as have been filed in favor of the Bank pursuant to the Lending Agreement, are permitted by the Lending Agreement, or are otherwise permitted by the Bank;

(g)   no statement or information contained in the Lending Agreement or any other document, certificate, or statement furnished by the Borrower to the Bank or any other Reserve Bank for use in connection with the transactions contemplated by the Lending Agreement, on and as of the date when furnished, is untrue as to any material fact or omits any material fact necessary to make the same not misleading, and the representations and warranties in the Lending Agreement are true and correct in all material respects;

(h)   the Borrower has evaluated the potential risks and liabilities accruing to the Borrower under applicable Federal and State environmental laws, rules, and regulations and has determined, to the best of the Borrower's knowledge that under applicable laws, rules, or regulations that impose environmental liability on a creditor or lender or an owner or manager of the real property that secures Collateral, the Borrower does not have and has not assumed any liability of any person thereunder; and

(i)   no Event of Default has occurred or is continuing.

9.2   Each time the Borrower requests an Advance, incurs any Indebtedness, or grants a security interest in any Collateral to a Reserve Bank, the Borrower is deemed to make all of the foregoing representations and warranties on and as of the date such Advance or Indebtedness is incurred or security granted. Such representations and warranties shall be true on and as of such date and shall remain true and correct so long as the Lending Agreement remains in effect, any Obligation remains outstanding, or any other amount is owing to the Bank.

## 10.0   COVENANTS

The Borrower covenants that so long as the Lending Agreement remains in effect or any Obligation remains outstanding or any other amount is owing to the Bank:

(a)   the Borrower shall provide to the Bank any reports or statements that the Bank requests;

(b)   the Borrower shall permit the Bank or its designee to inspect or copy any documents or evidence in the Borrower's possession or control relating to

11

Collateral and any Obligation;

(c)     except for the security interest herein granted or otherwise permitted hereunder or by the Bank, the Borrower shall have rights in the Collateral free from any Adverse Claim, and shall maintain the security interest created hereby as a perfected security interest with the priority set forth in Section 9.1(f) and shall take all actions necessary or prudent to defend against Adverse Claims;

(d)     except as otherwise permitted hereunder or by the Bank, the Borrower shall not (i) sell or otherwise dispose of, or offer to sell or otherwise dispose of, the Collateral or any interest therein, or (ii) pledge, mortgage, or create, or permit the existence of any right of any person in or claim to, the Collateral other than the security interest granted herein;

(e)     the Borrower shall pay promptly when due (or before they become delinquent) all taxes, assessments, governmental charges, and levies imposed upon the Collateral or any income or profits therefrom, and any claims of any kind against Collateral;

(f)     upon the Bank's request, the Borrower shall promptly reimburse the Bank for any expense incurred by the Bank with respect to enforcing or administering the Lending Agreement and any item of Collateral, including perfecting or maintaining perfection of the Borrower's and/or the Bank's security interest in Collateral, and assembling, transporting, safekeeping, managing, inspecting, or liquidating Collateral, whether Collateral is held by the Bank, its custodian, or the Borrower;

(g)     the Borrower shall not perform any act with respect to any Collateral that would impair the Bank's rights or interests therein, nor will the Borrower fail to perform any act that would reasonably be expected to prevent such impairment or that is necessary to preserve the Bank's rights;

(h)     at the Bank's request, the Borrower shall promptly execute any agreement or document and take any other actions that the Bank deems necessary or desirable, including but not limited to the execution and delivery of any document the Bank deems necessary to grant, perfect or otherwise protect the Bank's security interest in any existing or additional Collateral;

(i)     the Borrower shall promptly notify the Bank if the Borrower is or is about to become an undercapitalized depository institution or a critically undercapitalized depository institution, as such terms are defined in Regulation A;

(j)     the Borrower shall renew or keep in full force and effect its organizational existence or take all reasonable action to maintain all rights, privileges, licenses and franchises necessary or desirable in the normal conduct of its business;

(k)     without providing at least 30 days' prior written notice to the Bank and submitting an updated Certificate to the Bank, the Borrower shall not cause or permit any of the information provided in the Certificate, including its

12

jurisdiction of organization or its name on its Organizational Document (as defined in the Certificate), to become untrue;

(l)     the Borrower shall continuously maintain the FRB Lending Documents in the same manner as it maintains all other official corporate records, and the FRB Lending Documents shall be immediately and routinely available to any examiner authorized to examine the Borrower;

(m)     in any BIC Arrangement, the Borrower shall provide for periodic audits of BIC-held Collateral pledged to the Bank, shall notify the Bank immediately of any irregularities discovered during any audits, shall certify periodically, as determined by the Bank, that it is complying with the requirements of the BIC Arrangement, and shall ensure risk ratings assigned to any Collateral subject to Borrower's internal loan ratings are accurate;

(n)     the Borrower shall promptly notify the Bank of the occurrence or impending occurrence of any Event of Default; and

(o)     the Borrower shall promptly notify the Bank of any change in applicable law, the regulations or policies of its chartering and/or licensing authority, or its charter, bylaws, or other governing documents, or any legal or regulatory process asserted against the Borrower, that materially affects or may materially affect the Borrower's authority or ability to lawfully perform its obligations under the Lending Agreement.

## 11.0    WAIVER OF IMMUNITY; SUBMISSION TO JURISDICTION

11.1    If the Borrower or its property is now, or in the future becomes, entitled to any immunity, whether characterized as sovereign or otherwise (including, without limitation, immunity from set-off, from service of process, from jurisdiction of any court or tribunal, from attachment in aid of execution, from attachment prior to the entry of a judgment, or from execution upon a judgment) in any legal proceeding in Federal or State courts in the United States of America, or in the courts of the country where the Borrower is chartered, or in the courts of the country in which the Borrower principally conducts its business, then the Borrower expressly and irrevocably waives, to the maximum extent permitted by law, any such immunity. To the extent the Borrower receives any such entitlement in the future, the Borrower shall promptly notify the Bank of such entitlement.

11.2    The Borrower submits in any legal action or proceeding relating to or arising out of the Lending Agreement, or the conduct of any party with respect therefor or for recognition and enforcement of any judgment in respect thereof, to the nonexclusive general jurisdiction of the Federal District Court sitting where the Bank's head office is located and any appellate court thereof. In the case of a foreign Borrower, such Borrower also submits to the non-exclusive jurisdiction of the courts of the country where the Borrower is chartered or in which it principally conducts its business over any suit, action or proceeding arising out of or relating to the Lending Agreement. The Borrower agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the address provided in the Letter of Agreement; and agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or

13

Operating Circular No. 10
Effective August 28, 2023

shall limit the right to sue in any other jurisdiction. The Borrower irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the venue of any such suit, action, or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. The Borrower also agrees that a final judgment in any such suit, action, or proceeding brought in such court shall be conclusive and binding upon the Borrower. The foregoing does not diminish or otherwise affect the Bank's rights under Section 25B of the Federal Reserve Act, 12 USC § 632.

## 12.0    REMEDIES

12.1    Upon the occurrence of, and at any time during the continuance of, an Event of Default, the Bank may pursue any of the following remedies, separately, successively, or concurrently:

(a)    debit the Borrower's Account, or cause the Borrower's Account to be debited (in the case of an Account at another Reserve Bank), in an amount up to the Borrower's unpaid Obligations;

(b)    set off any Obligation against any amount owed by the Bank or any other Reserve Bank to the Borrower, whether or not such amount owed is then due and payable;

(c)    exercise any right of set-off or banker's lien provided by applicable law against the Borrower's property in the possession or control of, or maintained with, the Bank or any other Reserve Bank, including but not limited to items in process of collection and their proceeds and any balance to the credit of the Borrower with a Reserve Bank;

(d)    take possession or control of any Collateral not already in the Bank's possession or control, without demand and without legal process. Upon the Bank's demand, the Borrower shall assemble and make Collateral available to the Bank as the Bank directs. The Borrower grants to the Bank the right, for this purpose to enter into or on any premises where Collateral may be located; and

(e)    pursue any other remedy available to collect, enforce, or satisfy any Obligation, including exercising its rights as a secured creditor to collect income on the Collateral, or to sell, assign, transfer, lease or otherwise dispose of Collateral whether or not Collateral is in the Bank's possession or control.

12.2    If the Bank exercises its rights in Collateral upon an Event of Default:

(a)    the Bank may sell, assign, transfer, and deliver, at the Bank's option, all or any part of Collateral at private or public sale, at such prices as the Bank may, in good faith, deem best, without advertisement, and the Borrower waives notice of the time and place of the sale, except any notice that is required by law and may not be waived;

(b)    the Bank has no obligation to prepare Collateral for sale, and the Bank may

14

sell Collateral and disclaim any warranties without adversely affecting the commercial reasonableness of the sale;

(c)     the Bank has no obligation to collect from any third party or to marshal any assets in favor of the Borrower to satisfy any Obligation; and

(d)     the Bank or another Reserve Bank may purchase any or all of Collateral and pay for it by applying the purchase price to reduce amounts owed by the Borrower to the Bank or any other Reserve Bank.

**12.3**    The Borrower appoints the Bank, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Borrower, to endorse, assign, transfer, and deliver Collateral to any party, and to take any action deemed necessary or advisable by the Bank either to protect the Bank's interests or exercise its rights under the Lending Agreement, including taking any action to perfect or maintain the Bank's security interest (including but not limited to recording an assignment of a mortgage or filing a financing statement). This power of attorney is coupled with an interest and as such is irrevocable and full power of substitution is granted to the assignee or holder. As attorney-in-fact, the Bank may take any lawful action to collect all sums due in connection with Collateral, the Bank may release any Collateral, instruments or agreements securing or evidencing the Obligations as fully as the Borrower could do if acting for itself, and the Bank may take any action set forth in Section 7.5, but the Bank has no obligation to take any such actions or any other action in respect of the Collateral.

**12.4**    The proceeds realized by the Bank upon selling or disposing of Collateral, to the extent actually received in cash by the Bank or another Reserve Bank, will be applied toward satisfaction of the Obligations. The Bank shall apply such proceeds first to any fees, other charges, penalties, indemnities, and costs and expenses of, collection, or realizing on interests in Collateral (including reasonable attorneys' fees), next to accrued but unpaid interest, and last to the unpaid principal balance. The Bank will account to the Borrower for any surplus amount realized upon such sale or other disposition, and the Borrower shall remain liable for any deficiency.

**12.5**    No delay or failure by the Bank to exercise any right or remedy accruing upon an Event of Default shall impair any right or remedy, waive any default or operate as an acquiescence to the Event of Default, or affect any subsequent Event of Default of the same or of a different nature.

**12.6**    On complying with the provisions of the Lending Agreement and applicable law, the Bank is fully discharged from any liability or responsibility to any person regarding Collateral.

**13.0    INDEMNIFICATION**

**13.1**    The Borrower shall indemnify the Bank and its officers, directors, employees and agents (each, an "Indemnified Party") for any loss, claim, damage, liability, and expense (including, without limitation, reasonable attorneys' fees, court costs and expenses of litigation) incurred by an Indemnified Party in the course of or arising out of the performance of the Lending Agreement, any action related to Collateral, or any action to which an Indemnified Party may become subject in connection

15

Operating Circular No. 10
Effective August 28, 2023

with the Bank's exercise, enforcement or preservation of any right or remedy granted to it under the Lending Agreement, except to the extent that such loss, claim, damage, liability, or expense results, as determined by a court, from the Bank's gross negligence or willful misconduct.

13.2    The Bank will give the Borrower written notice of any claim that the Bank or any other person may have under this indemnity. The Borrower is not liable for any claim that is compromised or settled by the Bank or such persons without the Borrower's prior written consent, provided that the Borrower responded promptly and in the Bank's judgment, adequately, to the Bank's notice of such claim. This indemnity remains an obligation of the Borrower notwithstanding termination of the Lending Agreement, and is binding on the Borrower's successors and assigns. Upon written demand from the Bank, the Borrower shall pay promptly amounts owed under this indemnity, free and clear of any right of offset, counterclaim or other deduction, and the Bank's reasonable determination of amounts owing hereunder is binding. If not promptly paid by the Borrower, such obligation becomes an Obligation secured under the Lending Agreement.

## 14.0    MISCELLANEOUS

14.1    The Bank is not obligated by the Lending Agreement or otherwise to make, increase, renew, or extend any Advance to the Borrower.

14.2    The amount of any Advance Repayment Amount and/or Obligation reflected on the books and records of a Reserve Bank is presumptive evidence of the amounts due and owing by the Borrower to such Reserve Bank.

14.3    The Borrower's obligations under the Lending Agreement shall be performed by it at its own cost and expense.

14.4    Unless expressly agreed otherwise by the Bank, the time zone of the Bank's head office shall be used to determine any deadline hereunder, including the time an Advance Repayment Amount is due and payable.

14.5    The Bank may record telephone communications between the Bank and the Borrower, and such recordings may be submitted in evidence to any court or in any proceeding for the purpose of establishing any matters pertinent to the Lending Agreement.

14.6    The Bank may rely on any record used by the Borrower to endorse or pledge Collateral to the Bank.

14.7    The Bank's rights and remedies under the Lending Agreement are in addition to any others agreed to by the Borrower or that may exist at law or in equity.

14.8    Any provision of the Lending Agreement that is unenforceable or invalid under any law in any jurisdiction is ineffective to the extent of such unenforceability or invalidity without affecting the enforceability or validity of any other provision, and any such unenforceability or invalidity shall not invalidate or render unenforceable such provision in any other jurisdiction.

14.9    The Lending Agreement is binding on the receivers, administrators, permitted

16

assignees and successors, and legal representatives of the Borrower and inures to the benefit of the Bank, its assignees and successors.

**14.10**   The Bank may sell, transfer, assign or participate to any other Reserve Bank(s) any or all of its interest in repayment of any Obligation and may purchase any Obligation from any other Reserve Bank. The Borrower may not assign its rights or obligations hereunder.

**14.11**   The Bank is not required to provide a written advice to the Borrower for any Advance or Advance Repayment Amount.

**14.12**   The Bank has no liability for acting in reliance upon any communication (including a fax, telex, electronic communication, or similar communication) reasonably believed by the Bank to be genuine or to be sent by an individual acting on behalf of the Borrower.

**14.13**   The Section headings used herein are for convenience only and are not to affect the construction hereof or be taken into consideration in the construction hereof.

**14.14**   To the extent any Reserve Bank requires agreements or other documents to be in writing, including the Lending Agreement, a Reserve Bank may accept such documents created, generate, or stored by electronic means or executed with a digital signature provided that such format or form of execution does not affect the effectiveness or enforceability of the agreement or the security interest created thereunder. If a Reserve Bank accepts an agreement executed with a digital signature, the Reserve Bank will view the agreement as an electronic record as provided in the Electronic Signatures in Global and National Commerce Act (E-Sign Act) (15 U.S.C. § 7001 et seq.). A Reserve Bank may reject any document executed with a digital signature that does not satisfy the Reserve Bank's standards for acceptable signatures.

## 15.0   AMENDMENT

The Bank, in its sole discretion, may amend the Lending Agreement without prior notice at any time. The Bank shall notify the Borrower of any such amendment and, thereafter, any pledge of Collateral, request for any Advance or incurrence of any other Obligation shall constitute the Borrower's agreement to such amendment as of the effective date of such amendment. An amendment does not modify, except for a change in interest rate or other charges, the terms of an outstanding Advance.

## 16.0   NOTICE

**16.1**   Any notice or other communication in respect of this Agreement may be given in any manner set forth below to the addresses or numbers or in accordance with the e-mail or electronic messaging system details provided in or pursuant to this Agreement with respect to the receiving party and will be deemed effective as indicated:

   (a)   if in writing and delivered in person or by courier, on the date it is delivered;

   (b)   if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered, or its delivery

17

is attempted;

(c)    if sent by electronic messaging system, on the date that electronic message is received;

(d)    if sent by e-mail or through Discount Window Direct, on the date that message is delivered; or

(e)    if by telephone or other oral communication, on the date that oral communication occurred, provided that such oral communication either is confirmed promptly in writing by at least one of the methods specified in (a) to (d) above or is recorded,

unless the date of the delivery (or attempted delivery), the receipt or the occurrence, as applicable, is not a Business Day or that communication is delivered (or attempted), received or shall have occurred, as applicable, after the close of business on a Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Business Day.

**16.2**    Notices that are mailed or delivered in person or by courier to the Borrower must be addressed as indicated by the Borrower in the Letter of Agreement, or as otherwise specified by the Borrower in a record.

Notices that are mailed or delivered in person or by courier to the Bank must be addressed to the credit function at the Bank's head office or as otherwise specified by the Bank.

## 17.0    TERMINATION

**17.1**    The Borrower may terminate its consent to be bound by the Lending Agreement by giving written notice to the credit function at the Bank's head office or as otherwise specified by the Bank, so long as no Advance is then outstanding.[3] Notice of termination does not release the Borrower or affect the Bank's rights, remedies, powers, security interests or liens against Collateral in existence prior to the Bank's receipt of the notice, nor does notice of termination affect any provision of the Lending Agreement which by its terms survives termination of the Lending Agreement.

**17.2**    Upon termination, the Bank may retain Collateral until the Bank has had a reasonable opportunity to verify, in accordance with its normal customs and procedures, that all of the Borrower's Obligations, contingent or otherwise, to the Bank or any other Reserve Bank have been fully satisfied and discharged.

## 18.0    GOVERNING LAW

The Lending Agreement, including any Advance or any other transaction entered into pursuant thereto, is governed by the law of the State in which the Bank's head office is located. The Lending Agreement is a security agreement for purposes of the UCC, as in

---

[3] Collateral arrangements, including arrangements with securities intermediaries, such as Euroclear or Clearstream, and third-party custody and Borrower-in-Custody Arrangements may have their own termination provisions.

18

Operating Circular No. 10
Effective August 28, 2023

effect in any relevant jurisdiction, and other applicable law.

**19.0    WAIVER OF JURY TRIAL**

THE BORROWER AND THE BANK EACH HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, COUNTERCLAIM, OR CROSS CLAIM ARISING IN CONNECTION WITH, OUT OF, OR OTHERWISE RELATING TO THE LENDING AGREEMENT, THE COLLATERAL, OR ANY TRANSACTION OR AGREEMENT ARISING THEREFROM OR RELATED THERETO.

**20.0    STATUS OF PREVIOUS LENDING AGREEMENT**

This Operating Circular amends and restates the Bank's Operating Circular No. 10, *Lending*, dated July 16, 2013.

Operating Circular No. 10
Effective August 28, 2023

**APPENDIX 1: FINANCING STATEMENT COLLATERAL DESCRIPTION**

All accounts, chattel paper, inventory, equipment, instruments, investment property, general intangibles, documents, and all assets, now owned or hereafter acquired, that are identified, from time to time, by Debtor to Secured Party in writing, by electronic means (including by CD-ROM) or by any other means agreed by the parties, as collateral securing the obligations of Debtor to Secured Party under a written agreement between the parties, and all proceeds thereof; and all collateral, guarantees, letters of credit, surety bonds and other supporting obligations pertaining to the foregoing, and all proceeds thereof.

Appendix 1
to Operating Circular No. 10

**APPENDIX 2: TERMS OF CONTROL AGREEMENT**

Reference is made to Operating Circular No. 10 as issued by each of the Federal Reserve Banks, as the same may be amended, supplemented or otherwise modified from time to time ("OC-10"; capitalized terms used but not defined herein have the meaning assigned them in OC-10).

**Whereas**, by agreeing to OC-10, each Borrower has given the Federal Reserve Bank with which it has agreed to OC-10 (an "OC-10 Reserve Bank"), for itself and as agent for each other Federal Reserve Bank, a security interest in property, whether now owned or hereafter acquired, maintained with any other Federal Reserve Bank (an "Account Maintaining Reserve Bank") including, but not limited to, any deposit account, investment property in any securities account, and items in the process of collection and their proceeds (but excluding any investment property in any Unrestricted Securities Account maintained at any Federal Reserve Bank that the Borrower may not encumber under applicable law) (each an "Account");

**Whereas** each OC-10 Reserve Bank would like to perfect its security interest in each Account now or hereafter maintained at any Account Maintaining Reserve Bank by control, as such term is used in Articles 8 and 9 of the Uniform Commercial Code in effect in the relevant jurisdictions; and

**Whereas**, by agreeing to OC-10, each Borrower has agreed to and consented to be bound to the terms of this Control Agreement;

**Now, therefore**, each Account Maintaining Reserve Bank agrees with each OC-10 Reserve Bank, for itself and as agent for each other Federal Reserve Bank, that with respect to any Borrower maintaining an Account at such Account Maintaining Reserve Bank, it will follow the instructions of an OC-10 Reserve Bank as to the withdrawal or disposition of funds or securities from time to time credited to any such Account, or as to any other matters pertaining to such Account without further consent or instruction from Borrower, subject only to the interest that the Account Maintaining Reserve Bank may also have in such Account.

This Agreement is governed by the law of the State in which the Account Maintaining Reserve Bank's head office is located.

FEDERAL RESERVE BANK OF ATLANTA

By: _____
Name:
Title:
Date:

FEDERAL RESERVE BANK OF MINNEAPOLIS

By: _____
Name:
Title:
Date:

FEDERAL RESERVE BANK OF BOSTON

By: _____
Name:
Title:
Date:

FEDERAL RESERVE BANK OF NEW YORK

By: _____
Name:
Title:
Date:

FEDERAL RESERVE BANK OF CHICAGO

By: _____
Name:
Title:
Date:

FEDERAL RESERVE BANK OF PHILADELPHIA

By: _____
Name:
Title:
Date:

FEDERAL RESERVE BANK OF CLEVELAND

By: _____
Name:
Title:
Date:

FEDERAL RESERVE BANK OF RICHMOND

By: _____
Name:
Title:
Date:

FEDERAL RESERVE BANK OF DALLAS

By: _____
Name:
Title:
Date:

FEDERAL RESERVE BANK OF SAN FRANCISCO

By: _____
Name:
Title:
Date:

FEDERAL RESERVE BANK OF KANSAS CITY

By: _____
Name:
Title:
Date:

FEDERAL RESERVE BANK OF ST. LOUIS

By: _____
Name:
Title:
Date:

Appendix 2
to Operating Circular No. 10

**APPENDIX 3: APPLICATION PACKAGE FOR U.S. BORROWERS**

U.S. Borrowers desiring capacity to request to borrow funds from their local Federal Reserve Bank should submit the following documents, forms of which are included in this appendix:

Form of OC-10 Letter of Agreement
Form of OC-10 Certificate
Form of OC-10 Authorizing Resolutions for Borrowers
Form of OC-10 Official Authorization List

The form documents are available online. Before submitting such documentation, Borrowers should consult with their local Federal Reserve Bank for any special instructions.

## APPENDIX 4: APPLICATION PACKAGE FOR BRANCHES OR AGENCIES OF NON-U.S. BORROWERS

Non-U.S. Borrowers desiring capacity to request to borrow funds from their local Federal Reserve Bank should submit the following documents, forms of which are included in this appendix:

Form of OC-10 Letter of Agreement
Form of OC-10 Certificate
Form of OC-10 Authorizing Resolutions for Borrowers
Form of OC-10 Official Authorization List
Form of OC-10 Legal Opinion of Foreign Outside Counsel
Form of OC-10 Legal Opinion of United States Outside Counsel

The form documents are available online. Before submitting such documentation, Borrowers should consult with their local Federal Reserve Bank for any special instructions.

## APPENDIX 5: ANCILLARY AGREEMENTS

This appendix includes the following forms which are available online:

Form of Agreement for Third-Party Custodian to Hold Collateral
Form of Correspondent Credit and Payment Agreement
      Exhibit 1: Form of Letter Agreement for Obtaining Advances Through Correspondent

**APPENDIX 6: PROHIBITION AGAINST FEDERAL ASSISTANCE TO ANY SWAPS ENTITY**

This Appendix amends, supplements and becomes a part of the Reserve Banks' Operating Circular No. 10, as amended, supplemented or otherwise modified from time to time ("Operating Circular"), and shall be binding on each institution that has executed a Letter of Agreement prior to or following the date this Appendix is issued and each institution that receives an Advance under the Operating Circular.

**1.0    DEFINED TERMS**

**1.1**    All capitalized terms used but not defined herein have the meaning assigned them in the Operating Circular. The other capitalized terms used herein are limited to this Appendix 6 and have the meanings set out below:

**Borrower** means an entity that incurs an Obligation to the Bank; provided that, for purposes of the representations in section 2 below, in the case of a foreign bank, "Borrower" means the U.S. branch or agency that has requested an Advance.

**Commodity Exchange Act** means the Commodity Exchange Act (7 U.S.C. 1 et seq.), as amended, supplemented or otherwise modified from time to time.

**Dodd-Frank Act** means the Dodd-Frank Wall Street Reform and Consumer Protection Act.

**Federal assistance** has the same meaning as in section 716 of the Dodd-Frank Act (12 U.S.C. 8305).

**Insured Depository Institution** includes any insured depository institution as defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813) and any uninsured U.S. branch or agency of a foreign bank.

**Securities Exchange Act** means the Securities Exchange Act of 1934 (15U.S.C. 78a et seq.), as amended, supplemented or otherwise modified from time to time.

**Swaps Entity** means:

1.    any person that is registered as a swap dealer under the Commodity Exchange Act;

2.    any person that is registered as a security-based swap dealer under the Securities Exchange Act;

3.    any person that is registered as a major swap participant under the Commodity Exchange Act and is not an Insured Depository Institution; and

4.    any person that is registered as a major security-based swap participant under the Securities Exchange Act and is not an Insured Depository Institution.

**1.2**    The terms branch, agency, and foreign bank are defined in section 1 of the International Banking Act of 1978 (12 U.S.C. 3101), except that, for purposes of

Appendix 6
to Operating Circular No. 10

this Appendix 6, a bank organized under the laws of a territory of the United States, Puerto Rico, Guam, American Samoa or the Virgin Islands shall not be deemed a foreign bank.

## 2.0   REPRESENTATIONS BY BORROWERS

Each time on or after July 16, 2013 that the Borrower requests an Advance that qualifies as Federal assistance, and on each date thereafter on which that Advance remains outstanding, the Borrower must be, and is deemed to represent that it is:

a.      Not a Swaps Entity; or

b.      A Swaps Entity that is eligible to receive the Advance pursuant to one or more subsections of 716 of the Dodd-Frank Act.

For purposes of this representation, a Borrower that is a U.S. branch or agency of a foreign bank is a Swaps Entity if the foreign bank is registered as a swap dealer under the Commodity Exchange Act or as a security-based swap dealer under the Securities Exchange Act.

## 3.0   COVENANTS; ACKNOWLEDGEMENT; AGREEMENT BY BORROWER

**3.1**     If any representation herein becomes untrue, incorrect, or inaccurate while an Advance remains outstanding, Borrower shall notify Bank promptly.

**3.2**     Borrower acknowledges that any failure to comply with a requirement herein or any representation or warranty contained herein that is inaccurate on or as of the date it is deemed to be made or on any date on which an Advance remains outstanding is an Event of Default under the Operating Circular.

**3.3**     Any pledge of Collateral, request for an Advance or incurrence of any other Obligation by the Borrower after it has been notified of this Appendix 6 shall constitute the Borrower's agreement to the terms set forth herein.

Appendix 6
to Operating Circular No. 10

**APPENDIX 7: DISCOUNT WINDOW DIRECT**

**1.0    GENERAL**

1.1    Discount Window Direct ("DWD") is an online application that Borrowers can use to submit requests for Advances from and submit Collateral Schedules to the Reserve Banks, and communicate with the Reserve Banks about Advances and pledges of Collateral in accordance with Reserve Banks' Operating Circular No. 10, as amended, supplemented or otherwise modified from time to time ("OC-10"). DWD is owned and operated by the Reserve Banks. This Appendix provides the terms and conditions which govern the access to and use of DWD and the products, services, publications, data and information available on DWD. Borrowers and their Authorized Users (as defined herein) are bound by the terms and conditions of this Appendix. The Reserve Banks reserve the right to amend this Appendix at any time.

1.2    In no event may a Borrower or its officers, employees, agents or contractors:

   a.    modify, add to, disable, translate, reverse assemble, reverse compile, decompile, or otherwise attempt to derive the source code of DWD;

   b.    introduce spam, malicious code, or other information (e.g., virus, Trojan horse, worm), or perform any action that could adversely impact the performance or operation of DWD or that could affect another Borrower's use of DWD;

   c.    attempt to interfere with the normal operation of a Reserve Bank server or the network over which DWD is provided; or

   d.    use DWD to engage in any deceptive, unlawful, or fraudulent activity.

1.3    No funds are transferred through DWD. DWD is not a funds-transfer system, and this Appendix is not a funds-transfer system rule. No securities are transferred through DWD. DWD is not a securities-transfer system, and this Appendix is not a clearing corporation rule under section 8-111 of the UCC.

1.4    By using DWD, Borrower agrees to the terms of this Appendix, OC-10, OC-5, and the other Operating Circulars as applicable, each as amended, supplemented or otherwise modified from time to time. Use of DWD is a service which is accessed using an electronic connection pursuant to OC-5.

1.5    In the event of a conflict between the provisions of this Appendix and the provisions of OC-10 or the other Operating Circulars, the provisions of this Appendix control.

**2.0    DEFINITIONS**

2.1    Unless otherwise stated in this Appendix, a term used in this Appendix has the same meaning as the defined term in OC-10.

2.2    For purposes of this Appendix:

Appendix 7
to Operating Circular No. 10

"Authorized User" means an individual that the Borrower authorizes to access and use DWD through FedLine Solutions.

"OC-5" means the Reserve Banks' Operating Circular No. 5 (Electronic Access), as amended, supplemented or otherwise modified from time to time.

## 3.0    BORROWER RESPONSIBILITIES

**3.1**    Only Authorized Users may access and use DWD. In order for Authorized Users to have the capabilities on DWD to submit requests for Advances and submit Collateral Schedules, the Borrower must include the Authorized Users on a fully executed OC-10 Official Authorization List which lists their email addresses.

**3.2**    Borrowers are responsible and liable for the access and use of DWD by their Authorized Users.

## 4.0    NOTICES

**4.1**    Borrowers may use DWD to provide notices to the Reserve Banks in accordance with OC-10. Borrowers may not use DWD to provide notices under any other Operating Circular or agreement with the Reserve Banks.

**4.2**    By using DWD, Borrowers agree to receive communications from the Reserve Banks via DWD. It is the responsibility of the Borrowers to monitor DWD for communications from the Reserve Banks.

## 5.0    RESERVE BANK DISCLAIMERS

**5.1**    Certain aspects of the services provided on DWD are manual and do not occur in real time. All requests for Advances and submissions of Collateral Schedules made through DWD are subject to review and approval of Reserve Bank personnel.

**5.2**    In the event of a conflict between information displayed on or communicated through DWD and the books and records of the Reserve Banks, the information on the books and records of the Reserve Banks controls.

**5.3**    DWD is provided "as is" and "as available" without warranty of any kind. While the Reserve Banks use all reasonable efforts to protect the security of DWD, the Reserve Banks make no guarantee that DWD will always be safe, secure, or error-free, or that it will function without disruptions or delays. To the extent permitted by law, THE RESERVE BANKS DISCLAIM ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT.

## 6.0    TERMINATION AND ACCESS RESTRICTIONS

The Reserve Banks may terminate, suspend, or otherwise restrict any Authorized User's access and use of DWD at any time without notice if the Reserve Banks have reason to believe that such access or use does not comply with the terms of this Appendix, guidelines for the use of DWD, if any, or any other agreement with the Reserve Banks.

The Reserve Banks may terminate, suspend, or otherwise restrict any Authorized User's access or use of DWD if the Reserve Banks have reason to believe that such access or use poses a risk to the Reserve Banks, any other Borrower, or the security or proper functioning of DWD, or the Borrower or Authorized User does not timely respond to the Reserve Banks' request for information relating to access and use of DWD. The Reserve Banks may otherwise terminate, suspend, or restrict any Authorized User's access or use of DWD at any time upon notice to the Borrower. The Reserve Banks will endeavor, but are not obligated, to provide notice five (5) business days prior to terminating, suspending, or restricting an Authorized User's access or use of DWD.

## 7.0    INDEMNITY

Borrowers shall indemnify, hold harmless, and defend the Reserve Banks against any claim, loss, harm, cost or expense (including reasonable attorneys' fees and expenses of litigation) resulting from the Reserve Banks' acts or omissions in providing the functionalities of DWD under this Appendix except for any claim, loss, harm, cost, or expense arising solely out of the Reserve Banks' gross negligence or willful misconduct. Any legal action against the Reserve Banks with respect to DWD must be initiated by the Borrower within one year from the date of the transaction or occurrence that gives rise to the claim. In no event shall the Reserve Banks be liable for any special or consequential damages.