# Exhibit C

Daniel C. Girard (State Bar No. 114826)
dgirard@girardsharp.com
Simon S. Grille (State Bar No. 294914)
sgrille@girardsharp.com
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800

Jorge L. Piedra (Florida Bar No. 88315)
(*Pro Hac Vice*)
jpiedra@kttlaw.com
Dwayne A. Robinson (Florida Bar No. 99976)
(*Pro Hac Vice*)
drobinson@kttlaw.com
Michael R. Lorigas (Florida Bar No. 123597)
(*Pro Hac Vice*)
mlorigas@kttlaw.com
**KOZYAK TROPIN & THROCKMORTON**
2525 Ponce de Leon Boulevard, 9th Floor
Miami, Florida 33134
Telephone: 305-372-1800

*Attorneys for Benworth Capital Partners, LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| BENWORTH CAPITAL PARTNERS, LLC, <br><br> Petitioner, <br><br> v. <br><br> OTO ANALYTICS, LLC f/k/a OTO ANALYTICS, INC. d/b/a WOMPLY <br><br> Respondent. | Case No. <br><br> **NOTICE OF PETITION AND PETITION TO VACATE FINAL ARBITRATION AWARD** |

**FILED UNDER SEAL**

NOTICE OF PETITION AND PETITION TO VACATE FINAL ARBITRATION AWARD

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on Petitioner Benworth Capital Partners, LLC ("Benworth") will and hereby does petition and move this Court, pursuant to Section 10 of the Federal Arbitration Act, 9 U.S.C. § 10, *et seq.* (the "FAA"), for an order vacating the corrected final award issued by Arbitrator Alexander Brainerd, Esq. (the "Arbitrator") on June 26, 2024 (the "Final Award"), which incorporated the interim award issued by the Arbitrator on December 21, 2023 (the "Interim Award"), in favor of Respondent Oto Analytics, LLC f/k/a Oto Analytics, Inc. d/b/a Womply ("Womply"), ordering Benworth to pay Womply (1) the principal amount of $86,299,892; (2) pre-award interest totaling $25,363,697.68; and (3) attorneys' fees and costs totaling $6,256,665.04.

Vacatur of the Final Award is warranted on three grounds. First, under Section 10(a)(4) of the FAA, the Arbitrator "exceeded [his] powers" by ignoring undisputed, legally dispositive facts in manifest disregard of the law while also disregarding controlling federal regulations that were incorporated into the parties' agreements to achieve a result the Arbitrator believed was fair, resulting in an irrational award that does not draw its essence from the parties' agreements. 9 U.S.C. § 10(a)(4). Second, the Final Award is unenforceable because it compels Benworth to violate an explicit, well-defined Federal law that specifically prohibits the relief ordered by the Arbitrator. Finally, under Section 10(a)(3) of the FAA, the Arbitrator is "guilty of misconduct in refusing to postpone" the proceedings until the federal government completes its investigation of Womply concerning the same issues that were decided in the Final Award, which foreclosed Benworth from presenting evidence pertinent and material to its defenses and counterclaims. 9 U.S.C. § 10(a)(3).

Benworth files this petition as a new action based on 9 U.S.C. § 12, which contemplates that a party may file an independent action to vacate an arbitral award by providing that the court in which the petition to vacate is filed may enter an order "staying the proceedings of the adverse party to enforce the award." Benworth has marked this action as related to *Oto Analytics, LLC F/K/A Oto Analytics, Inc. d/b/a Womply v. Benworth Capital Partners, LLC*, No. 3:24-cv-03975-AMO, so that the cases may be related under Local Rule 3-12.

NOTICE OF PETITION AND PETITION TO VACATE FINAL ARBITRATION AWARD

The Petition is based on this Notice of Petition, the attached Petition, the accompanying Appendix in support of the Petition, all papers and records filed in this matter, all other matters on which the Court may take judicial notice, and any further argument or evidence that may be made or submitted at the hearing on this Petition.

Dated: August 7, 2024                          Respectfully submitted,

*/s/ Dwayne A. Robinson*
Jorge L. Piedra (Florida Bar No. 88315)
(*Pro Hac Vice*)
jpiedra@kttlaw.com
Dwayne A. Robinson (Florida Bar No. 99976)
(*Pro Hac Vice*)
drobinson@kttlaw.com
Michael R. Lorigas (Florida Bar No. 123597)
(*Pro Hac Vice*)
mlorigas@kttlaw.com
**KOZYAK TROPIN & THROCKMORTON**
2525 Ponce de Leon Boulevard, 9th Floor
Miami, Florida 33134
Telephone: 305-372-1800

-and-

Daniel C. Girard (State Bar No. 114826)
dgirard@girardsharp.com
Simon S. Grille (State Bar No. 294914)
sgrille@girardsharp.com
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800


*Attorneys for Benworth Capital Partners, LLC*

2
NOTICE OF PETITION AND PETITION TO VACATE FINAL ARBITRATION AWARD

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION ........................................................................................................1

PARTIES, JURISDICTION AND VENUE .................................................................6

DIVISIONAL ASSIGNMENT.....................................................................................6

BACKGROUND ..........................................................................................................7

      I.      The Paycheck Protection Program and the Parties ...................................7

            A.      The Governing SBA Regulations, Rules, and SOPs.................................8

            B.      Benworth's Ongoing Role in the PPP...........................................................10

            C.      Womply's Limited Role in the PPP...............................................................12

      II.     The Parties' Agreements.............................................................................12

            A.      The Agent Agreement..................................................................................13

            B.      The Operative Agreements ...........................................................................14

            C.      Womply's Technology Platform.....................................................................17

                 1.     Fast Lane...................................................................................17

                 2.     The Teslar Portal.......................................................................18

            D.      Benworth Pays Womply Nearly $465 Million in Fees..............................19

      III.    The Arbitration...........................................................................................19

            A.      Womply's Claims ........................................................................................19

            B.      Benworth's Defenses and Counterclaims...................................................19

            C.      Pre-Hearing Proceedings .............................................................................20

      IV.   The Arbitrator Refuses to Hear From the SBA ........................................20

      V.     The Awards.................................................................................................23

            A.      The March 2023 Hearing.............................................................................23

            B.      The Interim Award.......................................................................................24

PETITION TO VACATE FINAL ARBITRATION AWARD

C.    Post-Interim Award Proceedings ...............................................24

D.    The Final Award .......................................................................25

STANDARD FOR VACATUR...................................................................25

ARGUMENT...............................................................................................27

I.    THE AWARD MUST BE VACATED BECAUSE THE ARBITRATOR EXCEEDED HIS POWERS...........................................................27

A.    The Arbitrator's Application Of The Agent Fee Cap Is Legally Irreconcilable  With The Undisputed Facts. ..............................28

1.    The PPP loan application requirements. .......................29

2.    Womply's technology assisted in preparing and referring PPP loan applications........................................................33

3.    The Arbitrator failed to recognize undisputed, legally dispositive facts............................................................39

i.    Capital Plus does not foreclose applying the Agent Fee Cap to the Technology Fees........................................39

ii.    The Arbitrator admitted that the Technology Services assisted in preparing and referring PPP loan applications. ...............................................44

iii.    The Agent Fee Cap controls over conflicting terms in the Agreements. ...........................................46

B.    The Arbitrator Manifestly Disregarded The Law When He Admittedly Refused To Apply The Controlling SOPs. ............48

1.    The Arbitrator crafted a definition of origination with the sole intent of excluding Womply from the plain language of the SBA Regulations. ................................................50

2.    Womply carried out lender functions in underwriting PPP loans. .............................................................52

3.    The Arbitrator's reasoning for not applying the SOPs is inexplicable. ...................................................54

4.    Womply's course of conduct establishes it was a lender service provider..........................................................57

C.    The Final Award Grants Relief Not Permitted by the Agreements..........58

ii

PETITION TO VACATE FINAL ARBITRATION AWARD

II.     THE FINAL AWARD IS UNENFORCEABLE BECAUSE IT COMPELS BENWORTH TO VIOLATE PUBLIC POLICY. ............................62

III.    THE ARBITRATOR IS GUILTY OF MISCONDUCT FOR REFUSING TO POSTPONE THE PROCEEDINGS UNTIL THE SBA COMPLETES ITS INVESTIGATION OF WOMPLY. ................................................................63

CONCLUSION ...........................................................................................................66

PETITION TO VACATE FINAL ARBITRATION AWARD

# TABLE OF AUTHORITIES

**Authorities**

*300 DeHaro St. Invs. v. Dep't of Hous. & Cmty. Dev.*,
 161 Cal. App. 4th 1240 (2008) ................................................................................. 28, 51

*Am. Postal Workers Union AFL-CIO v. U.S. Postal Serv.*,
 682 F.2d 1280 (9th Cir. 1982) .......................................... 5, 6, 26, 39, 45, 46, 47, 57, 61, 62

*Aramark Facility Servs. v. Serv. Emps. Int'l Union, Loc. 1877, AFL CIO*,
 530 F.3d 817 (9th Cir. 2008) ............................................................................... 62

*Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC*,
 913 F.3d 1162 (9th Cir. 2019) .............................................................. 25, 26, 56, 61

*Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors, LLC*,
 268 F. Supp. 3d 1053 (N.D. Cal. 2017) .................................................................... 50

*Broadway Cab Co-op., Inc. v. Teamsters & Chauffeurs Local Union No. 281, IBT*,
 710 F.2d 1379 (9th Cir. 1983) .................................................................................. 63

*Comedy Club, Inc. v. Improv West Associates*,
 553 F.3d 1277 (9th Cir. 2009) ..................................................................... 40, 43, 44

*Coutee v. Barington Cap. Grp., L.P.*,
 336 F.3d 1128 (9th Cir. 2003) ............................................................................ 26, 39

*Daniel T.A. Cotts PLLC v. Am. Bank, N.A.*,
 2021 WL 2196636 (S.D. Tex. Feb. 9, 2021) ............................................................. 62

*Dewan v. Walia*,
 544 F. App'x 240 (4th Cir. 2013) ............................................................................. 54

*Garvey v. Roberts*,
 203 F.3d 580 (9th Cir. 2000) ............................................................................. 49, 58

*HayDay Farms, Inc. v. FeeDx Holdings, Inc.*,
 55 F.4th 1232 (9th Cir. 2022) .................................................................................. 26

*Karczewski v. DCH Mission Valley LLC*,
 862 F.3d 1006 (9th Cir. 2017) .................................................................................. 55

*Lindsey v. Travelers Com. Ins. Co.*,
 No. 22-16795, 2023 WL 8613598 (9th Cir. Dec. 13, 2023)..................................... 64

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
 514 U.S. 52 (1995)................................................................................................... 27

PETITION TO VACATE FINAL ARBITRATION AWARD

*Matter of Insurance Co. of N. Am. v St. Paul Fire & Mar. Ins. Co.*,
    215 A.D.2d 386, 626 N.Y.S.2d 232 (1995) ............................................................................. 65

*Michigan Mut. Ins. Co. v. Unigard Sec. Ins. Co.*,
    44 F.3d 826 (9th Cir. 1995) ............................................................................................. 26, 27

*Naing Int'l Enters., Ltd. v. Ellsworth Assocs., Inc.*,
    961 F. Supp. 1 (D.D.C. 1997) ...................................................................................... 27, 63, 65

*Navcom Tech., Inc. v. Oki Elec. Indus. Co., Ltd.*,
    No. 5:12-cv-04175-EJD, 2017 WL 2617977 (N.D. Cal. June 16, 2017) ............................. 57

*OTO Analytics, Inc. v. Capital Plus Financial, LLC*,
    2022 WL 1488441 (N.D. Tex. May 11, 2022) ......................................... 39, 40, 41, 42, 43, 44, 59, 62

*Pac. Motor Trucking Co. v. Auto. Machinists Union*,
    702 F.2d 176 (9th Cir. 1983) ........................................................................................ 26, 47, 58

*Phoenix Newspapers, Inc. v. Phoenix Mailers Union Loc. 752, Int'l Bhd. of Teamsters*,
    989 F.2d 1077 (9th Cir. 1993) ........................................................................................... 62, 63

*S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*,
    48 Cal. 3d 341 (1989) ............................................................................................................ 57

*Secci v. United Independant Taxi Drivers, Inc.*,
    8 Cal. App. 5th 846 (2017) .................................................................................................... 57

*Series AGI W. Linn of Appian Grp. Invs. DE LLC v. Eves*,
    (2013) 217 Cal.App.4th 156 ................................................................................................. 60

*Serv. Emps. Int'l Union, Loc. 99 v. Options—A Child Care & Hum. Servs. Agency*,
    200 Cal. App. 4th 869 (2011) ......................................................................................... 28, 51

*Temp Shain Corp. v. Bertek, Inc.*,
    120 F.3d 16 (2d Cir. 1997) .................................................................................................... 64

*United Food & Com. Workers Union, Loc. 1119, AFL-CIO v. United Markets, Inc.*,
    784 F.2d 1413 (9th Cir. 1986) ............................................................................................... 50

*United Transp. Union v. Union Pac. R. Co.*,
    116 F.3d 430 (9th Cir. 1997) ........................................................................................... 27, 62

*Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*,
    489 U.S. 468 (1989) .............................................................................................................. 27

**Statutes**

5 U.S.C. § 7311 ............................................................................................................... 46, 62

PETITION TO VACATE FINAL ARBITRATION AWARD

9 U.S.C. § 10 ................................................................................................................ 2, 6

9 U.S.C. § 10(a)(3) ................................................................................................. 2, 27, 63

9 U.S.C. § 10(a)(4) ..................................................................................................... 2, 25

9 U.S.C. § 12 .................................................................................................................... 2

15 U.S.C. § 636(a) ........................................................................................................... 8

15 U.S.C. § 636(a)(36)(B) ............................................................................................... 8

15 U.S.C. § 9012 ............................................................................................................. 8

28 U.S.C. § 1332 ............................................................................................................. 6

Cal. Civ. Code § 1641 ................................................................................................... 51

Cal. Civ. Code § 1856(c) .............................................................................................. 57

Cal. Civ. Code § 1858 ................................................................................................... 51

California Business and Professions Code §16600 ...................................................... 43

**Rules**

Fed. R. Civ. P. 24 ......................................................................................................... 12

**Regulations**

13 C.F.R. § 103.1(a) (2021) ...................................................................................... 9, 40

13 C.F.R. § 103.1(d) ...................................................................................... 48, 52, 55

13 C.F.R. § 103.1(f) ..................................................................................................... 56

13 C.F.R. § 103.5(a) ...................................................................... 10, 41, 42, 58, 59

13 C.F.R. § 103.5(a), (c) ............................................................................................. 62

13 C.F.R. § 103.5(c) ..................................................................................................... 59

13 CFR §120 ........................................................................................................... 15, 27

13 CFR §120.10 ................................................................................................. 8, 27, 62

13 C.F.R. § 120.180 ..................................................................................................... 62

85 Fed. Reg. 20811 (Apr. 15, 2020) ................................................................ 3, 10, 15

PETITION TO VACATE FINAL ARBITRATION AWARD

86 Fed. Reg. 3692 (Jan. 14, 2021) ..................................................................... 8, 15, 29

PETITION TO VACATE FINAL ARBITRATION AWARD

**INTRODUCTION**

This is one of the rare cases where the Court should vacate an arbitral award. The Final Award jeopardizes a federally authorized loan program that the Arbitrator swore to uphold. And the Arbitrator jeopardizes that federal relief program by expressly ignoring the implementing federal regulations he agreed to faithfully apply. In fact, in one instance, the Arbitrator indicated he would refuse to enforce federal regulations even if he thought they were applicable. This Court cannot allow a single private arbitrator to have the unreviewable power to nullify the mandates of Congress and redefine federal law. Otherwise, private parties may, through private arbitration agreements, not only thwart federal law but also compromise the integrity of federal regimes.

This case arises out of the unprecedented Paycheck Protection Program ("PPP") administered by the U.S. Small Business Association ("SBA") in response to the devastating economic consequences of the COVID-19 Pandemic. Through a simple application process, small businesses and self-employed individuals could obtain government-backed loans that were forgivable so long as the borrower complied with the PPP requirements. During the first round of PPP funding, however, thousands of applicants, who were primarily minorities, struggled to find banks that would approve their PPP loan applications because the costs associated with servicing smaller loans greatly outweighed the fees paid to banks. The SBA sought to remedy that inequity during the second round of PPP funding by incentivizing lenders with higher lender processing fees for smaller loans.

Womply sought to capitalize on the second round of PPP funding. Womply developed a technology platform, known as "Fast Lane," which it described as "a simple, web-based data collection process" designed to streamline the PPP application process for self-employed individuals. According to Toby Scammell, a convicted felon who served as the CEO and co-founder of Womply, Womply designed Fast Lane to "help with eligibility, qualification, verification, and fraud detection" for PPP loan applications. To that end, Womply incorporated "multiple layers of fraud prevention and identity verification, which is essential to serving PPP loans at scale in accordance with government rules."

Fast Lane ostensibly worked, in the sense that, by the end of the PPP in May 2021, Womply facilitated the approval of more than 1 million PPP loan applications totaling approximately $16 billion in taxpayer funded PPP loans. And through its partnerships with the PPP lenders who funded those

PETITION TO VACATE FINAL ARBITRATION AWARD

loans, Womply collected nearly *$2 billion* in taxpayer-funded lender processing fees with approximately *$465 million* of those fees coming from Benworth alone.

Benworth was an ideal PPP partner for Womply. Benworth is a minority-owned and mission-driven lender that the SBA and Department of Treasury approved to administer PPP loans. Benworth also had a credit facility with the Federal Reserve Bank that provided the monies necessary to fund the PPP loans. Based on Womply's representations concerning Fast Lane's fraud detection and prevention capabilities, Benworth agreed to partner with Womply in the PPP.

The partnership worked as follows. Through Fast Lane, Womply collected, analyzed, and verified all the information and documents borrowers were required to submit to apply for a PPP loan. After the borrower completed the Fast Lane application process, Womply deployed its fraud prevention and detection capabilities to filter out ineligible PPP borrowers. Only after the borrower passed these fraud measures would Womply refer to Benworth the borrower's PPP loan application package. Benworth was then responsible for reviewing the PPP loan application package, disbursing the funds for the PPP loan, and servicing the PPP loan. PPP loan servicing obligations include processing forgiveness applications, collecting and applying loan and forgiveness payments, submitting monthly reports to the SBA, and monitoring the loans for issues relating to fraud. Benworth's PPP loan servicing obligations continue to this day.

Womply and Benworth initially memorialized their partnership in an extensive "agent agreement" that described in detail the services Womply would provide. But when the SBA extended the second round of PPP funding from March to May 2021, Womply effectively forced Benworth to enter a series of new agreements. Although Womply has conceded that the services provided under both sets of agreements were the same, the new agreements dramatically increased the fees Benworth would owe Womply. In fact, the new agreements called for Benworth to pay Womply nearly 90% of all the lender processing fees it received from the SBA. Specifically, the new agreements provided for three categories of fees: (1) a "Referral Fee" in the amount of 1% of the PPP loan amount; (2) a flat $250 "API Fee" for each funded PPP loan; and (3) a tier-based "Technology Fee" that was calculated as up to 80% of the lender processing fees Benworth received from the SBA. However, like with the original agent agreement, the new agreements were subject to SBA regulations.

PETITION TO VACATE FINAL ARBITRATION AWARD

Shortly after the parties executed the new agreements, federal and state governmental agencies began subpoenaing Benworth for information relating to suspected fraudulent PPP loans that were referred to Benworth by Womply. Because the SBA may not guarantee purchase fraudulent PPP loans, which exposed Benworth to significant liability to the Federal Reserve Bank, Benworth terminated its relationship with Womply. Womply then induced Benworth to rescind its termination based on assurances that Womply would improve its fraud prevention measures. Benworth's concerns have since come to fruition.

At the conclusion of the PPP, Benworth funded more than 305,000 Womply-referred PPP loans totaling over $4 billion of taxpayer funds. And Benworth paid Womply $464,991,487, or 68.3% of the lender processing fees Benworth received from the SBA. But nearly half a billion dollars is not enough for Womply. Womply has also demanded an additional $200 million from Benworth. When Benworth refused, Womply cut off Benworth's access to the files that Benworth needed to service the PPP loans. And those servicing obligations are substantial. Benworth is responsible for responding to subpoenas, communicating with borrowers about the forgiveness and/or repayment process, monthly reporting to the SBA, cooperating with SBA audits and government agency investigations into fraud, submitting guarantee purchase applications, and handling PPP loans that are in collections. Womply then commenced the Arbitration.

The SBA regulations incorporated into the parties' agreements were the focus of Benworth's defenses and counterclaims in the Arbitration Womply commenced after terminating Benworth's access to the PPP loans files. Benworth contended that Womply could not prove Benworth breached the agreements because the SBA promulgated a PPP rule that capped at 1% the SBA lender fees that PPP lenders may share with their agents. Specifically, the rule provides that "[t]he total amount an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed . . . [o]ne (1) percent for loans of not more than $350,000" (the "Agent Fee Cap"). 85 Fed. Reg. 20811, 20816 (Apr. 15, 2020). The SBA determined that the Agent Fee Cap was reasonable given the minimal PPP "application requirements and the fees that lenders receive for making PPP loans." *Id.* And it makes common sense—PPP lenders, like Benworth, carry all the risk and responsibility for processing and servicing PPP loans.

PETITION TO VACATE FINAL ARBITRATION AWARD

In addition to the Agent Fee Cap, Benworth argued that SBA rules also preclude Womply from demanding more fees because of its status as a lender service provider. Under SBA regulations and standard operating procedures, which Womply agreed to be bound by, Womply is a lender service provider because, at a minimum, it collected and verified eligibility and financial information from PPP loan applicants to provide to Benworth. Those same SBA regulations and standard operating procedures preclude lenders from paying lender service providers and other agents unless the SBA has reviewed their compensation agreements. It is undisputed here that none of the parties' agreements were submitted to or reviewed by the SBA.

Benworth's position in the Arbitration was corroborated by a comprehensive 128-page congressional report titled, *"We Are Not the Fraud Police": How Fintechs Facilitated Fraud In The Paycheck Protection Program* (the "*Congressional Report*"). The Congressional Report was published in early December 2022 by the U.S. House of Representatives' Select Subcommittee on the Coronavirus Crisis after an independent investigation that spanned more than a year. After reviewing documents submitted by Womply and Benworth, considering a presentation made to it by Womply, and interviewing officials from the SBA, the Select Subcommittee found, among other things, that:

- Womply misrepresented to lenders its relationship with the SBA and improperly leveraged its close relationships with Trump Administration officials;

- Womply mischaracterized its status as a "technology service provider" to avoid SBA regulations;

- Womply likely described itself as a "technology service provider" because the criminal history of Womply's CEO, Toby Scammell, could have excluded Womply from providing PPP loan services; and

- Womply and its founders each obtained suspicious PPP loans.

As a result of the Congressional Report, the SBA immediately suspended Womply from doing any business with it and launched an investigation into Womply's compliance with PPP loan program requirements. Womply remains suspended from doing business with the SBA.

Benworth repeatedly moved the Arbitrator to postpone the hearing or defer ruling on the merits of the parties' dispute pending the completion of the SBA's investigation. The results of the SBA's investigation were pertinent and material to Benworth's defenses and counterclaims in the Arbitration. For example, Benworth alleged that Womply must return the approximately $420 million in fees that

PETITION TO VACATE FINAL ARBITRATION AWARD

Benworth paid in excess of the Agent Fee Cap. Womply contended that it has no obligation to return these unlawful fees because the parties' agreements include a provision stating that the SBA must first determine that its fees are unlawful before it has to return the fees to Benworth. The results of the SBA's investigation are the only evidence Benworth could have presented on that issue because the Arbitrator precluded Benworth from offering any SBA determinations through declaration or through testimony absent Benworth meeting requirements that it had no ability to comply with, including requiring Benworth to force a non-party government official over whom it had no control to sit for a deposition with less than a week's notice. Despite acknowledging that the results of the SBA's investigation of Womply may render his award "advisory," the Arbitrator refused to await the results of the investigation and rendered the Award without the benefit of the SBA's conclusions.

The conclusions in the Final Award not only show that the Arbitrator should have awaited the results of the SBA's investigation, but also that the Arbitrator had no intent of applying the controlling SBA rules and regulations—which, again, were incorporated into the parties' agreements—to the undisputed facts. The undisputed, legally dispositive facts, along with the factual findings in the Final Award and the statements of the Arbitrator, all firmly establish that the Agent Fee Cap applies to the Technology Fees and that Womply is a lender service provider. But the Arbitrator ignored the plain language of the SBA rules and regulations to dispense his own brand of industrial justice. Indeed, the Arbitrator concluded that even if Womply were a lender service provider (disentitling it to further fees without SBA approval), he would not abide by the SBA regulations, because doing so would inflict a "disproportionately harsh penalty" on Womply.

The Final Award is not the product of the Arbitrator interpreting the parties' agreements and applying the controlling law to the facts. Instead, the Final Award reflects that the Arbitrator appointed himself as the final decisionmaker on SBA policies so he could reach a result he believed was fair to Womply. But the Arbitrator had no power to nullify the mandates of the SBA and revise the parties' agreements.

As detailed below, the Ninth Circuit has vacated an arbitration award that conflicted with federal law. *See Am. Postal Workers Union AFL-CIO v. U.S. Postal Serv.*, 682 F.2d 1280, 1285 (9th Cir. 1982). The Ninth Circuit drew a distinction between arbitrations that merely determine "the competing interests

of two opposing parties" from those that also "require[] an adjudication of the coverage and application of a federal law passed by Congress . . . ." *Id*. Where an arbitrator's decision conflicts with federal law, it cannot stand: "***We cannot empower the arbitrator to nullify the mandates of Congress*** . . . ." *Id.* (emphasis added). The Arbitrator here did not simply misconstrue an agreement between two private parties; he disregarded federal regulations, which were also incorporated into the parties' agreement. This Court cannot permit a federal judgment that authorizes payments that federal law disallows.

For these reasons, as detailed below, this Court must vacate the Final Award.

## PARTIES, JURISDICTION AND VENUE

Benworth is a limited liability company organized under the laws of Florida with its principal place of business in Coral Gables, Florida. Benworth's sole member and equity holder is Bernardo Navarro, an individual who is domiciled in Puerto Rico.

Womply is a limited liability company organized under the laws of Delaware. Womply's sole member is Oto Holdco, LLC, which is a limited liability company organized under the laws of Delaware. Oto Holdco, LLC's sole member is SCAT20210724, LLC, which is a limited liability company organized under the laws of Arizona. SCAT20210724, LLC's sole member is AltoIRA Custodian FBO Toby Scammell Roth IRA. AltoIRA Custodian FBO Toby Scammell Roth IRA's sole beneficiary is Toby Scammell, who is a citizen of Nevada.

The Court has subject matter jurisdiction over this proceeding under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Venue is proper in the Northern District of California under 9 U.S.C. § 10 because the Final Award was entered in San Francisco, California, which is within this District.

## DIVISIONAL ASSIGNMENT

Pursuant to Civil Local Rule 3-5(b), assignment to the San Francisco Division is appropriate under Civil Local Rule 3-2(c) because a substantial part of the conduct at issue occurred in San Francisco County.

PETITION TO VACATE FINAL ARBITRATION AWARD

**BACKGROUND**

Attached as **Exhibit A** is an Appendix containing the materials necessary for the Court to resolve this Petition, including the Interim Award and Final Award, certain of the Parties' briefs filed in the Arbitration, transcripts from the hearings, and joint exhibits admitted into evidence. Citations to the Appendix are as follows: (App. ____), indicating the bates stamped page numbers. Citations to numbered paragraphs within a document are as follows: (App. __, ¶ ___), indicating the bates stamped page numbers and paragraph numbers. And citations to statements within a transcript are as follows: (App. __:__), indicating the bates stamped page numbers and line numbers.

**I.    The Paycheck Protection Program and the Parties**

In response to the COVID-19 Pandemic, on March 27, 2020, Congress authorized the PPP as part of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), a comprehensive aid package designed to provide trillions of dollars in emergency assistance. (App. 3119.) The PPP was designed to offer qualifying small businesses government-backed loans to fund expenses, such as payroll costs, rent, and utilities. (*Id*.) Congress authorized two rounds of PPP funding, first from April 3, 2020, to August 8, 2020, and then from January 11, 2021, to June 30, 2021. (App. 3119-20.)

During the first round of PPP funding, thousands of smaller businesses, which were primarily minority-owned, struggled to find banks that would approve their applications for PPP loans because the costs associated with servicing smaller loans greatly outweighed the fees paid to banks. The SBA sought to remedy that inequity during the second round of PPP funding by allowing non-bank lenders, like Benworth, to administer PPP loans and by incentivizing those lenders with higher lender processing fees for loans less than $50,000.

Benworth and Womply contracted during the second round of PPP funding. The parties' agreements, described in detail in Part II below, incorporated and gave controlling effect to "SBA Regulations," which include the SBA's regulations, rules, and standard operating procedures implementing the PPP. Those SBA Regulations, described below, govern the relationship between Benworth and Womply and define their respective roles in connection with PPP loans.

PETITION TO VACATE FINAL ARBITRATION AWARD

## A.    The Governing SBA Regulations, Rules, and SOPs

The PPP was not created as a standalone program; instead, it was added as a temporary expansion of the SBA's pre-existing Section 7(a) loan program under the Small Business Act, 15 U.S.C. § 636(a). (App. 3119.) The CARES Act authorized the SBA to guarantee PPP loans under the same terms, conditions, and processes as other loans made under the Section 7(a) loan program, except as otherwise provided in the CARES Act. 15 U.S.C. § 636(a)(36)(B). The CARES Act also gave the SBA emergency rulemaking authority and directed the SBA to promulgate regulations implementing the PPP within 15 days of enactment. 15 U.S.C. § 9012.

To that end, on January 14, 2021, the SBA issued an interim final rule implementing the requirements for PPP loans made after the enactment of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act ("Economic Aid Act") on December 27, 2020. *See* Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by Economic Aid Act, 86 Fed. Reg. 3692 (Jan. 14, 2021) (the "Interim Final Rule") (App. 3848-68). The Interim Final Rule primarily restated "existing regulatory provisions to provide lenders and new PPP borrowers a single regulation to consult on borrower eligibility, lender eligibility, and loan application and origination requirements, as well as general rules on increases and loan forgiveness for PPP loans." (App. 3849.) The Interim Final Rule "***supersede[d] any conflicting Loan Program Requirement*** (as defined in 13 CFR 120.10)." (App. 3851 (emphasis added).) Thus, all non-conflicting Loan Program Requirements applied to PPP loans.

Only two relevant provisions of the Interim Final Rule superseded and conflicted with existing SBA Loan Program Requirements: (1) the requirements for underwriting an SBA loan and (2) the fees an "agent" (defined below) may collect for assisting in the preparation and referral of PPP loans.

Normally, under SBA regulations and Standard Operating Procedures, lender underwriting and lending criteria are focused on a borrower's creditworthiness and ability to repay the loan with earnings from their business. (App. 3125, n.9.) But given the unique emergency nature of the PPP, the Interim Final Rule limited the underwriting obligations for PPP loans. (*Id.*) Under the Interim Final Rule, underwriting was limited to reviewing the PPP loan application and performing KYC and related checks, confirming an applicant's certifications contained in the PPP application, submission of tax documents

8

PETITION TO VACATE FINAL ARBITRATION AWARD

to verify loan amount eligibility, and submission of bank or other data to confirm the applicant's eligibility for a PPP loan. (App. 3863-64, art. III.C.3.)

As part of the PPP, the SBA compensated lenders by paying lender processing fees. For PPP loans of not more than $50,000, the SBA paid lender processing fees equal to the lesser of 50% of the loan amount or $2,500. (App. 3864, art. III.C.5.) But the Interim Final Rule restricted how those fees may be shared. Specifically, the SBA limited the fees that an "agent" may collect:

> Agents fees may not be paid out of the proceeds of a PPP loan. If a borrower has knowingly retained an agent, such fees will be paid by the borrower. A lender is only responsible for paying fees to an agent for services for which the lender directly contracts with the agent. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed . . . [o]ne (1) percent for loans of not more than $350,000 . . . .

 (the "Agent Fee Cap") (App. 3865, art. III.D.4). The SBA determined that the Agent Fee Cap was "reasonable based upon the application requirements and the fees that lenders receive for making PPP loans." (*Id*.) SBA regulations define who qualifies as an "Agent."

Under SBA regulations, "Agent means an authorized representative, including a[] . . . lender service provider, or any other person representing an Applicant or Participant by conducting business with SBA." 13 C.F.R. § 103.1(a) (2021). Conducting business with the SBA includes acting as lender service provider, as well as "[p]reparing or submitting on behalf of an applicant an application for financial assistance of any kind" and "[p]reparing or processing on behalf of a lender or a participant in any of SBA's programs an application for federal financial assistance . . . ." *Id.* § 103.1(b)(1), (2), (4).

The SBA also clarified the meaning of "lender service provider." *Id.* § 103.1(d). The SBA adopted specific guidance for agents who are lender service providers. *See* Small Business Administration, Office of Capital Access, *SOP 50 10 6: Lender and Development Company Loan Programs* at p. 185(Oct. 1, 2020) (hereinafter, the "SOPs") (App. 3258-3847.) The SOPs offer a non-exhaustive list of lender service providers, such as:

> i.    An individual or entity engaged by a 7(a) Lender to provide services for the purposes of obtaining Federal financial assistance that include interaction with the Applicant either in person *or through the use of technology*, to request or obtain eligibility and/or financial information that will be provided to the 7(a) Lender. This includes Agents who:

9

PETITION TO VACATE FINAL ARBITRATION AWARD

> a)  Perform any pre-qualification review based on SBA's eligibility and credit criteria . . . prior to submitting the Applicant's information to the 7(a) Lender; or
>
> b)  Provide to the 7(a) Lender an underwritten application, whether through ***the use of technology or otherwise***.
>
> ii.    Entities providing technology services to a 7(a) Lender that ***include underwriting***.
>
> iii.    An individual or entity generates a significant number of 7(a) Lender's loan originations. As a general rule, SBA considers a "significant number" to be two-thirds (66%) or more of the 7(a) Lender's loan originations for the prior 12 months.

(App. 3442 (emphasis added)); *see also, e.g.*, 85 Fed. Reg. at 20816, art. III.4.a. (incorporating SBA Regulations into the PPP by providing "[l]oans will be guaranteed under the PPP under the same terms, conditions and processes as other 7(a) loans . . . ."); (App. 3865, art. III.D.1 (same).)

SBA regulations require an agent or lender service provider to submit a compensation agreement to the SBA. 13 C.F.R. § 103.5(a). All lender service provider agreements must be reviewed and approved by the SBA. *Id*. at § 103.5(c). A lender service provider may only receive compensation from lenders "for services provided under an SBA-reviewed LSP Agreement." (App. 3442.) No provision of the Interim Final Rule conflicts with these SBA Loan Program Requirements.[1]

## B.    Benworth's Ongoing Role in the PPP

Prior to the COVID-19 Pandemic, Benworth had no experience with the SBA and was only a mortgage lender. (App. 3127.) In April 2020, the SBA approved Benworth's application to become a PPP lender. (*Id*.) To fund the PPP loans, Benworth executed a liquidity facility with the Federal Reserve Bank of San Francisco. The Federal Reserve then advanced the monies for the PPP loans funded by Benworth. (App. 2962-63; App. 3041-42.) Benworth is obligated to repay the Federal Reserve for the advances. (App. 2962-63; App. 3041-42.)

---

[1] Prior to the Economic Aid Act, the SBA promulgated several interim final rules implementing the PPP, including an interim final rule issued in April 2020, which also contains the Agent Fee Cap and the limited underwriting requirements for PPP loans. *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811 (Apr. 15, 2020). The substantive provisions of the April 2020 interim final rule are materially the same as those in the Interim Final Rule. Because all PPP loans referred to Benworth by Womply were made after the enactment of the Economic Aid Act, however, the Interim Final Rule controlled in the Arbitration and Benworth refers to the 2021 Interim Final Rule for simplicity. Unless otherwise specified, all citations are to the 2021 Interim Final Rule.

10

PETITION TO VACATE FINAL ARBITRATION AWARD

During the first round of PPP funding, Benworth funded approximately 700 PPP loans. (App. 3127-28.) During the second round of PPP funding, Benworth contracted with Womply and another lender service provider, Lendio, to fund PPP loans. (App. 3128.) By the end of the second round of PPP funding, Benworth funded approximately 311,000 PPP loans. (App. 1763:19-21; App. 2033:25 – 2034:3.) About 305,000 of those PPP loans, totaling more than $4 billion, were referred to Benworth by Womply. (App. 3133.) The SBA paid Benworth approximately $680 million in fees to process and service the Womply-referred PPP loans. (App. 3141.) Benworth has paid Womply nearly $465 million of the SBA fees. (App. 3140.)

Benworth's role in the PPP did not end when the PPP loans were funded. In July 2021, the SBA issued a Procedural Notice that details the substantial requirements for lenders, like Benworth, to service PPP loans. (App. 4024-30.) Thus, unlike Womply, whose role in the PPP was limited to just a few months, Benworth will be servicing the PPP loans for five years at least. (App. 3165.) Benworth's servicing obligations include responding to subpoenas, communicating with borrowers about the forgiveness and/or repayment process, monthly reporting to the SBA, cooperating with SBA audits, submitting guarantee purchase applications, and handling PPP loans that are in collections. (App. 2439:13 – 2445:19.) Further, after Womply terminated the parties' agreements in July 2021, Benworth was forced to respond to subpoenas without access to the lender-facing portal to review loan files that it paid Womply for—Teslar —which, in turn, meant that Benworth did not have access to the PPP loan files it needed to respond to the subpoenas. (App. 2412:10 – 2413:25.)

The lack of access to the PPP loan files created a significant hardship for Benworth. The SBA denied Benworth the guaranteed purchase of thousands of Womply-referred loans principally because Benworth was unable to provide the SBA with certain loan files held hostage by Womply. (App. 2962-64; App. 3041-42.) As of now, the PPP loans for which the SBA has denied Benworth guarantee purchase total more than $60 million. That is a mounting debt Benworth owes the Federal Reserve, which has been only further complicated by the Final Award. The Final Award requires Benworth to relinquish all the funds the federal government gave Benworth to fund and operate a federal program and give them to Womply—and to do so in violation of federal law. In fact, the Federal Reserve has warned that Womply's efforts to collect on the Final Award "cripple the ability of Benworth to continue" servicing its PPP loans.

PETITION TO VACATE FINAL ARBITRATION AWARD

*See* Federal Reserve Bank of San Francisco's Motion to Intervene under Fed. R. Civ. P. 24 (Doc. 127) at 2, No. 3:23-cv-01034-GMM (D.P.R. July 10, 2024).

### C. Womply's Limited Role in the PPP

"Womply was a technology company that delivered software and tools to small businesses to help with marketing, customer management, and business management." (App. 3127.) During the first round of PPP funding, "Womply released a free website that connected businesses seeking a PPP loan to PPP lenders, and several lenders agreed to pay Womply for this referral-only service." (*Id.*) "In early 2021," during the second round of PPP funding, Womply developed a technology platform known as Fast Lane that allowed applicants to apply for a PPP loan using their cellphone. (*Id.*)

Unlike Benworth, Womply's role in the PPP concluded when the SBA stopped accepting PPP loan applications. (App. 3165.) In total, Womply collected approximately *$2 billion* in SBA fees from the various lenders that contracted with it for the Fast Lane platform, with approximately *$465 million* of those fees coming from Benworth alone. (App. 3140; App. 1237:10-12.)

As discussed in more detail below, Womply has been admonished by the federal government for facilitating fraudulent PPP loans, including in a congressional report that caused the SBA to suspend Womply from conducting business with SBA and to launch an investigation into Womply's compliance with SBA Loan Program Requirements. *See infra*, pp. 20-23. More recently, the Federal Trade Commission sued Womply for engaging in deceptive practices with respect to the PPP and Womply settled that lawsuit for $26 million. (*See generally* App. 3072-90, 3099-3108.)

## II. The Parties' Agreements

In February 2021, during the second round of PPP funding, Benworth and Womply were introduced by a mutual business connection. (App. 3128.) As a minority-owned and mission-driven lender, Benworth was an ideal PPP collaborator for Womply because it needed a lender who could handle the increased volume of Spanish-speaking borrowers who were applying for PPP loans through its technology platform. Womply then sent Benworth a presentation describing its technology platform. (App. 3915.) According to Womply, its technology platform "operates best as an alternative to an existing manual application process." (App. 3925.) Based on Womply's representations in the

PETITION TO VACATE FINAL ARBITRATION AWARD

presentation, Benworth agreed to contract with Womply. All the agreements between Benworth and Womply specified that the terms and fees would be subject to SBA Regulations. *See infra*, pp. 14-15.

### A.    The Agent Agreement

Benworth and Womply entered into an agreement for Womply to refer PPP loan application packages to Benworth that had been prepared using Womply's technology platform (the "Agent Agreement"). (*See generally* App. 3932-52.) The Agent Agreement defined Womply as an "Agent." (App. 3932.) It provided that "Agent [i.e., Womply] shall provide Lender [i.e., Benworth] with . . . services . . . relating to the ***packaging and processing of PPP loan applications*** . . . ." (App. 3933, § 5 (emphasis added).)

The Agent Agreement says Womply will provide both "Processing Services" and "Technology Services." As to Processing Services, Womply agreed to the following:

- "Assisting each loan applicant in responding to questions about its eligibility under the PPP," (App. 3933, § 5(a)(ii));

- "Providing loan applicants"—i.e., not providing Benworth—"a technology platform that offers the Technology Services (defined below)," (App. 3933, § 5(a)(ii));

- "Coordinating the collection ***and review*** of required due diligence documentation under the PPP . . . including documentation necessary for Lender to comply with application KYC/AML/BSA[2] Laws," (App. 3933, § 5(a)(iii) (emphasis added));

- "Communicating with loan applicants regarding loan applications process and status, including without limitation SBA rejections, and responding to loan applicant questions in connection therewith," (App. 3933, § 5(a)(v)); and

- "Assisting Lender with the ***preparation and submission*** to the SBA of any reporting or documentation with respect to Included Loans, as required by SBA Regulations" (App. 3933, § 5(a)(vii) (emphasis added)).

As to Technology Services, Womply agreed to "make available to Lender and loan applicants a technology platform," (App. 3934, § 5(b)), that conducted the following services (among others):

- "Providing loan applicants"—not Benworth—"a technology platform into which loan applicants can input information necessary to complete its applicable borrower application for the PPP," (App. 3934, § 5(b)(i));

---

[2] "KYC" refers to "Know Your Customer," "AML" to "Anti Money Laundering," and "BSA" to "Bank Secrecy Act."

PETITION TO VACATE FINAL ARBITRATION AWARD

- "Ensuring the collection of all certifications, documentation and other information necessary to complete the borrower application form and such other forms or documents as the SBA may require in connection with the origination of Loans under the PPP," (App. 3934, § 5(b)(ii)); and

- "Submitting on Lender's behalf each borrower application through the SBA Paycheck Protection Program, or such other online platform as the SBA may designate for transmitting data to the SBA[,]" (App. 3935, § 5(b)(x)).

The Agent Agreement provides for Womply to be paid both "agent fees" and "technology fees." (App. 3935-36, § 6(a)-(b).) This agreement, like the others entered into by the parties, expressly adopted SBA regulations. (App. 3941, § 18.)

The parties entered into their operative agreements two months after the Agent Agreement, but as Womply conceded during the Arbitration, Womply provided the same services to Benworth under both sets of agreements. (App. 1155:16-24 ("Q. Did the services Womply was providing change under the amended agreements?" "A. No. The services Womply was providing did not change throughout the life cycle of the partnership. . . . [T]he actual core services did not change from February to April."); App. 1285:10-18 (same).)

**B.      The Operative Agreements**

The second round of PPP funding was set to expire on March 31, 2021. (App. 3129.) In mid-March 2021, Congress voted to extend that deadline to May 31, 2021. (*Id.*) Around this time, Womply began communicating with its lawyers about its agreement with Benworth and drafting new agreements. (*Id.*)

Approximately two months after entering into the Agent Agreement, in April 2021, Womply demanded that Benworth enter into a series of new agreements to replace the Agent Agreement. The new agreements consisted of (1) an Amended and Restated PPP Loan Referral Agreement ("Referral Agreement") (App. 3982-85); (2) the Womply Developer Order Form ("Order Form") (App. 3986-88); and (3) the Womply Master Developer Agreement ("MDA" and together with the Referral Agreement and the Order Form, the "Agreements") (App. 4003-14). The Agreements were fully integrated. (*E.g.*, App. 3985, § 16.)

The stated purpose of entering the Agreements was to "amend the economics" of the parties' prior agreement "to provide an early-payment discount to" Benworth. (App. 3982; *see also* App. 3984,

PETITION TO VACATE FINAL ARBITRATION AWARD

§ 9 (incorporating recitals from page 1 into the agreement).) However, as the face of the Agreements shows, Womply provided no "early-payment discount" to Benworth. In the Arbitration, Benworth contended that the real reason for the new Agreements was to accomplish Womply's goal of avoiding being characterized as an Agent or lender service provider under SBA regulations. (App. 81-82; App. 123-25; App. 337.) For example, Womply added language reciting that it "was not a lender service provider." (App. 3982, § 1.3; App. 3987, § 1.3.) Womply also omitted from the Agreements a provision in the Agent Agreement where Womply represented and warranted that all loans referred to Benworth "will be originated and underwritten in compliance with Applicable Law and SBA Regulations." (*Compare* App. 3945, (a)(iii) *with* Agreements.) The Agreements, nonetheless, remained subject to SBA regulations notwithstanding any provision therein to the contrary. (App. 3984, § 9; App. 3988, § 4.)

The choice of law clauses in the Agreements provide that "SBA Regulations" shall govern the agreements. (App. 3984, § 9; App. 3988, § 4.) The choice of law provision in the Referral Agreement reads in relevant part:

> This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to the provisions of the conflict of laws thereof. Notwithstanding the foregoing or any provision of this Agreement to the contrary, this agreement is subject to all Applicable Laws, including SBA Regulations. ***In the event of any conflict between the governing law and the SBA Regulations (defined below), the SBA Regulations shall control***. "SBA Regulations" means all PPP requirements and SBA guidelines under the CARES Act, the Economic Aid Act, the PPP Flexibility Act, any rules or guidance that have been issued by the SBA implementing the PPP, including SBA regulations published at 86 Fed. Reg. 3692 (Jan. 14, 2021) and 85 Fed. Reg. 20811 (Apr. 15, 2020) and any subsequent Interim Final Rules and other guidance as may have been or may be subsequently issued by SBA or the U.S. Department of the Treasury with respect to the origination, servicing and forgiveness of loans under the PPP and Frequently Asked Questions, or any other applicable SBA loan requirements, including those codified in 13 CFR part 120, in each case as amended, supplemented or modified from time to time.

(App. 3984, § 9 (emphasis added); *see also* App. 3988, § 4 (same).) The Agreements further include clauses requiring disputes to be resolved by arbitration in San Francisco, California under the rules of JAMS. (App. 3985 § 10 (emphasis added); *see also* App. 3988, § 4.)

It is undisputed that the Agreements were neither submitted to nor approved by the SBA. (App. 3130.) Nonetheless, the Agreements called for Benworth to pay Womply three categories of fees. The

15

PETITION TO VACATE FINAL ARBITRATION AWARD

Referral Agreement required Benworth to pay Womply "Referral Fees" in "consideration of Womply providing [Benworth] with Referrals," which was an amount equal to 1% of the PPP loan amount for each referred loan Womply referred to Benworth. (App. 3982, § 2.2.) However, the Referral Agreement acknowledges that Womply is entitled to the Referral Fees only for those PPP loans where it was "the first to submit a complete package" to Benworth. (App. 3982, § 1.1.) Benworth would owe the Referral Fee only if the SBA approved the PPP loan application, and Benworth funded the loan.

The Order Form required Benworth to pay Womply two additional fees: (i) a $250 API (application program interface) Fee for each referred loan, and (ii) a tier-based "Technology Fee" for each referred loan that exceeds $250. (App. 3987, § 2.1.) The Order Form provides that the "API Fee" compensates Womply for the "API Package":

| API Package | Payments |
| --- | --- |
| Tax Documents<br>Business Fraud Analytics<br>Bank Data<br>Identity<br>Account Verification<br>PPP Portfolio Management System | $250 per funded PPP loan sourced through the Services (the "**API Fee**") plus the Technology Fee set forth in Section 2 below. |

(App. 3986.) Womply testified that the API Fee was intended to compensate it for the use of Teslar. (App. 921:9-17, 922:7-10.)

The "Technology Fee" compensated Womply for the "Services" identified in the Order Form. The "Services" were defined as "integrations with and/or links to certain third-party service providers (including, without limitation, Plaid, Docusign, LexisNexis, Teslar, Inscribe, Ocrolus, AWS Mechanical Turk, Mindee, Person, Twilio, Sendgrid, etc.)" (the "Technology Services").[3] (App. 3987, § 1.2.)

_____

[3] The Arbitrator used the capitalized term, "Technology Services," throughout the Final Award when describing Womply's services under the Order Form. (App. 3114-15.) In defining Womply's "Technology Services," the Arbitrator adopted the definition of that term in the Agent Agreement. (*See* App. 3115, n.3 ("Technology Services is defined in the parties' Agent Agreement in paragraph 5.b, where an extensive list of eight distinct services is listed.").)

16

PETITION TO VACATE FINAL ARBITRATION AWARD

According to the Order Form, the Technology Services generated the information that would accompany a referral. (App. 3987, § 1.1.) It is undisputed that Benworth did not receive links to these third-party technology solutions. (App. 3150.)

Benworth was required to pay the Technology Fees within fifteen days of Benworth receiving the lender processing fees from the SBA. (App. 3988, § 2.3.) However, the Order Form requires Womply to return to Benworth any Technology Fees that "the SBA or governmental agency determines were not in compliance with applicable SBA and/or PPP Loan Program Requirements." (*Id*.) Like the Referral Fees, Benworth would owe the Technology and API Fees only if the SBA approved the PPP loan application and Benworth funded the loan. (App. 3986; App. 3987, § 2.1.)

### C.    Womply's Technology Platform

Womply's technology platform consisted of a borrower-facing portal ("Fast Lane") and a lender-facing portal (the "Teslar Portal").

### 1.    Fast Lane

Fast Lane assisted users with preparing PPP loan applications. A screenshot from Fast Lane's borrower-facing website invites readers to "**Start My PPP Application**." (App. 4002; App. 815:17-20.)[4] Womply described Fast Lane as a "Simple, five minute data collection process" through "Automated first and second draw loan applications." (App. 4002 (00:00:15); App. 1203:13-24.) Fast Lane also prompted applicants to correct errors they made in submitting information in support of their application. (App. 831:20-25, 832:16-18; App. 3887; App. 4018; App. 4019.) Fast Lane took the information applicants provided and populated it in a PPP application. (App. 970:2-17; App. 3880.)

Fast Lane allowed applicants to connect their bank accounts to Womply's technology. (App. 4021.) Fast Lane was able to analyze transaction history to confirm whether the applicant was in business by February 15, 2020, an eligibility requirement for a PPP loan. (*Id.*; App. 3889.)

---

[4] Two videos prepared by Womply that walk users through the process of applying for a PPP loan through Fast Lane were admitted into evidence as App. 4001 and App. 4002. Benworth will submit copies of those videos to the Court in accordance with the Local Rules for the Northern District of California. However, a transcript of App. 4002 was also made a part of the record in the Arbitration and is included within the Appendix accompanying this Petition. (*See* App. 1378-1400.)

PETITION TO VACATE FINAL ARBITRATION AWARD

Fast Lane also allowed applicants to upload tax documents that were "useful for determining and validating the loan size the applicant was seeking" as well as verifying that the applicant qualified for a PPP loan. (App. 833:20 – 834:18.) Womply utilized an API to assist with those functions. (*Id.*; App. 4020.) And then Fast Lane told applicants whether they were eligible for a loan and the size of that loan. (*See* App. 4020; App. 3888.)

Fast Lane required applicants to confirm that they could make certain PPP certifications; otherwise, they were not permitted to proceed with the workflow to submit a PPP application through Fast Lane. (App. 1214:25 – 1216:9; App. 981:10-21; App. 4001 (4:09:00 to 6:47:00); App. 3885.)

Fast Lane was designed to refer legitimate PPP loans that were eligible for funding. For instance, Womply admitted that Fast Lane filtered out applicants who would not be eligible for PPP applications because their identities could not be verified. (*See, e.g.*, App. 1239:17 – 1240:13.) Fast Lane also excluded from its referral loan packages those applicants who did not meet general eligibility requirements of the PPP. (App. 1453:21 – 1454:16.) According to Womply, an applicant would not be referred to a lender until the applicant completed Womply's "KYC review process." (App. 3957; *see also* App. 3911; App. 3913.)

In early May 2021, it became apparent to Benworth that Womply's technology was not performing as advertised. (App. 70-71.) Womply intentionally or negligently misrepresented the capabilities of its technology platform, which failed in multiple respects, causing Benworth to fund a yet-to-be determined number of fraudulent loans. (*Id.*) Benworth was concerned about the fraudulent loans because the SBA may not guarantee PPP loans subject to fraud, which would expose Benworth to a dangerous amount of liability. (*Id.*) Benworth conveyed this concern to Womply. (*Id.*)

Benworth thus elected to terminate its relationship with Womply on May 10, 2021. (*Id.*) In response, Womply promised to improve its technology platform. (*Id.*) Benworth, relying on that promise, rescinded its termination and continued the relationship with Womply. (*Id.*)

### 2. The Teslar Portal

The Teslar Portal is the mechanism through which Womply referred to Benworth PPP loan applicants and their complete loan packages. "The Teslar Portal was a web-based portal that allowed lenders like Benworth to access applicant information and the results of Womply's various technology

PETITION TO VACATE FINAL ARBITRATION AWARD

services that verified and analyzed information for them." (App. 3136.) "Through the Teslar Portal, lenders like Benworth could (among other things) efficiently review applicant information, generate loan documents, submit information to the SBA for approval, and initiate payment of loan proceeds." (App. 3136-37.) "The Teslar Portal also organized all the files associated with a lender like Benworth's PPP loan portfolio." (App. 3137.)

Shortly before commencing the Arbitration, Womply terminated Benworth's access to the Teslar Portal, depriving Benworth of access to the loan files associated with each PPP loan. (App. 72, ¶ 18; App. 3169.)

### D. Benworth Pays Womply Nearly $465 Million in Fees

By the conclusion of the PPP, Benworth funded approximately 305,000 Womply-referred loans. (App. 3140-41.) Benworth received approximately $680 million in lender processing fees from the SBA to fund and service these PPP loans. (App. 3141.) Of that $680 million, Benworth paid Womply $464,991,487 in fees, which represents **68.3%** of all the fees the SBA paid Benworth to not only process but also service the PPP loans. (*Id*.)

## III. The Arbitration

### A. Womply's Claims

On August 25, 2021, Womply initiated the Arbitration, asserting three causes of action: (1) Breach of Contract for Failure to Pay Referral Fees; (2) Breach of Contract for Failure to Pay API Fees; and (3) Breach of Contract for Failure to Pay Technology Fees. (App. 3115-16.) On the Technology Fees, Womply alleged it was entitled to Technology Fees calculated at 80% for the first 300,000 PPP loans referred to and funded by Benworth. (App. 3141.) Womply also requested pre-judgment compound interest at 1.5% per month (18% per annum) and an award of attorneys' fees and costs. (App. 3167.) In total, Womply sought more than **$200 million** in additional compensation from Benworth. (App. 2625.)

### B. Benworth's Defenses and Counterclaims

Benworth answered the demand and asserted various affirmative defenses and counterclaims. (App. 73-78.) Throughout the Arbitration, Benworth relied on two principal defenses. First, Womply could not prove that Benworth breached the Order Form because the Technology Fees were subject to

PETITION TO VACATE FINAL ARBITRATION AWARD

the Agent Fee Cap and Benworth had already paid Womply fees in excess of the Agent Fee Cap. (App. 3115-17.) Second, Womply could not prove that Benworth breached any of the Agreements because Womply acted as an agent and lender service provider and the Agreements were not submitted to the SBA, which is a prerequisite to Womply receiving compensation from Benworth under the Agreements. (App. 3115; App. 345; App. 2601, 2605; App. 2670-74.) Benworth also sought affirmative relief on similar grounds. (App. 3117.)

In addition, Benworth sought a declaration in Counterclaim I that Womply was required to promptly transmit all loan files for the PPP loans Womply referred to Benworth. (App. 74-75.) During the Arbitration, Womply finally delivered batches of loan files to Benworth. (App. 2962-64; App. 3041-46.) Womply represented that these batches constituted all the loan files and thereby rendered Counterclaim I "moot" to the extent it sought a declaration concerning the loan files. (App. 2962-64; App. 3041-46.) Based on these representations—which turned out to be false as discussed below, *see infra*, pp. 24-25—the parties did not continue to litigate this issue. (App. 2962-64; App. 3041-46.) Benworth also asserted "promissory fraud" as an affirmative defense based on Womply's defective technology platform. (App. 73.)

### C.    Pre-Hearing Proceedings

Prior to the March 2023 hearing, the Arbitrator issued orders on various matters, including discovery motions and Womply's multiple requests for summary disposition. (App. 3117.) On January 19, 2022, the Arbitrator issued the Parties' Joint Stipulated Protective Order. (*Id*.) The Arbitrator subsequently granted Womply relief from that order so it could pursue claims against Benworth, its CEO and his wife, and an affiliate of Benworth in Puerto Rico federal court for purported fraudulent transfers. (App. 262-64.) The Arbitrator also partially granted Benworth's motion to disqualify Womply's expert, a former SBA official, "to the extent that Womply wanted" the former SBA official "to give a legal opinion on how to apply the SBA regulations, but allowed" that official "to testify about the history of the PPP program and regulatory scheme[.]" (App. 3117-18.)

## IV.    The Arbitrator Refuses to Hear From the SBA

While the Arbitration was pending, in early December 2022, Congress's Select Subcommittee on the Coronavirus Crisis issued the Congressional Report. (App. 132.) The Congressional Report is a

damning exposé on the unlawful and unethical conduct Womply engaged in, in connection with the PPP, including its dealings with Benworth.

The Select Subcommittee found, inter alia, that (1) Womply misrepresented its relationship with the SBA and improperly leveraged its close relationships with Trump Administration officials; (2) Womply mischaracterized its status as a "technology service provider" to avoid SBA regulations; (3) Womply likely described itself as a "technology service provider" because the criminal history of Womply's CEO, Toby Scammell, could have excluded Womply from providing PPP loan services; (4) Womply was the "path of least resistance" for criminals and fraudsters because of its defective fraud prevention measures; (5) Womply and its founders each obtained suspicious PPP loans; and (6) Womply disseminated the sensitive personal and financial data of hundreds of thousands of PPP borrowers to Solo Global, a company recently formed by Womply's founders. (App. 137-39.)  These findings and others in the Congressional Report corroborated Benworth's position in the Arbitration.

In response to the Congressional Report, the SBA determined that it was necessary to take "immediate action to protect the interests of the Federal Government and the integrity of current and future SBA lending programs." (App. 4022.) To that end, on December 8, 2022, the SBA suspended Womply "from engaging in any actions related to SBA Lenders, SBA loans and SBA's loan programs [except those actions that are necessary to process forgiveness for PPP borrowers] for 180 days from the date of this letter, subject to further extension by written notice." (*Id*.) The SBA stated that the suspension "will provide time for the SBA to analyze the supporting documentation underlying the report's findings and assess Womply's compliance with SBA Loan Program Requirements . . .." (*Id.*) The SBA has since extended the suspension and it remains in effect.

The initial merits hearing was scheduled to commence on March 20, 2023. Pursuant to the JAMS Rules and the Arbitrator's instructions, the parties submitted a joint pre-hearing brief that, *inter alia*, identified the witnesses the parties intended to call at the hearing. (App. 267.) In that joint submission, Benworth disclosed that it would be calling Dianna Seaborn, a then-current high-ranking employee of the SBA who was featured in many of the emails the parties exchanged during discovery, to testify in her official capacity. (App. 272.) Benworth noted that Ms. Seaborn's anticipated area of testimony concerned whether the Technology Fees were subject to the Agent Fee Cap, whether Womply must

21

PETITION TO VACATE FINAL ARBITRATION AWARD

return the fees Benworth paid in excess of the Agent Fee Cap, and whether Womply acted as a lender service provider in its relationship with Benworth. (*Id.*) Womply then moved the Arbitrator to preclude Benworth from offering Ms. Seaborn as a witness. (App. 3118.)

On March 8, 2023, the Arbitrator held a pre-hearing conference to address logistical issues for the hearing and to rule on pending motions, including Womply's motion directed at Ms. Seaborn. With respect to the issue of Ms. Seaborn testifying, what should have been a routine pre-hearing motion turned into a nearly hour-long episode wherein the Arbitrator berated Benworth and its counsel, with Benworth's CEO present. The Arbitrator accused Benworth and its counsel of ambushing him and Womply with its disclosure of Ms. Seaborn as a witness and charged Benworth and its counsel with "compromising" the "integrity" of the Arbitration. (App. 310-11.) The Arbitrator ruled that he would designate Ms. Seaborn as an "expert witness" and preclude her from testifying unless Benworth complied with certain requirements over which it had no control. (App. 311-12.) Specifically, the Arbitrator would not allow Benworth to present testimony from Ms. Seaborn, a non-party government official over whom Benworth had no control, unless Benworth arranged for Ms. Seaborn to sit for a 2-hour deposition with just a few days' notice. (*Id.*)

During the pre-hearing conference, Benworth also sought a continuance of the hearing based on the SBA's ongoing investigation of Womply. (App. 3118.) The Arbitrator ordered Benworth to provide, within 48 hours, verified confirmation from the SBA that Womply is under investigation by the SBA with respect to the fees Womply received for services it provided to PPP lenders. The Arbitrator indicated that he would be inclined to grant a continuance of the final hearing set to commence on March 20, 2023, should Benworth provide said confirmation. (App. 305.) Benworth informed the Arbitrator, however, that it had no ability to tell the SBA how or when to act. Benworth was thus unable to provide the Arbitrator with the requested verified information but asked for additional time to meet the Arbitrator's demand. (App. 305-06.) The hearing proceeded as scheduled over Benworth's objections.

In September 2023, prior to the issuance of the Interim Award, Benworth renewed its motion for the Arbitrator to defer ruling on the merits of the parties' dispute until the SBA completes its investigation of Womply. (App. 2881.) During the final hearing, the Arbitrator stated he was not

22

PETITION TO VACATE FINAL ARBITRATION AWARD

interested in rendering an "advisory opinion" and would consider staying the case if Benworth provided "reliable information from the SBA . . . such as some kind of investigative notice[,]" that the SBA was investigating Womply's fees. (*See* App. 1493:24 – 1495:24.) The Arbitrator then advised Benworth that if it "find[s] additional information or a matter has come to [its] attention which [it] believe[s] warrant a continuance of this case or a deferral of this decision" then Benworth is "free to present that motion to [the Arbitrator], and [the Arbitrator] will obviously give it full consideration." (*See* App. 1499:20 – 1500:5.)

Benworth attached to its renewed motion the requested additional information. Specifically, Benworth provided the Arbitrator with correspondence from the SBA's Associate General Counsel for Litigation confirming that the SBA is actively investigating the legality of the fees Womply collected from lenders, like Benworth, in connection with the PPP as well as the services Womply provided with respect to those fees. (App. 2883.) Specifically, the SBA's Associate General Counsel for Litigation advised that (1) the SBA's investigation "does include the fees that Womply charged and its representations as to their nature and what services Womply rendered to earn them" and (2) the SBA "will be reaching a conclusion as to the legitimacy of those fees . . . ." (*Id*.) The Arbitrator denied Benworth's renewed motion, claiming that the correspondence from the SBA "was somewhat vague and general and did not provide information to determine the extent to which the SBA investigation overlaps or bears upon the issues raised in this Arbitration." (App. 2894.)

Due to health issues, the Arbitrator was delayed in issuing the Interim Award. In the meantime, the SBA extended its suspension of Womply for a third time to provide additional time to complete its investigation. (App. 2897-98.) Thus, on November 9, 2023, Benworth again renewed its motion for the Arbitrator to defer ruling on the merits of the parties' dispute until the SBA completes its investigation. (App. 2899-2901.) About six weeks later, the Arbitrator issued the Interim Award without ruling on Benworth's renewed motion to stay.

V.    The Awards

A.    The March 2023 Hearing

A seven-day in-person evidentiary hearing (the "Hearing") was held before the Arbitrator at the San Francisco office of JAMS on March 20-24 and 27-28, 2023. (App. 3118.) At the Hearing, the

Arbitrator heard testimony from six witnesses. (*Id.*) Multiple exhibits were also admitted into evidence before and during the Hearing. (App. 3119.) The Arbitrator, however, refused to consider the Congressional Report, calling it "rank hearsay." (App. 3118.)

On May 12, 2023, the parties submitted post-Hearing briefs. (App. 3119.) Reply briefs were submitted on May 31, 2023. (*Id.*) Virtual closing arguments took place on June 29, 2023. (*Id.*) The parties also submitted to the Arbitrator copies of the slides they used during their closing arguments on the final hearing day (June 29, 2023) and a Joint Compendium of SBA Rules and Regulations. (*Id.*)

**B.      The Interim Award**

The parties were served with the Interim Award on December 21, 2023. (App. 2903.) In the Interim Award, the Arbitrator ruled in favor of Womply on nearly every issue, with the only exception being the conclusion that the 70% tier applied to all PPP loans Womply referred to Benworth. (*See generally* App. 2902-56.) The Arbitrator denied Benworth any relief on its counterclaims and affirmative defenses. (App. 2955-56.) The Interim Award provided that subsequent proceedings would be held to determine pre-judgment interest and costs of collection, including attorneys' fees. (*Id.*)

**C.      Post-Interim Award Proceedings**

At the invitation of the Arbitrator, Benworth moved for reconsideration of the Interim Award. As relevant here, Benworth asked the Arbitrator to reconsider four rulings: (1) whether Benworth was entitled to a declaration that Womply must transmit all loans files to Benworth; (2) whether the Agent Fee Cap applies to the Technology Fees; (3) whether Womply acted as a lender service provider; and (4) whether Womply was entitled to additional compensation since the Agreements were not submitted to the SBA. (App. 2962-73; App. 3041-52.)

With respect to the transmission of loan files, Benworth explained to the Arbitrator that recent events revealed that issue was not moot and denying Benworth relief would cause substantial prejudice. (App. 2962-64; App. 3041-46.) For example, and contrary to the Interim Award's conclusion that PPP loans were 100% guaranteed by the SBA, the SBA had denied Benworth the guaranteed purchase of thousands of Womply-referred PPP loans, totaling millions of dollars, which Benworth now owes the Federal Reserve, because Benworth has been unable to provide the SBA with the necessary loan files held hostage by Womply. (App. 2962-64; App. 3041-46.) The issue with the Federal Reserve has put

PETITION TO VACATE FINAL ARBITRATION AWARD

Benworth in a compromising position because the Federal Reserve has directed Benworth not to pay Womply the amounts awarded by the Arbitrator. (App. 3097.)

The Arbitrator largely denied Benworth's motion for reconsideration. (App. 3060-61.) However, the Arbitrator ruled that Benworth was entitled to a declaration concerning the transmission of loan files and stated that the Final Award would reflect this ruling. (App. 3056-57.) The order denying reconsideration also set forth the procedures for resolving the remaining issues concerning pre-judgment interest, attorneys' fees, and costs. (App. 3059-60.)

**D.    The Final Award**

Following the submission of the Parties' pre-hearing briefs on the issues of pre-judgment interest, attorneys' fees, and costs, the Arbitrator held a hearing via Zoom commencing on April 8, 2024, and continuing on April 9 and 11, 2024. (App. 3168.) The Parties then submitted closing briefs. (*Id.*)

The Arbitrator made the initial final award on May 30, 2024, but it was not delivered to the Parties until June 11, 2024. (App. 3113; App. 6.) Benworth timely moved to correct a computational error in the original final award, which Womply did not oppose. (App. 3257, n. 21.) On June 26, 2024, the Arbitrator issued the corrected Final Award. (App. 3186.)

In the Final Award, the Arbitrator: (1) incorporated the Interim Award with some modifications to the Arbitrator's analysis of certain issues in response to arguments raised in Benworth's motion for reconsideration; (2) declared that Benworth is entitled to relief on its Counterclaim I(iv) and ordered Womply to transmit copies of borrowers' PPP loan files; (3) awarded Womply finance charges calculated at 10% per annum simple interest, which as of May 30, 2024, equaled $25,363,697.68; (4) awarded Womply attorneys' fees in the amount of $5,883,708.58; and (5) awarded Womply $372,956.46 in costs. (App. 3183-84.)

**STANDARD FOR VACATUR**

Benworth petitions to vacate the Final Award on three grounds, two of which are set forth in Section 10 of the FAA. The standards applicable to each ground for vacatur are addressed below.

1.    Vacatur of an arbitration award is appropriate where the arbitrator exceeds his powers. 9 U.S.C. § 10(a)(4). Ninth Circuit precedent establishes that an arbitrator exceeds his powers "when the award is 'completely irrational' or exhibits a 'manifest disregard of the law.'" *Aspic Eng'g & Constr.*

PETITION TO VACATE FINAL ARBITRATION AWARD

*Co. v. ECC Centcom Constructors LLC*, 913 F.3d 1162, 1166 (9th Cir. 2019) (*Aspic*). Both circumstances apply here.

An award is "completely irrational" if "the arbitration decision fails to draw its essence from the agreement." *Aspic*, 913 F.3d at 1166 (internal quotations omitted). "To consider whether an award drew its essence from the agreement, the court must ensure that the arbitrator looked to the words of the contract and to the conduct of the parties." *Michigan Mut. Ins. Co. v. Unigard Sec. Ins. Co.*, 44 F.3d 826, 831 (9th Cir. 1995) (cleaned up). Courts only "enforce an arbitration award if it represents a plausible interpretation of the contract in the context of the parties' conduct." *Pac. Motor Trucking Co. v. Auto. Machinists Union*, 702 F.2d 176, 177 (9th Cir. 1983) (internal quotations omitted). "An award that conflicts directly with the contract cannot be a 'plausible interpretation.'" *Id*. Simply put, "[a]n award is completely irrational if it ignores controlling terms of the parties' contract." *HayDay Farms, Inc. v. FeeDx Holdings, Inc.*, 55 F.4th 1232, 1241 (9th Cir. 2022).

"To demonstrate manifest disregard, the moving party must show that the arbitrator understood and correctly stated the law, but proceeded to disregard the same." *HayDay Farms*, 55 F.4th at 1241 (internal quotations omitted). "There must be some evidence in the record, other than the result, that the arbitrators were aware of the law and intentionally disregarded it." *Id*. "[A]n arbitrator's failure to recognize undisputed, legally dispositive facts may properly be deemed a manifest disregard for the law." *Coutee v. Barington Cap. Grp., L.P.*, 336 F.3d 1128, 1133 (9th Cir. 2003).

Under either the completely irrational or manifest disregard of the law standards of review, courts generally "must defer to an arbitrator's conclusions even where they are erroneous." *Am. Postal Workers Union v. U.S. Postal Serv.*, 682 F.2d 1280, 1284–85 (9th Cir.1982), *cert. denied*, 459 U.S. 1200 (1983). However, an "arbitrator's conclusions" are not "entitled to the deference ordinarily accorded" and do "not bind" this Court where, like here, an award is legally irreconcilable with the undisputed facts. *Id*. at 1285.

Moreover, "[a]lthough an arbitrator has great freedom in determining an award, he may not 'dispense his own brand of industrial justice.'" *Pacific Motor Trucking Co. v. Auto. Machinists Union*, 702 F.2d 176, 177 (9th Cir. 1983) ("Because the award conflicts ***directly with the contract***, the court properly vacated the award." (emphasis added)).

26

PETITION TO VACATE FINAL ARBITRATION AWARD

2.	An arbitration award may be vacated where it is contrary to public policy. *See United Transp. Union v. Union Pac. R. Co.*, 116 F.3d 430, 433 (9th Cir. 1997) (recognizing this basis for vacatur is "'extremely narrow'"). "To vacate an arbitration award on public policy grounds, the court must find (1) 'an explicit, well-defined policy' and (2) that the policy 'is one that specifically militates against the relief ordered by the arbitrator.'" *Id*.

3.	An arbitration award is also subject to vacatur where the arbitrator is "guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown[.]" 9 U.S.C. § 10(a)(3). Arbitrators are "accorded a degree of discretion in exercising their judgment with respect to a requested postponement." *Naing Int'l Enters., Ltd. v. Ellsworth Assocs., Inc.*, 961 F. Supp. 1, 3 (D.D.C. 1997). "Nonetheless, if the failure of an arbitrator to grant a postponement or adjournment results in the foreclosure of the presentation of 'pertinent and material evidence,' it is an abuse of discretion." *Id.*

<strong>ARGUMENT</strong>

**I.	THE AWARD MUST BE VACATED BECAUSE THE ARBITRATOR EXCEEDED HIS POWERS.**

The "central purpose" of the FAA is "to ensure 'that private agreements to arbitrate are enforced according to their terms.'" *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 53-54 (1995) (quoting *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)). Because arbitration "is a matter of consent, not coercion," the parties may limit the scope of an arbitrator's powers through "specify[ing] by contract the rules under which that arbitration will be conducted." *Volt*, 489 U.S. at 479. An arbitrator exceeds his powers when he strays from the limitations imposed by the parties. *Michigan Mut. Ins. Co. v. Unigard Sec. Ins. Co.*, 44 F.3d 826, 830 (9th Cir. 1995) ("Thus, when the arbitrators strayed from the limitations imposed by the parties, they exceeded their powers.").

The choice of law clauses in the Agreements limited the scope of the Arbitrator's powers by imposing three critical rules. The first rule required the Arbitrator to apply California law and "SBA Regulations," as that term is defined in the Agreements.[5] The second rule compelled the Arbitrator to

---

[5] The Referral Agreement defines "SBA Regulations" to include "applicable SBA loan requirements, including those codified in 13 CFR part 120 . . . ." (App. 3984, § 9.) "SBA loan requirements," in turn, is defined to include "SBA Standard Operating Procedures (SOPs)[.]" 13 C.F.R. § 120.10. The Order

27

PETITION TO VACATE FINAL ARBITRATION AWARD

give controlling effect to SBA Regulations, notwithstanding any provision of the Agreements or California law to the contrary. And the third rule obligated the Arbitrator to treat the SBA Regulations as express terms of the parties' bargain because they were specifically incorporated in the Agreements. *See Serv. Emps. Int'l Union, Loc. 99 v. Options—A Child Care & Hum. Servs. Agency*, 200 Cal. App. 4th 869, 879 n.6 (2011) ("When language of a statute or regulations is incorporated in a contract, such language establishes contractual rights and obligations apart from its legal identity as part of a statute or regulation."); *300 DeHaro St. Invs. v. Dep't of Hous. & Cmty. Dev.*, 161 Cal. App. 4th 1240, 1256 (2008) ("When statutory language is included in a contract, it assumes a new legal identity: that of contractual language.").

The Arbitrator failed to follow the rules imposed by the parties. Rather than apply the unambiguous language of the SBA Regulations (and, therefore, the Agreements) to the undisputed facts concerning Womply's conduct, the Arbitrator dispensed his own brand of industrial justice. Specifically, the Arbitrator exceeded his powers on three issues. First, the Arbitrator manifestly disregarded the law by ignoring undisputed, legally dispositive facts when he concluded that the Agent Fee Cap does not apply to the Technology Fees. Second, and for similar reasons, the Arbitrator manifestly disregarded the law and the Agreements when he concluded that Womply is not a lender service provider. Finally, the Award is unenforceable because it compels Benworth to compensate Womply in violation of controlling federal regulations.

### A.    The Arbitrator's Application Of The Agent Fee Cap Is Legally Irreconcilable With The Undisputed Facts.

In the Arbitration, Benworth argued that the Agent Fee Cap precluded Womply from recovering additional Technology Fees because the Technology Fees compensated Womply, in whole or in part, for services that directly related to preparing PPP loan applications or referring PPP loan applicants to Benworth. The Agent Fee Cap limited the "total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender)" to "[o]ne (1)

---

Form adopted the Referral Agreement's definition of "SBA Regulations." (App. 3986 ("Unless set forth otherwise, undefined capitalized terms are defined in the MDA or Amended and Restated PPP Loan Referral Agreement between the Parties (the 'Referral Agreement').").)

PETITION TO VACATE FINAL ARBITRATION AWARD

percent for loans of not more than $350,000[.]" Paycheck Protection Program as Amended by Economic Aid Act, 86 Fed. Reg. 3709, (Jan. 14, 2021). The SBA determined that the Agent Fee Cap was "reasonable based upon the application requirements and the fees that lenders receive for making PPP loans." *Id*. at 3709-10.

There was no dispute that Womply relied on the Technology Services to prepare PPP loan applications and refer PPP loan applicants to Benworth. In fact, during closing arguments, Benworth posed the following question that the Arbitrator must resolve: "Did any of Womply's technology assist in either referring or preparing PPP loan applications?" (App. 2776:15-16.) The Arbitrator's response was unequivocal: "***And the answer to that question is, yes, we don't have to argue that***." (App. 2776:17-18 (emphasis added).) The Arbitrator also understood, and Womply agreed, that the Technology Services "verif[ied] the information in the -- in the application." (App. 2701:7-13.) Thus, there was no evidentiary dispute about the functions the Technology Services performed. The only dispute centered on the conclusions to be drawn from those undisputed facts.

As shown below, the Arbitrator's conclusion that the Agent Fee Cap does not apply to the Technology Fees is legally irreconcilable with the undisputed facts. The Arbitrator conscientiously chose to ignore the SBA Regulations that the parties agreed would govern their agreement because the Arbitrator did not agree that the regulations were fair to Womply. Benworth first describes the information that must be included in a PPP loan application along with the documents that must accompany the application. *See infra* Part I.A.1. Benworth next surveys the undisputed facts establishing that Womply used the Technology Services to prepare and refer PPP loan applications. *See infra* Part I.A.2. Finally, Benworth explains how, despite these undisputed, legally dispositive facts, the Arbitrator manifestly disregarded the law by failing to apply the Agent Fee Cap to the Technology Fees. *See infra* Part I.A.3.

### 1.    The PPP loan application requirements.

The Interim Final Rule established the requirements for submitting a PPP loan application. PPP loan applicants were required to provide various categories of information and documents substantiating

PETITION TO VACATE FINAL ARBITRATION AWARD

that information.[6] Specifically, applicants were required to "submit Paycheck Protection Program Borrower Application Form (SBA Form 2483), or lender's equivalent form, and payroll documentation, as described" in the Interim Final Rule. (App. 3860, art. III.B.10.)[7] Each category of information and payroll documentation is addressed below.

**Borrower Identification Information**. PPP applicants were first required to provide identification and contact information, including their name, social security number, address, phone number, and email address:

| Check One: ☐ Sole proprietor ☐ Partnership ☐ C-Corp ☐ S-Corp ☐ LLC ☐ Independent contractor ☐ Self-employed individual ☐ 501(c)(3) nonprofit ☐ 501(c)(6) organization ☐ 501(c)(19) veterans organization ☐ Other 501(c) organization ☐ Housing cooperative ☐ Tribal business ☐ Other _____ | DBA or Tradename (if applicable) | Year of Establishment (if applicable) |
|---|---|---|
| **Business Legal Name** | **NAICS Code** | **Applicant (including affiliates, if applicable) Meets Size Standard (check one):** |
|  |  | ☐ No more than 500 employees (or 300 employees, if applicable) unless "per location" exception applies ☐ SBA industry size standards ☐ SBA alternative size standard |
| **Business Address (Street, City, State, Zip Code - No P.O. Box addresses allowed)** | **Business TIN (EIN, SSN, ITIN)** | **Business Phone** |
|  |  |  |
|  | **Primary Contact** | **Email Address** |
|  |  |  |

(App. 3960; *see also* App. 3967; App. 3133-34; App. 3860, art. III.B.10.)

---

[6] The Interim Final Rule enumerated specific PPP loan application requirements based on the nature of the borrower (i.e., whether the borrower was a corporation or individual). It is undisputed that all PPP borrowers who applied through Fast Lane had no employees and were self-employed individuals, independent contractors, or sole proprietors. Accordingly, this section discusses only the PPP loan application requirements that applied specifically to self-employed individuals, independent contractors, and sole proprietors.

[7] The parties jointly admitted into evidence copies of SBA Form 2483 for first and second draw PPP loan applications. (*See generally* App. 3960-66; App. 3967-73.)

30

PETITION TO VACATE FINAL ARBITRATION AWARD

**Financial Criteria**. PPP applicants were next required to provide financial information, including their average monthly payroll, the requested loan amount, and purpose(s) of the PPP loan:

| Average Monthly Payroll: | $ | x 2.5 + EIDL (Do Not Include Any EIDL Advance) equals Loan Request Amount: | $ | Number of Employees: | |
|---|---|---|---|---|---|
| Purpose of the loan (select all that apply): | ☐ Payroll Costs | ☐ Rent / Mortgage Interest | ☐ Utilities | | ☐ Covered Operations Expenditures |
| | ☐ Covered Property Damage | ☐ Covered Supplier Costs | ☐ Covered Worker Protection Expenditures | | ☐ Other (explain): _____ |

(App. 3960; *see also* App. 3967; App. 3134; App. 3856, art. III.B.4.b.)

**Bank Records**. The Interim Final Rule required PPP applicants to submit banking records for two purposes. First, applicants were required to provide documentation from 2019 or 2020, such as a "bank statement," to establish that they were "self-employed." (App. 3856, art. III.B.4.b.) Second, applicants were required to "provide a 2020 invoice, bank statement, or book of record to establish [they] were in operation on or around February 15, 2020." (*Id*.)

**Tax Documents**. The Interim Final Rule states that applicants "must provide the 2019 or 2020 (whichever [they] used to calculate loan amount) Form 1040 Schedule C with [their] PPP loan application to substantiate the applied-for PPP loan amount . . . ." (App. 3856, art. III.B.4.b.) Moreover, PPP applicants were also required to certify the following with respect to the tax documents that must accompany their PPP loan application:

> I acknowledge that the Lender will confirm the eligible loan amount **using required documents submitted**. I understand, acknowledge, and agree that the Lender can share any tax information that I have provided with SBA's authorized representatives, including authorized representatives of the SBA Office of Inspector General, for the purpose of compliance with SBA Loan Program Requirements and all SBA Reviews.

(App. 3963 (emphasis added); *see also* App. 3970; App. 3861, art. III.B.12.x.)

31

PETITION TO VACATE FINAL ARBITRATION AWARD

**Eligibility Questions**. PPP applicants were also required to answer "yes" or "no" to multiple questions that determined their eligibility for a PPP loan:

*If questions (1), (2), (5), or (6) are answered "Yes," the loan will not be approved.*

| Question | Yes | No |
|---|---|---|
| 1. Is the Applicant or any owner of the Applicant presently suspended, debarred, proposed for debarment, declared ineligible, voluntarily excluded from participation in this transaction by any Federal department or agency, or presently involved in any bankruptcy? | ☐ | ☐ |
| 2. Has the Applicant, any owner of the Applicant, or any business owned or controlled by any of them, ever obtained a direct or guaranteed loan from SBA or any other Federal agency (other than a Federal student loan made or guaranteed through a program administered by the Department of Education) that is (a) currently delinquent, or (b) has defaulted in the last 7 years and caused a loss to the government? | ☐ | ☐ |
| 3. Is the Applicant or any owner of the Applicant an owner of any other business, or have common management (including a management agreement) with any other business? If yes, list all such businesses (including their TINs if available) and describe the relationship on a separate sheet identified as addendum A. | ☐ | ☐ |
| 4. Did the Applicant receive an SBA Economic Injury Disaster Loan between January 31, 2020 and April 3, 2020? If yes, provide details on a separate sheet identified as addendum B. | ☐ | ☐ |
| 5. Is the Applicant (if an individual) or any individual owning 20% or more of the equity of the Applicant presently incarcerated or, for any felony, presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction? <br> Initial here to confirm your response to question 5 → _____ | ☐ | ☐ |
| 6. Within the last 5 years, for any felony involving fraud, bribery, embezzlement, or a false statement in a loan application or an application for federal financial assistance, has the Applicant (if an individual) or any owner of the Applicant 1) been convicted; 2) pleaded guilty; 3) pleaded nolo contendere; or 4) commenced any form of parole or probation (including probation before judgment)? <br> Initial here to confirm your response to question 6 → _____ | ☐ | ☐ |

(App. 3961; *see also* App. 3968; App. 3133-34; App. 3860, art. III.B.10.)

**PPP Certifications**. The Interim Final Rule further directed that applicants "must certify in good faith" to various attestations concerning, *inter alia*, the accuracy of the information provided in, and the documentation accompanying, the PPP loan application:

The authorized representative of the Applicant must certify in good faith to all of the below by **initialing** next to each one:

_____ The Applicant was in operation on February 15, 2020, has not permanently closed, and was either an eligible self-employed individual, independent contractor, or sole proprietorship with no employees, or had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC.

_____ Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.

_____ The funds will be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures as specified under the Paycheck Protection Program Rules; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

_____ I understand that loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, covered utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures, and not more than 40% of the forgiven amount may be for non-payroll costs. If required, the Applicant will provide to the Lender and/or SBA documentation verifying the number of full-time equivalent employees on the Applicant's payroll as well as the dollar amounts of eligible expenses for the covered period following this loan.

_____ The Applicant has not and will not receive another loan under the Paycheck Protection Program, section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)) (this does not include Paycheck Protection Program second draw loans, section 7(a)(37) of the Small Business Act (15 U.S.C. 636(a)(37)).

_____ The Applicant has not been approved for a Shuttered Venue Operator (SVO) grant from SBA as of the date of this loan application, and the Applicant acknowledges that if the Applicant is approved for an SVO grant before SBA issues a loan number for this loan, the Applicant is ineligible for the loan and acceptance of any loan proceeds will be considered an unauthorized use.

_____ The President, the Vice President, the head of an Executive department, or a Member of Congress, or the spouse of such person as determined under applicable common law, does not directly or indirectly hold a controlling interest in the Applicant, with such terms having the meanings provided in Section 322 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act.

_____ The Applicant is not an issuer, the securities of which are listed on an exchange registered as a national securities exchange under section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f).

(App. 3962-63; *see also* App. 3969-70; App. 3133-34; App. 3861, art. III.B.12.)

PETITION TO VACATE FINAL ARBITRATION AWARD

**KYC/BSA/AML Compliance**. PPP loan applications could be submitted to the SBA only *after* the information in the application is verified. For example, the PPP applicant's identifying information, such as date of birth, address, and taxpayer identification number, must be verified to confirm the applicant's identity. (App. 3864, art. III.C.3.d.ii.)

### 2. Womply's technology assisted in preparing and referring PPP loan applications.

As the Arbitrator admitted, there was no dispute that Womply's technology assisted in preparing and referring PPP loan applications. Womply's own witnesses and documents established that most of the Technology Services were used to collect, analyze, and verify the information and supporting documents required by the Interim Final Rule to submit a PPP loan application. The Technology Services "were performed using technology from third-party service providers that were linked to or integrated into Womply's technology platform[.]" (App. 3135.) The Technology Services identified in the Order Form include Plaid, Docusign, LexisNexis, Inscribe, Ocrolus, Mindee, Persona, Twilio, and Sendgrid. (App. 3987, § 1.2.) Each of these technologies were used in connection with preparing PPP loan applications and referring PPP loan application packages to Benworth.

**Borrower Identity Information**. Fast Lane prompted applicants to enter their email addresses, phone numbers, and physical addresses, which would later be populated into the PPP application form. (App. 3134.) Womply verified email addresses using SendGrid, phone numbers using Twilio, and the existence of physical addresses using Google Maps. (App. 3135.) With respect to Google Maps, Scammell testified that it served the purpose of ensuring that applicants "didn't input anything that was inadvertently incorrect." (App. 831:1 – 832:6.) Applicants could not continue applying for a PPP loan through Fast Lane unless this information was verified by Womply. (App. 3875 ("We verify emails for 100% of applications."); App. 3878 ("We verify mobile phones for 100% of applications.").)

**Financial Criteria**. Using information extracted from the tax documents provided by applicants, Womply, through Fast Lane, automatically calculated the loan amounts available to the applicants:

PETITION TO VACATE FINAL ARBITRATION AWARD

(App. 3888 (slide from presentation Womply sent to the SBA describing Fast Lane); App. 847:7-23 (Womply CEO Scammell testifying that Fast Lane presented applicants with PPP loan amounts they were eligible for, which "is the result of receiving those tax documents, running them through the third-party technology analysis, and then running the calculation on -- as a result of what you have presented as a user -- what we [i.e., Womply] believe the user may be eligible for.").)

PETITION TO VACATE FINAL ARBITRATION AWARD

**Bank Records**. Womply also allowed applicants to connect their bank accounts to Fast Lane. (App. 850:3-6.) Womply ==“extracted bank account information and transaction history” using Plaid.== (App. 3997, ¶ 18(g).)



(App. 4015.) ==Womply would then analyze the banking data to determine, among other things, applicants’ eligibility for a PPP loan based on whether they were in business on or before February 15, 2020. (App. 889:21-24; App. 4021 (“We analyze bank data to verify identity and determine whether the business was in operations on 2/15/20.”); App. 3889 (same).)==

**Tax Documents**. ==Fast Lane also directed applicants to upload the tax documents that must accompany the PPP loan application required by the Interim Final Rule. (App. 833:25 – 834:11.) Scammell explained that the tax documents were “useful for determining and validating the loan size the applicant was seeking” as well as verifying that the applicant was a business. (App 833:20 – 834:18.) Womply used Mindee, Inscribe, and Ocrolus “to make this flow seamless for borrowers.” (App. 835:19-25.) These technologies also allowed Womply to determine if the borrower uploaded the correct tax filing for the correct year. (App. 835:10-16.)==

PETITION TO VACATE FINAL ARBITRATION AWARD



(App. 4016.) Applicants could not continue applying through Fast Lane until they uploaded the correct tax documents. (App. 3887.) Once the correct tax documents were uploaded and analyzed, Womply told applicants whether they qualified for a loan and the size of that loan. (*See* App. 843:12-19; App. 4020; App. 3888.)

**Eligibility Questions**. Fast Lane further required applicants to "confirm" that they could answer "yes" or "no" to the eligibility questions in the PPP loan application. (App. 1383:22 – 1386:8 (Womply informing users that they must confirm the necessary answers to the eligibility questions in the PPP loan applications forms); *see also* App. 3961 (eligibility questions in First Draw PPP Loan Application); App. 3968 (eligibility questions in Second Draw PPP Loan Application).) Applicants could not continue applying through Fast Lane unless they could "confirm" the necessary answers to satisfy the eligibility requirements for a PPP loan. (App. 980:8-24 (Womply CEO Scammell testifying that if applicants could not "Confirm" the necessary answers to the eligibility questions they would be redirected to a lender who used Womply's referral only service and "they wouldn't be able to use the Fast Lane technology").)

**PPP Certifications**. Fast Lane also required applicants to confirm that they could make the requisite PPP certifications; otherwise, they were not permitted to proceed with the workflow to submit a PPP application through Fast Lane:

PETITION TO VACATE FINAL ARBITRATION AWARD



(App. 3885-86 (slide from presentation Womply sent to the SBA describing Fast Lane); App. 1214:25 – 1216:9; App. 981:10-21; App. 4001 (4:09:00 to 6:47:00).) After the borrower was referred to a lender, DocuSign was used (1) to generate the PPP application populated with the information provided through Fast Lane and (2) to collect the PPP certifications and applicants' signatures:

PETITION TO VACATE FINAL ARBITRATION AWARD



(App.                                                                                    4017;
App. 1145:13-21; App. 1230:15 – 1231:1; App. 970:9-13.)

**KYC/BSA/AML Compliance**. During the Fast Lane application process and before borrowers were referred to lenders, Womply used multiple third-party technologies, including Twilio, SendGrid, Persona, LexisNexis, and Docusign, to verify borrowers' identities. (App 825:1-20; 818:5-5, 840:14-25; 884:15 – 885:11.) Indeed, Womply's technology platform was designed to refer legitimate PPP loans that were eligible for funding. For instance, Womply admitted that its technology filtered out applicants who would not be eligible for PPP applications because their identities could not be verified. (*See, e.g.*, App. 1239:17 – 1240:13.) Womply also designed Fast Lane to exclude from its referred loans those applicants who did not meet general eligibility requirements of the PPP. (App. 1453:21 – 1454:16.)

According to Womply, an applicant would not be referred to a lender until the applicant completed Womply's "KYC review process." (App. 3957; *see also* App. 3911-3914.)

In a declaration admitted into evidence, Womply CEO Scammell testified that Womply did not refer applicants to lenders until *after* performing the services provided by SendGrid, Twilio, Persona, Plaid, DocuSign, Mindee, Ocrolus, and Inscribe. (App. 3996-97, ¶¶ 18-19.)

### 3. The Arbitrator failed to recognize undisputed, legally dispositive facts.

Although manifest disregard of the facts is not an independent ground for vacatur, when "legally dispositive facts are so firmly established . . . an arbitrator cannot fail to recognize them without manifestly disregarding the law." *Coutee v. Barington Cap. Grp., L.P.*, 336 F.3d 1128, 1133 (9th Cir. 2003) (citing *Am. Postal Workers Union v. U.S. Postal Serv.*, 682 F.2d 1280, 1284–86 (9th Cir. 1982), cert. denied, 459 U.S. 1200 (1983)). The Arbitrator manifestly disregarded the law here because he failed to recognize the undisputed, legally dispositive facts firmly establishing that the Technology Services, whether in whole or in part, were performed to assist "in preparing an application for a PPP loan (including referral to the lender)." (App. 3865, art. III.D.4.)

The Final Award provided three categories of reasons to justify the Arbitrator's failure to apply the Agent Fee Cap to the Technology Fees: (1) the unreported decision denying a motion to dismiss in *OTO Analytics, Inc. v. Capital Plus Financial, LLC*, 2022 WL 1488441 (N.D. Tex. May 11, 2022) foreclosed Benworth's arguments; (2) the Technology Fees compensated Womply for services separate and distinct from referral services; and (3) "extrinsic evidence" and the terms of the Agreements support disregarding the Agent Fee Cap. None of these reasons excuse the Arbitrator's failure to recognize the undisputed, legally dispositive facts.

### i. *Capital Plus does not foreclose applying the Agent Fee Cap to the Technology Fees.*

Citing *Capital Plus*, the Arbitrator ruled that "Benworth's argument that Womply's Technology Fees violate the [] Agent Fee Cap has already been rejected by a federal court" and "forecloses" application of the Agent Fee Cap to the Technology Fees here. (App. 3151.) But *Capital Plus* said no such thing. Nor does the decision carry the precedential value ascribed to it by the Arbitrator. And even if it did, the Arbitrator manifestly disregarded the law because the Final Award, while relying on *Capital*

39

*Plus*, "interpreted [the decision] in a way to render" its interpretation of the Agent Fee Cap "inapplicable to this case." *Comedy Club, Inc. v. Improv West Associates*, 553 F.3d 1277, 1293 (9th Cir. 2009).

*Capital Plus* is a Texas district court decision resolving a motion to dismiss. In *Capital Plus*, Womply sued another SBA lender (Capital Plus) for unpaid PPP fees. *Capital Plus*, 2022 WL 1488441 at \*2. Womply did not directly contract with Capital Plus; instead Womply and Blueacorn (a company that separately contracted with Capital Plus) entered into a referral agreement and a developer order form. *Id.* at \*2; *see also id.* at \*7. Under the developer order form, "Womply agreed to provide tax documents, bank data, identity and account verification, and access to the PPP Portfolio Management System." *Id.* at \*9. And under the referral agreement, "Womply verified the email, phone number, required information for the SBA form, business activity, tax documents, identity, bank account and limits, absence of fraud, and lack of duplicate applications[,]" *id.*—the same services Womply provided under the Order Form here, *see supra*, Part I.A.2.

To resolve Capital Plus's motion to dismiss, based solely on Womply's allegations, the Texas district court had to make three determinations: (1) "whether Womply is an 'agent' as defined by SBA regulations," (2) whether Womply could recover fees from Capital Plus under a breach of contract theory, and (3) whether the Agent Fee Cap precludes "recovery for Technology Fees." *Capital Plus*, 2022 WL 1488441 at \*3. The Arbitrator relied solely on the Texas district court's determination on the third issue, which construed the allegations of the complaint in Womply's favor, while ignoring the analysis of the first two issues, which interpret the SBA regulations in a way that is contrary to Womply's position. To demonstrate the Arbitrator's manifest disregard of the law, Benworth details the Texas district court's analysis of all three issues.

The Texas district court first determined that Womply was an "agent" under SBA regulations because Womply qualified as "any other person representing an Applicant or Participant by conducting business with SBA." *Id.* at \*6.[8] The court held that Womply represented PPP loan applicants because,

---

[8] SBA regulations define an "Agent" as "an authorized representative, including an attorney, accountant, consultant, packager, lender service provider, or ***any other person representing an Applicant or Participant by conducting business with SBA***." 13 C.F.R. § 103.1(a) (emphasis added). And the term "conduct business with the SBA" is defined to include "[p]reparing or submitting on behalf of an applicant an application for financial assistance of any kind . . .." *Id.* at § 103.1(b)(1). Based on the

"[d]uring the application process, Womply compiled documents that Applicants provided and verified certain information before sending the applications to Blueacorn." *Id*. at \*6. The court next held that Womply conducted business with the SBA because it prepared PPP loan applications. *Id*. In determining that Womply "prepared" PPP loan applications, the Texas district court looked to the Oxford English Dictionary definition of "prepare" because that term was not defined in SBA regulations. *Id*. According to the Oxford English Dictionary, the term "prepare" means "to bring into a suitable condition for some future action or purpose; to make ready in advance; to fit out, equip." *Id*. (cleaned up). Adopting that definition, the court concluded that "Womply's actions during the initial application phase" meet the definition of "prepare" because "Womply 'brought into a suitable condition for some future action or purpose' or 'made ready' applications for approval by Blueacorn and Capital Plus **by verifying information to prevent fraud**." *Id*. (cleaned up; emphasis added).

Having determined that Womply was an "agent" according to SBA regulations, the Texas district court next dismissed Womply's breach of contract claim against Capital Plus. *Id*. at \*7. The court explained that SBA regulations require an agent and lender to execute and provide to the SBA the applicable compensation agreement and, more specifically, SBA Form 159. *Id*. (citing 13 C.F.R. § 103.5(a)). Not only was there no contract between Womply and Capital Plus, but they also "did not submit Form 159 to the SBA and courts uniformly hold this precludes any recovery of SBA Fees." *Id*. As discussed below, the Arbitrator manifestly disregarded this SBA regulation when he ruled that Womply is entitled to additional fees from Benworth under agreements that were not submitted to the SBA. *See infra*, Part I.C.

Finally, the Texas district court held that, "[b]ased on the information before the Court **at this stage of litigation**, the Court does not find the SBA regulation **clearly** precludes the collection of a Technology Fee." *Id*. at \*10 (emphases added). Of course, because *Capital Plus* was decided at the motion to dismiss stage, the only information before the court was Womply's allegations and copies of

---

arguments advanced by the defendants in *Capital Plus*, which did not include the argument that Womply is a lender service provider, the Texas district court focused on whether Womply qualified as "any other person representing an Applicant or Participant by conducting business with the SBA." *See Capital Plus*, 2022 WL 1488441 at \*5-6.

PETITION TO VACATE FINAL ARBITRATION AWARD

the agreements, which the court was required to construe in Womply's favor. Based on that information, the court found that the referral fees and technology fees were for separate services because they were set forth in separate agreements. *Id*. at * 9. The court then concluded that, under the developer order form, "the services provided by Womply—providing tax documents, bank data, identity and account verification—***do not directly relate to a PPP loan application so these services do not prepare, or make ready, a PPP loan application for submission to the SBA***." *Id*. at *10 (emphasis added).

The Arbitrator ascribed more weight to *Capital Plus*'s application of the Agent Fee Cap than it can carry. The district court's conclusion regarding Womply's technology fees was not based on an analysis of PPP loan application requirements or an examination of Womply's technology services. *See id.* The district court simply—as it was required to do—accepted Womply's allegations as true: that Womply's technology services were unrelated with preparing or referring PPP loan applications. *See id.* That is evident by, again, the district court's caveat that, "[b]ased on the information before the Court ***at this stage of litigation***, the Court does not find the SBA regulation ***clearly*** precludes the collection of a Technology Fee." *Id*. (emphases added). The district court in *Capital Plus* thus left open the possibility that discovery would reveal additional information about the services Womply provided under the order form that may have resulted in the Agent Fee Cap precluding recovery of technology fees.

Such additional information was presented to the Arbitrator here. *See supra*, Part I.A.2; *see also infra*, Part I.A.3.ii. After being presented with that information, the Arbitrator ==admitted== that Womply's ==technology did prepare and refer PPP loan applications==. (App. 2776:15-18.) However, in a puzzling turn, the Arbitrator selectively adopted elements of the *Capital Plus* decision that was predicated on the opposite factual scenario, which the district court had to assume to be true.[9] (App. 3148, 3151.) And the Arbitrator ignored other aspects of *Capital Plus* that were harmful to Womply—i.e., that Womply was

---

[9] For example, *Capital Plus* stated that the service of providing tax documents and bank data do not relate to a PPP loan application. 2022 WL 1488441, at *10. But in the Arbitration, even Womply's witnesses admitted facts that contradict the allegations the district court had to accept as true in ruling on the motion to dismiss. (*See, e.g.*, App. 1222:13-24 (==Womply President Cory Capoccia testifying that the SBA required applicants to submit tax documents with their application for a PPP loan==); *see also id.* at 648:14-23 (==Mr. Capoccia testifying that Womply analyzed bank data to verify applicants were in business on February 15, 2020, a required attestation as well as a prerequisite to obtaining a PPP loan==).)

PETITION TO VACATE FINAL ARBITRATION AWARD

an "Agent" under the plain reading of SBA Regulations, a legal determination. *Compare* (App. 3147-48, 3151 *with Capital Plus*, 2022 WL 1488441 at *6-7.)

At bottom, the Arbitrator manifestly disregarded the law by interpreting *Capital Plus* "in a way to render it inapplicable to this case." *Comedy Club*, 553 F.3d at 1293. The Ninth Circuit partially vacated an arbitral award for a similar reason in *Comedy Club*. In *Comedy Club*, the district court confirmed an arbitral award ruling, among other things, that a covenant not to compete was valid under California Business and Professions Code §16600. *Id*. at 1282-83. On appeal, the Ninth Circuit held that the arbitrator's ruling "ignores CBPC §16600 and thus is in manifest disregard of the law." *Id*. at 1293. The Ninth Circuit explained that the arbitrator acknowledged but disregarded a California case interpreting §16600 (*Dayton Time Lock*), holding that such covenants may be invalid under California law. *Id.* The Ninth Circuit rejected the arbitrator's "fundamentally incorrect" reasons for disregarding *Dayton Time Lock*. *Id*. Given the arbitrator's awareness of *Dayton Time Lock*, coupled with the plain language of the opinion, the Ninth Circuit noted that "it was not in the province of the arbitrator to make a 'ruling' about § 16600 that was so at odds with what the California Court of Appeal stated in *Dayton Time Lock*." *Id*. at 1293, n.17. The same reasoning applies here.

*Comedy Club* likewise supports vacatur here. Although the Arbitrator ostensibly applied *Capital Plus*, his ruling about the scope of the Agent Fee Cap is so at odds with what was stated in the decision as well as the plain and express reading of the SBA Regulations. Relying on *Capital Plus*, the Arbitrator wrote that the Agent Fee Cap "'limits the fee for preparing an application for a PPP loan, but not for any other reason,' and the fees Womply received for providing technology and other services are not subject to the Agent Fee Cap because they 'do not directly relate to a PPP loan application.'" (App. 3151 (quoting *Capital Plus*, 2022 WL 1488441 at *10.) But, as discussed above, that holding in *Capital Plus* was premised on an assumption of facts the Arbitrator himself acknowledged did not exist in the present case. (App. 2776:15-18.) The Arbitrator also blithely ignored *Capital Plus*'s legal analysis that broadly defined the term "preparing" in reference to PPP loans under the SBA Regulations that adopted the Agent Fee Cap. *Capital Plus*, 2022 WL 1488441 at *6 (holding that to "prepare" means to "make ready"). The Arbitrator's ruling that none of the Technology Services 'made ready' a PPP loan ignores not only the holding of *Capital Plus* but the plain reading of SBA Regulations. This Court should vacate

PETITION TO VACATE FINAL ARBITRATION AWARD

the Final Award because it "ignores [*Capital Plus* as well as the Agent Fee Cap] and thus is in manifest disregard of the law." *Comedy Club*, 553 F.3d at 1293.

### ii. The Arbitrator admitted that the Technology Services assisted in preparing and referring PPP loan applications.

The Arbitrator also concluded that "the evidence introduced at the Hearing was clear that the substance of Womply's Technology Services was, in fact, different from Womply's referral services, and more specifically, the evidence proved that the Technology Services served the purpose of benefitting Benworth in accomplishing its underwriting functions as a lender under the SBA regulations." (App. 3148-50.)

However, the undisputed facts, the Arbitrator's own statements during closing arguments, and the findings in the Final Award all establish that the Technology Services related to preparing, or making ready, a PPP loan application—not exclusively underwriting. Except as to Teslar (which Benworth conceded was not subject to the Agent Fee Cap), Womply's witnesses, its videos, and its other documents established that Womply's Technology Services made ready PPP loan applications that were then submitted (or referred) to Benworth. *See supra*, Part I.A.2; *compare id.* (detailing how Womply's technology assisted in preparing PPP loan applications including by deploying identity verification and other fraud prevention measures) *with Capital Plus*, 2022 WL 1488441 at *6 (explaining that Womply "made ready" PPP loan applications for approval by a lender "by verifying information to prevent fraud"). Again, incomplete applications—or those that were not eligible for PPP—were never filtered to lenders like Benworth. *See supra*, Part I.A.2. The Arbitrator also agreed that it was so firmly established that "Womply's technology assist[ed] in either referring or preparing PPP loan applications" that there was no need for Benworth's counsel to even "argue that" issue. (App. 2776:15-18.) And the Final Award characterizes the Referral Fee as payment "for applicant information collection and referral services[,]" (App. 3131), while also finding that Womply's Technology Services "*allowed a prospective applicant to enter the necessary information to populate the SBA required application form for a PPP loan* and to provide the documentation or certifications lenders used to evaluate each application[,]"

PETITION TO VACATE FINAL ARBITRATION AWARD

(App. 3133-34 (emphasis added) (explaining also that the information that Womply's technology gathered was required by SBA rules to submit a PPP loan)).[10]

There is no way to reconcile the foregoing with the Final Award's conclusory statement that the Technology Services were principally related to underwriting, not preparing and referring PPP loans. The SBA eliminated traditional underwriting for PPP loans. *See supra* pp. 8-9. Rather than assessing an applicant's creditworthiness, *id.*, the SBA simply required applicants to attest to the accuracy of certain statements, the attestations of which were a component of the PPP application. *See supra* Part I.A.1. Acquiring the attestations thus was a part of making ready a PPP application. Underwriting also included certain borrower verification analysis, *see infra* Part I.B.2, which Womply's Technology Services indisputably deployed. The undisputed evidence at trial, however, showed that during PPP, Benworth never received underlying documents related to borrower verification. (App. 2594.) Womply deployed those verification tools to determine which loans it would refer to lenders like Benworth. *See supra* Part I.A.2. Even here, Womply's technology was deployed to prepare or refer PPP loans. Yet, the Arbitrator did not treat any portion of the Technology Fees as subject to the Agent Fee Cap. As became thematic in the Final Award, the Arbitrator manifestly disregarded the law and the parties' Agreements to reach a predetermined conclusion in favor of Womply.

*American Postal* demonstrates why this Court should disregard the Arbitrator's conclusion that the Agent Fee Cap does not apply to the Technology Fees and vacate the Final Award. In *American Postal*, the Ninth Circuit vacated an arbitration award that required the U.S. Postal Service to reinstate a former employee. The arbitrator awarded reinstatement based on the former employee's erroneous belief that his picketing activities were sanctioned by the union. However, "[b]y statute, a worker may not hold a government position if the individual has participated in a strike against the government."

---

[10] For reference, the Arbitrator's quoted statement above—i.e., that Womply's technology was used to "provide the documentation or certifications lenders used to evaluate each application" —was also at odds with the undisputed facts. *Id.* at 23. The uncontroverted evidence at trial was that Womply did not forward the tax records or bank statements that Fast Lane used to determine which loans Womply referred to Benworth. (App. 2594.) As for certifications, those were a part of PPP application itself, and there was nothing for lenders to evaluate: either applicants made the certifications, or they did not. Applicants who did not make the requisite certifications in Fast Lane never had their applications referred to Benworth. (App. 1214:25 – 1216:9; App. 981:10-21; App. 4001 (4:09:00 to 6:47:00); App. 3885-86.)

45

PETITION TO VACATE FINAL ARBITRATION AWARD

*American Postal*, 682 F.2d at 1283 (citing 5 U.S.C. § 7311). The arbitrator's award included findings demonstrating that the former employee participated in a strike. *Id*. In support of vacating the award, the court found it was "not necessary for an arbitrator to state the precise words that an employee 'participates in a strike' in order to conclude that his employment would violate section 7311." *Id*.

In declining to remand the matter to the arbitrator, the court emphasized that the arbitration did not merely involve a dispute between private parties:

> This case requires more than the resolution of the competing interests of two opposing private parties. It also requires an adjudication of the coverage and application of a federal law passed by Congress to insure a stable work force for the government and agencies of the United States. We therefore cannot treat the issues raised by this dispute merely as matters of conflict between an employer and its employees. ***In light of the undisputed facts of this case, we could not confirm an award of arbitration simply because the arbitrator stated that Murphy did not strike. To confirm such an award in this case would be to confer upon the arbitrator unreviewable power to construe and apply section 7311***. In his original decision, the arbitrator concluded that the penalty of discharge was too severe a sanction because Murphy was young, misinformed, and potentially valuable as an employee. The choice of sanctions, however, is not arbitrable; that choice has already been made by Congress. ***We cannot empower the arbitrator to nullify the mandates of Congress simply by stating that an individual did not strike when, as here, his actions, as presented in undisputed facts, constitute a strike for purposes of the section.***

*Id.* at 1285 (emphases added). Like in *American Postal*, this Court cannot accept the Arbitrator's conclusion that the Agent Fee Cap does not apply at all to the Technology Fees by simply stating that the Technology Services did not constitute preparing and referring PPP loan applications when, as here, the Technology Services, as presented in undisputed facts, constitute services that prepared and made ready a PPP loan application for submission to the SBA. *See supra*, Part I.A.2.

### iii. The Agent Fee Cap controls over conflicting terms in the Agreements.

Finally, the Arbitrator attempted to disguise his disregard of the SBA-imposed Agent Fee Cap by pointing to *some* of the terms of the Agreements and "extrinsic evidence" that, according to the Arbitrator, was "not necessary" to the issue. (App. 3147-48, 3151-52.) Specifically, the Arbitrator concluded that "the parties clearly perceived [the referral services, API services, and Technology Services] to be different at the time of contracting since they were enumerated separately in different contracts and each service had a different formula for fees." (App. 3147.) As for the extrinsic evidence,

PETITION TO VACATE FINAL ARBITRATION AWARD

the Arbitrator relied on Benworth "calculating and paying Womply's fees based on the three distinct formulae in the parties' Agreements." (App. 3151-52.)

The Arbitrator ineffectually relied on "extrinsic evidence" and some of the terms of the Agreements to justify charging Benworth in excess of 1% for services that he had admitted were "[a]bsolutely" and without "dispute" subject to the Agent Fee Cap. (App. 2775:19.) As noted above, the Parties incorporated the SBA Regulations into the Agreements and, further, granted those provisions precedence over anything else. (*See* App. 3984, § 9 ("***Notwithstanding . . . any provision of this Agreement to the contrary, this Agreement is subject to all Applicable Laws, including SBA Regulations***." (emphasis added); App. 3988, § 4 (same).) The Arbitrator was not permitted to disregard that rule and apply a rough sense of justice and ignore (or downgrade) provisions of the Agreements the Parties agreed would take precedence. *See Pacific Motor*, 702 F.2d at 177 ("The arbitrator disregarded a specific contract provision to correct what he perceived as an injustice. Although an arbitrator has great freedom in determining an award, he may not dispense his own brand of industrial justice."). Otherwise, this Court would "confer upon the arbitrator unreviewable power to construe and apply" the Agent Fee Cap and "empower the arbitrator to nullify the mandates of" the SBA. *See American Postal*, 682 F.2d at 1285. The Arbitrator thus decided that he would not apply SBA Regulations that clearly do apply to the Technology Fees because of purportedly contradicting provisions in the Agreements that the parties adhered to. But the Agreements specified that the SBA Regulations would control—not the provisions of the Agreements Womply drafted.[11]

---

[11] In both his analysis of the Agent Fee Cap and of the provisions relating to lender service providers, the Arbitrator cabined discussion of those issues exclusively when considering Benworth's affirmative defense of illegality. (*See, e.g.*, App. 3156-58.); *see also infra* pp. 59-60 (discussing such an instance). The Arbitrator thus refused to consider these SBA Regulations as provisions that were part and parcel of the parties' Agreements as they were intended. (App. 3984, § 9; App. 3988, § 4.) The Arbitrator impermissibly used that "illegality" framework to disregard not only the Agreements he swore to faithfully apply but also the federal regulations that he has no power to abrogate. (*See, e.g.*, App. 3156-57 (acknowledging that the SBA Regulations prohibit compensation to lender service providers under agreements that the SBA does not approve, but claiming that the Arbitrator could avoid applying that prohibition under certain exceptions recognized in reference to illegality affirmative defenses).) This Court should vacate for that reason as well. The Arbitrator plainly refused to enforce the Agreements as written.

47

PETITION TO VACATE FINAL ARBITRATION AWARD

**B.      The Arbitrator Manifestly Disregarded The Law When He Admittedly Refused To Apply The Controlling SOPs.**

The Final Award reflects that the Arbitrator understood "it is not" his "role to decide what is 'fair;' he is instead merely tasked with interpreting the contract provisions." (App. 3165.) One such contract provision the Arbitrator was tasked with interpreting was the SOPs' clause on compensating lender service providers (which, again, the Parties expressly incorporated into their Agreements, *see supra*, p. 15): "An LSP may only receive compensation from the 7(a) Lender for services provided under an SBA-reviewed LSP Agreement." (App. 3442.)

Prior to issuing the Interim Award, the Arbitrator announced his interpretation of the provision: "That seems pretty emphatic. That seems to say, if you don't have an approved agreement, you don't get paid." (App. 2801:12-18.) And it was undisputed that the Agreements were not submitted to the SBA. (App. 3130.) But the Arbitrator believed that enforcing this provision "would result in a disproportionately harsh penalty" to Womply. (App. 3158.) So, the Arbitrator concocted an array of implausible justifications to conclude that Womply was not a lender service provider subject to the SOPs' condition precedent to compensation.

SBA regulations define a lender service provider as "an Agent who carries out lender functions in originating, disbursing, servicing, or liquidating a specific SBA business loan or loan portfolio for compensation from the lender." 13 C.F.R. § 103.1(d). In the SOPs, the SBA clarified the meaning of "lender service provider" by enumerating a non-exhaustive list of "examples of when SBA considers an Agent to meet the definition of an LSP [, i.e., a lender service provider]." (App. 3442, § 6(e).) Those examples include:

> i.      An individual or entity engaged by a 7(a) Lender to provide services for the purposes of obtaining Federal financial assistance that include interaction with the Applicant either in person *or through the use of technology*, to request or obtain eligibility and/or financial information that will be provided to the 7(a) Lender. This includes Agents who:
>
> > a) Perform any pre-qualification review based on SBA's eligibility and credit criteria . . . prior to submitting the Applicant's information to the 7(a) Lender; or
> >
> > b) Provide to the 7(a) Lender an underwritten application, whether through *the use of technology or otherwise*.
>
> ii.      Entities providing technology services to a 7(a) Lender that *include underwriting*.

48

PETITION TO VACATE FINAL ARBITRATION AWARD

iii.    An individual or entity generates a significant number of 7(a) Lender's loan originations. As a general rule, SBA considers a "significant number" to be two-thirds (66%) or more of the 7(a) Lender's loan originations for the prior 12 months.

(App. 3442 (emphasis added)); *see also* (App. 3865, art. III.D.1 ("Loans will be guaranteed under the PPP under the same terms, conditions and processes as other 7(a) loans . . . .").)

Benworth argued, and the undisputed facts established, that Womply was a lender service provider under each of these examples. For example, Womply interacted with applicants through technology (Fast Lane) to obtain eligibility and financial information that would be provided to Benworth. *See supra*, Part I.A.2. Benworth retained Womply under the Agreements to submit to Benworth complete loan packages through Fast Lane, which collected, verified, and determined eligibility for PPP applicants seeking PPP loans. (*See* App. 3442, § 6(e)(i); App. 3982-85; App. 3442; App. 3955; App. 1453:21 – 1454:7; App. 1278:14-17.) At the very least, Womply's services to applicants constituted "pre-qualification review based on SBA's eligibility" criteria, a role assigned to lender service providers. (App. 3442, § 6(e)(i)(a)); App. 1453:21 – 1454:1; App. 3955; *see also supra* Part I.A.2.) Womply also generated *more than 90%* of Benworth's loan originations—much more than two-thirds. (App. 2587.)

Despite the undisputed facts firmly establishing that Womply was a lender service provider under the SOPs, the Arbitrator reached the opposite conclusion. The Arbitrator's reasons for his award leads "inexorably to the conclusion that in his reaching his decision the arbitrator 'dispensed his own brand of industrial justice.'" *Garvey v. Roberts*, 203 F.3d 580, 589 (9th Cir. 2000). "To understand why this decision can only be explained as an attempt by the arbitrator to dispense his own brand of industrial justice, we must review the context in which he reached his extraordinary conclusion." *Id*.

The Arbitrator gave four reasons why he concluded that Womply is not a lender service provider: (1) Womply did not originate PPP loans; (2) Womply did not engage in underwriting; (3) the Arbitrator was not required to apply the SOPs and (4) the parties' course of conduct suggests Womply was not a lender service provider. (App. 3152-56.) None of these reasons draw their essence from the Agreements or the governing SBA Regulations.

49

PETITION TO VACATE FINAL ARBITRATION AWARD

**1. The Arbitrator crafted a definition of origination with the sole intent of excluding Womply from the plain language of the SBA Regulations.**

The Arbitrator first determined that Womply was not a lender service provider because it did not originate loans. (App. 3153.) And the Arbitrator made that determination by creating his own definition of origination. But the parties did not give the Arbitrator the power to rewrite the SBA Regulations or the Agreements.

The Arbitrator defined "originating" as "underwriting and approving a loan and submitting it to the SBA for final approval." (App. 3153.) It is unclear from where the Arbitrator derived that definition, but it certainly did not come from the Agreements, the evidence, the parties' arguments, or the ordinary meaning of that term. In fact, not even Womply advanced such a narrow definition of origination. During closing arguments, Womply argued "originating appears to be viewed as all of the steps up until approval of a loan." (App. 2722:15-17.) According to Womply, then, "originating" would include not only underwriting but also collecting borrower information to prepare a PPP loan application. Benworth agrees.

The parties' interpretation of "originating" is also consistent with what the SBA views as origination. In an SBA form Benworth was required to submit to the SBA, the SBA characterized "Origination Activities" as "application evaluation, gathering documents, processing, etc." (App. 3990.) Benworth specifically brought this SBA form to the Arbitrator's attention on multiple occasions, including in its Response to Womply's Post-Hearing Brief (App. 2670-71.) and in its Motion for Reconsideration of the Interim Award (App. 2968), but the Arbitrator simply ignored this evidence from the SBA. And Womply provided no evidence or other authority to dispute this fact. But as the Arbitrator found in the Final Award, the evidence proved that Womply "collect[ed] data from potential applicants to refer those applicants to Benworth." (App. 3153.) Thus, contrary to the Arbitrator's statement in the Final Award, Womply's Technology Services do "fall within even a layman's understanding of what origination of a loan to the SBA means." (*Id*.) Only the Arbitrator has adopted a different view.

The Arbitrator's definition of origination is also implausible because it directly conflicts with the terms of the Agreements. *See Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors, LLC*, 268 F. Supp. 3d 1053, 1058 (N.D. Cal. 2017) ("[A]n award that conflicts directly with the contract cannot be a plausible interpretation."); *see also United Food & Com. Workers Union, Loc. 1119, AFL-CIO v.*

PETITION TO VACATE FINAL ARBITRATION AWARD

*United Markets, Inc.*, 784 F.2d 1413, 1416 (9th Cir. 1986) ("This direct conflict with the language of the agreement renders the arbitrator's interpretation implausible."). The Agreements not only specifically defined "SBA Regulation" to include the SOPs, but the SOPs were also express terms of the parties' bargain because they were specifically incorporated in the Agreements. *See Serv. Emps.*, 200 Cal. App. 4th at 879 n.6 ("When language of a statute or regulations is incorporated in a contract, such language establishes contractual rights and obligations apart from its legal identity as part of a statute or regulation."); *300 DeHaro St. Invs.*, 161 Cal. App. 4th at 1256 ("When statutory language is included in a contract, it assumes a new legal identity: that of contractual language.").

Multiple examples of lender service providers under the SOPs—which the Arbitrator described as a "document containing ***policies and procedures governing the PPP***[,]" (App. 3120 (emphasis added))—include activities that fall short of approving and submitting loans to the SBA. For instance, an entity performing "any pre-qualification review" of an applicant's information before submitting it to the lender is an example of a lender service provider according to the SBA. (App. 3442.) If the Arbitrator is correct that one must approve the loan to be a lender service provider, then the Arbitrator's definition of origination renders the SBA's own example obsolete. But as the Arbitrator acknowledged, "[i]t is a basic tenet of contract interpretation under California law that the whole of a contract is to be taken together so as to give effect to every part, with each clause aiding in the interpretation of another, and an interpretation giving effect to all provisions is preferred to one rendering any part of the contract meaningless." (App. 3147 (citing Cal. Civ. Code § 1641 and Cal. Civ. Code § 1858).) The Arbitrator's definition of origination violates these basic tenets.

Notwithstanding, the Final Award states that the Arbitrator's definition of origination is "strongly supported" by the Agreements because "Benworth contracted to pay Womply Technology Fees 'for each loan originated by [Benworth] under the PPP resulting from a Referral.'" (App. 3153.) Based on that contract language, the Arbitrator found that "the parties understood and agreed that it was Benworth that originated the loans, not Womply." (*Id.*) But the interpretation of origination advanced by the parties and reflected in the SBA's form (App. 3990) gives effect to that provision as well, while also conforming to the SBA Regulations on the matter, which were themselves incorporated in the Agreements.

PETITION TO VACATE FINAL ARBITRATION AWARD

As stated in the Referral Agreement, Benworth has the "ultimate"—not sole—responsibility for all loan decisions, including approvals and underwriting. (App. 3982.) Because the SBA regulations define a lender service provider to include an "Agent who *carries out lender functions* in originating," 13 C.F.R. § 103.1(d) (emphasis added), Womply may still be considered a lender service provider even if it did not have the sole (or ultimate) responsibility for *all* loan decisions leading to loan originations and instead only carried out certain lender origination functions, like underwriting. And the Arbitrator specifically found that "Womply's technology to some extent electronically performed the[] functions" of underwriting a PPP loan. (App. 3154.) Despite that finding, the Arbitrator still concluded that Womply's technology did not include underwriting. (*Id.*) This, too, is an irrational conclusion that is untethered to the undisputed facts and the SBA Regulations incorporated into the Agreements.

It is also an irrational conclusion that conflicts with the Final Award itself. Recall, in seeking to excuse Womply from the Agent Fee Cap, the Arbitrator concluded that Womply's Technology Services were primarily related to underwriting, not preparing or referring PPP loans. However, when the Arbitrator sought to excuse Womply from the applicability of provisions relating to lender service providers, the Arbitrator denied that Womply was engaged in underwriting.

### 2.    Womply carried out lender functions in underwriting PPP loans.

The Arbitrator concluded that it "was Benworth, not Womply, that was underwriting the PPP loans" because "Benworth was required to take the information developed by the Womply technology and make a final determination that all necessary criteria had been met before submitting a loan to the SBA for approval." (App. 3154.) This conclusion is irreconcilable with the plain language of the SBA Regulations as well as the undisputed, legally dispositive facts and the findings in the Final Award.

First, as highlighted above, the SBA Regulations did not require that lender service providers perform all (or the ultimate) underwriting functions. The regulations merely require that the agent "carries out lender functions *in* originating . . . ." SBA loans. 13 C.F.R. § 103.1(d) (emphasis added). The SOPs further include examples of lender service providers who perform functions short of rendering the ultimate underwriting decision of whether to fund a loan. (App. 3442, § 6(e)(i)(b) (defining as "lender service providers" entities that merely provide an underwritten application to an SBA lender).)  The

PETITION TO VACATE FINAL ARBITRATION AWARD

Arbitrator cannot adopt a definition of "underwriting" that would obliterate federal regulations or the terms of the parties' Agreements that incorporate those regulations.

As noted above, the SBA limited the underwriting requirements for PPP loans through the Interim Final Rule. *See supra*, pp. 8-9. Under the Interim Final Rule, underwriting was limited to:

- Confirming receipt of borrower certifications contained in the borrower's PPP application form, (App. 3863, art. III.C.3.a);
- Confirming receipt of information that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020, (App. 3863-64, art. III.C.3.b);
- Confirming the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing payroll documentation submitted with the borrower's application, (App. 3864, art. III.C.3.c);
- Following applicable Bank Secrecy Act (BSA) requirements, (App. 3864, art. III.C.3.d).

The Interim Final Rule further provides that "[e]ach lender's underwriting obligation under the PPP is limited to the items listed above [i.e., in article III.C.3] and reviewing the 'Paycheck Protection Application Form.'" (App. 3864.) The Arbitrator conceded, as he must, that "it is true that Womply's technology to some extent electronically performed some of these functions . . . ." (App. 3154.) The undisputed facts corroborate that concession and establish that Womply performed PPP underwriting functions.

First, Fast Lane required applicants to confirm that they could make the requisite PPP certifications; otherwise, they were not permitted to proceed with the workflow to submit a PPP application through Fast Lane. (App. 1214:25 – 1216:9; App. 981:10-21; App. 4001 (4:09:00 to 6:47:00); App. 3885-86.)

Second, Womply "extracted bank account information and transaction history" from applicants' bank accounts using Plaid and then analyzed that data to determine, among other things, applicants' eligibility for a PPP loan based on whether they were in business on or before February 15, 2020. (App. 3997, ¶ 18(g); App. 889:21-24; App. 4021; App. 3889.)

Third, Fast Lane automatically calculated the applicant's average monthly payroll by extracting information from the tax documents the applicant submitted to Womply. (App. 3888; App. 847:7-23.) Applicants could not continue applying through Fast Lane until they uploaded the correct tax documents. (App. 3887.)

Finally, Womply's technology followed applicable BSA requirements. For instance, Womply admitted that its technology filtered out applicants who would not be eligible for PPP applications because their identities could not be verified. (*See, e.g.*, App. 1239:17 – 1240:13.) According to Womply, an applicant would not be referred to a lender until the applicant completed Womply's "KYC review process." (App. 3957; *see also* App. 3911-3914.)

The findings in the Final Award also lead to the inescapable conclusion that Womply performed underwriting. For example, the Arbitrator found that "the Technology Services served the purpose of benefitting Benworth in accomplishing its underwriting functions as a lender under the SBA regulations." (App. 3148.) "Indeed, it is undisputed that without Womply's Technology Services, Benworth would have had to conduct manual reviews of each PPP loan applicant's information, making it impossible for it to have successfully processed billions of dollars in PPP loan applications." (*Id.*) The Arbitrator also found that Womply's technology "greatly increased the likelihood that a loan would be approved and funded . . .." (App. 3150.)

Like in *American Postal*, *see supra* pp. 45-46, this Court is not bound by the Arbitrator's conclusion that Womply is not a lender service provider when the findings in the Final Award and the undisputed facts presented to the Arbitrator confirm that Womply acted as a lender service provider under the Agreements. *See also Dewan v. Walia*, 544 F. App'x 240, 248 (4th Cir. 2013) ("Accordingly, we hold that the Arbitrator manifestly disregarded the law by holding the Release valid and enforceable but nevertheless arbitrating Walia's counterclaims arising out of his employment with the Company.").

### 3. The Arbitrator's reasoning for not applying the SOPs is inexplicable.

The Arbitrator further manifestly disregarded the law by expressly declining to rely on the SBA's examples of lender service providers. (App. 3154-55.) In the Final Award, the Arbitrator declined to apply the examples of lender service providers because the SBA included those examples in SOPs rather than a rule or the Code of Federal Regulations. (App. 3154-55.) As noted above (*see supra*, p. 15), the parties' Agreements expressly incorporated all SBA Regulations, including those contained in SOPs.

The Arbitrator, however, employed "conflict of law" principles to ignore the binding SBA Regulations. Specifically, the Arbitrator stated that "when an SOP conflicts with a regulation or rule, it is the language of the regulation or rule that ultimately prevails." (App. 3154.) That conflict of law

PETITION TO VACATE FINAL ARBITRATION AWARD

principle has no application to the SOPs' examples of lender service providers. There is no conflict between the SOPs (which lists examples of lender service providers) and the definition of lender service providers (contained in the Code of Federal Regulations).

The regulation defines a lender service provider as "an Agent who carries out lender functions in originating, disbursing, servicing, or liquidating a specific SBA business loan or loan portfolio for compensation from the lender." 13 C.F.R. § 103.1(d). In the SOPs, the SBA did what a federal agency does: it put further flesh on a regulatory definition by, among other things, giving examples. That is not a conflict. *See Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1016 (9th Cir. 2017) (applying "the familiar rule of construction that, where possible, provisions of a regulation should be read so as not to create a conflict") (internal quotations and alterations omitted).

Originally, in the Interim Award, the Arbitrator failed to identify any statute or regulation that conflicts with the SOPs' examples of a lender service provider. (App. 2944.) In its motion for reconsideration of the Interim Award, Benworth pointed out to the Arbitrator that Womply never argued that the SOPs' examples of lender service providers conflict with other SBA Regulations and the Arbitrator failed to identify any conflicting SBA rule or regulation. (App. 2969.) In the order denying reconsideration, the Arbitrator maintained that his "refus[al] to apply" the SOPs was correct, explaining that if one of the SOPs' examples "applied to the various entities involved in the PPP program, then practically every individual or entity involved in the program would be considered" a lender service provider. (App. 3058.) The Arbitrator characterized this as an "absurd" result that "would be in direct conflict with the SBA rules and regulations that specifically define and differentiate between different types of providers and agents." (*Id.*) The Arbitrator then incorporated these additional reasons in the Final Award. (*Compare* App. 2944 *with* App. 3154-55.)

The additional reasons cited by the Arbitrator in the Final Award still amount to a manifest disregard of the SBA Regulations (incorporated into the Agreements) for two reasons. First, the Arbitrator omitted critical language in the SOPs' example of a lender service provider that purportedly conflicts with other SBA regulations defining the different types of agents. Specifically, the Arbitrator quoted the example of a lender service provider that includes an entity that "'provide[s] services for the purposes of obtaining Federal financial assistance that include[s] interaction with the Applicant either in-

55

PETITION TO VACATE FINAL ARBITRATION AWARD

person or through the use of technology. . . .'" (App. 3155. (quoting from App. 3442) (alteration in original).) But the Arbitrator blatantly omitted the critical language concerning the purpose of the interaction with the applicant: ". . . to request or obtain eligibility and/or financial information that will be provided to the 7(a) Lender." (App. 3442.) Not every entity involved in the PPP interacted with applicants to request or obtain eligibility and/or financial information. For example, during the first round of PPP funding, Womply simply collected the contact information from potential borrowers, so it could refer just that information to a lender. (*See* App. 3127.)

Second, and for similar reasons, the SOPs' example of a lender service provider does not conflict with other SBA regulations that define and differentiate between the different types of agents. Sticking with Womply's role during the first round of PPP funding, Womply was a "Referral Agent." SBA regulations define a "Referral Agent" as "a person or entity who identifies and refers an Applicant to a lender or a lender to an Applicant. The Referral Agent may be employed and compensated by either an Applicant or a lender." 13 C.F.R. § 103.1(f). No conflict exists here because the entity's status as a Referral Agent does not require that it interact with the applicant for the purpose of obtaining eligibility and/or financial information. And unlike a lender service provider, which is limited to an entity that contracts with and is compensated by a lender, *id*. at § 103.1(d), the Referral Agent may be employed and compensated by either an applicant or a lender. The same is true with respect to a "Packager"—the only other type of agent identified in SBA regulations. *See id*. at 103.1(e) ("Packager means an Agent who is employed and compensated by an Applicant *or* lender to prepare the Applicant's application for financial assistance from SBA." (emphasis added)).

The Arbitrator stretched to find a means to invalidate federal regulations that were plainly applicable to Womply's activities. The Final Award's summary disposal of the SOPs' examples of lender service providers shows that the Arbitrator never intended to apply the terms of the Agreements because it would be inescapable that Womply is a lender service provider according to the SOPs—which the Arbitrator conceded contains "policies and procedures ***governing the PPP***" (App. 3120 (emphasis added))—that the parties agreed would govern. The Arbitrator had no authority to disregard the SOPs and his refusal to apply them to the undisputed facts constitutes a manifest disregard of the law that requires vacatur. *See Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC*, 913 F.3d 1162,

PETITION TO VACATE FINAL ARBITRATION AWARD

1166-68 (9th Cir. 2019) (affirming vacatur of arbitration award where the arbitrator failed to give controlling effect to federal regulations incorporated into the parties' agreement); *see also American Postal*, *supra* at pp. 45-46. The Final Award simply reflects the Arbitrator's disagreement with federal regulations: believing the SBA erred in defining the entities it would regulate. The Arbitrator manifestly disregarded the law that was incorporated into the Agreements and that he swore to apply. Neither the parties nor Congress delegated to the Arbitrator the authority to rewrite federal regulations. *See Am. Postal*, 682 F.2d at 1285. The Final Award must be vacated.

### 4. Womply's course of conduct establishes it was a lender service provider.

Finally, the Arbitrator determined that the "parties' course of conduct strongly points to the fact that Womply was not" a lender service provider. (App. 3155.) The Arbitrator first cited the boilerplate language Womply included in the Agreements disclaiming that it was a lender service provider. (*Id.*) The Arbitrator also noted that the CEO of Benworth sent a letter to the SBA stating "'Womply is not an LSP-they are an Agent.'" (*Id.* (citing JX301).) Neither fact can support the conclusion that Womply is not a lender service provider here.

Again, the Agreements required the Arbitrator to give controlling effect to "SBA Regulations," which includes the SOPs, notwithstanding any provision of the Agreements to the contrary. (*See* App. 3988 (providing that "SBA Regulations" govern over contrary provisions of the agreement).) Beyond that, as a matter of California law, the "label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced." *S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 48 Cal. 3d 341, 349 (1989); *see also Secci v. United Independant Taxi Drivers, Inc.*, 8 Cal. App. 5th 846, 862 (2017) (holding that evidence of the parties' contractual performance was sufficient to sustain jury's finding that the plaintiff-driver was an employee of the defendant-company even though the parties' contract stated the driver was an independent contractor).

No resort to course of performance or other extrinsic evidence was permissible to alter unambiguous and binding terms of the Agreements (i.e., the federal regulations that define lender service providers). *See Navcom Tech., Inc. v. Oki Elec. Indus. Co., Ltd.*, No. 5:12-cv-04175-EJD, 2017 WL 2617977 at *3 (N.D. Cal. June 16, 2017) ("Course of performance evidence may only be used to explain or supplement the terms of a contract (Cal. Civ. Code § 1856(c)); not 'to prove a meaning to which the

language of the instrument is reasonably susceptible.' It also cannot be used to 'vary or contradict the unambiguous terms of a written agreement.'" (internal citations omitted)). The Arbitrator also seemed to suggest that he could avoid applying federal law as well as the unambiguous terms of the Agreements based on the prior litigation (or pre-litigation) positions of Benworth or its principal. (App. 3155.) But the fully integrated Agreements deem the SBA Regulations to control their contractual relationship, including when they conflict with the terms of the Agreements themselves, not extrinsic evidence. (App. 3986; App. 3985, § 16 ("No waiver by either party, whether express or implied, of any provisions of this Agreement . . . shall constitute a continuing waiver of such provision or a breach or waiver of any other provision of this Agreement.").)

* * *

For the foregoing reasons, the undisputed, legally dispositive facts and the Arbitrator's findings in the Final Award do not permit any conclusion other than that Womply is a lender service provider. This Court is thus presented "with the extraordinary circumstance in which the arbitrator's own rulings make clear that, more than being simply erroneous, his finding is completely inexplicable and borders on the irrational." *Garvey*, 203 F.3d at 590. "In this circumstance, given the arbitrator's professional experience, the decision can be explained only by his desire to dispense his own brand of industrial justice." *Id*. at 590-91. "No other plausible explanation exists." *Id*. at 591.

### C.     The Final Award Grants Relief Not Permitted by the Agreements.

The Agent Fee Cap applies to the Technology Fees. *See supra*, Part I.A. Womply is a lender service provider. *See supra,* Part I. B. The facts of this case can only support those conclusions. Notwithstanding, the Arbitrator ordered Benworth to pay Womply additional fees in violation of the controlling SBA Regulations incorporated in the Agreements. In doing so, the Arbitrator disregarded "specific contract provision[s] to correct what he perceived as an injustice." *Pacific Motor*, 702 F.2d at 177. The result is an award that should be vacated because it "conflicts directly with the contract." *Id*.

Two SBA Regulations that the parties agreed to be bound by govern Womply's entitlement to fees under the Agreements. The first SBA Regulation requires Agents, including lender service providers, to provide compensation agreements to the SBA for its review. 13 C.F.R. 103.5(a) ("Any Applicant, Agent, or Packager must execute and provide to SBA a compensation agreement, and any

58

Lender Service Provider must execute and provide to SBA a Lender Service Provider agreement."). With respect to Agents other than lender service providers, the Agent must submit Form 159 to the SBA. *Capital Plus*, 2022 WL 1488441 at *7 (citing 13 C.F.R. § 103.5(a)). Womply and Benworth "did not submit Form 159 to the SBA and courts uniformly hold this precludes any recovery of SBA fees." *Id.*

Next, with respect to lender service provider agreements, the SOPs state a lender service provider "may only receive compensation" from the lender "for services provided under an SBA-reviewed" lender service provider agreement. (App. 3442; *see also* 13 C.F.R. § 103.5(c) ("Each Lender Service Provider must enter into a written agreement with each lender for whom it acts in that capacity. SBA will review all such agreements.").) Again, the Arbitrator already stated his opinion on what this provision means: "That seems pretty emphatic. That seems to say, if you don't have an approved agreement, you don't get paid." (App. 2801:12-18.)

As the Final Award confirms, there is no dispute that the Agreements were not submitted to the SBA. (App. 3130.) If the Arbitrator enforced these terms of the Agreements, as he pledged to do, then the Final Award would reflect that Womply is not entitled to any further fees. But the Arbitrator failed to do so. In fact, the Final Award does not even acknowledge Benworth's argument that, because the Referral Agreement was not submitted to the SBA, no additional Referral Fees are owed to Womply. (App. 345; App. 2605; App. 2670-74.)

Notwithstanding the fact that the Agreements were not submitted to the SBA, the Arbitrator held that, even if he concluded Womply was a lender service provider, he still would have awarded Womply additional fees under the Agreements. (App. 3156-58.) That decision was not based on the terms of the Agreements. Rather, the Arbitrator employed equitable principles, noting that Womply introduced "copious evidence of the efforts that went into developing its Fast Lane and related Teslar systems and the various application within those systems for which Womply had to pay a fee." (App. 3158.) The Arbitrator then reasoned that "[f]ailing to compensate Womply for these efforts would result in a disproportionately harsh penalty." (*Id.*) The Arbitrator also concluded that Womply is still entitled to additional fees because the SOPs do not state that an agreement is illegal or invalid if it is not submitted to the SBA. (App. 3156-57.) The Arbitrator missed the point.

PETITION TO VACATE FINAL ARBITRATION AWARD

The Agreements were not simply entered into with the backdrop of SBA Regulations. The Agreements clearly and expressly—as the Final Award admits (App. 3164)—incorporate SBA Regulations. And, further, the Agreements provide that the SBA Regulations would supersede contrary provisions in the Agreements. (App. 3988, §4 ("Notwithstanding the foregoing *or any provision of this Agreement to the contrary*, this Agreement is subject to all Applicable Laws, including SBA Regulations. In the event of any conflict between the governing law and the SBA Regulations, the ***SBA Regulations shall control*.**" (emphases added)); App. 3984, § 9.) The Parties expressly agreed that SBA Regulations "shall control" and be applicable notwithstanding "any provision of this Agreement," including those related to Womply's claimed Technology Fees. (*E.g.*, App. 3988, § 4.) Per the Final Award, each term of the contract must be given effect, and the Arbitrator cannot strike terms that Womply regrets. (*See* App. 3165-66 (citing *Series AGI W. Linn of Appian Grp. Invs. DE LLC v. Eves* (2013) 217 Cal.App.4th 156, 164 ("[C]ourts will not rewrite contracts to relieve parties from bad deals nor make better deals for parties than they negotiated for themselves.").).)

Moreover, the Arbitrator had no authority to employ equitable principles to save Womply's breach of contract claims. Indeed, the Arbitrator failed to draw a critical distinction between the respective standards for Benworth's defenses and counterclaims on this issue. Benworth does not deny that the Arbitrator had the authority to rely on equity to deny Benworth the right of disgorgement of fees Benworth previously paid to Womply that violate SBA Regulations (which are indisputably incorporated into the Agreements). But with respect to whether Benworth had a legal obligation to pay further fees (i.e., the third element of Womply's breach of contract claims), as a matter of California law and the Parties' governing Agreements, equity cannot save Womply, authorizing further compensation by using equitable principles to eviscerate an express provision of the Agreements. Put differently, the Arbitrator had no discretion to permit additional fees under Agreements that did not comply with SBA Regulations.

Worse, the Arbitrator ruled that Womply would still be entitled to additional compensation because California law provides an exception to the general rule that contracts made in violation of a regulation are void. (App. 3157-58.) There is no way to reconcile this ruling with the unequivocal requirement in the Agreements that SBA regulations control in the case of any conflict with California

law. California law cannot provide Womply with compensation when SBA regulations state Womply is entitled to none. The Arbitrator simply applied his own rough sense of justice—rather than applying the contractual regime the Parties agreed would govern. The Arbitrator clearly disregarded the SBA Regulations to avoid imposing what he perceived as a "disproportionately harsh penalty" on Womply. (App. 3158.)

This same type of reasoning led the Ninth Circuit to affirm the vacatur of arbitration awards in *Aspic* and *American Postal*. *Aspic* involved a dispute between an Afghan subcontractor and a contractor, who was engaged by the U.S. government for construction projects in Afghanistan. 913 F.3d at 1164. The subcontracts between the parties incorporated federal regulations by reference, with those regulations governing the performance of the work and the requirements for obtaining compensation. *Id*. One of those regulations required the Afghan subcontractor to submit its documents supporting reimbursement in the English language, which it did not do. *Id*. at 1168. The Arbitrator determined that strictly enforcing the regulatory requirements "would result in a forfeiture and unfairness" to the Afghan subcontractor. *Id*.

The Ninth Circuit held that, "[b]y concluding that [the Afghan subcontractor] need not comply with the FAR requirements, the Arbitrator exceeded his authority and failed to draw the essence of the Award from the Subcontracts." *Id*. "The Award disregarded specific provisions of the plaint text in an effort to prevent what the Arbitrator deemed an unfair result." *Id*. "Such an award is 'irrational.'" *Id*. The Ninth Circuit also emphasized that it is a "serious matter when an arbitral award determines that a (sub)contractor need not comply with the federal contracting regulations when no past practices demonstrate variation from those requirements." *Id*. at 1168. "To allow contractors and subcontractors, foreign or domestic, to evade the FAR provisions because a subcontractor was too unsophisticated or inexperienced to fully understand them would potentially cripple the government's ability to contract with private entities, and would violate controlling federal law." *Id*. at 1168-69.

Similarly, as discussed above, *see supra* pp. 45-46, in *American Postal*, the Ninth Circuit considered the vacatur of an arbitral award that ordered the Postal Service to reinstate a former employee who participated in a strike. There, the arbitrator ordered reinstatement because he believed the "penalty of discharge" would be "too severe." 682 F.2d at 1284. In affirming vacatur, the Ninth Circuit held that

61

PETITION TO VACATE FINAL ARBITRATION AWARD

the "district judge properly denied enforcement of the arbitrator's award" because reinstatement "would violate 5 U.S.C. s. 7311." *Id.* at 1286.

The same reasoning in *Aspic* and *American Postal* applies here. The SBA has determined that Agents, including lender service providers, may only receive compensation from a lender when the SBA has reviewed the agreements. It is undisputed that the SBA did not review the Agreements. The Arbitrator had no authority to override federal law and dispense his own brand of industrial justice. This Court must vacate the Award.

## II.    THE FINAL AWARD IS UNENFORCEABLE BECAUSE IT COMPELS BENWORTH TO VIOLATE PUBLIC POLICY.

"Judicial deference to an arbitrator's remedy is not required where a remedy violates an explicit, well-defined public policy." *Phoenix Newspapers, Inc. v. Phoenix Mailers Union Loc. 752, Int'l Bhd. of Teamsters*, 989 F.2d 1077, 1083 (9th Cir. 1993). "To vacate an arbitration award on public policy grounds, the court must find (1) an explicit, well-defined policy and (2) that the policy is one that specifically militates against the relief ordered by the arbitrator." *United Transp. Union*, 116 F.3d at 433. Examples of explicit, well-defined public policies include statutes, implementing regulations, and case law interpreting the statutes and regulations. *See Aramark Facility Servs. v. Serv. Emps. Int'l Union, Loc. 1877, AFL CIO*, 530 F.3d 817, 824 (9th Cir. 2008).

The explicit, well-defined policies here are the SBA Regulations and interpretations of those regulations that require agents, lender service providers, and lenders to submit compensation agreements for review by the SBA. 13 C.F.R. § 103.5(a), (c). As noted above (*see supra*, pp.58-59), with respect to compensation agreements for agents other than lender service providers, the agent must submit SBA Form 159 and "courts uniformly hold" that the failure to do so "precludes recovery of any SBA fees." *Capital Plus*, 2022 WL 1488441 at *7 (citing *Daniel T.A. Cotts PLLC v. Am. Bank, N.A.*, 2:20-CV-185, 2021 WL 2196636, at *4 (S.D. Tex. Feb. 9, 2021) (collecting cases)). And the SBA has determined that lender service providers "may only receive compensation from the 7(a) lender for services provided under an SBA-reviewed LSP Agreement." (App. 3442.) SBA regulations require Benworth to comply with this provision of the SOPs. *See* 13 C.F.R. § 120.180 (providing SBA lenders "must comply" with "Loan Program Requirements for the 7(a) Loan Program"); *see also* 13 C.F.R. 120.10 (defining "Loan Program

PETITION TO VACATE FINAL ARBITRATION AWARD

Requirements" to include "SBA Standard Operating Procedures (SOPs)"); (App. 3865, art. III.D.1. ("Loans will be guaranteed under the PPP under the same terms, conditions and processes as other 7(a) loans . . . .").)

These SBA Regulations are public policies that specifically militate against the relief ordered by the Arbitrator. The policies are against Agents, including lender service providers, receiving SBA fees under compensation agreements that have not been reviewed by the SBA. Under similar circumstances, courts in the Ninth Circuit have vacated arbitral awards on public policy grounds and this Court should do so here. *See, e.g.*, *Phoenix Newspapers*, 989 F.2d at 1083-84 (directing district court to vacate arbitral award that required the parties to agree on a higher wage rate in violation of a statute that required the parties to engage in only good faith bargaining); *Broadway Cab Co-op., Inc. v. Teamsters & Chauffeurs Local Union No. 281, IBT*, 710 F.2d 1379, 1385 (9th Cir. 1983) (reversing district court's confirmation of arbitral award where the award was "contrary to law and public policy" because the arbitrator contradicted Supreme Court precedent and applied an incorrect legal standard to the issue of whether taxicab owner-operators were independent contractors or employees); *see also supra*, pp. 61-62 (discussing *American Postal* and *Aspic*).

## III. THE ARBITRATOR IS GUILTY OF MISCONDUCT FOR REFUSING TO POSTPONE THE PROCEEDINGS UNTIL THE SBA COMPLETES ITS INVESTIGATION OF WOMPLY.

Courts may also vacate an arbitral award "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced[.]" 9 U.S.C. § 10(a)(3). "The arbitrary denial of a reasonable request for a postponement may serve as grounds for vacating an arbitration award." *Naing Int'l Enters.*, 961 F. Supp. at *3. Although arbitrators are accorded a degree of discretion with respect to a requested postponement, "if the failure of an arbitrator to grant a postponement or adjournment results in the foreclosure of the presentation of 'pertinent and material evidence,' it is an abuse of discretion." *Id.* Such is the case here.

There can be no dispute that the results of the SBA's investigation into Womply constitute pertinent and material evidence. The Agreements expressly contemplated that the SBA's determinations would be dispositive of any dispute. *See* (App. 3983, § 2.3 (providing that Womply shall return to

63

PETITION TO VACATE FINAL ARBITRATION AWARD

Benworth any fees that the SBA "determines were not in compliance with applicable SBA and/or PPP Loan Program Requirements"); App. 3988, § 2.3.) The SBA's Associate General Counsel for Litigation provided information specifying that the investigation includes "the fees that Womply charged and its representations as to their nature and what services Womply rendered to earn them in light of the amount of fraudulent loans that resulted from the underwriting and processing of those loans." (App. 2883-84.) And the Arbitrator himself acknowledged that the results of the SBA's investigation may render any award "advisory." (*See* App. 1493:24 – 1495:24.) The SBA's investigation would likely also produce material evidence as to whether Womply was a lender service provider. The SBA initiated its investigation of Womply in response to the Congressional Report, which concluded that Womply deliberately avoided characterizing itself as a lender service provider to evade being held accountable under SBA regulations. (App. 192-93.)

There also can be no dispute that issuing the Award before the SBA completed its investigation was severely prejudicial to Benworth. The Arbitrator refused to consider the Congressional Report, which completely corroborated Benworth's position on whether Womply was a lender service provider. And the Arbitrator refused to allow the SBA to testify, through Ms. Seaborn, absent Benworth complying with conditions it could not meet, including retaining Ms. Seaborn as an expert witness and making her available for a two-hour deposition. (App. 310-12.) Because the Arbitrator effectively refused to hear testimony from the SBA, through Ms. Seaborn, the results of the SBA's investigation were the only evidence left for Benworth to present to the Arbitrator on the issues of whether Womply was a lender service provider and whether Womply must return fees in excess of the Agent Fee Cap to Benworth. *See Temp Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20-21 (2d Cir. 1997) (holding that the district court should have vacated an arbitral award because the arbitration panel refused to defer ruling until a witness was available where that witness was "the only person" who could provide rebuttal testimony on certain issues). Meanwhile, in the Final Award (App. 3153), the Arbitrator faulted Benworth for not introducing the very evidence he foreclosed Benworth from producing. *See Lindsey v. Travelers Com. Ins. Co.*, No. 22-16795, 2023 WL 8613598, at *1 (9th Cir. Dec. 13, 2023) (affirming vacatur of arbitral award because the proceeding was "fundamentally unfair" where the arbitrator denied the claimant's discovery request for statistical data related to a disparate treatment claim and then

granted summary judgment against the claimant for failing to present evidence that race was a factor in his compensation). Thus, by issuing the Final Award prior to the completion of the SBA's investigation, the Arbitrator foreclosed Benworth from presenting pertinent and material evidence in support of its defenses and counterclaims.

Similar circumstances led to the vacatur of an arbitral award in *Naing*. *Naing* involved the alleged breach of a merger agreement, which included representations and warranties by one of the parties that it had complied with all SBA program requirements and did not engage in any conduct that would warrant suspension from the SBA program. During the underlying arbitration, it came to light that the party who made those representations was being investigated by the SBA and the other party moved to postpone the hearing pending the completion of the investigation. The arbitrators refused to postpone the hearing and subsequently entered an award in favor of the party subject to the investigation. The court concluded that the arbitrators abused their discretion in denying the postponement and vacated the award, explaining, "[r]egardless of whether the results of the investigation would have exonerated or condemned [the investigated party], the arbitrators' conclusions clearly were less informed without the SBA's conclusions in the record." 961 F. Supp. at 5-6.

This case is directly on point with *Naing*. The only difference is that, in *Naing*, the record contained a date certain by when the SBA would complete its investigation. *Id.* at 4. However, as *Naing* observed, "neither this Court nor the arbitration panel can allow the pursuit of an expedient adjudication to outweigh its obligation to ensure a just and fair one." 961 F. Supp. at 5-6. Indeed, in *Matter of Insurance Co. of N. Am. v St. Paul Fire & Mar. Ins. Co.*, 215 A.D.2d 386, 626 N.Y.S.2d 232 (1995), relied upon by the *Naing* court, the court vacated an arbitral award because the arbitrators refused to postpone the hearing until the completion of a criminal investigation that directly related to the incident at issue in the arbitration, without any reference to a deadline by when that investigation would be completed.

Here, the Arbitrator allowed expediency to outweigh his obligation to ensure a fundamentally fair hearing. Despite acknowledging the materiality of the results of the SBA's investigation to the issues in the Arbitration and the prospect that those results could render his award "advisory," the Arbitrator refused to defer his ruling until the SBA completed its investigation of Womply. In so doing, the

PETITION TO VACATE FINAL ARBITRATION AWARD

Arbitrator not only foreclosed Benworth from presenting evidence pertinent and material to its defenses and counterclaims, but the Arbitrator also usurped the role of the SBA and granted himself the authority to make final policy decisions about one of the most unprecedented government relief programs in American history.

This matter is not just a contract dispute between private parties. Rather, as the SBA's suspension letter to Womply established, Womply's PPP-related activities concern "the interests of the Federal Government and the integrity of current and future SBA lending programs." (App. 4022.) This Court should not allow the Arbitrator to compromise the interests of the federal government and the integrity of SBA programs simply because the SBA is conducting a careful and thorough investigation. Investigations of this nature take time. For example, it was not until March 2024 that the Federal Trade Commission filed its complaint against Womply for engaging in fraudulent and deceptive trade practices in connection with the PPP. (*See* App. 3072-90.)

The Arbitrator should have deferred ruling on this dispute until the SBA completed its investigation of Womply. His failure to do so foreclosed Benworth from presenting evidence pertinent and material to its defenses and counterclaims. The Final Award must be vacated.

**CONCLUSION**

This case involves more than a commercial dispute between private parties. It also concerns the federal government's interest in overseeing the expenditure of billions of dollars of taxpayer funds and the integrity of current and future government relief programs. By issuing the Final Award before the SBA completed its investigation of Womply and by making his own policy decisions on SBA rules and regulations, the Arbitrator exceeded his powers and is guilty of misconduct warranting vacatur of the Final Award.

If left uncorrected, the Award—in the short term—will deny Benworth the relief that it is rightfully entitled to and that is necessary for Benworth to continue to meet its PPP obligations. Benworth remains responsible for responding to subpoenas, communicating with borrowers about the forgiveness and/or repayment process, monthly reporting to the SBA, cooperating with SBA audits and government agency investigations into fraud, submitting guarantee purchase applications (which could be used to repay the Federal Reserve), and handling PPP loans that are in collections. As the Federal

66

PETITION TO VACATE FINAL ARBITRATION AWARD

Reserve has warned, Womply's efforts to collect on the Final Award "cripple the ability of Benworth to continue" servicing its PPP loans.

But in the long term, the costs will fall on the federal government and taxpayers as a whole by conferring upon private arbitrators the unreviewable power to construe and apply federal regulations and to make policy decisions critical to federal relief programs. This Court cannot allow Womply to take an additional $118 million from a federal loan program in violation of the plain terms of the implementing regulations, on top of the approximately $2 billion in taxpayer funds it already collected, while it remains under investigation by the federal agency charged with enforcing compliance with those very regulations. The Court should vacate the Final Award.

Dated: August 7, 2024                   Respectfully submitted,

                                        /s/ Dwayne A. Robinson
                                        Jorge L. Piedra (Florida Bar No. 88315)
                                        (*Pro Hac Vice*)
                                        jpiedra@kttlaw.com
                                        Dwayne A. Robinson (Florida Bar No. 99976)
                                        (*Pro Hac Vice*)
                                        drobinson@kttlaw.com
                                        Michael R. Lorigas (Florida Bar No. 123597)
                                        (*Pro Hac Vice*)
                                        mlorigas@kttlaw.com
                                        **KOZYAK TROPIN & THROCKMORTON**
                                        2525 Ponce de Leon Boulevard, 9th Floor
                                        Miami, Florida 33134
                                        Telephone: 305-372-1800

                                                       -and-

                                        Daniel C. Girard (State Bar No. 114826)
                                        dgirard@girardsharp.com
                                        Simon S. Grille (State Bar No. 294914)
                                        sgrille@girardsharp.com
                                        **GIRARD SHARP LLP**
                                        601 California Street, Suite 1400
                                        San Francisco, CA 94108
                                        Telephone: (415) 981-4800

                                        *Attorneys for Benworth Capital Partners, LLC*

67
PETITION TO VACATE FINAL ARBITRATION AWARD