# Exhibit D

Jorge L. Piedra (Florida Bar No. 88315)
(*Pro Hac Vice*)
jpiedra@kttlaw.com
Dwayne A. Robinson (Florida Bar No. 99976)
(*Pro Hac Vice*)
drobinson@kttlaw.com
Michael R. Lorigas (Florida Bar No. 123597)
(*Pro Hac Vice*)
mlorigas@kttlaw.com
**KOZYAK TROPIN & THROCKMORTON**
2525 Ponce de Leon Boulevard, 9th Floor
Miami, Florida 33134
Telephone: 305-372-1800

Simon S. Grille (State Bar No. 294914)
sgrille@girardsharp.com
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800

*Attorneys for Benworth Capital Partners, LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| OTO ANALYTICS, LLC f/k/a OTO ANALYTICS, INC. d/b/a WOMPLY,<br><br>                 Petitioner,<br><br>    v.<br><br>BENWORTH CAPITAL PARTNERS, LLC,<br><br>                Respondent. | Case No. 3:24-cv-03975-AMO<br><br>**OPPOSITION TO MOTION TO CONFIRM ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT**<br><br>Hon. Araceli Martínez-Olguín |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 3

    I.      THE AWARD MUST BE VACATED BECAUSE THE ARBITRATOR
           EXCEEDED HIS POWERS. ........................................................................ 3

          A.     The Arbitrator's Application Of The Agent Fee Cap Is Legally
              Irreconcilable  With The Undisputed Facts. ............................................... 5

          B.     The Arbitrator Manifestly Disregarded The Law When He
              Admittedly Refused To Apply The Controlling SOPs. ............................. 12

          C.     The Final Award Grants Relief Not Permitted by the Agreements. .......... 21

    II.     THE FINAL AWARD IS UNENFORCEABLE BECAUSE IT
           COMPELS BENWORTH TO VIOLATE PUBLIC POLICY. ........................... 24

    III.    THE ARBITRATOR IS GUILTY OF MISCONDUCT FOR REFUSING
           TO POSTPONE THE PROCEEDINGS UNTIL THE SBA COMPLETES
           ITS INVESTIGATION. ............................................................................... 24

CONCLUSION ................................................................................................................... 25

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*300 DeHaro St.*,

   161 Cal. App. 4th ............................................................................................... 14

*Am. Postal Workers Union AFL-CIO v. U.S. Postal Serv.*,

   682 F.2d 1280 (9th Cir. 1982) ................................................................... Passim

*Aramark Facility Servs. v. Serv. Emps. Int'l Union, Loc. 1877, AFL CIO*,

   530 F.3d 817 (9th Cir. 2008) .................................................................... 24

*Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC*,

   913 F.3d 1162 (9th Cir. 2019) ............................................................ 3, 19, 23

*Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors, LLC*,

   268 F. Supp. 3d 1053 (N.D. Cal. 2017) ................................................... 14

*Coutee v. Barington Cap. Grp., L.P.*,

   336 F.3d 1128 (9th Cir. 2003) ................................................................. 4, 9

*Dewan v. Walia*,

   544 F. App'x 240 (4th Cir. 2013) ............................................................ 17

*Garvey v. Roberts*,

   203 F.3d 580 (9th Cir. 2000) ................................................................ 13, 21

*HayDay Farms, Inc. v. FeeDx Holdings, Inc.*,

   55 F.4th 1232 (9th Cir. 2022) .................................................................. 4

*Karczewski v. DCH Mission Valley LLC*,

   862 F.3d 1006 (9th Cir. 2017) ................................................................. 18

*Michigan Mut. Ins. Co. v. Unigard Sec. Ins. Co.,*

   44 F.3d 826 (9th Cir. 1995) .................................................................... 3, 4

*Naing Int'l Enters., Ltd. v. Ellsworth Assocs., Inc.*,

   961 F. Supp. 1 (D.D.C. 1997) .............................................................. 24, 25

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

*Navcom Tech., Inc. v. Oki Elec. Indus. Co., Ltd.,*

  2017 WL 2617977 (N.D. Cal. June 16, 2017)......................................................................... 20

*OTO Analytics, Inc. v. Capital Plus Financial, LLC,*

  2022 WL 1488441 (N.D. Tex. May 11, 2022).................................................................... 10, 21

*Pac. Motor Trucking Co. v. Auto. Machinists Union,*

  702 F.2d 176 (9th Cir. 1983)............................................................................................. 4, 11, 21

*Phoenix Newspapers, Inc. v. Phoenix Mailers Union Loc. 752, Int'l Bhd. of Teamsters,*

  989 F.2d 1077 (9th Cir. 1993).............................................................................................. 24

*S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels.,*

  48 Cal. 3d 341 (1989) ........................................................................................................ 20

*Secci v. United Independant Taxi Drivers, Inc.,*

  8 Cal. App. 5th 846 (2017) ................................................................................................. 20

*Serv. Emps. Int'l Union, Loc. 99 v. Options—A Child Care & Hum. Servs. Agency,*

  200 Cal. App. 4th 869 (2011) ........................................................................................... 5, 14

*United Food & Com. Workers Union, Loc. 1119, AFL-CIO v. United Markets, Inc.,*

  784 F.2d 1413 (9th Cir. 1986).............................................................................................. 14

*United Transp. Union v. Union Pac. R. Co.,*

  116 F.3d 430 (9th Cir. 1997) .............................................................................................. 24


**Statutes**

9 U.S.C. § 9.................................................................................................................................. 1, 4

9 U.S.C. § 10(a)(3)......................................................................................................................... 24

9 U.S.C. § 10(a)(4)......................................................................................................................... 3

Cal. Civ. Code § 1856(c).............................................................................................................. 20


**Regulations**

13 C.F.R. 103.5(a)......................................................................................................................... 21

13 C.F.R. § 103.1(d)............................................................................................. 12, 15, 16, 18

iii

13 C.F.R. § 103.1(f) ...................................................................................................... 19

13 C.F.R. § 103.5(c) ..................................................................................................... 21

Paycheck Protection Program as Amended by Economic Aid Act,

  86 Fed. Reg., (Jan. 14, 2021) ...................................................................................... 5

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

**INTRODUCTION**

This Court should deny Womply's Motion to Confirm Arbitration Award and For Entry of Judgment (ECF No. 41) (the "Motion"). Under the FAA,[1] this Court cannot confirm an award that is vacated. In the related case, which the parties agree should be consolidated with this action (*see* ECF No. 50), Benworth petitioned this Court to vacate the same award at issue here (the "Petition to Vacate"). *See* Petition to Vacate, *Benworth Capital Partners, LLC v. Oto Analytics, LLC,* Case No.3:24-cv-4840-AMO (N.D. Calif. Aug. 7, 2024), ECF No. 1 (the "*Vacatur Proceedings*"). The Petition to Vacate details the reasons why the Court should vacate the Final Award. This Court thus cannot confirm the Final Award until it resolves the Petition to Vacate.

The grounds to oppose confirmation are essentially the same grounds for vacatur. *See* 9 U.S.C. § 9 (stating that the FAA requires confirmation of an award only if it has not been vacated, modified, or corrected). So, Benworth summarizes here the three grounds for vacatur set forth in the Petition to Vacate: (1) under Section 10(a)(4) of the FAA, the Arbitrator "exceeded [his] powers" by ignoring undisputed, legally dispositive facts in manifest disregard of the law while also disregarding controlling federal regulations that were incorporated into the parties' agreements to achieve a result the Arbitrator believed was fair, resulting in an irrational award that does not draw its essence from the parties' agreements; (2) the Final Award is unenforceable because it compels Benworth to violate an explicit, well-defined Federal law that specifically prohibits the relief ordered by the Arbitrator; and (3) under Section 10(a)(3) of the FAA, the Arbitrator is "guilty of misconduct in refusing to postpone" the proceedings until the federal government completes its investigation of Womply concerning the same issues that were decided in the Final Award, which foreclosed Benworth from presenting evidence pertinent and material to its defenses and counterclaims.[2]

Benworth acknowledges that review of an arbitration award is generally limited and deferential. But the circumstances here fall within two long-recognized exceptions to this general rule, both

---

[1] Unless otherwise defined herein, all capitalized terms have the same meaning as in the Motion.

[2] In the Motion, Womply preemptively argues that there is no basis to vacate the Final Award on the ground of an impartial arbitrator. (Motion at 11.) No response to that argument is necessary because Benworth does not seek to vacate the Final Award because of the Arbitrator's bias.

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

established by Ninth Circuit precedent. One of those exceptions involves awards that conflict with federal law. The Ninth Circuit draws a distinction between arbitrations that merely determine "the competing interests of two opposing parties" from those that also "require[] an adjudication of the coverage and application of a federal law passed by Congress . . . ." *Am. Postal Workers Union AFL-CIO v. U.S. Postal Serv.*, 682 F.2d 1280, 1285 (9th Cir. 1982). Where an arbitrator's decision conflicts with federal law, it cannot stand: "***We cannot empower the arbitrator to nullify the mandates of Congress*** . . . ." *Id.* (emphasis added).

The Arbitrator here did not simply misconstrue an agreement between two private parties. As detailed below, the Final Award jeopardizes a federally authorized loan program that the Arbitrator swore to uphold. And the Arbitrator jeopardizes that federal relief program by expressly ignoring the implementing federal regulations he agreed to faithfully apply. In fact, in one instance, the Arbitrator indicated he would refuse to enforce federal regulations even if he thought they were applicable. This Court cannot allow a single private arbitrator to have the unreviewable power to nullify the mandates of Congress and redefine federal law. Otherwise, private parties may, through private arbitration agreements, not only thwart federal law but also compromise the integrity of federal regimes.

The second exception recognized by the Ninth Circuit involves the deference owed to an arbitrator's conclusions. Although courts generally "must defer to an arbitrator's conclusions even where they are erroneous[,]" an "arbitrator's conclusions" are not "entitled to the deference ordinarily accorded" and do "not bind" this Court where, like here, an award is legally irreconcilable with the undisputed facts. *Am. Postal Workers*, 682 F.2d at 1284–85. The undisputed, legally dispositive facts, along with the factual findings in the Final Award and the statements of the Arbitrator, all firmly establish that Womply is not entitled to additional compensation from Benworth. And this Court owes no deference to the Arbitrator's contrary conclusions.

Benworth's position in the Arbitration was corroborated by a comprehensive 128-page congressional report titled, *"We Are Not the Fraud Police": How Fintechs Facilitated Fraud In The Paycheck Protection Program* (the "*Congressional Report*"). The Congressional Report, published after an independent investigation spanning more than a year, exposed Womply's improper conduct in connection with the PPP. As a result of the Congressional Report, the SBA immediately suspended

Womply from doing any business with it and launched an investigation into Womply's compliance with PPP loan program requirements. Womply remains suspended from doing business with the SBA.

Benworth repeatedly moved the Arbitrator to postpone the hearing or defer ruling on the merits of the parties' dispute pending the completion of the SBA's investigation. The results of the SBA's investigation were pertinent and material to Benworth's defenses and counterclaims in the Arbitration. Despite acknowledging that the results of the SBA's investigation of Womply may render his award "advisory," the Arbitrator refused to await the results of the investigation and rendered the Final Award without the benefit of the SBA's conclusions.

The Final Award is not the product of the Arbitrator interpreting the parties' agreements and applying the controlling law to the facts. Instead, the Final Award reflects that the Arbitrator appointed himself as the final decisionmaker on SBA policies so he could dispense his own brand of industrial justice and reach a result he believed was fair to Womply. But the Arbitrator had no power to nullify the mandates of the SBA or Congress or to revise the parties' agreements.

For these reasons, as detailed below, the Court should deny the Motion.

<strong>ARGUMENT</strong>

**I.    THE AWARD MUST BE VACATED BECAUSE THE ARBITRATOR EXCEEDED HIS POWERS.**

Vacatur of an arbitration award is appropriate where the arbitrator exceeds his powers. 9 U.S.C. § 10(a)(4). Ninth Circuit precedent establishes that an arbitrator exceeds his powers "when the award is 'completely irrational' or exhibits a 'manifest disregard of the law.'" *Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC*, 913 F.3d 1162, 1166 (9th Cir. 2019) (*Aspic*).

An award is "completely irrational" if "the arbitration decision fails to draw its essence from the agreement." *Aspic*, 913 F.3d at 1166 (internal quotations omitted). "To consider whether an award drew its essence from the agreement, the court must ensure that the arbitrator looked to the words of the contract and to the conduct of the parties." *Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co.*, 44 F.3d 826, 831 (9th Cir. 1995) (cleaned up). Courts only "enforce an arbitration award if it represents a plausible interpretation of the contract in the context of the parties' conduct." *Pac. Motor Trucking Co. v. Auto.*

OPPOSITION TO MOTION TO CONFIRM<br>ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

*Machinists Union*, 702 F.2d 176, 177 (9th Cir. 1983) (internal quotations omitted). "An award that conflicts directly with the contract cannot be a 'plausible interpretation.'" *Id*.

"To demonstrate manifest disregard, the moving party must show that the arbitrator understood and correctly stated the law, but proceeded to disregard the same." *HayDay Farms, Inc. v. FeeDx Holdings, Inc.*, 55 F.4th 1232, 1241 (9th Cir. 2022) (internal quotations omitted). "There must be some evidence in the record, other than the result, that the arbitrators were aware of the law and intentionally disregarded it." *Id*. "[A]n arbitrator's failure to recognize undisputed, legally dispositive facts may properly be deemed a manifest disregard for the law." *Coutee v. Barington Cap. Grp., L.P.*, 336 F.3d 1128, 1133 (9th Cir. 2003).

Under either the completely irrational or manifest disregard of the law standards of review, courts generally "must defer to an arbitrator's conclusions even where they are erroneous." *Am. Postal Workers*, 682 F.2d at 1284–85. However, an "arbitrator's conclusions" are not "entitled to the deference ordinarily accorded" and do "not bind" this Court where, like here, an award is legally irreconcilable with the undisputed facts. *Id*. at 1285. Moreover, "[a]lthough an arbitrator has great freedom in determining an award, he may not 'dispense his own brand of industrial justice.'" *Pacific Motor Trucking Co. v. Auto. Machinists Union*, 702 F.2d 176, 177 (9th Cir. 1983).

An arbitrator further exceeds his powers when he "stray[s] from the limitations imposed by the parties." *Michigan Mut. Ins. Co. v. Unigard Sec. Ins. Co.*, 44 F.3d 826, 830 (9th Cir. 1995). The choice of law clauses in the Agreements limited the scope of the Arbitrator's powers by imposing three critical rules. The first rule required the Arbitrator to apply California law and "SBA Regulations," as that term is defined in the Agreements.[3] The second rule compelled the Arbitrator to give controlling effect to SBA Regulations, notwithstanding any provision of the Agreements or California law to the contrary. And the third rule obligated the Arbitrator to treat the SBA Regulations as express terms of the parties'

---

[3] The Referral Agreement defines "SBA Regulations" to include "applicable SBA loan requirements, including those codified in 13 CFR part 120 . . . ." (ECF No. 41-3, § 9.) "SBA loan requirements," in turn, is defined to include "SBA Standard Operating Procedures (SOPs)[.]" 13 C.F.R. § 120.10. The Order Form adopted the Referral Agreement's definition of "SBA Regulations." (ECF No. 41-4 at 2 ("Unless set forth otherwise, undefined capitalized terms are defined in the MDA or Amended and Restated PPP Loan Referral Agreement between the Parties (the 'Referral Agreement').").)

4

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

bargain because they were specifically incorporated in the Agreements. *See Serv. Emps. Int'l Union, Loc. 99 v. Options—A Child Care & Hum. Servs. Agency*, 200 Cal. App. 4th 869, 879 n.6 (2011) ("When language of a statute or regulations is incorporated in a contract, such language establishes contractual rights and obligations apart from its legal identity as part of a statute or regulation.").

The Arbitrator failed to follow the rules imposed by the parties. Specifically, the Arbitrator exceeded his powers on three issues. First, the Arbitrator manifestly disregarded the law by ignoring undisputed, legally dispositive facts when he concluded that the Agent Fee Cap does not apply to the Technology Fees. Second, and for similar reasons, the Arbitrator manifestly disregarded the law and the Agreements when he concluded that Womply is not a lender service provider. Finally, the Final Award is unenforceable because it grants relief that is disallowed under the Agreements.

**A.    The Arbitrator's Application Of The Agent Fee Cap Is Legally Irreconcilable With The Undisputed Facts.**

The Agent Fee Cap limited the "total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender)" to "[o]ne (1) percent for loans of not more than $350,000[.]" Paycheck Protection Program as Amended by Economic Aid Act, 86 Fed. Reg. 3709, (Jan. 14, 2021). There was no dispute that Womply relied on the Technology Services to prepare PPP loan applications and refer PPP loan applicants to Benworth. In fact, during closing arguments, Benworth posed the following question that the Arbitrator must resolve: "Did any of Womply's technology assist in either referring or preparing PPP loan applications?" (**Ex. 1** at 1721:15-16.)[4] The Arbitrator's response was unequivocal: "***And the answer to that question is, yes, we don't have to argue that***." (*Id*. at 1721:17-18 (emphasis added).) The Arbitrator also understood, and Womply agreed, that the Technology Services "verif[ied] the information in the -- in the application." (*Id*. at 1646:7-13.) The Arbitrator ignored Womply's own instructional videos that showed its technology preparing PPP loan applications. Thus, there was no evidentiary dispute about the functions

---

[4] All references to "Ex." refer to exhibits attached to the accompanying declaration of Dwayne A. Robinson, Esq. in support of Benworth's Opposition to the Motion to Confirm Arbitration Award and for Entry of Judgment, dated September 6, 2024.

5

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

the Technology Services performed. The only dispute centered on the conclusions to be drawn from those undisputed facts.

As shown below, the Arbitrator's conclusion that the Agent Fee Cap does not apply to the Technology Fees is legally irreconcilable with the undisputed facts. Benworth first describes the information that must be included in a PPP loan application along with the documents that must accompany the application. *See infra* Part I.A.1. Benworth next surveys the undisputed facts establishing that Womply used the Technology Services to prepare and refer PPP loan applications. *See infra* Part I.A.2. Finally, Benworth explains how the Arbitrator manifestly disregarded the law by failing to apply the Agent Fee Cap to the Technology Fees. *See infra* Part I.A.3.

### 1.    The PPP loan application requirements.

The Interim Final Rule established the requirements for submitting a PPP loan application. PPP loan applicants were required to provide various categories of information and documents substantiating that information. Specifically, applicants were required to "submit Paycheck Protection Program Borrower Application Form (SBA Form 2483), or lender's equivalent form, and payroll documentation, as described" in the Interim Final Rule. (**Ex. 2** at art. III.B.10.) Each category of information and payroll documentation is addressed below.

**Borrower Identification Information**. PPP applicants were first required to provide identification and contact information, including their name, social security number, address, phone number, and email address. (**Ex. 3** at 1 (PPP First Draw Application Form); *see also* **Ex. 4** at 1 (PPP Second Draw Application Form); Final Award (ECF No. 41-5) at 22-23; **Ex. 2** at art. III.B.10.)

**Financial Criteria**. PPP applicants were next required to provide financial information, including their average monthly payroll, the requested loan amount, and purpose(s) of the PPP loan. (**Ex. 3** at 1; *see also* **Ex. 4** at 1; Final Award at 23; **Ex. 2** at art. III.B.4.b.)

**Bank Records**. The Interim Final Rule required PPP applicants to submit banking records for two purposes. First, applicants were required to provide documentation from 2019 or 2020, such as a "bank statement," to establish that they were "self-employed." (**Ex. 2** art. III.B.4.b.) Second, applicants were required to "provide a 2020 invoice, bank statement, or book of record to establish [they] were in operation on or around February 15, 2020." (*Id.*)

6

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

**Tax Documents**. The Interim Final Rule states that applicants "must provide the 2019 or 2020 (whichever [they] used to calculate loan amount) Form 1040 Schedule C with [their] PPP loan application to substantiate the applied-for PPP loan amount . . . ." (*Id.* at art. III.B.4.b.)

**Eligibility Questions**. PPP applicants were also required to answer "yes" or "no" to multiple questions that determined their eligibility for a PPP loan. Such as whether the applicant was suspended from participation or whether the applicant has a prior felony involving deception (**Ex. 3** at 2; *see also* **Ex. 4** at 2; Final Award at 22-23; **Ex. 2** at art. III.B.10.)

**PPP Certifications**. The Interim Final Rule further directed that applicants "must certify in good faith" to various attestations concerning, *inter alia*, the accuracy of the information provided in, and the documentation accompanying, the PPP loan application. (**Ex. 3** at 2-3; *see also* **Ex. 4** at 2-3; Final Award at 22-23; **Ex. 2** at art. III.B.12.)

**KYC/BSA/AML Compliance**. PPP loan applications could be submitted to the SBA only *after* the information in the application is verified. For example, the PPP applicant's identifying information, such as date of birth, address, and taxpayer identification number, must be verified to confirm the applicant's identity. (**Ex. 2** at art. III.C.3.d.ii.)

### 2. Womply's technology assisted in preparing and referring PPP loan applications.

As the Arbitrator admitted, there was no dispute that Womply's technology assisted in preparing and referring PPP loan applications. Womply's own witnesses and documents established that most of the Technology Services were used to collect, analyze, and verify the information and supporting documents required by the Interim Final Rule to submit a PPP loan application. The Technology Services "were performed using technology from third-party service providers that were linked to or integrated into Womply's technology platform[.]" (Final Award at 24.) The Technology Services identified in the Order Form include Plaid, Docusign, LexisNexis, Inscribe, Ocrolus, Mindee, Persona, Twilio, and Sendgrid. (Order Form, § 1.2.) Each of these technologies were used to help borrowers prepare PPP loan applications and refer PPP loan application packages to Benworth.

**Borrower Identity Information**. Fast Lane prompted applicants to enter their email addresses, phone numbers, and physical addresses, which would later be populated into the PPP application form.

7

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

(Final Award at 23.) Womply verified email addresses using SendGrid, phone numbers using Twilio, and the existence of physical addresses using Google Maps. (*Id*. at 24.) Applicants could not continue applying for a PPP loan through Fast Lane unless this information was verified by Womply. (**Ex. 5** at 20 ("We verify emails for 100% of applications."); *id.* at 10 ("We verify mobile phones for 100% of applications.").)

**Financial Criteria**. Using information extracted from the tax documents provided by applicants, Womply, through Fast Lane, automatically calculated the loan amounts available to the applicants. (**Ex. 5** at 20; **Ex. 6** at 362:12-19; *id*. at 366:7-23; **Ex. 7**.)

**Bank Records**. Womply also allowed applicants to connect their bank accounts to Fast Lane. (**Ex. 6** at 369:3-6.) Womply "extracted bank account information and transaction history" using Plaid. (**Ex. 8** at ¶ 18(g); **Ex. 9** at 1.) Womply would then analyze the banking data to determine, among other things, applicants' eligibility for a PPP loan based on whether they were in business on or before February 15, 2020. (**Ex. 6** at 408:21-24; **Ex. 18** ("We analyze bank data to verify identity and determine whether the business was in operations on 2/15/20."); **Ex. 5** at 21 (same).)

**Tax Documents**. Fast Lane also directed applicants to upload the tax documents that must accompany the PPP loan application required by the Interim Final Rule. (**Ex. 6** at 352:25 – 353:11.) Scammell explained that the tax documents were "useful for determining and validating the loan size the applicant was seeking" as well as verifying that the applicant was a business. (*Id*. at 352:20 – 353:18.) Womply used Mindee, Inscribe, and Ocrolus "to make this flow seamless for borrowers." (*Id*. at 354:19-25.) Importantly, Applicants could not continue applying through Fast Lane until they uploaded the correct tax documents. (**Ex. 5** at 19; *see also* **Ex. 9** at 2.)

**Eligibility Questions**. Fast Lane further required applicants to "confirm" that they could answer "yes" or "no" to the eligibility questions in the PPP loan application. (**Ex. 10** at 5:22 – 8:8 (Womply informing users that they must confirm the necessary answers to the eligibility questions in the PPP loan applications forms); *see also* **Ex. 3** at 2 (eligibility questions in First Draw PPP Loan Application); **Ex. 4** at 2 (eligibility questions in Second Draw PPP Loan Application).) As with the tax records, applicants could not continue applying through Fast Lane unless they could "confirm" the necessary answers to satisfy the eligibility requirements for a PPP loan. (**Ex. 6** at 499:8-24.)

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

**PPP Certifications**. Fast Lane also required applicants to confirm that they could make the requisite PPP certifications. Once more, applicants were not permitted to proceed with the workflow to submit a PPP application through Fast Lane without these certifications. (*See* **Ex. 5** at 17-18; **Ex. 10** at 644:25 – 646:9; **Ex. 6** at 500:10-21; **Ex. 11** (4:09:00 to 6:47:00).) After the borrower was referred to a lender, DocuSign was used (1) to generate the PPP application populated with the information provided through Fast Lane and (2) to collect the PPP certifications and applicants' signatures. (**Ex. 9** at 3; **Ex. 10** at 575:13-21; *id*. at 660:15 – 661:1; **Ex. 6** at 489:9-13.)

**KYC/BSA/AML Compliance**. During the Fast Lane application process and before borrowers were referred to lenders, Womply used multiple third-party technologies, including Twilio, SendGrid, Persona, LexisNexis, and Docusign, to verify borrowers' identities. (**Ex. 6** at 344:1-20; 337:5-5, 359:14-25; 403:15 – 404:11.) Indeed, Womply's technology platform was designed to refer legitimate PPP loans that were eligible for funding. For instance, Womply admitted that its technology filtered out applicants who would not be eligible for PPP applications because their identities could not be verified. (*See, e.g.*, **Ex. 10** at 669:17 – 670:13.) Womply also designed Fast Lane to exclude from its referred loans those applicants who did not meet general eligibility requirements of the PPP. (**Ex. 14** at 789:21 – 790:16.) According to Womply, an applicant would not be referred to a lender until the applicant completed Womply's "KYC review process." (**Ex. 12** at 1; *see also* **Ex. 5** at 42-46.) In a declaration admitted into evidence, Womply's CEO testified that Womply did not refer applicants to lenders until *after* performing these services. (**Ex. 8** at ¶¶ 18-19.)

    **3.**  **The Arbitrator failed to recognize undisputed, legally dispositive facts.**

Although manifest disregard of the facts is not an independent ground for vacatur, when "legally dispositive facts are so firmly established . . . an arbitrator cannot fail to recognize them without manifestly disregarding the law." *Coutee v. Barington Cap. Grp., L.P.*, 336 F.3d 1128, 1133 (9th Cir. 2003) (citing *Am. Postal Workers Union v. U.S. Postal Serv.*, 682 F.2d 1280, 1284–86 (9th Cir. 1982), cert. denied, 459 U.S. 1200 (1983)). The Arbitrator manifestly disregarded the law here because he failed to recognize the undisputed, legally dispositive facts firmly establishing that the Technology Services, whether in whole or in part, were performed to assist "in preparing an application for a PPP loan (including referral to the lender)." (**Ex. 2** at art. III.D.4.)

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

The undisputed facts, the Arbitrator's own statements during closing arguments, and the findings in the Final Award all establish that the Technology Services related to preparing, or making ready, a PPP loan application. Except as to Teslar (which Benworth conceded was not subject to the Agent Fee Cap), Womply's witnesses, its videos, and its other documents established that Womply's Technology Services made ready PPP loan applications that were then submitted (or referred) to Benworth. *See supra*, Part I.A.2; *compare id.* (detailing how Womply's technology assisted in preparing PPP loan applications including by deploying identity verification and other fraud prevention measures) *with OTO Analytics, Inc. v. Capital Plus Financial, LLC*, 2022 WL 1488441 *6 (N.D. Tex. May 11, 2022) (explaining that Womply "made ready" PPP loan applications for approval by a lender "by verifying information to prevent fraud"). Again, incomplete applications—or those that were not eligible for PPP—were never filtered to lenders like Benworth. *See supra*, Part I.A.2. The Arbitrator agreed that it was so firmly established that "Womply's technology assist[ed] in either referring or preparing PPP loan applications" that there was no need for Benworth's counsel to even "argue that" issue. (**Ex. 1** at 1721:15-18.) And the Final Award characterizes the Referral Fee as payment "for applicant information collection and referral services[,]" (Final Award at 20), while also finding that Womply's Technology Services "***allowed a prospective applicant to enter the necessary information to populate the SBA required application form for a PPP loan*** and to provide the documentation or certifications lenders used to evaluate each application[,]" (*id*. at 22-23 (emphasis added)). There is no way to reconcile the foregoing with the Final Award's conclusory statement that the Technology Services were principally related to underwriting, not preparing and referring PPP loans.

*American Postal* demonstrates why this Court should disregard the Arbitrator's conclusion that the Agent Fee Cap does not apply to the Technology Fees and vacate the Final Award. In *American Postal*, the Ninth Circuit vacated an arbitration award that required the U.S. Postal Service to reinstate a former employee. The arbitrator awarded reinstatement based on the former employee's erroneous belief that his picketing activities were sanctioned by the union. However, "[b]y statute, a worker may not hold a government position if the individual has participated in a strike against the government." *American Postal*, 682 F.2d at 1283 (citing 5 U.S.C. § 7311). The arbitrator's award included findings demonstrating that the former employee participated in a strike. *Id*. In support of vacating the award, the

10

court found it was "not necessary for an arbitrator to state the precise words that an employee 'participates in a strike' in order to conclude that his employment would violate section 7311." *Id.*

In declining to remand the matter to the arbitrator, the court emphasized that the arbitration did not merely involve a dispute between private parties:

> This case requires more than the resolution of the competing interests of two opposing private parties. It also requires an adjudication of the coverage and application of a federal law passed by Congress to insure a stable work force for the government and agencies of the United States. We therefore cannot treat the issues raised by this dispute merely as matters of conflict between an employer and its employees. ***In light of the undisputed facts of this case, we could not confirm an award of arbitration simply because the arbitrator stated that Murphy did not strike. To confirm such an award in this case would be to confer upon the arbitrator unreviewable power to construe and apply section 7311. … We cannot empower the arbitrator to nullify the mandates of Congress simply by stating that an individual did not strike when, as here, his actions, as presented in undisputed facts, constitute a strike for purposes of the section.***

*Id.* at 1285 (emphases added). Like in *American Postal*, this Court cannot accept the Arbitrator's conclusion that the Agent Fee Cap does not apply at all to the Technology Fees by simply stating that the Technology Services did not constitute preparing and referring PPP loan applications when, as here, the Technology Services, as presented in undisputed facts, constitute services that prepared and made ready a PPP loan application for submission to the SBA. *See supra*, Part I.A.2.

Nor can this Court accept the Arbitrator's reliance on "extrinsic evidence" and the terms of the Agreements to justify charging Benworth in excess of 1% for services that are "[a]bsolutely" and without "dispute" subject to the Agent Fee Cap. (**Ex. 1** at 1720:19.) As noted above, the Parties incorporated the SBA Regulations into the Agreements and, further, granted those provisions precedence over anything else. The Arbitrator was not permitted to disregard that rule and apply a rough sense of justice and ignore (or downgrade) provisions of the Agreements the Parties agreed would take precedence. *See Pacific Motor*, 702 F.2d at 177 (an arbitrator may not "disregard[] a specific contract provision" or "dispense his own brand of industrial justice."). Otherwise, this Court would "confer upon the arbitrator unreviewable power to construe and apply" the Agent Fee Cap and "empower the arbitrator to nullify the mandates of" the SBA. *See American Postal*, 682 F.2d at 1285.

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

**B.      The Arbitrator Manifestly Disregarded The Law When He Admittedly Refused To Apply The Controlling SOPs.**

The Final Award reflects that the Arbitrator understood "it is not" his "role to decide what is 'fair;' he is instead merely tasked with interpreting the contract provisions." (Final Award at 54.) One such contract provision the Arbitrator was tasked with interpreting was the SOPs' clause on compensating lender service providers (which, again, the Parties expressly incorporated into their Agreements, *see supra*, pp. 4-5): "An LSP may only receive compensation from the 7(a) Lender for services provided under an SBA-reviewed LSP Agreement." (**Ex. 13** at 185, § 6(c).)

Prior to issuing the Interim Award, the Arbitrator announced his interpretation of the provision: "That seems pretty emphatic. That seems to say, if you don't have an approved agreement, you don't get paid." (**Ex. 1** at 1746:12-18.) And it was undisputed that the Agreements were not submitted to the SBA. But the Arbitrator believed that enforcing this provision "would result in a disproportionately harsh penalty" to Womply. (Final Award at 47.) So, the Arbitrator concocted an array of implausible justifications to conclude that Womply was not a lender service provider.

SBA regulations define a lender service provider as "an Agent who carries out lender functions in originating, disbursing, servicing, or liquidating a specific SBA business loan or loan portfolio for compensation from the lender." 13 C.F.R. § 103.1(d). In the SOPs, the SBA clarified the meaning of "lender service provider" by enumerating a non-exhaustive list of "examples of when SBA considers an Agent to meet the definition of an LSP [, i.e., a lender service provider]." (**Ex. 13** at 185, § 6(e).) Those examples include:

i.      An individual or entity engaged by a 7(a) Lender to provide services for the purposes of obtaining Federal financial assistance that include interaction with the Applicant either in person *or through the use of technology*, to request or obtain eligibility and/or financial information that will be provided to the 7(a) Lender. This includes Agents who:

a)  Perform any pre-qualification review based on SBA's eligibility and credit criteria . . . prior to submitting the Applicant's information to the 7(a) Lender; or

b)  Provide to the 7(a) Lender an underwritten application, whether through *the use of technology or otherwise*.

ii.     Entities providing technology services to a 7(a) Lender that *include underwriting*.

12

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

iii.     An individual or entity generates a significant number of 7(a) Lender's loan originations. As a general rule, SBA considers a "significant number" to be two-thirds (66%) or more of the 7(a) Lender's loan originations for the prior 12 months.

(*Id*. (emphasis added).)

Benworth argued, and the undisputed facts established, that Womply was a lender service provider under each of these examples. For example, Womply interacted with applicants through technology (Fast Lane) to obtain eligibility and financial information that would be provided to Benworth. *See supra*, Part I.A.2. Benworth retained Womply under the Agreements to submit to Benworth complete loan packages through Fast Lane, which collected, verified, and determined eligibility for PPP applicants seeking PPP loans. (*See* **Ex. 13** at 185, § 6(e)(i); Referral Agreement at 1-4; **Ex. 8** at ¶¶ 15-18; **Ex. 14** at 789:21 – 790:7; **Ex. 10** at 708:14-17.) At the very least, Womply's services to applicants constituted "pre-qualification review based on SBA's eligibility" criteria, a role assigned to lender service providers. (**Ex. 13** at 185, § 6(e)(i)(a)); **Ex. 14** at 789:21 – 790:1; *see also supra* Part I.A.2.) Womply also generated ***more than 90%*** of Benworth's loan originations—much more than two-thirds. (**Ex. 15** at 11.)

Despite the undisputed facts firmly establishing that Womply was a lender service provider under the SOPs, the Arbitrator reached the opposite conclusion. The Arbitrator gave four reasons why he concluded that Womply is not a lender service provider: (1) Womply did not originate PPP loans; (2) Womply did not engage in underwriting; (3) the Arbitrator was not required to apply the SOPs and (4) the parties' course of conduct suggests Womply was not a lender service provider. (Final Award at 41-45.) None of these reasons draw their essence from the Agreements or the governing SBA Regulations. Instead, the Arbitrator's reasons for his award lead "inexorably to the conclusion that in reaching his decision the arbitrator 'dispensed his own brand of industrial justice.'" *Garvey v. Roberts*, 203 F.3d 580, 589 (9th Cir. 2000).

### 1.     The Arbitrator crafted a definition of origination with the sole intent of excluding Womply from the plain language of the SBA Regulations.

The Arbitrator first determined that Womply was not a lender service provider because it did not originate loans. (Final Award at 42.) And the Arbitrator made that determination by creating his own definition of origination: "underwriting and approving a loan and submitting it to the SBA for final

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

approval." (*Id.*) It is unclear from where the Arbitrator derived that definition, but it certainly did not come from the Agreements, the evidence, the parties' arguments, or the ordinary meaning of that term. In fact, not even Womply advanced such a narrow definition of origination. During closing arguments, Womply argued "originating appears to be viewed as all of the steps up until approval of a loan." (**Ex. 1** at 1667:15-17.) According to Womply, then, "originating" would include not only underwriting but also collecting borrower information to prepare a PPP loan application. Benworth agrees.

The parties' interpretation of "originating" is consistent with the SBA's. In an SBA form Benworth was required to submit to the SBA, the SBA characterized "Origination Activities" as "application evaluation, gathering documents, processing, etc." (**Ex. 16** at 2.) The Arbitrator purportedly considered this form on multiple occasions, including in Benworth's Response to Womply's Post-Hearing Brief (**Ex. 20** at 6-7) and in its Motion for Reconsideration of the Interim Award (**Ex. 17** at 12). And Womply provided no evidence or other authority to dispute the SBA's definition. The Arbitrator found in the Final Award that the evidence proved that Womply "collect[ed] data from potential applicants to refer those applicants to Benworth." (Final Award at 42.) Thus, contrary to the Arbitrator's statement in the Final Award, Womply's Technology Services do "fall within even a layman's understanding of what origination of a loan to the SBA means." (*Id.*)

The Arbitrator's definition of origination is also implausible because it directly conflicts with the terms of the Agreements. *See Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors, LLC*, 268 F. Supp. 3d 1053, 1058 (N.D. Cal. 2017) ("[A]n award that conflicts directly with the contract cannot be a plausible interpretation."); *see also United Food & Com. Workers Union, Loc. 1119, AFL-CIO v. United Markets, Inc.*, 784 F.2d 1413, 1416 (9th Cir. 1986) ("This direct conflict with the language of the agreement renders the arbitrator's interpretation implausible."). The Agreements not only specifically defined "SBA Regulation" to include the SOPs, but the SOPs were also express terms of the parties' bargain because they were specifically incorporated in the Agreements. *See Serv. Emps.*, 200 Cal. App. 4th at 879 n.6 ("When language of a statute or regulations is incorporated in a contract, such language establishes contractual rights and obligations apart from its legal identity as part of a statute or regulation."); *300 DeHaro St. Invs.*, 161 Cal. App. 4th at 1256 ("When statutory language is included in a contract, it assumes a new legal identity: that of contractual language.").

14

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

Notwithstanding, the Final Award states that the Arbitrator's definition of origination is "strongly supported" by the Agreements because "Benworth contracted to pay Womply Technology Fees 'for each loan originated by [Benworth] under the PPP resulting from a Referral.'" (Final Award at 42.) Based on that contract language, the Arbitrator found that "the parties understood and agreed that it was Benworth that originated the loans, not Womply." (*Id*.) But the interpretation of origination advanced by the parties and reflected in the SBA's form (**Ex. 16** at 2) gives effect to that provision as well, while also conforming to the SBA Regulations on the matter, which were themselves incorporated in the Agreements and which take precedence over any other term in the Agreements.

As stated in the Referral Agreement, Benworth has the "ultimate"—not sole—responsibility for all loan decisions, including approvals and underwriting. (Referral Agreement at 1.) Because the SBA regulations define a lender service provider to include an "Agent who *carries out lender functions* in originating," 13 C.F.R. § 103.1(d) (emphasis added), Womply may still be considered a lender service provider even if it did not have the sole (or ultimate) responsibility for *all* loan decisions leading to loan originations and instead only carried out certain lender origination functions, like underwriting. And the Arbitrator specifically found that "Womply's technology to some extent electronically performed the[] functions" of underwriting a PPP loan. (Final Award at 43.) Yet the Arbitrator still concluded that Womply's technology did not include underwriting. (*Id*.) This, too, is an irrational conclusion that is untethered to the undisputed facts and the SBA Regulations incorporated into the Agreements.

It is also an irrational conclusion that conflicts with the Final Award itself. Recall, in seeking to excuse Womply from the Agent Fee Cap, the Arbitrator concluded that Womply's Technology Services were primarily related to underwriting, not preparing or referring PPP loans. However, when the Arbitrator sought to excuse Womply from the applicability of provisions relating to lender service providers, the Arbitrator denied that Womply was engaged in underwriting.

### 2.    Womply carried out lender functions in underwriting PPP loans.

The Arbitrator concluded that it "was Benworth, not Womply, that was underwriting the PPP loans" because "Benworth was required to take the information developed by the Womply technology and make a final determination that all necessary criteria had been met before submitting a loan to the

15

SBA for approval." (Final Award at 43.) This conclusion is irreconcilable with the plain language of the SBA Regulations as well as the undisputed, legally dispositive facts and the findings in the Final Award.

First, the SBA Regulations do not require that lender service providers perform all (or the ultimate) underwriting functions. The regulations merely require that the agent "carries out lender functions *in* originating . . . ." SBA loans. 13 C.F.R. § 103.1(d) (emphasis added). The SOPs further include examples of lender service providers who perform functions short of rendering the ultimate underwriting decision of whether to fund a loan. (**Ex. 13** at 185, § 6(e)(i)(b) (defining as "lender service providers" entities that merely provide an underwritten application to an SBA lender).) The Arbitrator cannot adopt a definition of "underwriting" that would obliterate federal regulations or the terms of the parties' Agreements that incorporate those regulations.

Further, the SBA limited the underwriting requirements for PPP loans through the Interim Final Rule. Under the Interim Final Rule, underwriting was limited to:

- Confirming receipt of borrower certifications contained in the borrower's PPP application form, (**Ex. 2** at art. III.C.3.a);

- Confirming receipt of information that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020, (*id.* at art. III.C.3.b);

- Confirming the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing payroll documentation submitted with the borrower's application, (*id.* at art. III.C.3.c);

- Following applicable Bank Secrecy Act (BSA) requirements, (*id.* at art. III.C.3.d).

The Interim Final Rule further provides that "[e]ach lender's underwriting obligation under the PPP is limited to the items listed above [i.e., in article III.C.3] and reviewing the 'Paycheck Protection Application Form.'" (*Id.* at 17.) The Arbitrator conceded, as he must, that "it is true that Womply's technology to some extent electronically performed some of these functions . . . ." (Final Award at 43.) The undisputed facts corroborate that and establish that Womply performed PPP underwriting functions.

First, Fast Lane required applicants to confirm that they could make the requisite PPP certifications; otherwise, they were not permitted to proceed with the workflow to submit a PPP application through Fast Lane. (**Ex. 10** at 644:25 – 646:9; **Ex. 11** (4:09:00 to 6:47:00); **Ex. 5** at 17-18.)

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

Second, Womply "extracted bank account information and transaction history" from applicants' bank accounts using Plaid and then analyzed that data to determine, among other things, applicants' eligibility for a PPP loan based on whether they were in business on or before February 15, 2020. (**Ex. 8** at ¶ 18(g); **Ex. 6** at 408:21-24; **Ex. 18**; **Ex. 5** at 21.)

Third, Fast Lane automatically calculated the applicant's average monthly payroll by extracting information from the tax documents the applicant submitted to Womply. (**Ex. 5** at 20.) Applicants could not continue applying through Fast Lane until they uploaded the correct tax documents. (*Id*. at 19.)

Finally, Womply's technology followed applicable BSA requirements. For instance, Womply admitted that its technology filtered out applicants who would not be eligible for PPP applications because their identities could not be verified. (*See, e.g.*, **Ex. 10** at 669:17 – 670:13.) According to Womply, an applicant would not be referred to a lender until the applicant completed Womply's "KYC review process." (**Ex. 12** at 1; *see also* **Ex. 5** at 43-46.)

The Final Award also leads to the inescapable conclusion that Womply performed underwriting. The Arbitrator found that "the Technology Services served the purpose of benefitting Benworth in accomplishing its underwriting functions as a lender under the SBA regulations." (Final Award at 37.) "Indeed, it is undisputed that without Womply's Technology Services, Benworth would have had to conduct manual reviews of each PPP loan applicant's information." (*Id*.) And Womply's technology "greatly increased the likelihood that a loan would be approved and funded." (*Id*. at 39.)

Like in *American Postal*, *see supra* pp. 10-11, this Court is not bound by the Arbitrator's conclusion that Womply is not a lender service provider when the findings in the Final Award and the undisputed facts presented to the Arbitrator confirm that Womply acted as a lender service provider under the Agreements. *See also Dewan v. Walia*, 544 F. App'x 240, 248 (4th Cir. 2013) ("Accordingly, we hold that the Arbitrator manifestly disregarded the law by holding the Release valid and enforceable but nevertheless arbitrating Walia's counterclaims arising out of his employment with the Company.").

### 3.    The Arbitrator's reasoning for not applying the SOPs is inexplicable.

The Arbitrator further manifestly disregarded the law by expressly declining to rely on the SBA's examples of lender service providers. (*See* Final Award at 43-44.) In the Final Award, the Arbitrator declined to apply the examples of lender service providers because the SBA included those examples in

17

OPPOSITION TO MOTION TO CONFIRM<br>ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

SOPs rather than a rule or the Code of Federal Regulations. (*Id.*) As noted above (*see supra*, Part I.B.), the parties' Agreements expressly incorporated all SBA Regulations, including those contained in SOPs.

The Arbitrator, however, employed "conflict of law" principles to ignore the binding SBA Regulations. Specifically, the Arbitrator stated that "when an SOP conflicts with a regulation or rule, it is the language of the regulation or rule that ultimately prevails." (Final Award at 43.) That conflict of law principle has no application to the SOPs' examples of lender service providers. There is no conflict between the SOPs (which lists examples of lender service providers) and the definition of lender service providers contained in the Code of Federal Regulations. The regulation defines a lender service provider as "an Agent who carries out lender functions in originating, disbursing, servicing, or liquidating a specific SBA business loan or loan portfolio for compensation from the lender." 13 C.F.R. § 103.1(d). In the SOPs, the SBA did what a federal agency does: it put further flesh on a regulatory definition by, among other things, giving examples. That is not a conflict. *See Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1016 (9th Cir. 2017) (applying "the familiar rule of construction that, where possible, provisions of a regulation should be read so as not to create a conflict") (cleaned up).

The reasons cited by the Arbitrator in the Final Award for refusing to apply the SOPs still amount to a manifest disregard of the SBA Regulations (incorporated into the Agreements) for two reasons. First, the Arbitrator omitted critical language in the SOPs' example of a lender service provider that purportedly conflicts with other SBA regulations defining the different types of agents. Specifically, the Arbitrator quoted the example of a lender service provider that includes an entity that "'provide[s] services for the purposes of obtaining Federal financial assistance that include[s] interaction with the Applicant either in-person or through the use of technology. . . .'" (Final Award at 44 (alteration in original).) But the Arbitrator blatantly omitted the critical language concerning the purpose of the interaction with the applicant: ". . . to request or obtain eligibility and/or financial information that will be provided to the 7(a) Lender." (**Ex. 13** at 185.) Not every entity involved in the PPP interacted with applicants to request or obtain eligibility and/or financial information. For example, during the first round of PPP funding, Womply simply collected the contact information from potential borrowers, so it could refer just that information to a lender. (*See* Final Award at 16.)

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

Second, and for similar reasons, the SOPs' example of a lender service provider does not conflict with other SBA regulations that define and differentiate between the different types of agents. Sticking with Womply's role during the first round of PPP funding, Womply was a "Referral Agent." SBA regulations define a "Referral Agent" as "a person or entity who identifies and refers an Applicant to a lender or a lender to an Applicant. The Referral Agent may be employed and compensated by either an Applicant or a lender." 13 C.F.R. § 103.1(f). No conflict exists here because the entity's status as a Referral Agent does not require that it interact with the applicant for the purpose of obtaining eligibility and/or financial information. And unlike a lender service provider, which is limited to an entity that contracts with and is compensated by a lender, *id*. at § 103.1(d), the Referral Agent may be employed and compensated by either an applicant or a lender. The same is true with respect to a "Packager"—the only other type of agent identified in SBA regulations. *See id*. at 103.1(e) ("Packager means an Agent who is employed and compensated by an Applicant *or* lender to prepare the Applicant's application for financial assistance from SBA." (emphasis added)).

The Arbitrator stretched to find a means to invalidate federal regulations that were plainly applicable to Womply's activities. The Final Award's summary disposal of the SOPs' examples of lender service providers shows that the Arbitrator never intended to apply the terms of the Agreements because it would be inescapable that Womply is a lender service provider according to the SOPs—which the Arbitrator conceded contains "policies and procedures *governing the PPP*" (Final Award at 9 (emphasis added))—that the parties agreed would govern. The Arbitrator had no authority to disregard the SOPs and his refusal to apply them to the undisputed facts constitutes a manifest disregard of the law that requires vacatur. *See Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC*, 913 F.3d 1162, 1166-68 (9th Cir. 2019) (affirming vacatur of arbitration award where the arbitrator failed to give controlling effect to federal regulations incorporated into the parties' agreement); *see also American Postal*, *supra* at pp. 45-46. The Final Award must be vacated.

**4.      Womply's course of conduct establishes it was a lender service provider.**

Finally, the Arbitrator determined that the "parties' course of conduct strongly points to the fact that Womply was not" a lender service provider. (Final Award at 44.) The Arbitrator first cited the boilerplate language Womply included in the Agreements disclaiming that it was a lender service

19

provider. (*Id.*) The Arbitrator also noted that the CEO of Benworth sent a letter to the SBA stating "'Womply is not an LSP-they are an Agent.'" (*Id.*) Neither fact can support the conclusion that Womply is not a lender service provider here.

As a matter of California law, the "label placed by the parties on their relationship is not dispositive." *S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 48 Cal. 3d 341, 349 (1989); *see also Secci v. United Independent Taxi Drivers, Inc.*, 8 Cal. App. 5th 846, 862 (2017) (evidence of the parties' relationship was sufficient to sustain jury's finding that the plaintiff-driver was an employee of the defendant-company even though the parties' contract stated the driver was an independent contractor). Beyond that, the Agreements required the Arbitrator to give controlling effect to "SBA Regulations," which includes the SOPs, notwithstanding any provision of the Agreements to the contrary. (*See* Referral Agreement, § 9 (providing that "SBA Regulations" govern over contrary provisions of the agreement).)

No resort to course of performance or other extrinsic evidence is permissible to alter unambiguous terms of the Agreements (i.e., the federal regulations that define lender service providers). *See Navcom Tech., Inc. v. Oki Elec. Indus. Co., Ltd.*, No. 5:12-cv-04175-EJD, 2017 WL 2617977 at *3 (N.D. Cal. June 16, 2017) ("Course of performance evidence may only be used to explain or supplement the terms of a contract (Cal. Civ. Code § 1856(c)); not 'to prove a meaning to which the language of the instrument is reasonably susceptible.' It also cannot be used to 'vary or contradict the unambiguous terms of a written agreement.'" (internal citations omitted)). The Arbitrator seemed to suggest that he could avoid applying the unambiguous terms of the Agreements based on the prior litigation (or pre-litigation) positions of Benworth or its principal. (Final Award at 44.) But the fully integrated Agreements deem the SBA Regulations to control their contractual relationship, not extrinsic evidence. (Referral Agreement, § 9; *id.* at § 16 ("No waiver by either party, whether express or implied, of any provisions of this Agreement . . . shall constitute a continuing waiver of such provision or a breach or waiver of any other provision of this Agreement.").)

* * *

For the foregoing reasons, the undisputed, legally dispositive facts and the Arbitrator's findings in the Final Award do not permit any conclusion other than that Womply is a lender service provider. This Court is thus presented "with the extraordinary circumstance in which the arbitrator's own rulings

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

make clear that, more than being simply erroneous, his finding is completely inexplicable and borders on the irrational." *Garvey*, 203 F.3d at 590. "In this circumstance, given the arbitrator's professional experience, the decision can be explained only by his desire to dispense his own brand of industrial justice." *Id.* at 590-91. "No other plausible explanation exists." *Id.* at 591.

### C.    The Final Award Grants Relief Not Permitted by the Agreements.

The Agent Fee Cap applies to the Technology Fees. *See supra*, Part I.A. Womply is a lender service provider. *See supra,* Part I.B. Notwithstanding, the Arbitrator ordered Benworth to pay Womply additional fees in violation of the controlling SBA Regulations incorporated in the Agreements. In doing so, the Arbitrator disregarded "specific contract provision[s] to correct what he perceived as an injustice." *Pacific Motor*, 702 F.2d at 177. The result is an award that should be vacated because it "conflicts directly with the contract." *Id.*

Two SBA Regulations that the parties agreed to be bound by govern Womply's entitlement to fees under the Agreements. The first SBA Regulation requires Agents, including lender service providers, to provide compensation agreements to the SBA for its review. 13 C.F.R. 103.5(a). With respect to Agents other than lender service providers, the Agent must submit Form 159 to the SBA. *Capital Plus*, 2022 WL 1488441 at *7 (citing 13 C.F.R. § 103.5(a)). Womply and Benworth "did not submit Form 159 to the SBA and courts uniformly hold this precludes any recovery of SBA fees." *Id.*

Next, with respect to lender service provider agreements, the SOPs state a lender service provider "may only receive compensation" from the lender "for services provided under an SBA-reviewed" lender service provider agreement. (**Ex. 13** at 185; *see also* 13 C.F.R. § 103.5(c) ("Each Lender Service Provider must enter into a written agreement with each lender for whom it acts in that capacity. SBA will review all such agreements.").)[5] Again, the Arbitrator already stated his opinion on what this provision means: "That seems pretty emphatic. That seems to say, if you don't have an approved agreement, you don't get paid." (**Ex. 1** at 1746:12-18.)

---

[5] SBA regulations require Benworth to comply with this provision of the SOPs. *See* 13 C.F.R. § 120.180 (providing SBA lenders "must comply" with "Loan Program Requirements for the 7(a) Loan Program"); *see also* 13 C.F.R. 120.10 (defining "Loan Program Requirements" to include "SBA Standard Operating Procedures (SOPs)").

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

There is no dispute that the Agreements were not submitted to the SBA. (Final Award at 19.) If the Arbitrator had enforced the terms of the Agreements, as he pledged to do, then the Final Award would reflect that Womply is not entitled to any further fees. But the Arbitrator failed to do so.[6]

Notwithstanding the fact that the Agreements were not submitted to the SBA, the Arbitrator held that, even if he concluded Womply was a lender service provider, he still would have awarded Womply additional fees under the Agreements. (Final Award at 45-47.) That decision was not based on the terms of the Agreements. Rather, the Arbitrator employed equitable principles, noting that Womply introduced "copious evidence of the efforts that went into developing its Fast Lane and related Teslar systems and the various application within those systems for which Womply had to pay a fee." (*Id*. at 47.) The Arbitrator then reasoned that "[f]ailing to compensate Womply for these efforts would result in a disproportionately harsh penalty." (*Id*.) The Arbitrator also concluded that Womply is still entitled to additional fees because the SOPs do not state that an agreement is illegal or invalid if it is not submitted to the SBA. (*Id*. at 45-46.) The Arbitrator missed the point.

The Agreements were not simply entered into with the backdrop of SBA Regulations. The Agreements clearly and expressly—as the Final Award admits (*id*. at 53)—incorporate SBA Regulations. The Agreements also provide that the SBA Regulations would supersede contrary provisions in the Agreements. *See supra*, pp. 4-5. Moreover, the Arbitrator had no authority to employ equitable principles to save Womply's breach of contract claims. Specifically with respect to whether Benworth had a legal obligation to pay further fees (i.e., the third element of Womply's breach of contract claims), as a matter of California law and the Parties' governing Agreements, equity cannot save Womply, authorizing further compensation by using equitable principles to eviscerate an express provision of the Agreements. Put differently, the Arbitrator had no discretion to permit additional fees under Agreements that did not comply with SBA Regulations.

Worse, the Arbitrator ruled that Womply would still be entitled to additional compensation because California law provides an exception to the general rule that contracts made in violation of a

---

[6] In fact, the Final Award does not even acknowledge Benworth's argument that, because the Referral Agreement was not submitted to the SBA, no additional Referral Fees are owed to Womply. (**Ex. 19** at 18; **Ex. 15** at 29; **Ex. 20** at 6-10.)

22

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

regulation are void. (Final Award at 46-47.) There is no way to reconcile this ruling with the unequivocal requirement in the Agreements that SBA regulations control in the case of any conflict with California law. The Arbitrator applied his own rough sense of justice in disregarding the SBA Regulations to avoid imposing what he perceived as a "disproportionately harsh penalty" on Womply (*id*. at 47)—rather than applying the contractual regime the Parties agreed would govern

This led the Ninth Circuit to affirm the vacatur of arbitration awards in *Aspic* and *American Postal*. *Aspic* involved a dispute between an Afghan subcontractor and a contractor, who was engaged by the U.S. government for construction projects in Afghanistan. 913 F.3d at 1164. The subcontracts between the parties incorporated federal regulations by reference, with those regulations governing the performance of the work and the requirements for obtaining compensation. *Id.* One of those regulations required the Afghan subcontractor to submit its documents supporting reimbursement in the English language, which it did not do. *Id*. at 1168. The arbitrator determined that strictly enforcing the regulatory requirements "would result in a forfeiture and unfairness" to the Afghan subcontractor. *Id*. The Ninth Circuit held that, "[b]y concluding that [the Afghan subcontractor] need not comply with the FAR requirements, the Arbitrator exceeded his authority and failed to draw the essence of the Award from the Subcontracts." *Id*. "The Award disregarded specific provisions of the plaint text in an effort to prevent what the Arbitrator deemed an unfair result." *Id*. "Such an award is 'irrational.'" *Id.*[7]

Similarly, as discussed above, *see supra* pp. 10-11, in *American Postal*, the Ninth Circuit considered the vacatur of an arbitral award that ordered the Postal Service to reinstate a former employee who participated in a strike. There, the arbitrator ordered reinstatement because he believed the "penalty of discharge" would be "too severe." 682 F.2d at 1284. In affirming vacatur, the Ninth Circuit held that the "district judge properly denied enforcement of the arbitrator's award" because reinstatement "would violate 5 U.S.C. s. 7311." *Id.* at 1286.

---

[7] The Ninth Circuit also emphasized that it is a "serious matter when an arbitral award determines that a (sub)contractor need not comply with the federal contracting regulations when no past practices demonstrate variation from those requirements." *Id*. at 1168. "To allow contractors and subcontractors, foreign or domestic, to evade the FAR provisions because a subcontractor was too unsophisticated or inexperienced to fully understand them would potentially cripple the government's ability to contract with private entities, and would violate controlling federal law." *Id*. at 1168-69.

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

Here, the SBA has determined that Agents, including lender service providers, may only receive compensation from a lender when the SBA has reviewed the agreements. It is undisputed that the SBA did not review the Agreements. The Arbitrator had no authority to override federal law and dispense his own brand of industrial justice. This Court must vacate the Final Award.

## II.    THE FINAL AWARD IS UNENFORCEABLE BECAUSE IT COMPELS BENWORTH TO VIOLATE PUBLIC POLICY.

"Judicial deference to an arbitrator's remedy is not required where a remedy violates an explicit, well-defined public policy." *Phoenix Newspapers, Inc. v. Phoenix Mailers Union Loc. 752, Int'l Bhd. of Teamsters*, 989 F.2d 1077, 1083 (9th Cir. 1993). "To vacate an arbitration award on public policy grounds, the court must find (1) an explicit, well-defined policy and (2) that the policy is one that specifically militates against the relief ordered by the arbitrator." *United Transp. Union*, 116 F.3d at 433. Examples of explicit, well-defined public policies include statutes, implementing regulations, and case law interpreting the statutes and regulations. *See Aramark Facility Servs. v. Serv. Emps. Int'l Union, Loc. 1877, AFL CIO*, 530 F.3d 817, 824 (9th Cir. 2008).

For the same reasons discussed above, *see supra*, Part I.C., the SBA Regulations (and the interpretations of those regulations) are explicit, well-defined policies that specifically militate against the relief ordered by the Arbitrator. Under similar circumstances, the Ninth Circuit has vacated awards on public policy grounds and this Court should do so here. *See, e.g.*, *Phoenix Newspapers*, 989 F.2d at 1083-84 (directing district court to vacate arbitral award that required the parties to agree on a higher wage rate in violation of a statute that required the parties to engage in only good faith bargaining); *see also supra*, p. 23 (discussing *American Postal* and *Aspic*).

## III.    THE ARBITRATOR IS GUILTY OF MISCONDUCT FOR REFUSING TO POSTPONE THE PROCEEDINGS UNTIL THE SBA COMPLETES ITS INVESTIGATION.

Courts may also vacate an arbitral award "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced[.]" 9 U.S.C. § 10(a)(3). "The arbitrary denial of a reasonable request for a postponement may serve as grounds for vacating an arbitration award." *Naing Int'l Enters. Ltd. v. Ellsworth Assocs., Inc.*, 961 F. Supp. 1, 3 (D.D.C. 1997). Although arbitrators are accorded a degree of discretion, "if the failure

24

of an arbitrator to grant a postponement or adjournment results in the foreclosure of the presentation of 'pertinent and material evidence,' it is an abuse of discretion." *Id.* Such is the case here.

There can be no dispute that the results of the SBA's investigation into Womply constitute pertinent and material evidence. The Agreements expressly contemplated that the SBA's determinations would be dispositive of any dispute. (*See* Referral Agreement, § 2.3 (providing that Womply shall return to Benworth any fees that the SBA "determines were not in compliance with applicable SBA and/or PPP Loan Program Requirements"); Order Form, § 2.3.) The SBA's investigation specifically concerned "the fees that Womply charged and its representations as to their nature and what services Womply rendered to earn them . . . ." (**Ex. 21** at Ex. A.) And the Arbitrator himself acknowledged that the results of the investigation may render any award "advisory." (*See* **Ex. 14** at 829:24 – 831:24.) The SBA's investigation would likely also produce material evidence as to whether Womply was a lender service provider. The SBA initiated its investigation of Womply in response to the Congressional Report, which concluded that Womply avoided characterizing itself as a lender service provider. (**Ex. 22** at 4-6.)

Womply argues that *Naing*—a case where the court vacated an award because the arbitrators refused to continue the arbitration pending the completion of an SBA investigation—has no application here because, in *Naing*, the record contained a date certain by when the SBA would complete its investigation whereas the SBA has not yet completed its investigation of Womply. (Motion at 11-12.) However, as *Naing* observed, "neither this Court nor the arbitration panel can allow the pursuit of an expedient adjudication to outweigh its obligation to ensure a just and fair one." 961 F. Supp. at 5-6.

Here, the Arbitrator allowed expediency to outweigh his obligation to ensure a fundamentally fair hearing. Despite acknowledging the materiality of the results of the SBA's investigation to the issues in the Arbitration and the prospect that those results could render his award "advisory," the Arbitrator refused to defer his ruling until the SBA completed its investigation of Womply. In so doing, the Arbitrator not only foreclosed Benworth from presenting pertinent evidence and material, but the Arbitrator also usurped the role of the SBA and granted himself the authority to make final policy decisions about one of the most unprecedented government relief programs in American history.

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion.

25

Dated: September 6, 2024.                    Respectfully submitted,

                                             */s/ Dwayne A. Robinson*
                                             Jorge L. Piedra (Florida Bar No. 88315)
                                             (*Pro Hac Vice*)
                                             jpiedra@kttlaw.com
                                             Dwayne A. Robinson (Florida Bar No. 99976)
                                             (*Pro Hac Vice*)
                                             drobinson@kttlaw.com
                                             Michael R. Lorigas (Florida Bar No. 123597)
                                             (*Pro Hac Vice*)
                                             mlorigas@kttlaw.com
                                             **KOZYAK TROPIN & THROCKMORTON**
                                             2525 Ponce de Leon Boulevard, 9th Floor
                                             Miami, Florida 33134
                                             Telephone: 305-372-1800

                                                          -and-

                                             Simon S. Grille (State Bar No. 294914)
                                             sgrille@girardsharp.com
                                             **GIRARD SHARP LLP**
                                             601 California Street, Suite 1400
                                             San Francisco, CA 94108
                                             Telephone: (415) 981-4800

                                             *Attorneys for Benworth Capital Partners, LLC*

---

26

OPPOSITION TO MOTION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT