EXHIBIT 1

# WILLKIE FARR & GALLAGHER LLP

One Front Street
San Francisco, CA 94111
Tel: 415 858 7400
Fax: 415 858 7599

December 21, 2022

**VIA JAMS ACCESS**

Alexander L. Brainerd, Esq.
JAMS, Inc.
Two Embarcadero Center
Suite 1500
San Francisco, CA 94111

Re: _Oto Analytics, Inc. d/b/a Womply v. Benworth Capital Partners LLC_, JAMS Ref. No. 1210038203

Dear Arbitrator Brainerd,

On behalf of Oto Analytics, Inc. d/b/a Womply (n/k/a Oto Analytics, LLC) ("**Womply**"), we write in further support of Womply's November 17, 2022 emergency request for permission to disclose Protected Material to a court in order to seek equitable and/or injunctive relief in connection with its claims in this Arbitration (the "**Emergency Request**").[1]  As explained in detail below, the new information provided by Benworth Capital Partners LLC ("**Benworth**") and Mr. Navarro makes clear that Benworth fraudulently transferred more than **_$171 million_** to Benworth Capital Partners PR LLC ("**Benworth PR**") at the outset of this Arbitration in order to prevent Womply from collecting the more than $154 million in fees it earned (the "**Disputed Fees**") under the parties' contracts.

## A.    Introduction

Womply is seeking an award in this Arbitration of almost $200 million from Respondent Benworth, which is comprised of approximately $154 million in Disputed Fees and approximately $41 million in contractual interest that continues to accrue.  In its Answer and Counterclaims, filed on October 1, 2022, Benworth claimed that it "has held any disputed fees **_in trust_** until its dispute with Womply . . . is resolved." (Answer and Counterclaims at 5.)  It also asserts two principal defenses.  **_First_**, Benworth claims that Womply's interpretation of the fee provisions in the parties' contracts is incorrect.  However, even if Benworth's interpretation is adopted, Benworth would still owe Womply approximately $88 million in fees and $24 million in contractual interest.  **_Second_**, Benworth claims that Womply is not entitled to the fees Benworth agreed to pay because Womply's fees exceed a cap set by the United States Small Business Administration.  Womply believes this argument is entirely without merit and has already been rejected by a federal court.  In any event, unless Benworth succeeds on its fee cap defense, it is a near certainty that Benworth will owe Womply substantial damages.

As detailed in Womply's Emergency Request, Womply later learned that Benworth was not holding the Disputed Fees in trust and instead had transferred the disputed fees to Benworth PR, a limited liability

---

[1] Capitalized terms not defined herein have the same meaning as in the Emergency Request.

Alexander L. Brainerd, Esq.
December 21, 2022
Page 2

company organized under the laws of Puerto Rico that is wholly owned by Bernardo Navarro and his wife, Claudia Navarro.  Mr. Navarro also is the CEO, founder, and owner of Benworth, and he testified at his October 26, 2022 deposition that Benworth could not satisfy a judgment against it of even $40 million, which is much less than the amount of the Disputed Fees.

By order of the Arbitrator, Womply took a short second deposition of Mr. Navarro on December 16, 2022, regarding Benworth PR.  On December 14, 2022, two days before the deposition, Benworth produced an Amended Loan Servicing Agreement, dated September 23, 2021, between Benworth and Benworth PR (the "**Amended LS Agreement**").  Womply promptly requested that Benworth produce the original agreement, and Benworth produced the original Loan Servicing Agreement, dated May 31, 2021 (the "**Original LS Agreement**," and together with the Amended LS Agreement, the "**LS Agreements**"), just 38 minutes before Mr. Navarro's December 16 deposition.

**B.      Benworth Fraudulently Transferred the Disputed Fees to Benworth PR.**

As discussed below, Womply has now learned that:  (i) Benworth transferred *all $171 million* to Benworth PR in the *summer of 2021*, *before* Benworth represented to the Arbitrator and Womply that it was holding the Disputed Fees "in trust;" (ii) this upfront payment was purportedly intended to compensate Benworth PR for providing services to Benworth that Benworth had previously performed in-house at a fraction of the cost; (iii) Benworth PR is engaged in the same business as Benworth, and it functions as little more than the San Juan, Puerto Rico office of Benworth; and (iv) Mr. Navarro oversees the operations of both Benworth and Benworth PR, but the Navarros gave majority ownership of Benworth PR to Ms. Navarro because it was in the best interest of the Navarro family.

Womply should be given relief from the Protective Order to protect its interest rights.  The purpose of the Protective Order is to allow the parties to engage in discovery without worrying that sensitive confidential information will be disclosed to third parties unnecessarily except under limited circumstances, or otherwise used for purposes other than in connection with the Arbitration.  It is not meant to serve as a shield to protect a party from liability for wrongdoing or (as is the case here) to allow a party to avoid scrutiny for fraudulently transferring assets to avoid a judgment.  Therefore, Womply should be permitted to disclose to a court of competent jurisdiction the information about Benworth's fraudulent transfers to Benworth PR that it obtained in discovery in this Arbitration only to the extent necessary to enforce its rights under its agreements with Benworth.

**1.      Benworth PR's Fees Were Determined by Mr. Navarro Alone and Are Not Reasonable for the Services Provided.**

Pursuant to the Amended Agreement, Benworth PR provides Benworth with certain limited administrative and loan servicing services.  Specifically, with respect to Benworth's PPP loans, Benworth PR agreed to:  (i) "communicate with borrowers to encourage them to apply for Forgiveness;" (ii) "monitor all fraudulent loan applications," "submit SBA OIG investigations," and "submit Suspicious Activity Reports to FINCEN of the United States Treasury Department;" (iii) "facilitate the response to all subpoenas and request for information from any and all governmental agency;" (iv) "submit fraudulent or non-performing loans to the United States Small Business Administration (SBA) for Guaranteed Purchase" (*i.e.*, for the SBA to purchase the loan pursuant to the SBA's guarantee);

Alexander L. Brainerd, Esq.
December 21, 2022
Page 3

(v) "administer servicing functions;" and (vi) "work with [Benworth's] customers who have submitted a Forgiveness Application to the SBA and are required by the SBA to provide additional information needed to the SBA to process the Forgiveness Application." (Ex. 1 (Amended LS Agreement) at 2–3.)

In return, Benworth agreed to pay Benworth PR a flat fee of $550 for each of Benworth's PPP loans, which is comprised of $500 for the loan forgiveness services and $50 for the fraud monitoring and guaranteed purchase services. (*Id.* at 6.) In addition, Benworth agreed to pay Benworth PR 65 basis points of the outstanding amount of a PPP loan for "loan Servicing." (*Id.*) The Amended Agreement also provides for additional potential fees. Specifically, if Benworth cancels "servicing," "a $50.00 fee per [PPP loan] cancelled shall apply in addition to the minimum servicing fee charge per file." (*Id.*) Benworth PR also has the ability to obtain fees at "an hourly rate of $75.00 to $250.00 per hour" for additional services, including "trial testimony, deposition testimony, travel and waiting time in litigation matters." (*Id.*)

Mr. Navarro admitted that he and his wife alone drafted the Agreements and that they did not receive guidance or advice from legal counsel or accountants. (Ex. 2 (Navarro Dep. Tr. Vol. II) at 11:17–12:9.) He also testified that none of the Benworth or Benworth PR employees reviewed the LS Agreements before they were executed. (*Id.* at 12:10–13.)

Mr. Navarro further testified that he developed the $550 per PPP loan fee structure himself by taking the "average" of quotes he received from four firms that offered to provide Benworth with the same services Benworth PR ultimately provided. (*Id.* at 13:20–14:13.) Three of those quotes were from Lendio ($150), Professional Bank ($250), and Lenders Cooperative ($395), and all three quotes were substantially less than the $550 per PPP loan fee that Mr. Navarro settled on. (*Id.* at 76:14–77:6.) Only one quote, from the large, well-known accounting firm BDO, was more than the $550 fee. (*Id.*) By including this outlier quote from a large accounting firm (neither Benworth PR nor any of the other vendors that provided quotes are large accounting firms), Mr. Navarro skewed the results of his "averaging" approach to obtain a higher rate for Benworth PR.



Benworth funded a total of approximately 311,000 PPP loans. (*Id.* at 34:6–8.) Therefore, at a rate of $550 per PPP loan, Benworth agreed to pay Benworth PR more than ***$171 million*** in fees pursuant to the LS Agreements. Had Benworth instead contracted with Lendio, it would have received the same services at a rate of $150 per PPP loan, for a total of approximately $47 million. What is more, Lendio

Alexander L. Brainerd, Esq.
December 21, 2022
Page 4

was *already* providing PPP-related services to Benworth (Ex. 3 (Navarro Dep. Tr. Vol. I) at 40:17–20), so it should have been relatively straightforward for Benworth to have Lendio provide these additional services for far less money than Mr. Navarro charged Benworth.

Mr. Navarro confirmed that, for certain relatively small PPP loans, Benworth pays Benworth PR more in fees to service the loans under the LS Agreements than Benworth received to fund the loans in the first place. For example, for making a $1,000 PPP loan, Benworth receives $500 in Lender Processing Fees from the SBA, but it pays Benworth PR $550 to service that same loan. (*See* Ex. 2 (Navarro Dep. Tr. Vol. II) at 36:14–37:4.) And this is before taking into account the fees Benworth agreed to pay Womply.[2] When asked why Benworth would enter into an agreement with Benworth PR in which it lost money, Mr. Navarro answered simply: "This is what this service commands for processing these type[s] of loans." (*Id.* at 37:5–12.) In other words, it is what Mr. and Ms. Navarro commanded Benworth pay Benworth PR for these services, because the fee structure was not the result of an arm's-length negotiation.

In addition to the $550 per PPP loan fee, Benworth PR also may be entitled to 65 basis points of the outstanding amount of Benworth's PPP loans. As Mr. Navarro explained, if a PPP loan is not forgiven, and Benworth becomes entitled to the 1.00% interest rate on a PPP loan provided for under the PPP, then Benworth will pay Benworth PR a rate of 0.65% per annum. (*Id.* at 77:23–78:15.) For the Womply-referred PPP loans, which have a principal amount of approximately $4 billion, this could be up to an additional $26 million in fees paid to Benworth PR. More importantly, it represents the entire amount of the interest Benworth is entitled to under the PPP. That is because PPP lenders like Benworth are entitled to borrow funds from the Paycheck Protection Program Liquidity Facility in order to fund PPP loans, and the interest rate on the loan to the lender is 35 basis points. (Ex. 4 (PPP Liquidity Facility Term Sheet) at 1 ("Extensions of credit under the Facility will be made at a rate of 35 basis points.").) Accordingly, after deducting the 35 basis points Benworth pays to borrow funds from the PPP Liquidity Facility, it keeps only 65 basis points for itself. But Benworth has agreed to pay that 65 basis points to Benworth PR under the LS Agreements. Thus, contrary to Benworth's counsel's statements at prior conferences with the Arbitrator, Benworth is not receiving interest payments that it can use to satisfy an award in this case. Any such interest will be paid to Benworth PR under the LS Agreements. Benworth also could receive additional fees for any servicing cancellation by Benworth, or if Benworth PR performs other services outside of the scope of the Agreements. Mr. Navarro testified that he was "not sure" whether Benworth had paid Benworth additional fees for out-of-scope services. (Ex. 1 (Navarro Dep. Tr. Vol. II) at 39:17–21.)

---

[2] Benworth's agreements with Womply also provide that, for some loans, Benworth will owe Womply more in fees than Benworth receives for funding the loan. However, Womply agreed that Benworth would never owe Womply more than it received for funding a loan, and Womply's damages claim in this Arbitration is consistent with that approach. By contrast, Mr. Navarro testified that he did not add any provision to the LS Agreements to ensure that Benworth would not lose money on its arrangement with Benworth PR. (Ex. 2 (Navarro Dep. Tr. Vol. II) at 37:17–22.)

Alexander L. Brainerd, Esq.
December 21, 2022
Page 5

      **2.**      ***Benworth Paid All Disputed Fees to Benworth PR Upfront in the Summer of 2021,*** <u>***Before***</u> ***Benworth Misrepresented It was Holding Disputed Fees "In Trust."***

Had Benworth paid Womply all of its fees, Womply estimates that Benworth would have retained approximately $61 million in Lender Processing Fees from the federal government for funding Womply-referred PPP loans (not including interest received on the PPP loans). However, because Benworth is withholding approximately $154 million from Womply in Disputed Fees, that means Benworth should have had at least $215 million in its possession.

In his second deposition on December 16, 2022, Mr. Navarro testified that Benworth paid Benworth PR the ***full $171 million in the summer of 2021***.

> Q.  We discussed earlier that Benworth Florida was paying Benworth Puerto Rico $550 per loan on 311,000 loans.  That's $171 million.  ***Did Benworth Florida pay $171 million to Benworth Puerto Rico in 2021***?
>
> A.  Possibly.
>
> Q.  To the best of your knowledge, did it?
>
> A.  To the best of my knowledge, ***yes***.

(Ex. 2 (Navarro Dep. Tr. Vol. II) at 54:11–22 (emphasis added).)

> Q.  ***So all of the payments from Benworth Florida to Benworth Puerto Rico happened in the summer of 2021***?
>
> A.  ***Yes***.

(*Id.* at 56:4–7 (emphasis added).)

This is significant for at least four reasons.  ***First***, it reflects the Navarros' desire to move money out of Benworth as quickly as possible.  Instead of paying fees to Benworth PR as the services are provided over many months or even years, Benworth paid the full amount of the fees upfront at approximately the same time this Arbitration was commenced.  Indeed, Mr. Navarro testified that Benworth PR is monitoring only 89,000 PPP loans for fraud (*id.* at 81:5–8), but Benworth has paid Benworth PR its fees for monitoring fraud for ***all 311,000*** of Benworth PPP loans:

> Q.  And did Benworth Florida pay Benworth Puerto Rico $550 per loan for all 311,000 PPP loans?
>
> A.  Yes.

(*Id.* at 34:9–12.)  And Mr. Navarro, the CEO of Benworth, did not even know if Benworth had received invoices from Benworth PR.  (*Id.* at 55:3–5.)

Alexander L. Brainerd, Esq.
December 21, 2022
Page 6

**Second**, it means that Benworth should have been left with approximately $44 million in Lender Processing Fees ($215 million – $171 million = $44 million), but Mr. Navarro testified that Benworth would not be able to satisfy an award against it in this Arbitration of even $40 million. (Ex. 3 (Navarro Dep. Tr. Vol. I) at 167:20–23.) It is unclear what happened to the rest of the money, but Mr. Navarro could not answer how much money Benworth paid Benworth PR in 2022. (Ex. 2 (Navarro Dep. Tr. Vol. II) at 53:25–54:4.)

**Third**, it establishes that Benworth's representation to the Arbitrator and Womply in its October 1, 2021 Answer and Counterclaims that Benworth was holding the Disputed Fees "in trust" was false when it was made. By that time, Benworth had already transferred the Disputed Fees to Benworth PR in the summer of 2021.

**Fourth**, it shows that certain of Mr. Navarro's testimony at his first deposition on October 26, 2022, was false. He testified then that Benworth paid Benworth PR approximately $110 million in 2021 and at least $60 million in 2022. (Ex. 3 (Navarro Dep. Tr. Vol I) at 170:13–21, 171:19–172:10.) He also testified that the "in trust" representation in Benworth's Answer and Counterclaims was true when it was made on October 1, 2021:

> Q. It reads, "Since Womply refused to uphold its promise, and given the earlier fraudulent loans, Benworth has held any disputed fees in trust until its dispute with Womply, including the matter of the fraudulent loans, is resolved." Do you see that?
>
> A. I do.
>
> Q. That's not true, is it?
>
> A. **At the time of this document it was**. We've had to use those loans for different matters.

(Ex. 3 (Navarro Dep. Tr. Vol. I) at 191:25–192:11 (emphasis added).) In fact, Mr. Navarro has now admitted that Benworth transferred all of the Disputed Fees (and more) to Benworth PR in the summer of 2021, at the very outset of this Arbitration and before Benworth filed its Answer and Counterclaims.

### 3. Benworth Could Have Performed All of the Services It Outsourced to Benworth PR, Which Is Effectively Benworth's Puerto Rico Office.

There is substantial evidence that Benworth PR is little more than Benworth's Puerto Rico office. In the Amended LS Agreement, both Benworth and Benworth PR are described as a "mortgage lender/servicer" (Ex. 1 at 1), and Mr. Navarro testified that, like Benworth, Benworth PR originates mortgage loans. (Ex. 2 (Navarro Dep. Tr. Vol. II) at 53:15–20.) In addition, after Benworth PR was formed, the Navarros gave raises to four Benworth employees to perform similar functions at Benworth PR. (*Id.* at 89:6–11.) The website www.benworthcapital.com also lists both Benworth's Florida address and Benworth PR's Puerto Rico address as points of contact; it also does not differentiate between

Alexander L. Brainerd, Esq.
December 21, 2022
Page 7

Benworth and Benworth PR, and it refers to Benworth PR as Benworth's "office in San Juan, Puerto Rico." (Ex. 5.)

Mr. Navarro testified that he formed Benworth PR because he wanted to "start doing business in Puerto Rico." (Ex. 2 (Navarro Dep. Tr. Vol. II) at 10:2–6.)  However, his testimony also confirms that a primary purpose for creating Benworth PR was to siphon money out of Benworth for the benefit of the Navarro family.  He testified that he and Ms. Navarro executed the Original LS Agreement pursuant to which Benworth would pay Benworth PR at least $550 per PPP loan on or around *May 31, 2021*—almost a month *before* they formed Benworth PR.  (*Id.* at 8:22–9:2.)  This makes clear that moving money out of Florida was a principal reason for forming Benworth PR.

Mr. Navarro also could not provide a valid justification for why Benworth outsourced services to Benworth PR for more than $171 million instead of performing those services itself at a fraction of the cost.  His only explanation for outsourcing the services was that he and his family moved to Puerto Rico in June 2021.  (*Id.* at 15:13–22 ("We were moving to Puerto Rico").)  But simply moving to Puerto Rico, for whatever reason, is not a valid justification for having Benworth outsource services that Benworth could have performed in Florida.  Indeed, Mr. Navarro confirmed that, even now a year and a half after he moved to Puerto Rico, he continues to serve as the CEO of Benworth in Florida, which still exists and has employees.  (*Id.* at 65:17–66:2.)  In fact, he testified that he performs all of his work for Benworth in Florida from Puerto Rico:

> Q.  How often do you go back to Florida?
>
> A.  Only for depositions.
>
> Q.  You don't go back to Florida to work at Benworth Florida?
>
> A.  I work from Puerto Rico.

(*Id.* at 60:3–8.)

It also is undisputed that Benworth could have performed these services itself.  Mr. Navarro testified that, before Benworth PR was formed in June 2021, Benworth serviced the PPP loans itself.  (*Id.* at 47:14–49:10.)  After Benworth entered into the LS Agreements, those services were provided by Benworth PR.  But, given that Benworth PR is effectively the Puerto Rico office of Benworth in Florida, Benworth had to conduct a "Transfer Pricing Analysis" in 2022 to determine "what functions were performed by what entity." (*Id.* at 49:16–20.)  That analysis determined that "86 percent of the work to process and service PPP loans was performed" by Benworth PR, and the remaining 14 percent was performed by Benworth.  (*Id.* at 46:6–48:6.)  There is no valid reason for Benworth to outsource loan servicing to Benworth PR at exorbitant rates, causing Benworth to lose money on certain PPP loans, when Benworth had been performing those services previously.

Alexander L. Brainerd, Esq.
December 21, 2022
Page 8

### 4. Mr. Navarro Confirmed He Operates Benworth PR, Despite His Initial Claim to be a "Consultant."

At his first deposition, Mr. Navarro described his role at Benworth PR as that of a "consultant." (Ex. 3 (Navarro Dep. Tr. Vol. I) at 173:12–16.) He also testified that Ms. Navarro was Benworth PR's CEO and that she managed the operations of the Puerto Rico entity. (*Id.* at 172:12–22.)

However, after being confronted with conflicting testimony from Toya de la Cruz (a former Benworth employee who now works for Benworth PR), Mr. Navarro changed his tune. Ms. de la Cruz testified that all of the employees at Benworth PR reported to Ms. de la Cruz, who in turn reported to Mr. Navarro. (Ex. 6 (de la Cruz Dep. Tr.) at 29:3–6, 155:8–17.) She further testified that she had no idea what Ms. Navarro did at Benworth PR other than handle some "paperwork." (*Id.* at 156:16–24.) At his second deposition, Mr. Navarro confirmed Ms. de la Cruz's testimony that all Benworth PR employees effectively report to Mr. Navarro, with the exception of Ms. Navarro and the accountant with whom Ms. Navarro works. (Ex. 2 (Navarro Dep. Tr. Vol. II) at 67:20–24.) Mr. Navarro also confirmed that he oversees the operations of Benworth PR's business, like he does for Benworth in Florida:

> Q. What are your job responsibilities at Benworth Puerto Rico?
>
> A. Oversee the operations of the business.
>
> …
>
> Q. What are your job responsibilities at Benworth Florida?
>
> A. I manage the day-to-day operations of Benworth Florida.
>
> Q. You also oversee the operations of the business of Benworth Florida?
>
> A. I do.

(*Id.* at 65:10–23.) Mr. Navarro further testified that he is authorized to write checks for Benworth PR, and that he has authorized transfers out of Benworth PR's bank accounts. (*Id.* at 56:18–23.)

This confirms that Mr. Navarro stands on both sides of the transactions he engineered between Benworth and Benworth PR. His initial claim that Ms. Navarro manages the operations of Benworth PR, which was false, was a poor attempt to suggest that Benworth and Benworth PR are at arms' length. They plainly are not.

### 5. The Purpose of Forming Benworth PR Was to Transfer Assets from Benworth to Mr. Navarro's Wife, Claudia Navarro, for the Benefit of the Navarro Family.

At his first deposition, Mr. Navarro testified that he is the sole owner of Benworth, and that his wife owns 99.95% of Benworth PR and he owns the remaining 0.05%. (Ex. 3 (Navarro Dep. Tr. Vol. I) at 15:2–4, 169:18–170:5.) At his second deposition, Mr. Navarro testified that Ms. Navarro in fact owns 99% of Benworth PR and he owns the remaining 1%. (Ex. 2 (Navarro Dep. Tr. Vol. II) at 62:6–15.) In

Alexander L. Brainerd, Esq.
December 21, 2022
Page 9

any event, it is clear that Benworth PR was formed for the purpose of transferring assets from Benworth, which is controlled by Mr. Navarro, to Ms. Navarro in an attempt to shield them from Womply and to keep them within the Navarro family. Mr. Navarro testified that the primary reason he and his wife put Benworth PR under the control of Ms. Navarro was for "family planning" and for the "betterment" of the Navarro family.

> Q. Why did you structure the ownership that way?
>
> A. Family planning.
>
> Q. I don't understand. What does that mean?
>
> A. That means my wife and I got together and ***for the betterment of our family and the future of my children, that is what I mean, that is how we structured the company***.

(*Id.* at 62:21–63:6 (emphasis added.)

### 6.    *It is Unclear Whether Benworth PR Still Has the Disputed Fees.*

Mr. Navarro claimed not to know important information about Benworth PR's finances. For example, he claimed not to know Benworth PR's cash holdings, whether Benworth PR still has the Disputed Fees, whether Benworth PR has sufficient assets to unwind the transfer of funds from Benworth, or Benworth PR's operating revenue. (*Id.* at 51:19–52:17, 56:12–15.) Mr. Navarro's purported lack of knowledge regarding Benworth PR's finances is not credible, given that Mr. Navarro "[o]versee[s] the operations of the business," (*id.* at 65:12–13), Benworth PR is effectively Benworth's San Juan office, Mr. Navarro and his wife own 100% of Benworth PR, he formed Benworth PR for the betterment of his family, and Benworth PR is likely the most valuable asset the Navarros own as a result of the fraudulent transfers from Benworth.

In any event, Mr. Navarro disclosed that Benworth PR has distributed money to Mr. and Ms. Navarro. However, when he was asked how much was distributed, Benworth's counsel repeated its earlier improper discovery conduct and instructed Mr. Navarro not to answer:

> Q. Did you make any payments to entities controlled by you or Mrs. Navarro?
>
> A. Yes.
>
> Q. What entities?
>
> A. Personal.
>
> Q. Payments specifically to you and Mrs. Navarro?
>
> A. Yes.

Alexander L. Brainerd, Esq.
December 21, 2022
Page 10

Q.  And you authorized them?

A.  She did.

Q.  And how much in payments did you receive from Benworth Puerto Rico?

**Mr. Piedra:**  Instruct not to answer.  Privacy grounds.  Outside the scope of what the Arbitrator ordered for this proceeding.

Q.  I disagree with that, but are you going to follow your counsel's instruction[?]

A.  I am.

Q.  And how much in payments did you authorize Benworth Puerto Rico to pay to Mrs. Navarro?

**Mr. Piedra:**  Same instruction, same grounds.

Q.  Are you going to follow your counsel's instruction?

A.  Yes.

. . .

Q.  Excluding payments to you and Mrs. Navarro personally, did you transfer or make any funds or make any payments to entities controlled by you or Mrs. Navarro?

**Mr. Piedra:**  Same instruction, same grounds.  Outside the scope and privacy and relevancy.

Q.  Are you going to follow your counsel's instruction?

A.  I am.

(*Id.* at 57:8–58:12, 59:6–16.)

Accordingly, it is unclear whether Benworth PR still possesses the Disputed Fees transferred from Benworth, or whether those fees have been transferred to the Navarros or entities controlled by the Navarros.

Alexander L. Brainerd, Esq.
December 21, 2022
Page 11

## C.    Request for Relief from the Protective Order

It is beyond dispute that Benworth fraudulently transferred the Disputed Fees to Benworth PR in a sham transaction designed to leave Benworth depleted of assets and unable to satisfy an award against it in this Arbitration.  As the Arbitrator recognized at the December 7, 2022 conference regarding the Emergency Request, Womply is entitled to seek equitable and/or injunctive relief under the parties' arbitration agreement.  That could include a claim to unwind the transfer of the Disputed Fees to Benworth PR as a fraudulent transaction, as well as a motion for an attachment of assets pending a decision on the merits in this Arbitration.  Even if Womply did not pursue those options now, and Womply received an award in this case (which Mr. Navarro testified Benworth could not satisfy), Womply would have to pursue Benworth PR and the Navarros in a court of competent jurisdiction to execute the award.

Womply should not be prevented from enforcing its rights in a court of law to preserve the Disputed Fees or to execute an award in this Arbitration under the guise of preserving confidentiality.  This is especially so when the information at issue does not concern sensitive personal or business information. The Protective Order in this case broadly defines "Confidential Information" to include any "information, documents, or testimony not previously disclosed to the public."  That is the only reason Benworth is able to designate information about the fraudulent transfers as confidential.

The Arbitrator also suggested that Womply identify exactly which Protected Material it wanted to disclose to a court.  While the amount of Protected Material Womply needs to disclose to a court may be limited, Womply cannot predict all of the information it would need to disclose in order address any arguments Benworth may make in opposition.  Womply also expects that, to the extent the Arbitrator allows Womply to disclose some Protected Material to a Court, Benworth will request that it too be allowed to use Protected Material to defend itself against any claim asserted by Womply.  Therefore, Womply respectfully requests that the Arbitrator allow both parties to disclose Protected Material to a Court only to the extent necessary to prosecute and/or defend against any claims asserted in furtherance of the parties' rights under their agreements.  That approach will give equal treatment to both sides, but will also allow both sides the opportunity to assert all claims and defenses available to them in any such action.  However, if the Arbitrator prefers that Womply identify the Protected Information it believes it would need to disclose to a court to enforce its rights, Womply will do so upon the Arbitrator's request.

We are available for an additional conference on this issue if the Arbitrator believes it would be helpful.

Respectfully submitted,

*/s/ Alexander L. Cheney*

Alexander L. Cheney

cc:    Joshua S. Levy
       Corali Lopez-Castro
       Jorge Piedra
       Simon Grille