# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PHILIP VON KAHLE, in his capacity as assignee for the benefit of the creditors of COEX COFFEE INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> CARGILL, INC., <br><br> Defendant. | : <br> : <br> : <br> : <br> : <br> : <br> :     Case No. 21-CV-08532-AT <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

**FIRST AMENDED COMPLAINT**

Philip von Kahle ("Plaintiff"), in his capacity as assignee for the benefit of creditors of Coex Coffee International, Inc. ("Coex Miami"), alleges the following:

**SUMMARY OF THE ACTION**

1. In July 2020, Coex Miami, a business that bought and sold coffee in Miami, Florida, initiated an insolvency proceeding in Florida state court known as an assignment for the benefit of creditors, which is a state-law governed alternative to the federal bankruptcy system. More than sixty of Coex Miami's creditors have filed claims against the assignment estate seeking to recover more than $220 million.

2. This is an action by the assignee to avoid three limited guarantees and to avoid and recover $91,593,168.18 in transfers – both actually and constructively fraudulent transfers – made by Coex Miami to Defendant Cargill, Inc. ("Cargill"), a privately held global food corporation with headquarters in Minnesota, for the benefit of all of Coex Miami's creditors.

3. Corporación Coex, Inc.'s ("Coex Panama") is a Panamanian corporation owned and controlled by Raul Alvarez and Alfredo Romero, who are brothers to Coex Miami's two

principals, Ernesto Alvarez and Ernesto Romero, respectively. Coex Panama and Coex Miami do not have a parent-subsidiary relationship. The two companies are separate and distinct entities with no common ownership.

4. In late 2014, Coex Panama and Cargill engaged in certain over-the-counter commodity swap transactions. By the following year, Coex Panama was indebted to Cargill for millions of dollars in connection with those trades.

5. This action alleges that from December 29, 2015 through and including May 29, 2020, Coex Miami satisfied more than $91 million of Coex Panama's speculative trading debts to Cargill by actually defrauding Coex Miami's institutional lenders and constructively defrauding all of Coex Miami's creditors. Because Coex Miami was insolvent during that time, it used fictitious purchase orders to falsely represent to its lenders that it was requesting more than $91 million in loan proceeds to purchase coffee and resell it, which was Coex Miami's core business. In truth and in fact, the funds were not used to purchase coffee, but instead were disbursed directly to Cargill to satisfy Coex Panama's trading debts to Cargill.

6. To further hinder, delay, and defraud Coex Miami's creditors, Coex Miami executed limited guarantees with Cargill that purported to guarantee the payment of millions of dollars owed by Coex Panama to Cargill. Plaintiff seeks to avoid those limited guarantees as actually fraudulent because they hindered, delayed, and defrauded Coex Miami's creditors. Plaintiff also seeks to avoid the limited guarantees as constructively fraudulent because Coex Miami received no consideration or reasonably equivalent value in exchange for them.

7. Coex Miami's conduct has also revealed multiple "badges of fraud" demonstrating that Coex Miami's intent was to hinder, delay, and defraud its creditors, such as: (*i*) more than $91 million in transfers for the benefit of a company owned and controlled by two family

2

members/insiders of Coex Miami's principals; (*ii*) no apparent business purpose or justification for entering into the limited guarantees or making the transfers; (*iii*) concealment of the limited guarantees and the transfers from Coex Miami's creditors and auditor; (*iv*) facilitation of the scheme by means of fictitious purchase orders; (*v*) the lack of consideration or reasonably equivalent value given to Coex Miami in exchange for undertaking the limited guarantees or the transfers; (*vi*) the noisy withdrawal by the company's auditor; (*vii*) tens of millions of dollars transferred to Cargill in excess of the explicit financial limits in the guarantees; and (*viii*) Coex Miami's precarious financial situation at the time, which was either already insolvent or rendered insolvent as a result of the limited guarantees and/or the transfers.

8.      Plaintiff, as assignee of Coex Miami, therefore seeks to (*i*) avoid the three limited guarantees between Coex Miami and Cargill, and to (*ii*) avoid and recover more than $91 million in transfers from Coex Miami to Cargill that were made to satisfy Coex Panama's trading debts to Cargill.

## THE PARTIES, JURISDICTION, AND VENUE

9.      Plaintiff is a citizen of the State of Florida and the assignee for the benefit of creditors of Coex Miami.

10.      Coex Miami is also a citizen of the State of Florida because it is a Florida corporation with its principal place of business in Miami-Dade County, Florida.

11.      On July 2, 2020, Coex Miami executed an assignment for the benefit of creditors (the "Assignment") pursuant to Fla. Stat. § 727.101 *et seq.* in Circuit Court for the 11th Judicial Circuit of Florida in Miami-Dade County in favor of Plaintiff whereby it assigned all of its assets to Plaintiff to be liquidated for the benefit of creditors.

12.      Plaintiff accepted such Assignment on July 2, 2020 and a petition for assignment for benefit of creditors was filed with the Clerk of the Court for the 11th Judicial Circuit of Florida

3

in Miami-Dade County on July 7, 2020, thereby commencing an assignment for the benefit of creditors proceeding pursuant to Fla. Stat. § 727.101 *et seq.* and initiating the case styled *In re Coex Coffee International, Inc.*, Case No. 20-014293 CA 10 (the "Assignment Proceeding").

13.     Plaintiff has standing to bring this action pursuant to Fla. Stat. §§ 727.108(2), 727.109(8) & 727.110(1).

14.     Defendant Cargill is a Delaware corporation with its principal place of business in Minneapolis, Minnesota.

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of the parties and the amount in controversy exceeds $75,000.

16.     Cargill has consented to the personal jurisdiction of this Court because Cargill has argued in a prior case brought by Plaintiff against Cargill in Circuit Court for the 11th Judicial Circuit of Florida in Miami-Dade County that a forum selection clause in three limited guarantees that are at issue in this action is mandatory. That clause provides that: "Each of the Guarantor [Coex Miami] and the Counterparty [Cargill] hereby agrees that any United States Federal court sitting in the City of New York, borough of Manhattan shall have jurisdiction to settle any disputes which may arise in conjunction with this guarantee."

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the forum selection clause that Cargill previously claimed was mandatory provides that any disputes between the parties shall be heard in this District.

### GENERAL ALLEGATIONS

**A.     Coex Miami's Coffee Business**

18.     Coex Miami was in the business of purchasing coffee from growers around the world and selling that coffee to major suppliers such as Keurig and Starbucks.

19. Coex Miami was owned in trust for the benefit of Ernesto Alvarez and Ernesto Romero, who functioned as Coex Miami's officers and directors, including as the company's President.

20. To keep its business running, Coex Miami relied on lines of credit from various institutional lenders that in the aggregate typically exceeded $260 million. Coex Miami used this financing to (*i*) purchase of coffee from overseas, (*ii*) ship and store coffee inventory, and later (*iii*) to sell coffee to third parties.

21. Coex Miami frequently asked its lenders for loans to fund "pre-export advances," which are loans used to pay for coffee that was not ready to ship. Coffee beans at this stage may still be growing, or may require processing by the grower, before they are ready to ship to Coex Miami and then ultimately to an end-user that makes coffee products.

22. As a result, a request from Coex Miami for a pre-export advance from one of its lenders would not be supported by a warehouse receipt or bill of lading, which would serve as proof of the coffee's existence.

23. As part of its business buying and selling coffee, Coex Miami also conducted derivatives trades with Cargill. The purported purpose of those trades was to hedge against fluctuations in the price of coffee, which are inherent risks in the coffee importation business due to long timeframes associated with growing, processing, and delivering coffee to customers.

**B.     Coex Panama and its Trading Relationship with Cargill**

24. Coex Panama is a Panamanian corporation. At all times relevant, it was owned and controlled by Alfredo Romero and Raul Alvarez.

25. Raul Alvarez and Alfredo Romero are brothers to Coex Miami's two principals: Ernesto Alvarez and Ernesto Romero, respectively.

26. Coex Panama began trading over-the-counter derivatives with Cargill in 2014 pursuant to a Master Over-The-Counter Products Agreement dated November 3, 2014.

27. Coex Miami is not a party to the Master Over-The-Counter Products Agreement dated November 3, 2014 between Cargill and Coex Panama.

28. An over-the-counter derivative is a private contract negotiated between parties outside a national exchange or other type of formal intermediary.

29. Upon information and belief, the over-the-counter derivatives utilized by Coex Panama and Cargill largely consisted of commodity swap contracts.

30. Generally speaking, a commodity swap contract is a type of derivative contract where two parties agree to exchange cash flows dependent on the price of an underlying commodity, in this case, coffee.

31. The relationship between Coex Panama and Cargill was primarily managed by Cargill's risk management division ("CRM"). Through CRM, Cargill facilitated and managed all swap contracts and trading activity between Cargill and Coex Panama.

32. Pursuant to their trading relationship, Coex Panama was often required to transfer funds to Cargill to cover: (*i*) collateral threshold requirements set by Cargill; (*ii*) Cargill's margin calls; and (*iii*) to settle trades with Cargill. These financial obligations are discussed further below.

33. *Collateral threshold requirements.* Cargill from time to time would adjust Coex Panama's collateral threshold, which functioned essentially as Coex Panama's unsecured trading credit line with Cargill. Because the collateral threshold set the level of unsecured exposure Cargill would allow Coex Panama to maintain, the credit team within Cargill allegedly conducted its own independent analysis of Coex Panama's creditworthiness when setting the collateral threshold.

34.     *Margin calls*. When Coex Panama's daily mark-to-market trading activities exceeded the collateral threshold, Cargill made a margin call on Coex Panama.  A margin call required Coex Panama to provide sufficient cash to reduce its trade exposure to Cargill at or below the collateral threshold.  Once called by Cargill, margin payments had to be transferred to Cargill by the following business day.  Margin calls were issued by Cargill in the form of a daily position report emailed to the customer.

35.     *Settling trades*. Additionally, Coex Panama was also obligated to pay Cargill when trades settled and Coex Panama was indebted to Cargill in excess of the margin payments collected by Cargill throughout the duration of the trade.

**C.     Coex Miami Actually and Constructively Defrauded its Creditors to Pay Cargill for Coex Panama's Trading Debts to Cargill**

36.     As early as July 2015, Coex Panama incurred millions of dollars of trading obligations to Cargill.  To satisfy these obligations, Coex Panama sometimes utilized its own funds to pay Cargill.

37.     However, beginning in December 2015, Coex Miami fraudulently transferred funds to Cargill to satisfy Coex Panama's trading debts to Cargill.

38.     As set forth in **Exhibit 1** to this Amended Complaint, from December 29, 2015 through and including May 29, 2020, Coex Miami transferred a total of $91,593,168.18 to Cargill to satisfy Coex Panama's trading obligations to Cargill (collectively, the "Transfers"). The Transfers, as is explained below, fall into two related but distinct categories: the Pre-Export Advance Transfers (Transfers 1-90) and the Coex Miami Operating Account Transfers (Transfers 91-93).

7

### 1.     The Pre-Export Advance Transfers

39.     All of the Pre-Export Advance Transfers were initiated by Coex Miami by means of fabricated and fictitious purchase orders for phantom pre-export orders of coffee. Coex Miami submitted the fictitious purchase orders to its lenders to fraudulently induce them to loan Coex Miami money. In total, $89,583,153.96 was transferred from Coex Miami's loan accounts directly to Cargill to payoff Coex Panama's trading debts to Cargill.

40.     The Pre-Export Advance Transfers were both actually fraudulent and constructively fraudulent.

41.     The loan terms for four of Coex Miami's lenders – Bank Leumi, Professional Bank, Banesco, and Synovus – required that any loan proceeds be used to buy actual coffee because the coffee served as the lenders' collateral for each respective loan. The loan terms did not permit Coex Miami to use loan proceeds to pay Cargill for Coex Panama's debt to Cargill.  For example:

a.     The Bank Leumi loan documents state that: "The Revolving Loans shall be available exclusively for the Borrower's short-term trade financing of the import of green coffee beans and sale thereof . . . ." (Oct. 1, 2014 Amendment to Revolving Credit Agreement);

b.     The Professional Bank loan documents state that loan proceeds were "for Borrower's purchase of coffee bean inventory not yet subject to Sales Contracts" (Credit Agreement Dated as of February 14, 2018);

c.     The Banesco loan documents state that loan advances are "in conjunction with financing coffee purchases, financing Borrower's Ex-Dock coffee sale account receivables, financing inventory against non-negotiable warehouse receipts, and financing Borrower's issuance of letters of credit as set forth in the Loan Agreement" (2016 Modification of Revolving Credit Line of Credit Promissory Note); and

8

d.     The Synovus loan documents state that "[t]he Borrower shall use the proceeds of the Revolving Loan to finance up to eighty percent (80%) of the cost of Borrower's purchase of coffee inventory for sale and delivery to Designated Accounts . . . ." (Revolving Credit Agreement dated January 6, 2012).

42.     The loan proceeds from Bank Leumi, Banesco, Professional Bank, and Synovus identified in **Exhibit 1** were not used to purchase coffee, but were sent to Cargill to pay for Coex Panama's trading debts to Cargill.

43.     BICSA's loan terms stated that "[e]ach Advance may be used only for the purposes specified in its corresponding Advance Request" which must identify "the use or uses which will be made of the funds requested."  (Line of Credit Agreement and Promissory Note dated January 27, 2014). All of the Advance requests submitted to BICSA claimed that the requested funds would be used to purchase coffee, which was not true because the funds were sent to Cargill to pay for Coex Panama's trading debts to Cargill.

44.     The purchase orders submitted to Coex Miami's lenders were fictitious because they falsely represented that Coex Miami would use the requested loan proceeds to purchase coffee from a particular company or grower in a specified amount, at a specified price, and for delivery within a specified timeframe.

45.     All of the fictitious purchase orders were for the purchase of coffee from a Coex Panama-related entity, such as Coex (Guatemala) S.A., Coex Honduras, S.A. DE C.V., and Comercial Exportadora, S.A.

46.     In truth and in fact, none of the purchase orders submitted by Coex Miami to its lenders requesting funds to purportedly purchase coffee for Pre-Export Advance Transfers were ever contemplated as actual, legitimate business transactions. The documents supporting those

9

transactions were created by Coex Miami to trick Coex Miami's lenders into loaning money to Coex Miami that the lenders believed would be secured by Coex Miami's purchase of actual coffee.

47. In truth and in fact, Coex Miami never paid any of the vendors identified on the fictitious purchase orders submitted to Coex Miami's lenders supporting Pre-Export Advance Transfers for the coffee described on those purchase orders with the funds Coex Miami requested from its lenders.

48. In truth and in fact, Coex Miami's books and records show that Coex Miami never even purchased nor received some of the coffee described on the fictitious purchase orders supporting the Pre-Export Advance Transfers. In particular, there are no shipping or transportation records in Coex Miami's books and records showing that the coffee in the fictitious purchase orders supporting the Pre-Export Advance Transfers was ever transported or delivered as it would have been had the purchase orders reflected actual, legitimate purchases of coffee from overseas.

49. The fictitious purchase orders supporting the Pre-Export Advance Transfers were also not maintained in the same way as other, legitimate purchase orders were maintained in Coex Miami's books and records. The purchase order numbers assigned to the fictitious purchase orders were assigned by Tradepag:TRM ("TRM"), the enterprise accounting software used by Coex Miami, and were at times reused for other purchase orders, thereby making it more difficult to identify and trace the fictitious purchase orders. By comparison, actual, legitimate transactions supported by purchase orders were regularly kept and maintained on TRM in the regular course of business and those legitimate transactions are supported by records demonstrating how the coffee was transported, when it was delivered, and when Coex Miami was compensated after it sold the coffee that had been imported.

10

### 2. The Coex Miami Operating Account Transfers

50. Three transfers totaling $2,010,014.22, labelled the Coex Miami Operating Account Transfers in **Exhibit 1**, were sent from Coex Miami's operating account at Bank of America to Cargill for payment of Coex Panama's debt to Cargill. The Coex Miami Operating Account Transfers were both actually fraudulent and constructively fraudulent.

51. Unlike the Pre-Export Advance Transfers, the Coex Miami Operating Account Transfers were not supported by the fictitious purchase order scheme which was at the heart of the Pre-Export Advance Transfer scheme. The presence of multiple badges of fraud nonetheless demonstrate that the Coex Miami Operating Account Transfers were actually fraudulent, such as: (*i*) the transfers were for the benefit of family members and insiders; (*ii*) there was no consideration or value exchange for the transfers; (*iii*) there was no legitimate business purpose for the transfers; (*iv*) the true purpose of the transfers was concealed from the company's auditors; and (*v*) Coex Miami was insolvent at the time of the transfers.

52. Coex Miami did not receive reasonably equivalent value in exchange from Cargill for the Coex Miami Operating Account Transfers.

53. In addition, as explained *infra*, Coex Miami was insolvent at the time Coex Miami made the Transfers.

### D. The Limited Guarantees

54. In furtherance of the scheme to defraud Coex Miami's creditors, Coex Miami and Cargill entered into three limited guarantees (collectively the "Limited Guarantees") that guaranteed the payment of millions of dollars of Coex Panama's debt to Cargill.

55. The first limited corporate guarantee between Cargill and Coex Miami is dated April 1, 2016 (the "April 2016 Limited Guarantee") and is attached hereto as **Exhibit 2**. The April

11

2016 Limited Guarantee caps Coex Miami's liability to a maximum aggregate amount of $6 million.

56.     The second limited corporate guarantee between Cargill and Coex Miami is dated December 15, 2016 (the "December 2016 Limited Guarantee") and is attached hereto as **Exhibit 3**. The December 2016 Limited Guarantee caps Coex Miami's liability to a maximum aggregate amount of $9,250,000.

57.     The third and final limited corporate guarantee between Cargill and Coex Miami is dated January 8, 2020 (the "January 2020 Limited Guarantee") and is attached hereto as **Exhibit 4**. The January 2020 Limited Guarantee limits Coex Miami's liability to a maximum aggregate amount of $14,750,000.

58.     All three of the Limited Guarantees:

     a.     Are "continuing", "unconditional guarantees";

     b.     Are "guarantee[s] of payment and not a guarantee of collection";

     c.     State that the consideration for the guarantee is the "Master Over-The-Counter Products Agreement dated as of November 3, 2014, by and between Corporación Coex, Inc. (hereinafter "Subsidiary") and Cargill, Incorporated (hereinafter "Counterparty")"; and

     d.     Limit Coex Miami's aggregate liability to a specific amount: "In no event shall [Coex Miami]'s liability under this guarantee exceed the maximum aggregate amount of [$6 million for the April 2016 Limited Guarantee, $9,250,000 for the December 2016 Limited Guarantee, and $14,750,000 for the January 2020 Limited Guarantee], including accrued interest and the reasonable and properly documented out- of pocket costs of enforcing the obligations of [Coex Miami] hereunder, including attorney's fees."

12

59.     As set forth in the Master Over-the-Counter Swap Agreement by and between Coex Panama and Cargill, the Limited Guarantees served as credit support for Coex Panama's unsecured trading debts with Cargill (i.e., Coex Panama's Collateral Threshold). Each increase in Coex Miami's aggregate liability pursuant to the Limited Guarantees corresponded with an increase in Coex Panama's Collateral Threshold (i.e., its unsecured trading line) with Cargill. For example, by the time the January 2020 Limited Guarantee was executed, Cargill increased Coex Panama's Collateral Threshold to $14,750,000 million and decreased Coex Miami's Collateral Threshold to $0.00.

60.     Accordingly, the December 2016 Limited Guarantee, as an amendment to the April 2016 Limited Guarantee, increased Coex Miami's aggregate liability to Cargill from $6 million to $9,250,000.

61.     The January 2020 Limited Guarantee increased Coex Miami's aggregate liability to Cargill from $9,250,000 to $14,750,000.

62.     The only substantive difference between the three Limited Guarantees is the limit of Coex Miami's aggregate liability, which at its highest was $14,750,000 on January 8, 2020.

### 1.     The Limited Guarantees Should be Avoided as Actually Fraudulent

63.     The Limited Guarantees were obligations incurred by Coex Miami to hinder, delay, and defraud Coex Miami's creditors for several reasons.

64.     *First*, Coex Miami was paying Coex Panama's debts to Cargill before the first limited guarantee, the April 2016 Limited Guarantee, was executed. *See* **Ex. 1**, Transfers 1-7. These transfers, which predate the April 2016 Limited Guarantee, demonstrate that Coex Miami did not need or require a guarantee to pay Coex Panama's debts to Cargill. By entering into the Limited Guarantees, Coex Miami and Cargill created a contractual obligation where no previous one existed or was necessary.

13

65.    *Second*, the fraudulent nature of the Limited Guarantees is further underscored by the fact that none of the Limited Guarantees are supported by any consideration. The only consideration identified in the Limited Guarantees is the "Master Over-The-Counter Products Agreement dated as of November 3, 2014, by and between Corporación Coex, Inc. (hereinafter "Subsidiary") and Cargill, Incorporated (hereinafter "Counterparty")." But that agreement is between Coex Panama and Cargill. Coex Miami is not a party to that agreement. Coex Miami did not receive any consideration from Cargill or Coex Panama in exchange for the Limited Guarantees.

66.    *Third*, all three limited guarantees identify Coex Panama as a "Subsidiary" and state that Coex Miami "unconditionally guarantees" the payment of "all amounts payable by Subsidiary [i.e., Coex Panama]" to Cargill. This is significant because a downstream corporate guarantee (a guarantee from a parent to a subsidiary) is much more defensible than a guarantee between two unrelated and distinct entities.

67.    Coex Miami and Coex Panama are not parent and subsidiary or vice versa. Coex Miami and Coex Panama are unrelated and distinct entities with no common ownership.

68.    Ernesto Alvarez and Ernesto Romero knew that Coex Miami and Coex Panama were not parent and subsidiary when they executed the Limited Guarantees.

69.    Coex Miami hindered, delayed, and defrauded its creditors by falsely representing in the Limited Guarantees that Coex Panama was Coex Miami's subsidiary, which if true, would make it more likely that the Limited Guarantees would be upheld if contested by creditors. A guarantee between two separate and distinct entities, by comparison, would more difficult for Coex Miami to defend because the benefit to Coex Miami in such as case is less direct and quantifiable, if there is any benefit at all.

70.    *Fourth*, the Limited Guarantees were concealed from Coex Miami's creditors and auditor. The contingent liabilities do not appear in the company's financial statements which were relied upon by the company's creditors, and transfers that were made pursuant to them were incorrectly booked in Coex Miami's financials as assets other than related entity loans.

### 2.    The Limited Guarantees Should be Avoided as Constructively Fraudulent

71.    Coex Miami did not receive consideration or reasonably equivalent value in exchange for the Limited Guarantees. Coex Miami also did not have sufficient assets on hand to justify entering into the Limited Guarantees, nor could Coex Miami pay the debts due under the Limited Guarantees as they came due without submitting fictitious purchase orders to its lenders.

### E.    A Substantial Majority the Transfers were Not Obligations Due under the Limited Guarantees

72.    As set forth below, the vast majority of the Transfers – $76,843,168.18 out of $91,593,168.18 – were not even obligations due under the Limited Guarantees.

73.    *The First Seven Transfers*. The first seven transfers to Cargill total $9,935,264.63 and span from December 29, 2015 through and including February 11, 2016.

|   | Date | From Payee / To Sender | Amount |
|---|------|------------------------|--------|
| 1 | 12/29/2015 | Transfer from CCI Bank Leumi Acct#6701 to Cargill Inc Citibank Acct#7984 | $2,676,423.75 |
| 2 | 12/29/2015 | Transfer from CCI Bank Leumi Acct#6701 to Cargill Inc Citibank Acct#7984 | $2,269,141.88 |
| 3 | 1/12/2016 | Transfer from CCI Banesco Acct#7868 to Cargill Inc Citibank Acct#7984 | $813,739.50 |
| 4 | 1/12/2016 | Transfer from CCI Banesco Acct#7868 to Cargill Inc Citibank Acct#7984 | $813,739.50 |
| 5 | 1/21/2016 | Transfer from CCI Banesco Acct#7868 to Cargill Inc Citibank Acct#7984 | 1,104,840.00 |
| 6 | 2/9/2016 | Transfer from CCI Banesco Acct#7868 to Cargill Inc Citibank Acct#7984 | $1,486,170.00 |

| | Date | From Payee / To Sender | Amount |
|---|---|---|---|
| 7 | 2/11/2016 | Transfer from CCI Banesco Acct#7868 to Cargill Inc Citibank Acct#7984 | $771,210.00 |

*See* **Ex. 1**, Transfers 1-7 (the "First Seven Transfers").

74. The First Seven Transfer were part of the Pre-Export Advance Transfers scheme.

75. The First Seven Transfers predate the first limited guarantee, which was the April 2016 Limited Guarantee.

76. Accordingly, Coex Miami had no contractual obligation to Cargill to make the First Seven Transfers.

77. ***The April 2016 Limited Guarantee***. The April 2016 Limited Guarantee, even if valid, did not impose an obligation on Coex Miami to pay Cargill for Coex Panama's debts because none of the Transfers were made *after* the April 2016 Limited Guarantee was executed by Coex Miami but *before* the December 2016 Limited Guarantee was executed. The two closest Transfers in time are transfers 7 and 8 identified in **Exhibit 1**:

| | Date | From Payee / To Sender | Amount |
|---|---|---|---|
| 7 | 2/11/2016 | Transfer from CCI Banesco Acct#7868 to Cargill Inc Citibank Acct#7984 | $771,210.00 |
| 8 | 12/23/2016 | Transfer from CCI Banesco Acct#7868 to Cargill Inc Citibank Acct#7984 | $1,191,366.00 |

The former (transfer 7) pre-dates the April 2016 Limited Guarantee and the latter (Transfer 8) post-dates the December 2016 Limited Guarantee.

78. Accordingly, even if the April 2016 Limited Guarantee is not avoided, it could not have imposed an obligation on Coex Miami to pay Coex Panama's debts to Cargill because all of

the Transfers that post-date April 1, 2016 would have been made pursuant to the December 2016 Limited Guarantee.

79.    ***The December 2016 Limited Guarantee***. The December 2016 Limited Guarantee limited Coex Miami's financial obligation to Cargill to an aggregate limit of $9,250,000. As set forth in **Exhibit 1**, and assuming *arguendo* that the guarantee is not avoided, Coex Miami met and exceeded that limit on June 8, 2017 because by that date, Coex Miami had transferred $9,380,975.33 to Cargill, which was $130,975.33 more than the $9,250,000 liability cap. *See* **Ex. 1**, Transfers 8 to 25.

80.    The third and final limited guarantee was executed on January 8, 2020. From June 8, 2017 – the date that Coex Miami met and exceeded by $130,975.33 the liability cap under the December 2016 Limited Guarantee – to January 8, 2020, Coex Miami transferred a total of $44,053,282.54 to Cargill to satisfy Coex Panama's debts. *See* **Ex. 1**, Transfers 24 to 71.

81.    Accordingly, $44,053,282.54 in transfers made after the execution of the December 2016 Limited Guarantee and prior to the execution of the January 2021 Limited Guarantee from Coex Miami to Cargill for Coex Panama's benefit were not made pursuant to any of the Limited Guarantees.

82.    ***The January 2020 Limited Guarantee***. The January 2020 Limited Guarantee limited Coex Miami's financial obligation to Cargill to an aggregate limit of $14,750,000, increasing the aggregate liability by $5.5 million.  As set forth in **Exhibit 1**, and assuming *arguendo* that the guarantee is not avoided, Coex Miami met and exceeded that limit on January 15, 2020 because by that date, Coex Miami had transferred $5,548,950 to Cargill for Coex Panama's benefit, which was $48,950 more than the $5.5 million increase in the liability cap for Coex Miami. *See* **Ex. 1**, Transfers 72 to 74.

83.     Including the excess payment of $48,950, Coex Miami transferred a total of $22,854,621.01 to Cargill from January 15, 2020 through and including May 29, 2020.

84.     Accordingly, $22,854,621.01 in transfers made after the execution of the January 2021 Limited Guarantee from Coex Miami to Cargill for Coex Panama's benefit were not made pursuant to any of the Limited Guarantees.

*********

85.     Even assuming *arguendo* that the Limited Guarantees are valid, $76,843,168.18 out of $91,593,168.18 in Transfers were not obligations due under the Limited Guarantees, as can be seen from the following bar graph comparing the Transfers to the Limited Guarantees:



**F.      Coex Miami was Insolvent or Became Insolvent As a Result of the Limited Guarantees and Transfers**

86.     At all material times—including from the time of the first transfer identified in **Exhibit 1** to the last, and at the time Coex Miami executed each limited guarantee—Coex Miami was insolvent on (*i*) a balance sheet basis, (*ii*) cash flow basis, and (*iii*) adequate capital basis.

18

87. Coex Miami's insolvency during the relevant periods is underscored by the fact that the funds that constituted the first Transfer from Coex Miami to Cargill to satisfy Coex Panama's trading loss were secured through the pre-export advance fraud described above. Simply put, and as described below, Coex Miami was relying on multiple forms of fraud to address an ongoing liquidity crisis.

88. Due to the fraud, Coex Miami's financial statements are unreliable; however, the misrepresentations in them were made to present a better financial picture than actually existed, not a worse one.

89. Those financial statements reveal that Coex Miami's business was highly illiquid and operated, at all relevant times, with comparatively little cash on hand. This was, in part, due to the razor thin margins attributable to its legitimate coffee business and the highly leveraged nature of that business.

90. For instance, Coex Miami's financial statements reported cash and equivalents of (*i*) $1,307,783 for the 2016 calendar year; (*ii*) $2,877,855 for the 2017 calendar year; and (*iii*) $2,486,100 for the 2018 calendar year.

91. By comparison, Coex Miami's annual expenses ranged in the hundreds of millions of dollars and could not be covered by what Coex Miami's financial statements claimed to be the available cash and equivalents on hand.

92. On the legitimate side of its business, Coex Miami typically used three tranches of loans to finance coffee from purchase to warehousing to sale. First, as explained above, Coex Miami would ask its lenders to fund pre-export advances for orders of coffee not yet available for shipment. Next, when pre-ordered coffee finally shipped, Coex Miami would often take out an inventory loan, using the proceeds to retire loans associated with the pre-order. Finally, in instances

19

where Coex Miami's inventory loans came due before receiving sale proceeds from an end buyer, Coex Miami would take out sale financing to retire its inventory loans, only then to use the sale proceeds to satisfy the sale financing.

93. To be certain, Coex Miami's fraud persisted throughout all three phases of financing, not just the Pre-Export Advances. While the fraud alone illustrates that Coex Miami could not pay its debts as they came due, its insolvency was made far worse by Coex Miami's practice of using fictitious purchase orders to take out loans—incurring an obligation for which there was no corresponding assets or revenue to service or retire the loan.

94. Indeed, even for legitimate coffee orders, Coex Miami would often engage in another fraud commonly known as "double hypothecation," where a borrower takes out two loans against the same collateral.

95. For instance, beginning in 2019 and through the date of the Assignment, Coex Miami simultaneously submitted the same legitimate purchase orders to both Bank of America and its other lenders to induce the lenders to disburse funds against the same coffee inventory. While the other lenders disbursed the funds at the direction of Coex Miami to the suppliers identified in the purchase orders, Bank of America would disburse funds directly to Coex Miami's operating account. Needless to say, when double hypothecated, Coex Miami did not use the Bank of America loan proceeds to purchase the coffee identified in the purchase orders; rather, it was used to meet its growing liquidity crisis.

96. Finally, on the sale side, Coex Miami engaged in a similar "double hypothecation" practice whereby it factored receivables previously pledged to its institutional lenders.

97. Coex Miami was thus saddled with debt for which there was no corresponding source of revenue to satisfy the debt which, coupled with its lack of liquidity, left Coex Miami

unable to satisfy its debts as they came due. That, in turn, caused Coex Miami to increase its borrowing to meet these obligations, leading to more loans to pay off loans and so on and so forth.

98.     From 2014 to 2019, Coex Miami's total notes payable increased from $161,926,107 to $200,488,247, corresponding with staggering losses in its annual revenue. In 2014, Coex Miami achieved $415,891,204 in annual sales. By 2019, that number shrunk to $308,156,883. Despite the nine-figure drop in revenue, during that same period Coex Miami's notes payable increased by nearly $40 million.

99.     Coex Miami attempted to cover these losses with fictitious entries in its balance sheet, including fictitious entries for "Advances to Coffee Suppliers," "Trade Account Receivables," and "Unrealized Gains on Forward Contracts," which escalated year-over-year as the fraud and corresponding indebtedness grew:

|  | **2019** | **2018** | **2017** | **2016** | **2015** | **2014** |
|---|---|---|---|---|---|---|
| **Trade Account Receivables** | $32,451,460 | $49,063,036 | $47,087,361 | $29,267,008 | $31,148,102 | $25,997,040 |
| **Advances To Coffee Suppliers** | $50,847,826 | $44,594,035 | $27,066,203 | $19,377,538 | $19,354,001 | $10,529,639 |
| **Unrealized Gains on Forward Contracts** | $40,150,884 | $40,190,166 | $26,539,759 | $17,001,646 | $23,342,199 | $17,073,572 |

But for these fictitious entries, Coex Miami's liabilities in each year above exceeded its assets, contingent, prospective, or otherwise.

100.     Put simply, Coex Miami appears to have been balance sheet insolvent since at least 2014.

21

101.    To be sure, the information available to Plaintiff comes from audited financial statements for Coex Miami for 2014-2018 and accountant work papers for 2019, which were prepared by the BDO accounting firm.

102.    On June 25, 2020, BDO terminated its relationship with Coex Miami because it identified "errors and irregularities," including "[c]onflicting, potentially fabricated, and missing evidential matter for forward and futures contracts . . .", among other highly suspicious activity. BDO also question the "business purpose" of "significant" "[r]elated party transactions," which upon information and belief, was a reference to Coex Panama and related entities. BDO explained that Coex Miami's behavior was "indicative of a lack of internal controls over financial reporting" and "evidence of an environment at [Coex Miami] that is not conducive to executing an audit."

103.    While BDO's resignation reflects a taint on not only Coex Miami's unaudited financial statements, but also its 2014-2018 audited financial statements, BDO's resignation made clear that the material misrepresentations concerning Coex Miami's financial position, once accounted for, resulted in the enterprise's insolvency.

104.    At all relevant times, Coex Miami concealed its fraudulent activity, as well as the Transfers and the Limited Guarantees to Cargill, from its lenders. Again, the existence of the fraud itself is evidence of Coex Miami's lack of adequate capital as of the date of the Transfers and the incurrence of the obligations contained in the Limited Guarantees. If it was solvent, Coex Miami would not have resorted to fraudulent activity to cover its legitimate and illegitimate expenses.

105.    But even if Coex Miami were otherwise solvent, the Transfers and Limited Guarantees rendered it insolvent.

106.     Coex Miami did not have sufficient assets, capital, or liquidity to cover the over $91 million transferred to Cargill to cover Coex Panama's trade speculation, or to make good on the Limited Guarantees.

**G.     Coex Miami's Concealment of the Limited Guarantees and the Transfers**

107.     Coex Miami concealed the Limited Guarantees and the Transfers from its creditors in at least six ways. *First*, Coex Miami concealed the Transfers from its creditors by falsely and fraudulently representing to its creditors that loan proceeds would be used to purchase coffee. In truth and fact, the loan proceeds were used to pay Cargill for Coex Panama's trading debts.

108.     *Second*, without identifying Cargill by name, Coex Miami asked its lenders to directly transfer the loan proceeds that Coex Miami procured by means of fictitious purchase orders directly to Cargill's bank accounts by providing Cargill's banking information, but not Cargill's name in the vast majority of cases. By having its lenders send money directly to Cargill, the Pre-Export Advance Transfers did not appear in Coex Miami's operating bank account, thereby making it much more difficult for Coex Miami's lenders and auditor to detect the transactions and inquire about them.

109.     *Third*, once generated, Coex Miami reused some of the purchase order numbers generated by their TRM accounting software that were used to create fictitious purchase orders which were provided to its lenders, thereby making it much more difficult for Coex Miami's auditors to detect and track the fictitious coffee purchases and corresponding Pre-Export Advance Transfers.  Instead, upon information and belief, the contra accounting entries for the increased notes payable liability due to the fraudulent loans were booked to *increase* one or more *assets* on Coex Miami's balance sheet with no offsets to one or more other liabilities.

110.     *Fourth*, Coex Miami did not provide its auditors with copies of the Limited Guarantees so that Coex Miami's audited financial statements would not reflect millions of dollars

of guarantees for which Coex Miami received little to no value in return. Coex Miami also did not disclose to the company's auditor that Coex Miami was submitting fictitious purchase orders to its lenders to pay Cargill for Coex Panama's trading debts.

111.   As a result, nowhere within the notes to Coex Miami's audited financial statements for the relevant time-period was there a disclosure of: (*i*) the true reason why Coex Miami was borrowing millions of dollars from its institutional lenders as it related to Cargill and Coex Panama; (*ii*) the Limited Guarantees; or (*iii*) the obligations incurred by Coex Miami in favor of Cargill as a result of Coex Panama's trading obligations.

112.   And *fifth*, in BDO's letter of resignation to Coex Miami, BDO urged Coex Miami to "share [the] termination letter" with Coex Miami's "lenders and other stakeholders so these parties are aware of the Company's current financial situation and the reasons for our resignation."

113.   Coex Miami did not share BDO's resignation letter with Coex Miami's lenders because Coex Miami wanted to conceal the Limited Guarantees, the Transfers, and Coex Miami's true financial condition from its lenders.

114.   *Sixth*, as set forth in more detail below, neither the Limited Guarantees nor any other obligations owed to Cargill appeared on the schedules of liabilities provided to the Assignee.

## H.   Cargill did not Act in Good Faith

115.   By contrast, neither Coex Miami's insolvency, nor the fraud, were concealed from Cargill as it had actual notice of both facts.

116.   First, before entering into, and throughout the entirety of Cargill's direct trading relationship with Coex Miami, Cargill requested and reviewed the same audited financial statements discussed. This is important for at least two reasons:

   a.   Although falsified to make Coex Miami's financial picture rosier than reality, those financials reveal that Coex Miami did not have the liquidity to support Coex

24

Panama's trading losses (even the limited amounts set forth in the Limited Guarantees, let alone the unlimited amounts actually received by Cargill); and

b.      The financials show that Coex Miami was highly leveraged and used "financial institutions and lenders for the purchase of coffee inventory."

117.    Focusing on this second point, Cargill was also a party to the inter-creditor agreement between Coex Miami and its institutional lenders that were ostensibly financing Coex Miami's purchase and sale of coffee.

118.    Based on its review of Coex Miami's financials, its involvement in the inter-creditor agreement, and its general familiarity with its trading partner's business, Cargill was aware of Coex Miami's existing lending relationships and the fact that those relationships, as highlighted above, were for the exclusive use of buying, storing and selling coffee, respectively.

119.    Nevertheless, Cargill knew that Coex Miami was using loan proceeds to payoff Coex Panama's speculative trading debts to Cargill.

120.    Cargill's own bank statements reflect as much. For example, Cargill produced to Assignee on April 27, 2021 a December, 2016 statement for its account at Citibank (Account ending in #5721). The statement reflects two incoming wire transfers on December 27, 2016 (Pre-Export Advance Transfer Nos. 9 & 10). The narrative for each incoming wire transfer is important because they (*i*) reflect the identity of the payee as Banesco USA, one of Coex Miami's institutional lender, (*ii*) reflect the identity of ordering party for the transfers as Coex Miami (and not Coex Panama), and (*iii*) identify specific purchase orders (PO 161597 and PO 161596, respectively). The purchase orders, of course, are the fictitious purchase orders Coex Miami used to induce Banesco to make the corresponding loans and disburse the proceeds.

121. Cargill's operations team reviewed each of these statements, the transfers, and the narrative for the express purpose of identifying the legal entity making the transfer and allocating the payments internally.

122. Further, with respect to these specific transfers (as well as others), Luis Garcia, Coex Miami's chief operating officer emailed Matt Dunbar, Cargill's senior managing director in charge of the Coex Miami and Coex Panama relationships and another Cargill employee, Fernando Castro, on December 28, 2016:

| | |
|---|---|
| **From:** | Luis F. Garcia <lfgarcia@coexgroup.com> |
| **Sent:** | Wednesday, December 28, 2016 10:52 AM |
| **To:** | 'Matt Dunbar' |
| **Cc:** | 'Fernando Castro' |
| **Subject:** | CARGILL CORP COEX |
| **Attachments:** | [Customer Outgoing Wire Advice - eMail] Message ID:161227132047C200 Advice Code:OTCSADEM ; [Customer Outgoing Wire Advice - eMail] Message ID:161223164850C200 Advice Code:OTCSADEM ; ADVICE OF DEBIT - BANK CONFIDENTIAL; ADVICE OF DEBIT - BANK CONFIDENTIAL; ADVICE OF DEBIT - BANK CONFIDENTIAL |

Hi Matt:

Please be advise that we sent the following amounts to Cargill – Corp Coex account.

| | |
|---|---|
| December 23 | $1,191,366.00 |
| December 23 | $ 35,000.00 |
| December 27 | $1,301,976.00 |
| December 27 | $1,101,672.00 |
| December 27 | $ 500,000.00 |

Please confirm reception of the funds

Sincerely

*Luis F. Garcia*

Attached to the email are wire confirmations from the originating bank for each transfer identified, including Pre-Export Advance Transfer Nos. 9 & 10. Below is an excerpt from No. 9:

```
                              DETAILS OF PAYMENT
PAYMENT DATE AND TIME:              27-DEC-2016 16:49:02 EST
PAID AMOUNT:                        USD 1,101,672.00
METHOD OF PAYMENT:                  FED Payment
TRANSACTION NUMBER:                 201612270000911
IMAD(CYCLE DATE/LTERM/IMSN)         20161227/MMQFMPDI/000196/
OMAD(CYCLE DATE/LTERM/OMSN)         20161227/B1Q8021R/033723/
REFERENCE:                          P201612270000911
PAID TO:                            F/021000089
                                    CITIBANK, N.A.
                                    NEW YORK
                                    NY
BENEFICIARY:                        X/XXXX7984
                                    COMERCIAL EXPORTADORA SA
                                    VIP SAL 142 PO BOX 52-5364
                                    MIAMI FL
DEBITED TO:                         D/XXXXXX7868
                                    COEX COFFEE INTERNATIONAL, INC.
                                    525 NW 27TH AVENUE
                                    MIAMI FL 33125
ORIGINATOR TO BENEFICIARY INFO:     BY ORDER OF COEX COFFEE
                                    INTERNATIONAL PO 161597
```

The wire transfer confirmation reflects even more information than the bank statement narrative. It reflects the beneficiary as Comercial Exportadora SA, which was a stranger to the Coex Miami–Coex Panama–Cargill relationship.

123. The foregoing information put Cargill on actual notice of Coex Miami's insolvency and fraud.

## I. Coex Miami Initiates an Assignment for the Benefit of Creditors Proceeding in Florida State Court

124. As set forth above, on July 2, 2020, Coex Miami executed an assignment for the benefit of creditors pursuant to Fla. Stat. § 727.101 *et seq.* in favor of Plaintiff whereby it assigned all of its assets to Plaintiff to be liquidated for the benefit of creditors. Plaintiff accepted such Assignment on July 2, 2020 and a petition for assignment for benefit of creditors was filed on July 7, 2020 commencing the Assignment Proceeding.

125. In connection with the Assignment, and pursuant to *Fla. Stat.* §727.104, Coex Miami provided Plaintiff on July 2, 2020 detailed schedules of all of its creditors, including

27

whether such creditor was secured or unsecured and the amount of money owed to such creditor at time of the Assignment.

126. Nowhere within this schedule did Coex Miami disclose any obligation owing to Cargill.

127. In the weeks that followed the Assignment, Plaintiff's team of professionals began the time-consuming task of identifying, preserving, and copying data from Coex Miami's servers, local desktops, and offsite cloud backups, along with physical files kept in Coex Miami's offices in Miami, Florida. This included (*i*) identifying and storing data for 96 different email custodians, (*ii*) onboarding and reviewing about 12.5 terabytes of Coex Miami's digital files, and (*iii*) relocating, scanning, and sifting through 1,490 boxes of paper documents, estimated to contain nearly 2.3 million pages.

128. At the same time Plaintiff was undertaking these tasks, it was in the process of running Coex Miami's operations as they wound down. Coex Miami's wind-down operations were of paramount importance to Plaintiff's as assignee for the benefit of Coex Miami's creditors for at least two related reasons.

a. *First*, coffee beans are a perishable good. The coffee beans then in Coex Miami's worldwide inventory, or trickling in after the Assignment, were one of the estate's largest assets, which had to be properly stored to preserve their value before being liquidated. The task of locating all of Coex Miami's coffee inventory and orders-in-process was a time-consuming, but priority aspect of Plaintiff's duties. That process, which transpired over a period of ten months, culminated in the sale of 500,387 bags of coffee for $57,123,433.00 in sales.

28

b.    *Second*, Coex Miami had incurred many loans against its inventory. The cost of servicing these loans and the risk of the loans maturing before the inventory could be liquidated also required focus be put on running Coex Miami's wind-down operations.

129.    The process of collecting Coex Miami's data and files had to be accomplished in a way that minimized disruptions to these wind-down operations, which in turn increased the number of days taken just to identify, preserve, and copy data.

130.    Once collected and stored, Plaintiff was able to begin the process of analyzing Coex Miami's financial transactions. The analysis of Coex Miami's bank transactions alone encompasses over 75,000 transactions moving over $9 billion, which all begins with a time-consuming data-entry process for each transaction statement.

131.    The process of fully unwinding Coex Miami's financial position, complicated by the concealment of transactions as explained above, is ongoing.

132.    At the same time as this review was ongoing, the Assignee examined under oath the designated corporate representative of Coex Miami pursuant to Fla. Stat. § 727.107(3).

133.    The purpose of that examination was for designated witness to provide testimony "concerning the acts, conduct, assets, liabilities, and financial condition of [Coex Miami] or any matter related to the assignee's administration of the estate."

134.    The designated witness was not Ernesto Alvarez or Ernesto Romero.  Nor was the designated witness the company's long serving chief financial officer, Luis Garcia, or any other senior executive of Coex Miami. Rather, the designated witness was a staff accountant with minimal knowledge of the finances and operations of Coex Miami.

135. When questioned as to the accuracy of the schedules prepared by Coex Miami and provided to Plaintiff, the witness testified that they were accurate and did not disclose that Coex Miami owed any debt to Cargill.

136. In connection with his statutory duties, on July 10, 2021, Assignee gave all creditors notice of the Assignment and the deadline for creditors to file claims against the assignment estate. Assignment Proceeding D.E. 4. Notably, Assignee did not provide notice to Cargill. *Id*. at D.E.10.

137. Sixty-six creditors filed claims against the assignment estate in the aggregate amount that exceed $220 million. They include claims asserted by Coex Miami's lenders, vendors, purchasers, logistics providers, warehouse facilities, and other coffee industry constituents.

138. On October 29, 2020, Cargill filed a proof of claim in the Assignment proceeding in the amount of $8,035,174.69 based solely upon the January 2020 Limited Guarantee. No reference was made to the incurrence of any other obligation by Coex Miami in favor of Cargill in the proof of claim, including the April 2016 Limited Guarantee or the December 2016 Limited Guarantee.

139. Thereafter, on December 1, 2020, Plaintiff served a subpoena on Cargill requesting production of documents identifying payments received by it and contractual agreements between Coex Miami and Cargill.

140. Cargill requested several extensions to produce responsive materials, and only after threat by Plaintiff to seek court intervention, did Cargill make an initial production of documents on February 17, 2021.

141. That initial production did not include any documents identifying any transfers by Coex Miami to Cargill relating to the three limited guaranties, nor did it include the April 2016 Limited Guarantee or the December 2016 Limited Guarantee.

142. As set forth above, the Limited Guarantees and the Transfers were concealed from creditors and auditors.

143. For all of these reasons, the Transfers could not reasonably have been discovered by Plaintiff until the spring or early summer of 2021.

**J.    Plaintiff Initiates Supplemental Proceeding against Cargill**

144. Pursuant to Florida Statutes Sections 727.109(8)(c) and 727.110(1)(c), Plaintiff is authorized and empowered to avoid any conveyance or transfer void or voidable by law. Pursuant to Florida Statutes Section 727.105, creditors of the assignment estate are stayed from bringing any such avoidance claim.

145. Pursuant to that statutory authority, the Plaintiff initiated a supplemental proceeding related to the Assignment Proceeding pending the 11th Judicial Circuit in and for Miami-Dade County, Florida against Cargill, as well as Ernesto Romero and Ernesto Alvarez, on July 1, 2021, pursuant to section 727.110 of the Florida Statutes, seeking to avoid the Limited Guarantees, and avoid and recover the Transfers.

146. As set forth above, Cargill moved to dismiss the supplemental proceeding based on the forum selection clause in the January 2021 Guarantee. After hearing the motion, the Court ruled from the bench that the case would be transferred to this Court.

**COUNT I**
**AVOIDANCE OF THE LIMITED GUARANTEES AS MADE**
**WITH ACTUAL INTENT TO HINDER, DELAY, OR DEFRAUD**

147. Plaintiff re-states and re-alleges paragraphs 1 through 146 above as if fully set forth herein.

148. This is a claim to avoid the incurrence of obligations with the actual intent to hinder, delay, and defraud Coex Miami's creditors pursuant to New York Debtor & Creditor Law §§ 276,

278, or alternatively, if the Court finds Florida law applies, pursuant to Florida Statutes §§ 726.105(1)(a) and 726.108(1)(a), or such other applicable law.

149. This Count is asserted on behalf of all creditors of Coex Miami within the definition of "creditor" as that term is used in Section 270 of the New York Debtor & Creditor Law, which claims include their own claims and those that have been assigned to them by prior creditors or their predecessors or successors, by operation of law, or otherwise.

150. There are both then-existing and future creditors as to whom the incurrence of the obligations in the Limited Guarantees were actually fraudulent.

151. Coex Miami incurred obligations in the form of three limited guarantees – the April 2016 Limited Guarantee, the December 2016 Limited Guarantee, and the January 2020 Limited Guarantee – to Cargill for trading debts owed by Coex Panama to Cargill.

152. Coex Miami incurred these obligations to Cargill with the actual intent to hinder, delay, or defraud Coex Miami's creditors.

153. The following badges of fraud are present and establish that Coex Miami had the actual intent to hinder, delay, and defraud its creditors in connection with the Limited Guarantees:

    a. <u>The obligations were incurred for the benefit of family members and insiders</u>. Coex Miami guaranteed to Cargill the obligations of Coex Panama, which was owned and controlled by family members – two brothers – of the principals of Coex Miami.

    b. <u>Coex Miami's principals created fictitious purchase orders</u>. Coex Miami's principals created and sent fictitious purchase orders to Coex Miami's lenders to fraudulently induce the lenders to disburse $89,583,153.96 of Coex Miami's loan proceeds to Cargill.

c. <u>The Limited Guarantees and the Transfers were concealed</u>. The Limited Guarantees were not disclosed to Coex Miami's creditors, were not disclosed to the company's auditors, were not disclosed on the company's audited financial statements, and neither the Limited Guarantees nor any other obligations owed to Cargill appeared on the schedules of liabilities provided to the Assignee. In addition, Coex Miami fraudulently induced its lenders using fictitious purchase orders to directly disburse $89,583,153.96 of Coex Miami's loan proceeds to Cargill to pay Coex Panama's trading debts to Cargill, thereby bypassing Coex Miami's operating bank accounts which helped conceal the scheme from Coex Miami's creditors, lenders, and auditors.

d. <u>Coex Miami received no consideration and less than reasonably equivalent value for the obligations</u>. Coex Miami received no consideration in exchange for the Limited Guarantees. Coex Miami also received less than reasonably equivalent value for guaranteeing Coex Panama's trading debts to Cargill.

e. <u>Coex Miami was insolvent or became insolvent shortly after the obligation was incurred</u>. Coex Miami was insolvent at all relevant times. Alternatively, the obligations incurred under the Limited Guarantees and the Transfers rendered Coex Miami insolvent.

f. <u>The auditor's noisy withdrawal</u>. On June 25, 2020, BDO terminated its relationship with Coex Miami because of identified "errors and irregularities," including fraud potentially, that BDO was unable to reasonably resolve. BDO also question the "business purpose" of "significant" "[r]elated party transactions." Finally, BDO found that Coex Miami's business environment was "indicative of a lack of internal controls over financial reporting" and "evidence of an environment at the Company that is not conducive to executing an audit."

g. <u>Transfers in excess of the Limited Guarantees</u>. Coex Miami transferred $76,843,168.18 in excess of the limits in the Limited Guarantees to Cargill. Coex Miami was under no obligation to transfer funds that exceeded those limits but did so to hinder, delay, and defraud its lenders.

154. As a direct and proximate result of the foregoing, each of the Limited Guarantees is an actual fraudulent conveyance and may be avoided by the Assignee.

**WHEREFORE**, Plaintiff requests the Court to enter a judgment in favor of Plaintiff and against Defendant Cargill avoiding the Limited Guarantees and granting such other relief the Court deems just and proper, including reasonable attorneys' fees pursuant to Debt. & Cred. Law § 276-a and costs.

**COUNT II**
**AVOIDANCE OF THE GUARANTEES AS MADE WITHOUT**
**RECEIVING REASONABLY EQUIVALENT VALUE IN EXCHANGE**

155. Plaintiff re-states and re-alleges paragraphs 1 through 146 above as if fully set forth herein.

156. This is a claim to avoid the incurrence of obligations as constructively fraudulent to creditors pursuant to New York Debtor & Creditor Law §§ 273-275, 278, or alternatively, if the Court finds Florida law applies, pursuant to Florida Statutes §§ 726.105(1)(b), 726.106(1) and 726.108(1)(a), or such other applicable law.

157. This Count is asserted on behalf of all creditors of Coex Miami within the definition of "creditor" as that term is used in Section 270 of the New York Debtor & Creditor Law, which claims include their own claims and those that had been assigned to them by prior creditors or their predecessors or successors, by operation of law, or otherwise.

158. There are both then-existing and future creditors as to whom the incurrence of the obligations in the Limited Guarantees were actually fraudulent.

34

159. Coex Miami incurred obligations in the form of three limited guarantees – the April 2016 Limited Guarantee, the December 2016 Limited Guarantee, and the January 2020 Limited Guarantee – to Cargill for trading debts owed by Coex Panama to Cargill.

160. Coex Miami received no consideration and less than reasonably equivalent value in exchange for the Limited Guarantees.

161. Coex Miami was engaged or was about to engage in a business or a transaction for which the remaining assets of Coex Miami were unreasonably small in relation to its business or transaction

162. Coex Miami intended to incur, or believed it would incur, debts that would be beyond Coex Miami's ability to pay as they became due.

163. Coex Miami was insolvent at that time or became insolvent as a result of the obligations.

164. As a direct and proximate result of the foregoing, each of the Limited Guarantees is a constructively fraudulent obligation that may be avoided by the Assignee.

**WHEREFORE**, Plaintiff requests the Court to enter a judgment in favor of Plaintiff and against Defendant Cargill avoiding the Limited Guarantees and granting such other relief the Court deems just and proper.

### COUNT III
### AVOIDANCE AND RECOVERY OF TRANSFERS MADE WITH
### ACTUAL INTENT TO HINDER, DELAY, OR DEFRAUD

165. Plaintiff re-states and re-alleges paragraphs 1 through 146 above as if fully set forth herein.

166. This is a claim to avoid the transfer of Coex Miami's property with the actual intent to hinder, delay, and defraud creditors pursuant to New York Debtor & Creditor Law §§ 276, 278,

or alternatively, if the Court finds Florida law applies, pursuant to Florida Statutes §§ 726.105(1)(a), 726.108(1)(a), and 726.109(2) or such other applicable law.

167.    This Count is asserted on behalf of all creditors of Coex Miami within the definition of "creditor" as that term is used in Section 270 of the New York Debtor & Creditor Law, which claims include their own claims and those that had been assigned to them by prior creditors or their predecessors or successors, by operation of law, or otherwise.

168.    There are both then-existing and future creditors as to whom the incurrence of the obligations in the Limited Guarantees were actually fraudulent.

169.    As detailed in **Exhibit 1** to this Amended Complaint, the Pre-Export Advance Transfers that are avoidable and recoverable for the benefit of the assignment estate and its creditors. Coex Miami made the Pre-Export Advance Transfers to Cargill with the actual intent to hinder, delay, or defraud Coex Miami's creditors.

170.    Each of the following badges of fraud exists, and establishes that Coex Miami had the actual intent to hinder, delay or defraud its creditors in connection with the transfer of property to Cargill:

      a.     The Transfers were made for the benefit of family members and insiders. Coex Miami made the Transfers to Cargill for the benefit of Coex Panama, which was owned and controlled by family members – two brothers – of the principals of Coex Miami.

      b.     Coex Miami's principals created fictitious purchase orders. Coex Miami's principals created and sent fictitious purchase orders to Coex Miami's lenders to fraudulently induce the lenders to transfer $89,583,153.96 to Cargill.

      c.     The Limited Guarantees and the Transfers were concealed. The Limited Guarantees were not disclosed to Coex Miami's creditors, were not disclosed to the

36

company's auditors, were not disclosed on the company's audited financial statements, and neither the Limited Guarantees nor any other obligations owed to Cargill appeared on the schedules of liabilities provided to the Assignee. In addition, Coex Miami fraudulently induced its lenders using fictitious purchase orders to directly disburse $89,583,153.96 of Coex Miami's loan proceeds to Cargill to pay Coex Panama's trading debts to Cargill, thereby bypassing Coex Miami's operating bank accounts which helped conceal the scheme from Coex Miami's creditors, lenders, and auditors.

d. <u>Coex Miami received no consideration and less than reasonably equivalent value for the Transfers</u>. Coex Miami received no consideration in exchange for the Transfers. Coex Miami also received less than reasonably equivalent value for making the Transfers to satisfy Coex Panama's trading debts to Cargill.

e. <u>Coex Miami was insolvent or became insolvent shortly after the obligation was incurred</u>. Coex Miami was insolvent at all relevant times. Alternatively, the obligations incurred under the Limited Guarantees and the Transfers rendered Coex Miami insolvent.

f. <u>The auditor's noisy withdrawal</u>. On June 25, 2020, BDO terminated its relationship with Coex Miami because of identified "errors and irregularities," including fraud potentially, that BDO was unable to reasonably resolve. BDO also question the "business purpose" of "significant" "[r]elated party transactions." Finally, BDO found that Coex Miami's business environment was "indicative of a lack of internal controls over financial reporting" and "evidence of an environment at the Company that is not conducive to executing an audit."

g. <u>Transfers in excess of the Limited Guarantees</u>. Coex Miami transferred $76,843,168.18 in excess of the limits in the Limited Guarantees to Cargill. Coex Miami

37

was under no obligation to transfer funds that exceeded those limits but did so to hinder, delay, and defraud its lenders.

171.    As a direct and proximate result of the foregoing, each of the Transfers is an actual fraudulent conveyance and may be avoided by the Assignee. As such, pursuant to New York Debtor & Creditor Law § 278, the Assignee may set aside or annul each Transfer as against Cargill in an amount necessary to satisfy the claims against the assignment estate.

**WHEREFORE**, Plaintiff requests the Court enter a judgment in favor of Plaintiff and against Defendant Cargill avoiding the Pre-Export Advance Transfers identified in **Exhibit 1**; awarding damages to Plaintiff against Defendant Cargill in the aggregate amount of the Pre-Export Advance Transfers avoided; awarding to Plaintiff, for the benefit of Coex Miami's assignment estate pre- and post-judgment interest and costs and reasonable attorneys' fees pursuant to Debt. & Cred. Law § 276-a and costs; and granting such other relief the Court deems just and proper.

**COUNT IV**
**AVOIDANCE AND RECOVERY OF TRANSFERS MADE**
**WITHOUT RECEIVING REASONABLY EQUIVALENT VALUE IN EXCHANGE**

172.    Plaintiff re-states and re-alleges paragraphs 1 through 146 above as if fully set forth herein.

173.    This is a claim to avoid the Transfers to Cargill as constructively fraudulent pursuant to New York Debtor & Creditor Law §§ 273-275, 278, or alternatively, if the Court finds Florida law applies, pursuant to Florida Statutes §§ 726.105(1)(b), 726.106(1), 726.108(1)(a) and 726.109(2), or such other applicable law.

174.    This Count is asserted on behalf of all creditors of Coex Miami within the definition of "creditor" as that term is used in Section 270 of the New York Debtor & Creditor Law, which claims include their own claims and those that had been assigned to them by prior creditors or their predecessors or successors, by operation of law, or otherwise.

38

175.    There are both then-existing and future creditors as to whom the incurrence of the obligations in the Limited Guarantees were actually fraudulent.

176.    As set forth in **Exhibit 1** of this Amended Complaint, Coex Miami made the Transfers to Cargill.

177.    Coex Miami received less than reasonably equivalent value in exchange for the Transfers.

178.    Coex Miami was engaged or was about to engage in a business or a transaction for which the remaining assets of Coex Miami were unreasonably small in relation to its business or transaction

179.    Coex Miami intended to incur, or believed it would incur, debts that would be beyond Coex Miami's ability to pay as they became due.

180.    Coex Miami was insolvent at that time or Coex Miami became insolvent as a result of the Transfers.

181.    As a direct and proximate result of the foregoing, each of the Transfers is a constructively fraudulent conveyance and may be avoided by the Assignee. As such, pursuant to New York Debtor & Creditor Law § 278, the Assignee may set aside or annul each Transfer as against Cargill in an amount necessary to satisfy the claims against the assignment estate.

**WHEREFORE**, Plaintiff requests the Court enter a judgment in favor of Plaintiff and against Defendant Cargill avoiding the Transfers identified in **Exhibit 1**; awarding damages to Plaintiff against Defendant Cargill in the aggregate amount of the Transfers avoided; awarding to Plaintiff, for the benefit of Coex Miami's assignment estate pre-and post-judgment interest and costs; and granting such other relief the Court deems just and proper.

Dated: November 29, 2021

Respectfully submitted,

**STEARNS WEAVER MILLER WEISSLER
ALAHADEFF & SITTERSON, P.A.**
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-3395

By: */s/ Eugene E. Stearns*
    EUGENE E. STEARNS
    Florida Bar No. 0149335
    estearns@stearnsweaver.com
    DREW DILLWORTH
    Florida Bar No. 0167835
    ddillworth@stearnsweaver.com
    JASON P. HERNANDEZ
    Florida Bar No. 18598
    jhernandez@stearnsweaver.com
    ERIC SILVER
    Florida Bar No. 057262
    esilver@stearnsweaver.com

– and –

**PHANG & FELDMAN, P.A.**
1125 NE 125 Street, Ste. 303
Miami, Florida 33161
Telephone: (305) 614-1223

By: *s/ Kathleen S. Phang*
    KATHLEEN S. PHANG
    Florida Bar No. 348650
    katie@katiephang.com
    feldman@katiephang.com
    service@katiephang.com

*Counsel for Plaintiff Philip von Kahle*