# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **FEDERAL RESERVE BANK OF SAN FRANCISCO**,<br><br>Plaintiff,<br><br>v.<br><br>**BENWORTH CAPITAL PARTNERS PR, LLC; BENWORTH CAPITAL PARTNERS, LLC; BERNARDO NAVARRO and CLAUDIA NAVARRO**,<br><br>Defendants. | Civil No. 23-01034 (GMM) |

## MOTION TO ENFORCE *ORDER* AT ECF NO. 224 GRANTING PLAINTIFF-INTERVENOR FEDERAL RESERVE BANK OF SAN FRANCISCO'S <u>MOTION TO COMPEL BENWORTH'S QUICKBOOKS ACCOUNTING DATA</u>

**TO THE HONOROBLE UNITED STATES DISTRICT JUDGE GINA R. MENDEZ MIRO:**

**COMES NOW** Plaintiff Federal Reserve Bank of San Francisco (the "<u>Reserve Bank</u>") by and through undersigned counsel, and respectfully requests that this Court enforce the *Order*, ECF No. 224, granting the Reserve Bank's *Motion to Compel Benworth's QuickBooks Accounting Data* ("<u>QuickBooks Motion to Compel</u>" at ECF No. 200) as follows:

1.      It has now been over a month since this Court, on March 24, ordered Defendants to produce their QuickBooks data, recognizing the Reserve Bank's legitimate need for financial records that Defendants resisted turning over for months.  Despite agreeing that a simple export of the QuickBooks data would be the least burdensome and most efficient approach, Defendants nonetheless refuse to comply, insisting instead on "supervised access" grounded solely in their subjective distrust of the Reserve Bank's motives.  Their proposed path not only ignores the Court's unambiguous directive but would introduce entirely avoidable logistical challenges over

scheduling, data retrieval, and whether the Reserve Bank has actually received sufficient access. Defendants have not—and cannot—articulate any sound basis in fact or law for their refusal to simply export the data, and their proposal would mire the Parties and the Court in needless conflict and further delay, all to obstruct a legitimate, Court-ordered discovery obligation. Their approach should be rejected in favor of a simple export.

## BACKGROUND

2.    On January 17, 2025, the Reserve Bank filed its QuickBooks Motion to Compel seeking an order from this Court compelling Defendants Benworth Capital Partners PR LLC ("Benworth PR"), Benworth Capital Partners LLC ("Benworth FL"), Bernardo Navarro ("Mr. Navarro"), and Claudia Navarro (together with Mr. Navarro, the "Navarros"; collectively, "Defendants"; together with the Reserve Bank, the "Parties") to  provide "full access to Benworth's QuickBooks data without interference by Defendants' counsel," because this financial information is necessary to, among other things, trace the flow of funds among and between Defendants and other affiliated entities; assess the value of services provided by Benworth PR to Benworth FL; and determine Benworth FL's solvency.  QuickBooks Motion to Compel at 1-2 & 12. Following Defendants' joint opposition and the Reserve Bank's reply (ECF Nos. 206 & 209), on March 24, 2025, the Court entered an Order granting the QuickBooks Motion to Compel ("Order" at ECF No. 224).

3.    The Order compelled Defendants to produce the QuickBooks data by "either (1) provid[ing] Plaintiff-Intervenor with exported data from their QuickBooks database for the period January 1, 2020, to the present, or (2) allow[ing] a representative for Plaintiff-Intervenor to have access to the QuickBooks database at reasonable times for a reasonable period of time," with such access observed by "a non-attorney representative for Defendants" who "shall not disclose to

Plaintiff or Plaintiff's counsel any information regarding searches conducted or data retrieved."[1] The Order also ordered the Parties to "meet and confer to discuss the preferred mode of compliance with the Court's order on or before April 11, 2025."

4.      On March 31, 2025, the Parties met to discuss, among other issues, the preferred mode of compliance with the Order (the "First Meet and Confer").  At the First Meet and Confer, both Parties agreed that exporting all data (the "Export" option) would be both feasible and far less burdensome on both Parties than arranging for supervised access (the "Supervised Access" option).  *See* Exhibit 1 at 18 (summarizing counsels' discussions).  Defendants' counsel also explained that they were considering Supervised Access with their client and asked how the Reserve Bank envisioned the logistics of that option would work in practice.  The Reserve Bank responded that arranging for supervised access would involve significantly more logistical complexity than an Export and would require additional information from Defendants, including the amount and type of data, whether the access was virtual or on-site, and other information learned through a review of the QuickBooks data itself.  Defendants' counsel represented that they would need to discuss these questions with their client and that they would report back to the Reserve Bank by April 4, 2025.  On April 4, 2025, Defendants' counsel represented that their client needed additional time to discuss the options and would do so on April 7, 2025.

5.      On April 9, 2025, Defendants responded via email asserting a unilateral right to determine the mode of access and electing Supervised Access.  Defendants provided no

---

[1]      The operative text of the Order states in full: "Defendants are ordered to either (1) provide Plaintiff-Intervenor with exported data from their QuickBooks database for period January 1, 2020, to the present, or (2) allow a representative for Plaintiff-Intervenor to have access to the QuickBooks database at reasonable times for a reasonable period of time.  A non-attorney representative for Defendants may observe the Plaintiff- Intervenor's representative's access to the database, provided, however that such representative shall not disclose to Plaintiff or Plaintiff's counsel any information regarding searches conducted or data retrieved.  Parties shall meet and confer to discuss the preferred mode of compliance with the Courts' order on or before April 11, 2025." ECF No. 224.

explanation for their purported election and did not answer any of the logistical questions raised during the First Meet and Confer, other than stating that the Supervised Access sessions would be "conducted via Zoom." Exhibit 1 at 9.

6.    On April 11, 2025, the Reserve Bank requested the Parties meet and confer to discuss the QuickBooks production and other outstanding discovery issues. The Parties exchanged several emails to select a date and time for the meet and confer, throughout which Defendants changed their availability. On April 16, 2025, the Reserve Bank sent an email requesting that Defendants clarify their stance about the QuickBooks mode of compliance and seeking to finalize the date and time of the meet and confer as the time proposed by the Defendants (April 24, 2024, at 2:30pm). On April 22, 2025, Defendants indicated their about-face on the form of access to the QuickBooks data was motivated by their subjective opinion of the Reserve Bank's motives for filing this suit. *See* Exhibit 1 at 1-2.

7.    On April 24, 2025, the Parties met again to discuss, among other issues, Defendants' preference for Supervised Access (the "Second Meet and Confer"). At the Second Meet and Confer, the Reserve Bank repeated its view that the Court's order does not give Defendants the unilateral right to elect the mode of production of the QuickBooks data and asked whether Defendants had any additional detail to share beyond that sessions would be conducted via Zoom. Defendants' additional information was limited to explaining that each time the Parties coordinate to schedule a QuickBooks database access session, the representative for the Reserve Bank would be provided a one-time username and password on that day, would access the database through their computer, and would share their screen, using Zoom, with Defendants' non-attorney representative. The Reserve Bank also asked what benefits were gained by Supervised Access,

and Defendants referred to the security of knowing that access to Defendants' data would be supervised.

8.      The Reserve Bank explained that this limited explanation did not address the burdens previously discussed or answer any questions raised by the Reserve Bank during the First Meet and Confer on March 31. Specifically, the Reserve Bank explained that Defendants' position failed to adequately address (1) the difficulties of scheduling multiple rounds of supervised access with an undetermined number of individuals, including Reserve Bank attorneys, Reserve Bank experts, Benworth personnel required to provide QuickBooks credentials, and Defendants' non-attorney representative, (2) the uncertainty over the need for additional access sessions, given incomplete and ongoing discovery by Defendants, (3) the Reserve Bank's lack of knowledge about the type and volume of data creating uncertainty over how long a particular access session will need to be for sufficient factual development, and (4) Defendants' failure to describe how they envision the Reserve Bank retrieving data in the course of supervised access sessions.  The Reserve Bank specifically asked how it could retrieve data through Supervised Access sessions. Defendants declined to answer the question and insisted that the Reserve Bank propose exactly what the Reserve Bank envisioned doing during remote access sessions and what the Reserve Bank is "going to do with the data," and to somehow answer these questions without revealing privileged work product. *See* Exhibit 2 at 3. The Reserve Bank noted it could not provide these answers without knowing what the QuickBooks data contains or having all relevant discovery and again requested Defendants' position on data retrieval, which Defendants declined to share.

9.      Given the facts, the Reserve Bank seeks enforcement of the Order from the Court. Given that the Parties agreed at the March 31 First Meet and Confer that the less burdensome

option is for the Defendants to export the QuickBooks data, the Reserve Bank requests that the Court order the Defendants to export such data within 5 days of the Court's order.[2]

## ARGUMENT

**I.    The Court's Order Does Not Give The Defendants A Unilateral Right To Elect The Most Burdensome Mode Of Compliance, And Their Position Is Inconsistent With Basic Principles Of The Federal Rules And Judicial Economy.**

10.    The Court's Order requiring production of Defendants' QuickBooks data does not permit Defendants to unilaterally elect to produce such data via the more burdensome production option. Instead, the Court ordered Defendants to produce the QuickBooks data through one of two methods and required the Parties to "meet and confer to discuss the preferred mode of compliance." The Local Rules in this District make clear that the purpose of meet and confer discussions is precisely to attempt "to reach an agreement with opposing counsel" prior to bringing a discovery dispute to the Court for resolution. *See* D.P.R. R. 26(b) (2024). The Parties have done so and agreed that a simple export of QuickBooks data—which the Court found to be discoverable—is the least burdensome mode of production. Defendants agree this is feasible but have asserted a right to proceed with Supervised Access without this Court's approval and—critically—without providing any reasoned, fact-based explanation, rationale, or plan. Defendants have repeatedly failed to give a basis or explanation for why an export of the QuickBooks data provides any risk to Defendants. Under Federal Rule of Civil Procedure 26(b)(2)(C)(i), "the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." As discovery shall be obtained from the most convenient, less burdensome, and less expensive source, the Court should

---

[2]    *See infra* n. 7 (explaining alternative relief sought through this Motion).

enforce its Order and require that the Defendants export the data to avoid further disputes and significant additional burdens on both parties and counsel.

### a. Supervised Access is Expensive, Burdensome, and Inconvenient

11. Supervised Access would drain both Parties' resources attending to cumbersome logistical arrangements, such as repeatedly scheduling and attending sessions, while needlessly introducing questions regarding the completeness of the Reserve Bank's access to the QuickBooks data. Should disputes arise over which files were disclosed or how they were presented during supervised sessions, the Parties may be forced to return to this Court to resolve complicated, fact-intensive issues. All of these burdens could easily be eliminated with a simple Export, which allows the Reserve Bank to conduct a complete and efficient review without any looming questions for the Parties or Court. The Court should order an Export for the following reasons:

12. <u>First</u>, discovery remains ongoing, and the Reserve Bank will require access to the QuickBooks database multiple times over the next several months as additional facts come to light.[3] This will require ongoing scheduling between the parties, likely prompting scheduling conflicts, which have already occurred, often on short notice from Defendants.[4] Under the current

---

[3] An incomplete list of discovery still to be produced from Defendants includes: (a) production of responsive mobile data from the Navarros' phones, including communications between the Navarros and communications among the Navarros and other Benworth employees, (b) production of responsive documents based on search parameters agreed during the March 31 meet and confer, and (c) production of promissory notes between the Navarros and Benworth or its affiliates. *See* Exhibit 2 at 4-5. In addition, the Reserve Bank's review of Defendants' productions has required, on multiple occasions, that Defendants make additional productions or, in one case, an entire re-production due to Defendants' failure to comply with the ESI protocol. *See e.g.*, Exhibit 1 at 5-6 (observing Defendants' re-production of over 40,000 documents because the prior production did not include family-complete communications).

[4] Defendants' counsel has previously canceled meet-and-confer discussion on several occasions in these proceedings, including October 29, 2024 (Defendants' counsel canceled less than two hours before the call without providing any dates or times to reschedule) and March 25, 2025 (on the morning of the scheduled call, Defendants' counsel proposed rescheduling because they had inadvertently not calendared the Parties' previously agreed deadline for delivering privilege logs, had not yet discussed with their clients the Court's discovery-related orders issued the prior day, and had not completed a previously-agreed review of documents for responsiveness). The March 25, 2025 meet-and-confer discussion was only scheduled in the first place after the Reserve Bank's request on March 11, 2025, which was met with multiple delayed responses and the announcement of a rescheduled production by Defendants'

schedule, fact discovery extends until June 9, 2025, and fact depositions will not be complete until August 8, 2025.[5]  The Reserve Bank will almost certainly require access to the QuickBooks database at various time intervals in response to additional information learned through discovery. For example, less than two weeks ago, Defendants apparently completed production of documents in response to the Reserve Bank's requests regarding entities controlled by Mr. and Mrs. Navarro. The Reserve Bank is actively reviewing these documents, but recent history—including a required re-production of over 40,000 documents by Defendants—indicates additional issues may arise during that review that require additional productions. *See infra* n. 3. Moreover, a considerable volume of the Defendants' discovery remains unproduced, including mobile data from the Navarros and any communications from Mrs. Navarro.  *See* Exhibit 2 at 4-5.  Further, scheduling conflicts will inevitably arise, and the Parties may disagree about whether the number of sessions is "reasonable" under the Court's Order, potentially requiring further involvement by this Court.[6] Managing such scheduling conflicts during the next several months is a non-essential burden on the Parties and the Court's resources that can be completely avoided by the Export option.

13.     Second, Supervised Access would be impractical, burdensome, and inefficient because unknown limitations or disputes about the "data retrieved"—which Defendants refused to take a position on during the Second Meet and Confer—will hamper the Reserve Bank's ability to iterate on a review strategy and build its case in an efficient and expedient way.  In short, under Defendant's proposal, the Reserve Bank's factual development will become stop-and-go traffic. For example, the Reserve Bank is likely to learn of facts that materially change its understanding

---

counsel, which further delayed the scheduled discussion.  In January, Defendants also refused to offer any availability by any of its attorneys for a nearly two-week period to discuss open discovery matters.

[5]     Order at ECF No. 233.

[6]     Defendants previewed the likelihood of dispute on this issue by stating during the Second Meet and Confer that they did not agree with the Reserve Bank that multiple sessions would be necessary.

of QuickBooks data previously reviewed during a given "access session," requiring another "access session" to investigate, for example, a newly relevant time period for key transfers or records of Defendants' relationships with newly-identified third parties.

14.    But even then, it is no answer that the Reserve Bank could just request another "access session."  The Reserve Bank, like any litigant, must have the ability to incorporate and synthesize new information with what it has previously received, which means re-reviewing information and developing connections as it supports is claims and crafts appropriate relief.  This process would be hamstrung by Supervised Access and the uncertainty over what data may be retrieved from the database.  For example, the Reserve Bank may need to compare multiple examples of a certain type of document stored on the QuickBooks database, but an "access session" would permit review of only a single document or ledger by one individual at a time.  Furthermore, the Reserve Bank, in consultation with its expert, may need to review the QuickBooks data alongside documents previously produced from Defendants or third parties, or even work product prepared by counsel or its experts.  Whether doing so is even possible under Defendants' proposal is unclear.  And even if it were, the associated burden of securing both Parties' agreement to any necessary protocols, including to protect privileged information, makes obvious the superiority of a simple Export.

### b.  Supervised Access Provides No Benefits, and Defendants Provide No Facts to Justify Overriding the Attendant Burdens

15.    In the face of these burdens and inefficiencies, Defendants fail to identify any affirmative reason for electing Supervised Access other than their subjective view that the Reserve Bank has an improper motive for pursuing this litigation.  Defendants' objection is absurd.  The Reserve Bank's need for the QuickBooks data is genuine, as this Court recognized by issuing its Order in the first place.  Defendant's purported concern that Supervised Access is needed "to

ensure no improper actions are taken with respect to the data," Exhibit 1 at 2, is vague and imprecise, is unmoored from any conduct by the Reserve Bank and, in any case, can be addressed by an appropriate designation pursuant to the Protective Order, which the Reserve Bank has complied with throughout these proceedings. *See* ECF No. 176.

16.     When the Reserve Bank directly asked, during the Second Meet and Confer, how an Export introduced any risk to Defendants or why Supervised Access introduced any benefit, Defendants again failed to provide any coherent rationale for their purported election. Instead, Defendants repeatedly returned to the idea that the Reserve Bank owed Defendants an explanation of what the Reserve Bank intended to do with the QuickBooks data, which has been provided to the Defendants numerous times.  In short, Defendants have no answer to the notion that an Export is both simple and risk-free.

### c.  Supervised Access Is Inconsistent with Applicable Discovery Caselaw

17.     The Supervised Access option is also not aligned with case law on this issue. Courts have repeatedly and consistently ordered and required that production be provided in the least burdensome, least expensive, and most convenient way.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i); *W Holding Co. v. Chartis Ins. Co. of Puerto Rico*, No. CIV. 11-2271 GAG, 2013 WL 1352562, at *1 (D.P.R. Apr. 3, 2013) (holding that parties produce static images in load files if it was the least burdensome way); *Treister v. PNC Bank*, No. 05-23207-CIV, 2007 WL 521935, at *1 (S.D. Fla. Feb. 15, 2007) (ruling that some discovery was not necessary as it could be found from another source that was more convenient and less burdensome); *Johns v. United States*, No. 0:23-CV-60576, 2024 WL 2977224, at *2 (S.D. Fla. June 13, 2024) (limiting discovery when there was a most convenient, less burdensome, or less expensive option).

18.    The Reserve Bank appreciates that the Court's Order closely tracked the language from an order in *von Kahle v. Cargill, Inc*., No. 1:21-cv-08532, ECF No. 194 (S.D.N.Y. Dec. 13, 2023) ("von Kahle") cited in Plaintiff's QuickBooks Motion to Compel, at 10, which granted a similar motion to compel.  But, having now had the benefit of meeting and conferring, it is clear that the facts that led the Court to provide access via shared access in *von Kahle* are not present here.

19.    Specifically, in *von Kahle*, the Defendant sought access to Plaintiff's database, which was impossible to export without destroying discoverable data.  QuickBooks Motion to Compel at Ex. 5.[7]   Given that fact, the only way to provide Defendants with access to the data while preserving its existence was to utilize a shared access model.  Here, Defendants acknowledge that exporting the raw data from QuickBooks is readily feasible and the least burdensome option, and there is no basis to think doing so would compromise the underlying data in any way (and indeed, Defendants' stated reason for refusing to export the data is exclusively motive-based and has no connection to the kinds of facts present in *von Kahle*).

20.    The purpose of the QuickBooks Motion to Compel and the accompanying Order was to provide the Reserve Bank with the discoverable data it sought in the manner least burdensome to both parties.  The Defendants do not contest that the Export option is the least burdensome production option.

21.    Accordingly, the Court should enforce the Order which required the Defendants to produce the QuickBooks database via the least burdensome method as mutually selected by the

---

[7]    The *von Kahle* Court also granted supervised access to the database and prohibited the "non-attorney representative of Plaintiff or Plaintiff's counsel" from disclosing "to Plaintiff or Plaintiff's counsel" any information about Defendant's searches.  As explained below, the Court's Order in the instant case prohibited the "non-attorney representative for Defendants" from disclosing "**to Plaintiff or Plaintiff's counsel** any information regarding searches conducted or data retrieved." Plaintiff seeks through this Motion to clarify, in the case of supervised access, that the Court's Order prohibits disclosure to Defendants or their counsel.

Parties.  The Court should enforce the Order based on the Parties' discussion at the First Meet and Confer in which the Parties agreed that the Export method is the least burdensome method and order Defendants to export the QuickBooks database within 5 days of the Court's order, so as to avoid the burdens described above and to allow the Reserve Bank fair and efficient access to the database.

**WHEREFORE,** the Reserve Bank respectfully requests that the Court grant this motion and, accordingly, enter an order enforcing the Order at ECF No. 224 requiring that Defendants must complete production of the QuickBooks data within 5 days of the Court's order.  In the alternative, should the Court instead agree with the Defendants' position that they have the unilateral right to determine how to manage the QuickBooks data, the Reserve Bank (1) seeks clarification that the language in the Order prohibiting the "non-attorney representative for Defendants" from disclosing "to Plaintiff or Plaintiff's counsel any information regarding searches conducted or data retrieved" was a typographical error, and, in fact, there is a prohibition on the disclosure to *Defendants* or their counsel in the case of supervised access and (2) asks the Court to explicitly allow the Reserve Bank to export data during Supervised Access sessions.

Respectfully submitted in San Juan, Puerto Rico on May 5, 2025.

## CERTIFICATE OF SERVICE

I certify that on May 5, 2025, I filed a copy of the foregoing document using the Court's CM/ECF system, which will automatically generate a Notice of Electronic Filing to all counsel of record in this matter.

| | |
|---|---|
| Thomas S. Kessler (admitted *pro hac vice*)<br>tkessler@cgsh.com<br><br>CLEARY GOTTLIEB STEEN &<br>HAMILTON LLP<br>One Liberty Plaza<br>New York, New York 10006<br>Telephone: (212) 225-2000<br>Facsimile: (212) 225-3999<br>*Attorneys for the Federal Reserve Bank of San Francisco* | s/ Antonio L. Roig Lorenzo<br>antonio.roig@oneillborges.com<br>USDC-PR No. 207712<br><br>s/ Salvador J. Antonetti Stutts<br>salvador.antonetti@oneillborges.com<br>USDC-PR No. 215002<br><br>s/ Ubaldo M. Fernández Barrera<br>ubaldo.fernandez@oneillborges.com<br>USDC-PR No. 224807<br><br>s/ Aníbal A. Román Medina<br>anibal.roman@oneillborges.com<br>USDC-PR No. 308410<br><br>O'NEILL & BORGES LLC<br>250 Muñoz Rivera Ave., Ste. 800<br>San Juan, PR 00918-1813<br>Tel: (787) 764-8181<br>Fax: (787) 753-8944<br>*Attorneys for the Federal Reserve Bank of San Francisco* |